$C^W$ 530

1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name   JAY      MATTHEW      A.

            (Last)        (First)        (Initial)

**FILED**

3

4    Prisoner Number   D-55653

APR 1 7 2008

5    Institutional Address   Correctional Training Facility

             P.O. Box 689, Soledad, CA 93960

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6

7            **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF CALIFORNIA**

*CW*

8    MATTHEW ADAM JAY,

     (Enter the full name of plaintiff in this action.)

*CV* 08    1998

9            vs.                )    Case No. _____

10    ARNOLD SCHWARZENEGGER, Governor; )    (To be provided by the clerk of court)

11    BEN CURRY, Warden,           )    **PETITION FOR A WRIT**
                                  )    **OF HABEAS CORPUS**

12    XXXXXXX                 )    **EVIDENTIARY HEARING**

13                                     )    **REQUESTED**

14    (Enter the full name of respondent(s) or jailor in this action)   )    E-filing

*(PR)*

15

16            **Read Comments Carefully Before Filling In**

17    **When and Where to File**

18         You should file in the Northern District if you were convicted and sentenced in one of these

19    counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20    San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21    this district if you are challenging the manner in which your sentence is being executed, such as loss of

22    good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23         If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24    one of the above-named fifteen counties, your petition will likely be transferred to the United States

25    District Court for the district in which the state court that convicted and sentenced you is located. If

26    you are challenging the execution of your sentence and you are not in prison in one of these counties,

27    your petition will likely be transferred to the district court for the district that includes the institution

28    where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS      - 1 -

1  <u>Who to Name as Respondent</u>

2      You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10 <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11     1. What sentence are you challenging in this petition?

12         (a)    Name and location of court that imposed sentence (for example; Alameda

13              County Superior Court, Oakland):

14    Los Angeles County Superior Court      Los Angeles

15              Court                         Location

16         (b)    Case number, if known _____

17         (c)    Date and terms of sentence   AB11060

18         (d)    Are you now in custody serving this term? (Custody means being in jail, on

19              parole or probation, etc.)      Yes XX     No _____

20              Where?

21              Name of Institution: Correctional Training Facility

22              Address: P.O. Box 689, Soledad, CA 93960

23     2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 challenging more than one sentence, you should file a different petition for each sentence.)

26 Second degree murder / attempted murder, 187 & 664/187

27 _____

28 _____

PET. FOR WRIT OF HAB. CORPUS    - 2 -

3.  Did you have any of the following?

   Arraignment:                                Yes _____     No _____

   Preliminary Hearing:                        Yes _____     No _____

   Motion to Suppress:                         Yes _____     No _____

4.  How did you plead?

   Guilty _____     Not Guilty _____     Nolo Contendere _____

   Any other plea (specify) _____

5.  If you went to trial, what kind of trial did you have?

   Jury _____     Judge alone _____     Judge alone on a transcript

6.  Did you testify at your trial?                 Yes _____     No _____

7.  Did you have an attorney at the following proceedings:

   (a)    Arraignment                           Yes _____     No _____

   (b)    Preliminary hearing                   Yes _____     No _____

   (c)    Time of plea                          Yes _____     No _____

   (d)    Trial                                 Yes _____     No _____

   (e)    Sentencing                            Yes _____     No _____

   (f)    Appeal                                Yes _____     No _____

   (g)    Other post-conviction proceeding      Yes _____     No _____

8.  Did you appeal your conviction?                Yes _____     No _____

   (a)    If you did, to what court(s) did you appeal?

          Court of Appeal                       Yes _____     No _____

          Year: _____     Result:_____

          Supreme Court of California           Yes _____     No _____

          Year: _____     Result:_____

          Any other court                       Yes _____     No _____

          Year: _____     Result:_____

   (b)    If you appealed, were the grounds the same as those that you are raising in this

N. A.
PAROLE HEARING

petition?                                      Yes _____    No_____

(c)     Was there an opinion?              Yes _____    No_____

(d)     Did you seek permission to file a late appeal under Rule 31(a)?

                                               Yes _____    No_____

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

this conviction in any court, state or federal?              Yes _XX_    No_____

[Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

challenged the same conviction you are challenging now and if that petition was denied or dismissed

with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

for an order authorizing the district court to consider this petition.  You may not file a second or

subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

U.S.C. §§ 2244(b).]

(a)     If you sought relief in any proceeding other than an appeal, answer the following

        questions for each proceeding.  Attach extra paper if you need more space.

I.      Name of Court: Los Angeles County Superior Court

        Type of Proceeding: _____Habeas corpus_____

        Grounds raised (Be brief but specific):

        a.___SAME AS RAISED HEREIN, except for undue
             influence by victims rights groups claim.

        b._____

        c._____

        d._____

        Result: ___Denied___          Date of Result:8/15/2007

II.     Name of Court: _Calif. App. Ct., 2nd App. Dist._

        Type of Proceeding:Habeas Corpus

        Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

1   a. SAME AS RAISED HEREIN, including undue
2      influence claim.
    b._____
3   c._____
4   d._____
5   Result: Summarily denied      Date of Result: 11/20/2007
6   III.  Name of Court: California Supreme Court
7   Type of Proceeding: Petition for Review
8   Grounds raised (Be brief but specific):
9      a. SAME AS RAISED HEREIN
10  b._____
11  c._____
12  d._____
13  Result: Summarily denied      Date of Result: 2/20/2008
14  IV.  Name of Court: _____
15  Type of Proceeding: _____
16  Grounds raised (Be brief but specific):
17     a._____
18  b._____
19  c._____
20  d._____
21  Result: _____ Date of Result:_____
22  (b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?
23                          Yes XX      No____
24  Name and location of court: U.S. Dist. Ct., Northern Dist.
    Cases C 06-01795 CW & CV 08 0845 CW, 2004 and 2006
25  B. GROUNDS FOR RELIEF parole decisions, respectively.
26  State briefly every reason that you believe you are being confined unlawfully. Give facts to
27  support each claim. For example, what legal right or privilege were you denied? What happened?
28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

need more space.    Answer the same questions for each claim.

## Claim I

*THE BOARD OF PAROLE HEARINGS DECISION FINDING PETITIONER UNSUITABLE FOR PAROLE OVER TWO DECADES AFTER THE COMMITMENT OFFENSE WAS NOT SUPPORTED BY EVIDENCE THAT HE IS A CURRENT THREAT TO PUBLIC SAFETY, VIOLATING PETITIONER'S RIGHT TO DUE PROCESS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.*

## S U P P O R T I N G   F A C T S

On February 16, 2007, Matthew Jay (hereafter Petitioner) was seen by the Board of Parole Hearings (hereafter Board) for his eighth parole suitability hearing (EXHIBIT 1).[1]/  The hearing resulted in a split decision.  On April 17, 2007, after an en banc hearing by the Board, it was determined Petitioner is unsuitable for parole for reasons stated by Commissioner Kubochi.

On February 11, 1986, Petitioner and two coconspirators, Ferran Meier and Richard Parker, were charged with one count of second degree murder in violation of Penal Code § 187,[1]/ and one count of attempted murder of Rory Rizk in violation of Penal Code §§ 664/187 (EXHIBIT 2).

Petitioner pled guilty to both counts as charged; the sentences ran concurrent for an indeterminate sentence of 15 years to life pursuant to Penal Code § 190 (EXHIBIT 3).

The Commitment Offense

A probation officer's report (hereafter POR) was prepared for sentencing (EXHIBIT 4).  In that the Board drew from the POR for

---

1.  References to parole hearing transcript, EXHIBIT 1, will be noted by HT followed by page number and line number, e.g., (HT 1:1).

2.  All codes and regulations are California, unless otherwise noted. California Code of Regulations, Title 15, will be cited, Cal. Code Regs., tit. 15.

the facts of the case at Petitioner's suitability hearing (EXHIBIT 1, HT 16-22), Petitioner presents the facts from the POR herein, presenting <u>all</u> relevant information to provide a complete order of events, the facts being taken from pp. 2-5, 12-13. In presenting these facts, in no way is Petitioner trying to mitigate the horrific facts of this offense or mitigate his culpability, but does want the Court to know his individual involvement and state of mind.

"On the evening of October 13, 1985, Defendant Meier, at that time, age 16, was at his place of employment, and apparently decided to kill his mother that night. He was able to obtain a promise of assistance from Defendant Jay. Later, while still at work, Defendant Meier told Defendant Parker, age 23 of his plans and Parker also agreed to assist him. At some point, the three defendants went to a nearby restaurant where they discussed how they would kill Defendant Meier's mother. Defendant Meier produced a rope that he had fashioned into a noose, and it was decided that they would strangle her in Meier's bedroom and then transport her body, in her car, to the Malibu Canyon area, light the car on fire, and push it over a cliff in order to make it appear an accident.

"The three defendants then proceeded to the home of Defendant Meier in Canoga Park. Meier let his two co-defendants into his room through a window. While Parker and Jay laid in wait, Defendant Meier lured his mother into the room. Parker placed a noose around the neck of Shirley Rizk, Defendant Meier's mother and began to strangle her. Parker pulled on the rope around her neck, while the other two co-defendants pulled on her legs. At some point during the strangulation, her eight year old son, Rory, awakened to her screams and went to investigate. He was able to look into Meier's bedroom and observed Jay and Defendant Parker in that room and his mother on the floor. While Parker and Jay continued to attempt the strangulation, Defendant Mieir took victim Rory away from the room in an effort to keep him from knowing what was happening. Meier told his half brother to watch television and then returned to his bedroom. The three defendants then apparently strangled Shirley Rizk for approximately 15 minutes before she died" (POR 3-4).

Petitioner "says he held the victim's right shoulder and her right arm while Defendants Parker and Meier strangled her with a noose. He commented, 'I was too scared to just get out (before) completion of the strangling ... I froze.' Further, he recalls crying while it was happening. He asked to leave and go home while the victim was still struggling, and according to [Petitioner], Meier told him that no, he could not, as 'we still need you" (POR, p. 12).

"During this period of time, Defendant Meier repeatedly left the room to deal with his brother who wanted to know what was going on. The defendants (Meier) came to the realization that Rory was a potential witness and then it was determined that he must also be killed. It was decided (by Meier) that they would poison him and Defendant Meier gave Defendant Jay some money to go to a store and purchase Snarol snail poison and D-Con rat poison. While Jay went to get the poison, Parker and Meier placed Shirley Rizk's body in the trunk of the car and Defendant Meier cleaned blood off the floor of his bedroom rug.

"Defendant Jay purchased the poison and returned to the Meier residence with it" (POR, p. 4). "At that time [Petitioner] describes his state of mind as that of 'mass confusion, hysteria, fear ... I felt like I had no answers" (POR, p. 12).

Upon returning to the Meier residence, Petitioner "told Torry that he needed to leave. Torry replied that it was all right to leave, but they (co-defendants) would pick him up in about two hours" (POR, p. 12).

"Defendant Meier then attempted to poison his brother.... At some point Rory went into the garage and saw his mother's body in the open trunk of her vehicle with her legs extending from under her robe" (POR, p. 4).

"Defendant Meier then asked Rory if he wanted to go for a ride in Malibu Canyon. Rory agreed. With his mother's body in the trunk and Rory in the back seat, Defendant Meier and the co-defendant (Parker) then drove away from the family home. En route they stopped at a gas station and purchased a gallon of gas. After driving through the Malibu Canyon area and finding a good location to push the car over a cliff, they drove back to Defendant Jay's house. Jay then followed them to the agreed-upon location in Malibu Canyon" (POR, pp. 4-5). Jay "stopped about twenty yards behind. The co-defendants told him that victim Rory was in the car asleep. While sitting in his father's vehicle he saw the co-defendant's push the car over a cliff" (POR, pp. 12-13). Defendant Meier then poured gasoline on a rag and stuffed the rag into the gas tank filler of Shirley Rizk's car. Meier then blindfolded Rory, tied his hands behind his back, and put him in the back seat of the car. Defendant Parker then placed the body of Shirley Rizk behind the steering wheel. The car was then pushed over the embankment as Defendant Parker lit the rag on fire. .... With the car burning, the defendants then left in Defendant Jay's car. As the car became consumed by flames, Rory was able to untie himself and remove his blindfold. He saw his deceased mother in the front seat and blood on her face. After opening a window, he climbed out of the burning car and began to call for help" (POR, pp. 4-5).

Meier and Parker got into Petitioner's vehicle and he drove them back to Meier's residence, and Petitioner went home and went

to sleep (EXHIBIT 4, p. 13).

A passing motorist saw the fire and stopped; Rory had freed himself and yelled for help, the motorist helped him up the hill. When law enforcement and fire personnel arrived, Rory told them what happened. On the way to the hospital, a Deputy Sheriff spotted Meier's car described by Rory. The car was stopped and arrests were made (EXHIBIT 4, p. 5).

"The next day (Petitioner) had no idea what had happened. It did not register until he saw it in the news. He then told his brother and 'someone else' what he had done. Later, the police arrived and arrested him" (EXHIBIT 4, p. 13).

There are allegations that Meier offered Petitioner $2,000 to assist Meier in the murder of his mother. The allegation is true, "but [Petitioner] agreed to the conspiracy before the offer was made. In any event, he did not expect to receive the money as he did not believe that Meier had that kind of cash" (EXHIBIT 4, p. 15).

That sums up the commitment offense. There are, however, additional facts set out in the POR that were important to the plea agreement, sentencing, an parole suitability that need to be presented.

Petitioner "was barely eighteen years-of-age at the time of the offense" (EXHIBIT 4, p. 9). In fact, he was only "18 years and 76 days at the time this event occurred" (EXHIBIT 5, RT 5, Reporters Transcript of sentencing).

Petitioner first became acquainted with Torran Meier while working together at a fast food restaurant. Petitioner "saw him as a 'very big guy' and 'intimidating.' Petitioner had seen Meier

in fights after school and thought he "seemed 'crazy.'"  Meier "commented on numerous occasions that he was going to kill his mother. [Petitioner] says he turned down an earlier offer to help murder Meier's mother and at that time he, [and two other friends] went to the West Valley Police Station and reported it" (EXHIBIT 4, p. 14).

Petitioner tried to distance himself from Meier.  "However, one day Meier called and then came to [Petitioner's] home.  They held a conversation outside.  Meier said he needed a favor.  Then he pulled out a rope from behind his back and allegedly said, 'Tonight's the night, will you help me?'  [Petitioner] nodded his head, yes.  He believes he did so because he was under the combined influence of marijuana, alcohol, cocaine and hashish" (EXHIBIT 4, p. 14).

Petitioner "said that it was difficult to explain, but for months preceding the offense he felt he had lost control of his life and was totally powerless" (EXHIBIT 4, p. 15).

Interviewing Petitioner's friends, he was described as "very easy-going and friendly, as not a strong person, but instead a follower.  He just likes to say yes and wants no 'hassles'.  He wants to get along with everyone.  He was a church Alter Boy and B-plus student until his senior year.  He broke up with his girlfriend about that time and was using a lot of drugs" (EXHIBIT 4, p. 19).  At the time of the offense, Petitioner was described as looking like a "Zombie" (EXHIBIT 4, p. 20).

Investigating officers and Parole Officers who interviewed Meier's reported that "Defendant Meier had the ability to lead others

and influenced the co-defendants to help him kill his mother" (EXHIBIT 4, p. 18); and, "a rather imposing figure, quite sophisticated, poised and apparently persuasive. He was always calm and seemed in command of everything, even while incarcerated at juvenile hall where he seemed to have already established rapport with the staff. He seemed and looked much older than his years" (EXHIBIT 4, pp. 20-21).

A court ordered psychiatric evaluation was prepared for sentencing considerations. Dr. David Sheffner reported that Petitioner had been abusing drugs and alcohol since 1981 or 1982. Petitioner was described "as passing-dependent personality and being a follower verses an instigator, self-sacrificing in interpersonal relationships. He was not considered to be socially or physically an aggressive person. [¶] "There was evidence of chronic childhood depression which increased even more when [Petitioner] broke up with a girlfriend in 1984" (EXHIBIT 4, pp. 15-16). It was Dr. Sheffner's expert opinion that "dependency, drugs and depression all combined in a spiraling psychiatric deterioration resulting in apathetic, severely depressed, severely drug-dependent, non-functioning adolescent. Doing drugs became the focal point of his life and drug depression-dependency were intertwined, each reinforcing the other" (EXHIBIT 4, p. 16).

Noted in the POR, "The doctor cited an example of behavior change in that [Petitioner] allegedly tried to turn in co-defendant Meier a year earlier and then after severe drug use, agreed to participate in the crime" (EXHIBIT 4, pp. 16-17). It was Dr. Sheffner's expert opinion that "dependency, depression and chronic apathy, secondary to depression and marijuana set the stage for the offense, but ...

there was a very prominent circumstantial element operating as well, i.e., given the 'leadership' (and motivation) of Torry...' further, ... it is hard to imagine [Petitioner's] involvement in the murder without the very specific circumstances of his exposure to Torry" (EXHIBIT 4, p. 17).

The sentencing experts who signed off on the POR agreed, writing: "By the time [Petitioner] began his association with Torran Meier, [Petitioner] was rapidly deteriorating. Meier had a plan, but needed help. It was not easy to recruit others to help strangle his mother, but eventually the strong, persuasive Meier found acquiescence from Parker, a homeless drifter and thief, and the drug-dazed Jay, whom Meier described to parole authorities as being out of his mind from the results of chronic drug abuse at the time of the offense" (EXHIBIT 4, p. 23).

## Sentencing

In the POR, it was the sentencing experts opinion that the following mitigating circumstances applied: (1) "while his role cannot be said to be a minor one, it was the most minor of the three"; (2) "The [Petitioner] participated in the crime under the circumstances of extreme drug use.... This would indicate the [Petitioner's] conduct was partially excusable for some other reason not amounting to a defense"; (3) Petitioner, "with no apparent pre-disposition to do so, was induced by Defendant Meier to participate in the crime; (4) Petitioner "has no prior record"; and (5) Petitioner "voluntarily acknowledges committing the crime before he was apprehended, thus insuring his eventual arrest and conviction" (EXHIBIT 4, p. 24). In aggravation, the sentencing experts found: "The crime involved

great violence, disclosing a high degree of cruelty and callousness"
(Id.).

At sentencing, taking the POR into full consideration, it was
reiterated that the controlling offense was fixed to be "murder in
the second degree as charged in the information" in violation of
Penal Code § 187, and "attempted murder as charged in the information"
in violation of Penal Code §§ 664/187 (EXHIBIT 3); being sentenced
to 15 years to life plus 7 years running concurrent (EXHIBIT 5,
pp. 16-17). The plea agreement on the second degree murder was for
the minimum elements of the offense (EXHIBIT 2; EXHIBIT 3).

## Parole Suitability Hearing

The Board rendered a split decision, Commissioner Kubochi voting
to deny parole, and Deputy Commissioner Melvin voting to grant parole.
In that the decision to deny parole is based on only two factors,
the commitment offense and past history of Petitioner's depression,
the following facts will focus primarily on the evidence related
to those issues, and evidence supporting Deputy Commissioner's vote
for parole suitability.

At Petitioner's parole suitability on February 16, 2007,
Presiding Commissioner Kubochi read the facts of the offense from
the POR into the record (EXHIBIT 1, HT 16-22).

## Preconviction History

Commissioner Kubochi provided a quick overview of Petitioner's
preconviction history, (HT 22-23). In short, Petitioner came from
a good home, has no prior criminal history as a juvenile, was 13
years old at the time of the instant offense, performed well in school
until the 12th grade when his grades deteriorated due to drug abuse,

completed high school while in the county jail, was employed while in high school, and was a polysubstance abuser from the age of 12 until his arrest the day after the offense.

Postconviction History

Deputy Commissioner Melvin reviewed Petitioner's postconviction achievements (HT 23-25). In short, Petitioner's classification score is 19 (the lowest a lifer can achieve), has remained disciplinary free, has earned 88 units toward a B.A. degree and is 32 units short of that degree, has participated in Alcoholics Anonymous for 17 years nonstop. Additionally, Petitioner has participated in a plethora of self-help programs (see EXHIBIT 6). In short, in addition to 17 years of participation in AA: (1) Inmate Employability Program, (2) Anger Management, (3) Anger Management II (HT 30, 36); (4) Alternative to Violence (HT 36); (5) Advanced Alternative to Violence, (6) training to facilitate Alternative to Violence, (7) Breaking Barriers, (8) Advanced Breaking Barriers, (9) Life Skills, (10) One-on-One therapy from 1988 to 1993 (EXHIBIT 7) (HT 37). Additionally, in what Correctional Officer Villarreal states as "rare" to do so, provides a character reference in support of parole of Petitioner (HT 29-30).

Psychological Evaluations

Deputy Commissioner Melvin covered Petitioner's psychological evaluations, starting from the most recent prepared by the Board's own forensic expert, Dr. Marek (EXHIBIT 3). Petitioner recognizes, although "a return to drug slash alcohol use" may be "[s]ignificant risk factors and precursors to violence" for him, Dr. Marek's expert opinion, "[i]f released to the community, his violence potential

is the same as the average citizen, in that he is very unlikely to

harm anyone again" (EXHIBIT 3, p. 3; HT 27).

Most importantly, addressing directly past concerns by the Board,

Dr. Marek offers his expert opinion, at HT 27-28, quoting from EXHIBIT

3, p. 3:

> "The 2004 Board expressed concerns about how previous evaluators
> suggested that Jay was 'easily influenced [and] extremely immature'
> and that Jay might 'require serious introspection and
> counseling...beyond a statement of regret regarding a lapse of
> judgment, elements within a deeper level of motivational force
> have yet to be addressed....' This evaluator respectfully believes
> that being easily influenced and immaturity are reasonable, probably
> accurate, inferences to be made from Jay's behavior but there are
> no apparent pre- or post-offense behaviors that confirm these
> hypotheses or turn them into lifelong, deep-seated, unalterable
> traits for which psychotherapy is mandated. For example, there
> is no evidence that Jay ever allowed the world-class predators
> in prison to manipulate him.
>
> "Second, Jay's crime is what it is, and he should be paroled,
> or not paroled, based on those custody factors, not on a possible
> 'deeper level of motivation' that could be raised about anyone,
> and that may have been raised as an issue primarily due to the
> heinous nature of Jay's crime. If this evaluator's respectful
> difference of opinion is accurate, then Jay is in the uncomfortable
> position of having to 'prove a negative,' that he doesn't need
> psychological treatment. Looking at 'the big picture' of Jay's
> adjustment, it does not appear he needs psychotherapy. Indeed,
> a look at all of his file support and his many letters of
> recommendation would militate toward a conclusion of overall
> psychological strength, not the opposite."

Additional psychiatric evaluations in evidence before the Board

and referred to elsewhere during the hearing, particularly by Deputy

Commissioner Melvin in her decision to grant parole, are outlined

below.

In 2005, Dr. Macomber writes, in his expert opinion, that

Petitioner "had good self-awareness and insight" (EXHIBIT 9, p. 2).

"Drugs and alcohol are readily available in the institutional

enviroment. However, he has significantly changed his life, and

has avoided any [involvement] with drugs or alcohol during the last

20 years" (Id.). .... "Due to the fact that drugs and alcohol are
available, and he could have used them if he had chosen to, it is
clear that drugs and alcohol are no longer a problem in his life.
Therefore, this cannot be listed as a current diagnostic problem"
(Id.). Under "Assessment of Dangerousness" it is Dr. Macomber's
expert opinion that Petitioner "has grown significantly over his
20 years of incarceration. He is no longer the immature,
drug-dependant individual that he was at the time of the commitment
offense" (Id., p. 4). "[I]f 100 men were released on parole, he
would do better than 98% of them. This indiates an extremely low
risk level. As a result, his potential for violence is no more than
the average citizen in the community, and is probably less than the
average citizen in the community due to his life experiences" (Id.).

In 2002, Dr. Howlin writes, in his expert opinion, after a
thorough review of Petitioner's substance abuse history (EXHIBIT
10, pp. 3-4): "Inmate Jay demonstrates insight specifically related
to factors about his own recovery" (Id., p. 4). Addressing
Petitioner's current mental statutes, Dr. Howlin writes: "There was
no evidence of a mood or thought disorder. His judgment appears
to be sound. He demonstrates good insight into his commitment
offense" (Id., p. 5). Petitioner demonstrated "insight into his
actions and the crime, and remorse for the victim and the victim's
family members" (Id., p. 7). Under "Assessment of Dangerousness"
it is Dr. Howlin's expert opinion that if Petitioner is "released
to the community, his violence potential is estimated to be no more
than the average citizen in the community" (Id., p. 7). It was Dr.
Howlin's expert opinion that Petitiner "does not have a mental health

- 16 -

disorder which would necessitate treatment, either during his incarceration period or following parole" (Id., p. 8).

In 2001 Dr. Reed writes, in his expert opinion, after reviewing Petitioner's substance abuse history and commitment offense: "Heavy drug abuse does appear to be directly related to the instant offense, and the inmate appears to have an adequate understanding of this relationship and the need to maintain abstinence from drug and alcohol use" (EXHIBIT 11, p. 5). Under "Assessment of Dangerousness" it is Dr. Reed's expert opinion that Petitioner's "level of dangerousness is considered to be average to that of the average citizen in the community" (Id., p. 5, 6). Germane to the commitment offense, it was Dr. Reed's expert opinion, recognizing that: Petitioner "heavily abused drugs from the age of 12 or 13 until the age of 18. Such heavy drug usage during this development period likely heavily impacted his cognitive, emotional and social development" (Id.). It was also Dr. Reed's expert opinion that Petitioner "does not have a mental health disorder which would necessitate treatment either during his incarceration period or following upon parole" (Id., p. 6).

In 1998, Dr. Clair writes in his expert opinion,, in a brief psychological evaluation referring to the previous extensive evaluation prepared in 1995, agrees that Petitioner, a "thirty-one year old to be a mature and effectively rehabilitated person" (EXHIBIT 12, p. 2). See also Dr. McDill's evaluation (EXHIBIT 13, p. 3).

The foundation for the above psychiatric evaluations was the 1994 evaluation prepared by Dr. Ronald Kitt (EXHIBIT 14). Dr. Kitt writes: "This inmate presented as an individual who clearly has turned a significant corner in his life" (Id., p. 2). In response to why

Petitioner participated in such a horrible murder, Dr. Kitt writes, "the inmate listed several factors. He indicated that, at that time in his life, he did not have the ability to say no. He mentioned that drugs numbed him and disinhibited him. He stated that he was operating from a strong wish to help a friend -- to please anyone. He also indicated that he was in a drug-induced twilight zone, dissociated state of mind. He also mentioned basic immaturity and youthful punk stupidity." (Dr. Kitt summed it up.) "Such a description pretty much tells the whole story" (Id., p. 2).

After a thorough psychiatric evaluation, in Dr. Kitt's expert opinion: "This inmate seems to have reached a watershed, of sorts, in his life. It is clear from the behavioral record that important behavioral controls are in place and operating well" (EXHIBIT 14, p. 3). Dr. Kitt concludes: "For all practical purposes, this inmate's behavioral record indicates that rehabilitation has been complete, in that he will not be at risk for reoffense upon release" (Id., p. 3).

Germane to Commissioner Kubochi's decision, adopted by the Board en banc to deny parole, is Petitioner's childhood depression.

Petitioner spoke of his brief time in therapy for childhood depression, and through therapy, "came to understand that I had a hard time dealing with sugar and its effects on my body, and she (the therapist) called it Sugar Blue Syndrome" (EXHIBIT 1, HT 34). Commissioner Kubochi candidly admitted: "I have no expertise in this area" (HT 35). Petitioner continued to explain that as a child he was normally depressed, but sugar made it worse (HT 35-36).

Over the years, forensic experts have addressed Petitioner's

- 18 -

childhood depression, specifically, in chronological order. In 1994

Dr. Kennedy writes: "Although having had problems with depression

in his adolescent years, with no history of manic symptomatology,

there has been no indication of depression since Matthew's initial

psychotherapeutic session to this present time" (EXHIBIT 7, p. 1).

Additionally, Dr. Kennedy writes (EXHIBIT 7, p. 2):

> "B. <u>Depression</u>: While there is evidence of chronic childhood
> depression and a strong family history of depression the course
> of therapy has not revealed any of the features of a person with
> a depressive disorder.  At the time of the crime there were
> depressive equivalents such as alcoholism, drug dependency and
> the loss of a girlfriend which impacted upon his attitude and
> behavior.  Matthew's ability to make good use of the prison's
> rehabilitation programs, sustain steady employment and receive
> his high school diploma, followed by completing two years of
> university studies, is a clear indicator that he is not now
> afflicted with, nor has he suffered major depression during his
> nine years of incarceration."

In 1995 Dr. Kitt observed "no vegetative signs of depression"

(EXHIBIT 16, p. 1).

In 2005, the only reference to depression by Dr. Macomber is

in the past tense as a historical factor, "and there was evidence

of a chronic childhood depression..." (EXHIBIT 9, p. 2'); "prior to

this offense, inmate Jay had been struggling with low self-esteem

and occasional depression, coupled with heavy drug use" (<u>Id</u>., p.

But currently, there is no AXIS II diagnosis (<u>Id</u>., p. 2).

In the current psychiatric evaluation, addressing the Board's

past lay opinons of Petitioner's childhood depression, Dr. Marek

writes in his expert opinion: "His insight and judgment were good.

He is not currently in need of any mental health treatment" and,

there is no AXIS II diagnosis (EXHIBIT 8, p. 2).  It was Dr. Marek's

expert opinion that Petitioner "is in the uncomfortable position

of having to 'prove a negative,' that he doesn't need psychological

treatment. Looking at 'the big picture' of Jay's adjustment, it does not appear he needs psychotherapy" (Id., p. 3).

Also before the Board was Petitioner's Life Prisoner Evaluation Report (LPER) prepared by correctional experts (EXHIBIT 15). Relevant to the commitment offense, Deputy Commissioner Melvin read into the record that correctional experts noted the four prominent elements that combined to produce Petitioner's participation in the crimes: "Dependency, depression, drugs, and circumstances produced Jay's involvement in the present offense" (EXHIBIT 1, HT 26).

Parole Plans

In short, there is a total of 53 letters of support from family, friends, and respected citizens of the community (HT 32). Being acknowledged by the Board, Petitioner will not burden the Court with copies of the letters as an exhibit; simply, Petitioner has offers of residence, employment, financial support, and emotional and spiritual support.

Petitioner will live with his parents in Santa Clarita Valley (HT 38), and has a firm offer of employment with Krieger Industries (HT 39-39). Petitioner has "a secondary employment opportunity" as well (HT 39), and, additionally, presented the Board with Internet listings of employment opportunities in the field of inventory coordinator and control specialist for the area he will be paroling to (HT 40).

Deputy Commissioner Melvin inquired of Petitioner's post-release plans for substance abuse programming, to which Petitioner stated he indeed has a cousin, Alex Mutan, and will be attending four AA meetings a week (HT 41), and, has arranged for individual counseling

with Dr. Cynthia Jewel (HT 41-42). Petitioner explained that recovery
is a lifelong effort and he will participate in AA "whether it's
in here or out there. You know, and so AA is an important part of
my life and who I am today, and will remain so when I am released"
(HT 47). When asked about his changes as a person, Petitioner
responded: "Today I have the internal resources, like I mentioned
before, to be happy with who I am to know who I am today and know
what I want. I'm a person who values, again values more -- probably
the most important thing I value is my sobriety and my faith in God"
(HT 48) (which includes the value of life).

Opposition to Parole/Closing Statements

A letter of opposition was submitted by the Los Angeles County
Sheriff's Department in 2006 and read by the Board for the current
hearing. The opposition letter was based entirely on the immutable
factors of the commitment offense (HT 43-45).

Deputy District Attorney Bushling representing the Los Angeles
County District Attorney's Office stated opposition based on the
commitment offense (HT 48-50). Apparently, not having knowledge
of the opinions of forensic experts, or ignoring the evidence, stated
no contributing factors caused Petitioner to participate in this
horrible murder (HT 49). And, in Mr. Bushling's opinion, Petitioner
does not have the "ability to empathize" (HT 50), and, "I don't see
that addressed in what he's done with himself" (HT 50).

Relevant to Mr. Bushling's statements, as far back as the POR
Petitioner stated, "I feel much remorse for what happened, but I'm
glad that the kid lived ... I'm ecstatic that I'm sober" (EXHIBIT
4, p. 13). The sentencing experts concluded: Petitioner "is

- 21 -

apparently remorseful and understanding of what led to the
catastrophic events on the evening of the offense" (Id., 4, p. 22).
It was noted as early as 1994 that Petitioner had reached out to
his victim's family (EXHIBIT 7, p. 3), and wrote Rory Rizk expressing
remorse for him and taking his mother from him (EXHIBIT 13, p. 3).
Additionally, when opportunity presents itself, Petitioner counsels
others about the perils of drugs and alcohol, even reaching outside
prison walls counseling two young men (EXHIBIT 1, HT 64).

Counsel for Petitioner made a closing statement, giving an
overview of Petitioner's progress over the past 22 years since the
offense (HT 50-64), incorporated herein by reference as most of what
was covered in the statement is presented above.

In closing, Petitioner asked that the Board (and now the Court),
"look at who I am today. I know that if you look at who I was then,
yes, I was a threat and I deserve to be in prison. Just like the
DA said, I did have problems with my moral compass. It was lacking.
But drugs played a vital role in sucking that out of me. In hiding
it from me. When I stopped using drugs, when I came to prison, like
my attorney said, I have continued to grow every way, shape, or form.
Why? I found my true self. I found my identity. I found my spirit"
(HT 66).

## D E C I S I O N

The decision was a split decision, Commissioner Kubochi finding
Petitioner unsuitable for parole, and Deputy Cmmissioner Melvin
finding Petitioner suitable for parole. The Board, en banc, adopting
Commissioner Kubochi's decision. It comes down to, which of the
two commissioners' decisions was based on a rational connection

between the evidence, principles of law, and the decision made.
That will be presented in Petitioner's memorandum of law.

## Unsuitability Determination

In determining Petitioner "would pose an unreasonable risk of
danger to society or a threat to public safety if released from
prison" Commissioner Kubochi relied on the following two factors:
(1) "The offense was carried out in an especially cruel and callous
manner. There were multiple victims attacked and injured.... The
offense was carried out in a dispassionate and calculated manner.
There were discussions as far as a year earlier amongst you and the
codefendant about committing the murder" (EXHIBIT 1, HT 67). "Drug
use is inconsistent with such long term premeditated and deliberated
plan" (HT 67-68). The facts of the crimes were then recited (HT
68-70).

And (2), "the constant issue of depression which does affect
you, requires further insight on your part. .... The way that I as
a Panel Member sees this (a Panel member who admits he has "no
expertise in this area" (HT 35)), if you don't get a better handle
on your depression, that is going to be the doorway back into a
lifestyle that could be detrimental to you as well as any other member
of society" (HT 70-71). "But to assure the safety of society and
other people, you have to be able to present additional insights
as to this lifelong issue that you've battled" (HT 72).

## Suitability Determination

Deputy Commissioner Melvin concluded that Petitioner "is suitable
for parole and would not pose an unreasonable risk of danger to
society or threat to public safety if released from prison" (HT 72).

- 23 -

In short: "The prisoner has no juvenile record of assaulting others, has a stable social history as exhibited by reasonably stable relationships with others.... While in prison, has enhanced his ability to function within the law upon release through participation in educational programs, self-help and/or therapy, and vocational programs" (HT 72), providing "proof that he has participated extensively in AA for over 17 years" (HT 73). Petitioner "has received a forklift operators certificate of proficiency as an inventory material coordinator. The inmate committed the crime as a result of significant stress in his life. There is reference in one of the reports, psychological report from the doctor, who notes the depression and the drug use. He has also indicated on the record the stress that you were dealing with as a result of the deperssion and drug use" (HT 73).

Deputy Commissioner Melvin continued: Petitioner "lacks a significant criminal history of violent crime. There is no indication of a juvenile record nor any adult crimes before the life crime. Because of maturation, growth, greater understanding and/or advanced age, he as reduced probability of recidivism. In reviewing the last three psychological reports from Dr. Merrick [sic], from Dr. Macomber, and then from Dr. Reed, your dangerousness level was assessed as lower than average" (HT 73-74).

"Has recently maintained positive institutional behavior which indicates significant improvement and self-control. In this case, there are absolutely no 115s and no 128s. Has maintained close family ties while in prison via letters and/or visits. Shows signs of remorse by indicating that he understands the nature and magnitude

of the offense and accepts responsibility for the criminal behavior
and has a desire to change towards good citizenship.  In reading
the last three psychological reports, it's noted that you are very
remorseful, cried, was deemed to be sincere by the evaluator"
(HT 74).  Deputy Commissioner Melvin then cited relevant portions
of Dr. Marek's psychological evaluation "because it forms really
the basis for my decision" (HT 74), essentially: Petitioner's
"'violence potential is lower than average due to his excellent
institutional adjustment.  Jay's crime is what it is and he should
be paroled or not paroled based on those -- He should be paroled
or not paroled based on those custody factors, not on a possible
deeper level of motivation that could be raised about anyone and
that may have been raised as an issue primarily due to the heinous
nature of Jay's crime'" (HT 74-75).  And, reading from Dr. Macomber's
forensic evaluation, in his expert opinion, "'if 100 men were released
on parole, he would do better than 98 percent of them.  This indicates
an extremely low risk level'" (HT 75).

    In closing, Deputy Commissioner Melvin clearly stated: "You
indicated that you're a different person.  And I do believe that
you're not that man that you were at 18 years old. .... Your behavior
back in 1985 was completely, completely a reprobate mind.  But in
the 21 years since you've been here, you've demonstrated by your
behavior that you are ready to be released into society" (HT 77).
In other words, Petitioner is REHABILITATED and not a CURRENT threat
to public safety.

En Banc Decision

    On April 17, sitting en banc, the Board adopted the decision

of its Commissioner, Mr. Kubochi, to find Petitioner unsuitable for parole (EXHIBIT 16).

Superior Court decision

On August 15, 2007, in the Superior Court of California, County of Los Angeles, the Honorable Steven R. Van Sicklen denied Petitioner's writ of habeas corpus (EXHIBIT 17). The reason for the denial being the commitment offense over two decades ago, the manner of death, strangulation, was more than the minimum necessary to commit the offense; therefore, relying on In re Rosenkrantz (2002) 29 Cal.4th 616, 667, "some evidence," "the offense was especially heinous, there is some evidence to support the Board's denial" (EXHIBIT 17, p. 2).

Post Superior Court habeas corpus

After Petitioner filed his writ in the Superior Court, intervening events occurred that Petitioner would request this Court TAKE JUDICIAL NOTICE.

In a letter from a parole commissioner who was forced to resign, Belinda Harris-Ritter, the letter dated June 5, 2007, to the Senate Rules Committe, reprinted by permission in "California Lifer Newsletter" #16, pp. 22-2?, July 2007 (EXHIBIT 18), it was exposed that: (a) Commissioners who grant parole are terminated; (b) the Board is told what to do; and (c) en banc hearings "are the only Board meetings...where no one on the Board says anything except the Chair who is running the meeting" (EXHIBIT 18, p. 2?).

In a newspaper article, "Parole board members feel pressure" in The Monterey County Herald, p. A1, c. 1, October 9, 2007 (EXHIBIT 19), Tracey St. Julian also tells how she was forced to resign for

- 26 -

granting parole dates.  The Monterey Herald news article refers to

the Honorable Linda Condrone, Judge, Superior Court of Caliornia,

County of Santa Clara, and the findings in an evidentiary hearing

in her court.  Although on appeal, because the respondent did not

disprove any of the findings, the decision from that eventiary hearing

is attached as EXHIBIT 20, which Petitioner request's the Court TAKE

JUDICIAL NOTICE because the findings are valid until proved otherwise.

The pressure for the termination of Ms. Harris-Ritter and Ms.

St. Julian was put on Governor Schwarzenneger by victims' rights

activists, e.g., "the Doris Tate Crime Victims Bureau" (EXHIBIT 21),

who's Chairperson, Susan Fisher, was appointed to the newly formed

Cabinet position of Crime Victim Advocate in the Governor's Office

(EXHIBIT 22).  It is the Doris Tate organization, among others, that

puts political pressure on the Governor and politicians to remove

honest Board Commissioners (EXHIBIT 21).

On October 14, 2007, in The Monterey County Herald, in a piece

by the Honorable Robert F. Moody, "Policies contribute to parole

sham" on p. E1, c.1, states how the Willie Horton syndrome has

fostered the present political influence on parole, pointedly

observing: "The mirage of an earned release, followed by the reality

of perpetual denials of parole, leaves them hopeless and extremely

embittered " (EXHIBIT 23).

After receiving the Harris-Ritter letter, on June 1?, 2007,

Senate President Pro Tem Don Perata released a statement that the

Board's practices are "troubling, to say the least" (EXHIBIT 24),

but has yet to hold a Senate hearing and propose any changes.

Petitioner respectfully request's that the Court conduct an

EVIDENTIARY HEARING on the political pressures of victims
organizations on the parole process and the Governor's response to
them in terminating commissioners that follow that law, denying
Petitioner, as well as all life prisoners with the possibility of
parole, due process guaranteed by the federal constitution.

* * * * * * *


If any of these grounds was not previously presented to any
other court, state briefly which grounds were not presented and why:

No new grounds are presented.

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    **PLEASE SEE MEMORANDUM OF LAW UNDER SEPARATE COVER**

5    _____

6    _____

7    Do you have an attorney for this petition?                    Yes_____        No _xx_

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on _April 12, 2008_____                    _____

14                    Date                                    Matthew Adam Jay
                                                                                Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS              -  29  -

# EXHIBIT
# 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life    )        CDC Number:   D-55653
Term Parole Consideration    )
Hearing of:                  )
                             )      **INMATE COPY**
MATTHEW JAY                  )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 16, 2007

9:29 A.M.

**PENDING REVIEW AND APPROVAL**

PANEL PRESENT:

STAN KUBOCHI, Presiding Commissioner
MARGERY MELVIN, Deputy Commissioner

OTHERS PRESENT:

MATTHEW JAY, Inmate
STEVE DEFILIPPIS, Attorney for Inmate
BRYANT BUSHLING, Deputy District Attorney


CORRECTIONS TO THE DECISION HAVE BEEN MADE

            _____No        See Review of Hearing
            _____Yes        Transcript Memorandum


Sandra Tillman, Capitol Electronic Reporting

### I N D E X

|  | Page |
|---|---|
| Proceedings | 3 |
| Case Factors | 16 |
| Pre-Commitment Factors | 22 |
| Post-Commitment Factors | 23 |
| Parole Plans | 38 |
| Closing Statements | 48 |
| Recess | 66 |
| Decision | 67 |
| Adjournment | 77 |
| Transcript Certification | 79 |

P R O C E E D I N G S

1

2      DEPUTY COMMISSIONER MELVIN:  We're on the record.

3      PRESIDING COMMISSIONER KUBOCHI:  Thank you,

4  Commissioner.  Good morning, sir, how are you.

5      INMATE JAY:  I'm doing fine, thank you.  Good

6  morning.

7      PRESIDING COMMISSIONER KUBOCHI:  Counsel, how are

8  you?

9      ATTORNEY DEFILIPPIS:  Good morning.  Doing well.

10      PRESIDING COMMISSIONER KUBOCHI:  Everybody

11  settled in?

12      INMATE JAY:  Yes.

13      ATTORNEY DEFILIPPIS:  Yes.

14      PRESIDING COMMISSIONER KUBOCHI:  Are you

15  comfortable?

16      INMATE JAY:  I am.  Thank you.

17      PRESIDING COMMISSIONER KUBOCHI:  Okay.  This is a

18  Subsequent Parole Consideration Hearing for Matthew Jay,

19  J-A-Y, CDC number D-55653.  Today's date is February the

20  16th, 2007.  The time is approximately 9:29.  We are

21  located at the Correctional Training Facility, Soledad,

22  California.  The Inmate Jay was received on or about --

23  and these are approximations, sir.

24      I would point out to you that at any time if you

25  or Counsel need to correct and make any changes, you

1  have that right to do.  The information we put on the

2  record comes from your Central File, but sometimes there

3  are typographical errors or simple human mistakes in it.

4  All I'm asking you is that you wait for an appropriate

5  time when the speaker stops because these hearings are

6  transcribed.  The person doing that process can't do

7  voice overs.  If two or more people are talking at the

8  same time in their anxiety to correct the record, it

9  won't -- it will be inaudible.

10           **INMATE JAY:**  Okay.

11           **PRESIDING COMMISSIONER KUBOCHI:**  And I've seen

12  that.

13           **INMATE JAY:**  Okay.  Thank you.

14           **PRESIDING COMMISSIONER KUBOCHI:**  Thank you, sir.

15  It appears that Mr. Jay was received after a CYA

16  commitment for the life crime on September 24th, 1987,

17  from Los Angeles County.  His life term began on or

18  about June 10th, 1987.  It appeared that his minimum

19  eligible parole date was October 18th, 1995.

20           The controlling offense for which Mr. Jay has

21  been committed stems from docket number A811060, Count

22  One,. a violation of Penal Code 187, murder, second

23  degree.  Also a conviction for County Two, Penal Code

24  violation 664/187, attempt murder.  At the time of

25  sentencing, the court ran Count Two concurrent to Count

1  One, resulting in the sentence of 15 years to life.

2      This hearing is being tape recorded, Mr. Jay.

3  And for the purpose of voice identification, each of us

4  are required to state our first and last name, spelling

5  our last name.  And when it is your turn, when you go on

6  record, please provide your CDC number.  My name is Stan

7  Kubochi, K-U-B-O-C-H-I, Commissioner.

8      **DEPUTY COMMISSIONER MELVIN:**  Good morning.  My

9  name is Margery Melvin, M-E-L-V-I-N, Deputy

10  Commissioner.

11      **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Bryant

12  Bushling, B-U-S-H-L-I-N-G, representing the L.A. County

13  DA's office.

14      **ATTORNEY DEFILIPPIS:**  And Steve Defilippis,

15  D-E-F-I-L-I-P-P-I-S.  I'm the Attorney for Mr. Jay.

16      **INMATE JAY:**  Inmate Matthew Jay, J-A-Y, Delta

17  55653.

18      **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Defilippis,

19  if during the proceedings, I over accent one of the

20  vowels, please excuse me.  It's not a sign of

21  disrespect.  It's something that I do quite often, and I

22  apologize in advance on that.

23      **ATTORNEY DEFILIPPIS:**  That's all right.  Most

24  people mispronounce my name.  It's not the typical one.

25      **PRESIDING COMMISSIONER KUBOCHI:**  People have a

1   harder time with Kubochi, I assure you.  Ms. Melvin was

2   one of the ten people in my whole life that pronounced

3   it properly on the first shot.  It had been limited to

4   the fingers on one hand, but I had to add her to that

5   list.  I kid you not.

6         Mr. Jay, before proceeding, I have to review your

7   rights under the Americans With Disabilities Act to

8   assure that any physical disabilities are accommodated

9   for this proceeding to assure that you can communicate

10  effectively not only with your attorney but with your

11  Panel.  As a starting point, sir, I note, and Counsel, I

12  direct your attention to a BPT Form 1073, with an

13  apparent date of 9/26/2006, with an apparent signature

14  by Mr. Jay.  It was a form reviewed by Correctional

15  Officer -- Correctional Counselor Mitchell, signed by

16  Counselor Mitchell on or about September 26th, '06, that

17  Correctional Counselor Mitchell reviewed the Central

18  File with -- in the presence of Mr. Jay and that the

19  Correctional Counselor noted no disabilities identified

20  from the file review.  Was that correct, Mr. Jay?

21       **INMATE JAY:**  That is correct.

22       **PRESIDING COMMISSIONER KUBOCHI:**  Regarding your

23  personal signature, there's a checked box indicating

24  that you do not need any help for your parole hearing;

25  is that correct?

1          INMATE JAY:  Yes, that's correct.

2          PRESIDING COMMISSIONER KUBOCHI:  It was correct

3   at that time, and also at the current time?

4          INMATE JAY:  That's true.

5          PRESIDING COMMISSIONER KUBOCHI:  And I take it by

6   that response on the form, that you don't have any

7   hearing impairments for purposes of this proceeding?

8          INMATE JAY:  No.  No problems.

9          PRESIDING COMMISSIONER KUBOCHI:  Any vision

10  impairments?

11         INMATE JAY:  Vision is fine.

12         PRESIDING COMMISSIONER KUBOCHI:  Any movement

13  issues, walking, sitting, standing?

14         INMATE JAY:  No, I'm fine.

15         PRESIDING COMMISSIONER KUBOCHI:  Thank you, Mr.

16  Jay.  And you signed that form freely and voluntarily?

17         INMATE JAY:  I did.

18         PRESIDING COMMISSIONER KUBOCHI:  And you

19  understood the content of the form?

20         INMATE JAY:  I, excuse me, I did.

21         PRESIDING COMMISSIONER KUBOCHI:  And the purpose?

22         INMATE JAY:  Yes, I did.

23         PRESIDING COMMISSIONER KUBOCHI:  I hesitated

24  because it was two questions in one sentence.  Counsel,

25  are there any ADA issues that you wish to raise to the

1    Panel at this time?

2         **ATTORNEY DEFILIPPIS:**  None.

3         **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  Are

4    you satisfied that Mr. -- that your client signed this

5    form freely and voluntarily?

6         **ATTORNEY DEFILIPPIS:**  Yes, I am.

7         **PRESIDING COMMISSIONER KUBOCHI:**  Thank you, sir.

8    In the last couple of years, Mr. Jay, have you taken any

9    antipsychotic medications?

10        **INMATE JAY:**  No, I haven't.

11        **PRESIDING COMMISSIONER KUBOCHI:**  In the last

12   couple of months, have you taken any medication that

13   affects your ability to think?

14        **INMATE JAY:**  No, I have not.

15        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  What

16   was your highest grade completed in school before your

17   incarceration?

18        **INMATE JAY:**  Before my incarceration was 11th

19   grade completed.

20        **PRESIDING COMMISSIONER KUBOCHI:**  And I've seen

21   your, I'm going to call it a resume of accomplishments,

22   post-conviction.  And I note that you have taken five,

23   taken and completed five (inaudible) college units; is

24   that correct?

25        **INMATE JAY:**  That is correct.

1    **PRESIDING COMMISSIONER KUBOCHI:** And I take it

2    that you feel that you have the ability to read and

3    write?

4    **INMATE JAY:** Absolutely.

5    **PRESIDING COMMISSIONER KUBOCHI:** Thank you. Mr.

6    Jay, this is a Subsequent Parole Consideration Hearing

7    and it is being conducted pursuant to the Penal Code and

8    the rules and regulations of the Board of Parole

9    Hearings governing parole life considerations. The

10   purpose of today's hearing is to once again consider

11   your suitability for parole. In doing so, we will

12   consider the number and nature of the crimes for which

13   you were committed, your prior criminal and social

14   history, your behavior and programming since your

15   commitment, and your plans if released.

16        We've had the opportunity to review your Central

17   File and you will be given the opportunity, as I

18   indicated at the outset, to make any corrections or

19   changes as you deem appropriate. We will consider your

20   progress since your commitment, your counselor's report,

21   and your mental health evaluations. We will focus on

22   your progress and any new reports since the last Board

23   hearing.

24        Any change in parole plans should be brought to

25   our attention. I'd like you to know that changes in

1  parole plans are not a detriment.  They won't be held

2  against you.  Life on the outside changes, and this

3  Panel understands that.

4       **INMATE JAY:**  Okay.

5       **PRESIDING COMMISSIONER KUBOCHI:**  We would

6  encourage you to make any changes or corrections that

7  you feel have occurred.

8       **INMATE JAY:**  Okay.

9       **PRESIDING COMMISSIONER KUBOCHI:**  We will reach a

10  decision today, Mr. Jay, and inform you whether or not

11  we find you suitable for parole and the reasons for our

12  decision.  If you are found suitable for parole, the

13  length of your confinement will be explained to you.

14  Before we recess for deliberations, the District

15  Attorney's representative, Mr. Bushling, your Attorney,

16  and you'll notice, Mr. Defilippis, I simply stopped at

17  your attorney so I wouldn't have to pronounce or risk

18  mispronouncing your name, and you will be given an

19  opportunity to make a final statement regarding your

20  suitability.

21       We will then recess, clear the room, and

22.  deliberate.  Once we have completed our deliberations,

23  we will resume the hearing and announce our decision.

24  The California Code of Regulations states that

25  regardless of time served, a life inmate shall be found

1    unsuitable for and denied parole if, in the judgment of

2    the Panel, the inmate would pose an unreasonable risk of

3    danger to society if released from prison.

4         Mr. Jay, you have certain rights.  Those rights

5    included the right to a timely notice of this hearing.

6    The right to review your Central File.  And the right to

7    present relevant documents.  Do you understand those

8    rights?

9         **INMATE JAY:**  I do, Sir.

10        **PRESIDING COMMISSIONER KUBOCHI:**  And it's my

11   understanding, Counsel, and I'm not going to read them

12   in detail.  I'm just going to refer to them, because

13   they will become exhibits for this hearing, that we have

14   what I would call a resume from Mr. Jay.  A two page

15   document indicating his post-conviction accomplishments.

16   Would you agree with that?

17        **ATTORNEY DEFILIPPIS:**  That's correct.

18        **PRESIDING COMMISSIONER KUBOCHI:**  I was handed

19   that this morning.  And there is no time problem with

20   this Panel.  We review anything that you present.  Also,

21   there's a one page laudatory chrono from Officer

22   Villarreal, which has a date on the bottom of it,

23   February 15th, 2007.  That will be another exhibit.

24   What we'll do is I'd ask Commissioner Melvin or either

25   Counsel to remind me before recessing to make sure that

1  we mark these exhibits because we do have a method of

2  putting them into a particular file for purposes of

3  verification.

4       In addition, I believe your attorney was provided

5  a cover sheet of updated material.  I am numbering the

6  documents in the middle of the pages with a -- starting

7  with a number one for the cover sheet.  They are letters

8  of support.  Commissioner Melvin will go in more detail

9  at the appropriate time, but I understand that exhibit

10 to be as a letter of support from Susan Mullins dated

11 November 30th, 2006, a letter from Patricia Pfeiffer.

12      And Mr. Defilippis, could you spell her last name

13 for the record because I have a little problem.

14      **ATTORNEY DEFILIPPIS:**  My understanding is it is

15 difficult to read on that letter, P-F-E-I-F-F-E-R.

16      **PRESIDING COMMISSIONER KUBOCHI:**  That's

17 satisfactory for the Panel.  That was dated

18 December 16th, 2006.  Another letter of support dated

19 December 7th, 2006, from Reverend Hank Mitchel,

20 M-I-T-C-H-E-L.  Mullins, going back to that letter from

21 November was M-U-L-L-I-N-S.  And a letter of support

22 dated January 25th, 2006, from John Vanderbergh,

23 V-A-N-D-E-R-B-E-R-G-H.  That is -- will be another

24 exhibit.

25      And the only reason I wouldn't mark them now,

1    Counsel is -- in fact, I'm going to strike that.   Mr.

2    Jay's two page document, that will be Two, because the

3    Exhibit Checklist which I'm now going to hand you,

4    Counsel.   And I'd appreciate after you do so if you'd

5    give that to the District Attorney for his review.   It

6    will be Exhibit One.   Thank you, Officer.

7         Mr. Jay's resume will be marked Exhibit Two by

8    the Panel.   The laudatory chrono from Officer Villarreal

9    will be Exhibit Three.   And the updated material

10   consisting of five pages numbered in the middle by me

11   will be Exhibit Number Four.

12        **ATTORNEY DEFILIPPIS:**   One thing I would note

13   about Exhibit One is that it leaves blank a listing of

14   all disciplinary reports and listing of all counseling

15   chronos.   Of course, there are none, but there is

16   actually documentation in the Lifer Hearing packet I

17   received of the fact that there is no disciplinaries.

18        **PRESIDING COMMISSIONER KUBOCHI:**   I think we can

19   address that when Commissioner Melvin addresses post-

20   conviction factors.   And I believe you'll be satisfied

21   with that process.   And feel free to make any

22   corrections or additions that you deem necessary,

23   Counsel.

24        **ATTORNEY DEFILIPPIS:**   As far as anything else on

25   that, I do have all the documents.

1    **PRESIDING COMMISSIONER KUBOCHI:** Thank you very

2    much, Counsel. That exhibit checklist will be Exhibit

3    One. In regard to the rights of timely notice, to

4    review your Central File and the right to present any

5    other additional documents? Do you understand those

6    rights, Mr. Jay?

7    **INMATE JAY:** I do.

8    **PRESIDING COMMISSIONER KUBOCHI:** And do you

9    believe those rights have been met?

10   **INMATE JAY:** They have.

11   **PRESIDING COMMISSIONER KUBOCHI:** And, Counsel, do

12   you have any additional documents at this time?

13   **ATTORNEY DEFILIPPIS:** Not at this time.

14   **PRESIDING COMMISSIONER KUBOCHI:** Thank you. Mr.

15   Jay, you have an additional right to be heard by an

16   impartial Panel. Do you have any objection to

17   proceeding with this Panel as presently constituted?

18   **INMATE JAY:** No, I do not.

19   **PRESIDING COMMISSIONER KUBOCHI:** You will receive

20   a copy of our written, tentative decision today, Mr.

21   Jay. That decision becomes final within 120 days. A

22   copy of the decision and a copy of the transcript will

23   be sent to you. There have been recent changes in the

24   law in Title 15 of the California Code of Regulations in

25   regard to your appeal rights. I would address any

1    issues or concerns about appeal rights to your attorney.

2         **INMATE JAY:**  Okay.

3         **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Jay, you are

4    not required to admit or discuss this offense.  However,

5    this Panel does accept as true the findings of the

6    court.  Do you understand that?

7         **INMATE JAY:**  I do, Sir.

8         **PRESIDING COMMISSIONER KUBOCHI:**  We're not here

9    to re-litigate this case.  And although there are two

10   Panel members here and you and your counsel, we're not

11   going to try to gang up on you.  The purpose of this

12   Panel is simply to talk about the factors as set forth

13   in the regulations pursuant to a finding of suitability

14   or nonsuitability and we have to go into some facts

15   concerning those factors.

16        **INMATE JAY:**  Okay.

17        **PRESIDING COMMISSIONER KUBOCHI:**  Meaning it's not

18   adversarial.

19        **INMATE JAY:**  Okay.

20        **PRESIDING COMMISSIONER KUBOCHI:**  We're not biased

21   one way or the other against you.

22        **INMATE JAY:**  Okay.  Thank you.

23        **PRESIDING COMMISSIONER KUBOCHI:**  Commissioner

24   Melvin, is there any confidential material to be relied

25   upon by the Panel this morning?

1      **DEPUTY COMMISSIONER MELVIN:**  No, there is not.

2      **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

3    much.  Counsel, will your client be talking about the

4    life crime?

5      **ATTORNEY DEFILIPPIS:**  He will be testifying as to

6    all other matters.  He will not be discussing the life

7    crime today.

8      **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  That is

9    your right sir, and we recognize that.  As to all other

10   statements you give, will you please raise your right

11   hand.  Do you solemnly swear or affirm that the

12   testimony you give at this hearing will be the truth,

13   the whole truth, and nothing but the truth?

14     **INMATE JAY:**  I do, Sir.

15     **PRESIDING COMMISSIONER KUBOCHI:**  Counsel, for

16   your edification, I will read the facts as contained in

17   the probation officer's report dated February 2nd, 1987,

18   from Los Angeles County.  And specifically that report

19   says that:

20          "On the evening of October 13th, 1985, a

21          Codefendant Meyer, who at the time was age 16,

22          was at his place of employment and apparently

23          decided to kill his mother that night.  He was

24          able to obtain a promise of assistance from

25          Defendant Matthew Jay.  Later while still at

1    work, Codefendant Meyer told another codefendant,

2    Parker, age 23, of his plans and Parker agreed to

3    assist him.

4         "At some point the three Defendants went

5    to a nearby restaurant where they discussed how

6    they would kill Defendant Meyer's mother.

7    Defendant Meyer produced a rope they had

8    fashioned into a noose and it was decided that

9    they would strangle her in Meyer's bedroom and

10   then transport her body in her car to the Malibu

11   Canyon area, light the car on fire, and push it

12   over a cliff in order to make it appear an

13   accident.  The three Defendants then proceeded to

14   the home of Defendant Meyer in Canoga Park.

15   Meyer led his two Codefendants into his room

16   through a window.

17        "While Parker and Jay laid in wait,

18   Defendant Meyer lured his mother into the room.

19   Parker placed a noose around the neck of Shirley

20   Rizk, R-I-Z-K, Defendant Meyer's mother, and

21   began to strangle her.  Parker pulled on the rope

22   around her neck while the other two Codefendants

23   pulled on her legs.  At some point during the

24   strangulation, her eight-year-old son, Rory,

25   R-O-R-Y, awakened to her screams and went to

1    investigate.  He was able to look into Meyer's

2    bedroom and observe Inmate Jay and Codefendant

3    Parker in that room and his mother on the floor.

4         "While Codefendant Parker and Inmate Jay

5    continued to attempt the strangulation,

6    Codefendant Meyer took Victim Rory away from the

7    room in an effort to keep him from knowing what

8    was happening.  Meyer told his half brother to

9    watch television and then returned to his

10   bedroom.  The three Defendants then apparently

11   strangled Shirley Rizk for approximately 15

12   minutes before she died.  During this period of

13   time, Defendant Meyer repeatedly left the room to

14   deal with his brother who wanted to know what was

15   going on.

16        "The Defendants came to the realization

17   that Rory was a potential witness, and it was

18   determined that he must also be killed.  It was

19   decided that they would poison him, and Defendant

20   Meyer gave Inmate Jay some money to go to the

21   store and purchase Snarol, S-N-A-R-O-L, Snail

22   Poison and D/Con, D slash C-O-N, rat poison.

23   While Jay went to get the poison, Parker and

24   Meyer placed Shirley Rizk's body in the trunk of

25   the car, and Defendant Meyer cleaned blood off

1    the floor of his bedroom rug.

2         "Defendant Jay purchased the poison and

3    returned to the Meyer residence with it.

4    Defendant Meyer then attempted to poison his

5    brother, Victim Rory Rizk.  After testing his

6    blood sugar, as Rory was a diabetic, Defendant

7    Meyer tried to induce him to eat a peanut butter

8    sandwich laced with snail bait.  Rory did not

9    like the taste of the sandwich and would not eat

10   it.  Meyer then tried to induce Rory to drink

11   some type of malt which he made also laced with

12   poison.  Rory again refused because of its taste.

13        "At some point, Rory went into the garage

14   and saw his mother's body in the open trunk of

15   the vehicle with her legs extending from under

16   her robe.  Defendant Meyer then asked Rory if he

17   wanted to go for a ride in Malibu Canyon.  Rory

18   agreed.  With his mother's body in the trunk and

19   Rory in the back seat, Defendant Meyer and

20   Codefendants then drove away from the family

21   home.  En route, they stopped at a gas station

22   and purchased a gallon of gas.  After driving

23   through the Malibu Canyon area and finding a good

24   location to push the car over a cliff, the drove

25   back to Defendant Jay's house.

"Jay then followed them to the agreed upon location in Malibu Canyon. Defendant Meyer then poured gasoline on a rag and stuffed the rag into the gas tank of Shirley Rizk's car. Meyer then blindfolded Rory, tied his hands behind his back, and put him in the back seat of the car. Defendant Parker then placed the body of Shirley Rizk behind the steering wheel. The car was then pushed over the embankment as Defendant Parker lit the rag on fire. The car rolled down the embankment, possibly rolling over, and coming to a rest approximately 30 feet below with the car burning. The defendants then left in Defendant Jay's car.

"As the car became consumed by flames, Rory was able to untie himself and remove his blindfold. He saw his deceased mother in the front seat with blood on her face. After opening the window, he climbed out of the burning car and began to call for help. A passing motorist observed the fire and stopped to investigate. He heard Rory's call for help and assisted him up the hill. Later sheriffs deputies and fire department personnel arrived on scene and Rory told them what had happened.

1          "While Rory was being transported to the

2     hospital by ambulance, the deputy sheriff

3     following the ambulance observed the car

4     described by Rory as the one owned by Rory's

5     brother, Defendant Meyer.  The vehicle was

6     stopped.  Defendant Meyer and Defendant Parker

7     were arrested at that point.  Defendant Parker

8     made a full statement to homicide investigators

9     implicating himself, Defendant Meyer, and Inmate

10    Jay.

11         "On October 16th, 1985, Inmate Jay was

12    arrested.  Subsequent investigation by sheriff's

13    deputies revealed that at some time prior to

14    committing these offenses, Defendant Meyer

15    approached other individuals informing them of

16    his desire to plan to kill his mother.  According

17    to the sheriff's report, Defendant Meyer

18    reportedly told one Michael Mendelsohn of his

19    plan in the summer of 1985.  Then in the summer

20    of 1985, Defendant Meyer told Mendelsohn, quote,

21    'I'm going to kill her at home.  I could choke

22    her or poison her.  I'll put her in a car, drive

23    her to Malibu Canyon, push the car over the cliff

24    and make it look like an accident.  Matt paren

25    Defendant Jay, parenthesis, will pick me up,'

22

1          unquote.   Mendelsohn further told officers that

2          approximately 8:00 p.m. on October the 13th,

3          1985, he went to Defendant Meyer's place of work

4          and Meyer told him, quote, 'I'm going to do it

5          tonight, Rick, parenthesis Codefendant Richard

6          Parker parenthesis, knows all about it,' unquote.

7                 "Another individual, Mark David Safran,

8          S-A-F-R-A-N, told investigating officers that the

9          day after the killing, Defendant Matthew Jay told

10         him that the defendant offered him two thousand

11         dollars to help kill his mother."

12         The record should reflect that Inmate Jay has no

13    prior record.  In regard to his personal history, Mr.

14    Jay is the second of three children born to Herman and

15    Elaine Jay.  He has an older brother and a younger

16    sister.  Jay's father is a retired teacher.  And I'm

17    taking that from, Counsel, a May 2005 Board report.

18    Jay's father is a retired teacher from the Los Angeles

19    County school district, and his mother an Episcopalian

20    priest.  There is no arrest history of any of the other

21    family members.

22         At the time of the life crime, Inmate Jay was 18

23    years old, and he had always lived with his parents.  He

24    has never married and never had children.  He had

25    performed very well in high school until the 12th grade

1  when his grades deteriorated because of drug use.  He

2  eventually dropped out of high school.  Jay later

3  completed his high school education while in county

4  jail.

5         During his high school years, Mr. Jay had been

6  employed at Marie Callender's and Carl's Jr.

7  Restaurants.  He had also worked as a busboy.  Jay first

8  used marijuana and alcohol in the seventh grade.  By age

9  15, he was a regular marijuana user.  His daily

10  consumption included 15 to 20 pipe loads per day.  At

11  age 17, he began using cocaine at a rate of five to

12  seven times per month.  He stated that he was able to

13  finance this from working and from money he had had in a

14  bank account.

15         Jay told the probation officer that he was also

16  using methamphetamines orally.  From age 14 to 16, he

17  was drinking every weekend.  He saw it as a game, trying

18  to out drink others and see just how much he consumed.

19  He stated he was in treatment with a psychologist at a

20  hospital in Woodland Hills, but cannot remember much

21  about it.

22         At this time, Commissioner Melvin will discuss

23  your post-conviction factors.

24         **DEPUTY COMMISSIONER MELVIN:**  Okay.  Mr. Matthew,

25  I'm sorry, Mr. Jay, at present your custody level is

24

1   Medium A.   Your classification score is 19.   And let me

2   go back.   I need to preface by saying, as you know, I'll

3   cover what you've been doing from the time of your last

4   Board hearing up until the present.   I'm going to review

5   and allow you all to comment on the Board report as well

6   as the psychological report from Dr. Merrick.   And if I

7   leave anything out, please let me know.

8           I'll start with going over just basic factors.

9   As I stated, your custody level is Medium A.

10  Classification score is 19.   Absolutely no 115s.

11  Absolutely no 128 counseling chronos.   You do have your

12  GED and you have taken approximately 88 units through

13  correspondence through University of Iowa.   And you have

14  about 32 units to -- that you need to do to complete

15  your, to get your degree.   Your current courses are in

16  the areas of English and politics.

17          Regarding self-help, you have participated in AA

18  for approximately 17 years nonstop, and Anger Management

19  class.   And then the IEP stands for?

20          **INMATE JAY:**   Inmate Employability Program.

21          **DEPUTY COMMISSIONER MELVIN:**   Thank you.   Your

22  current work assignment is --                        .

23          **PRESIDING COMMISSIONER KUBOCHI:**   If you don't

24  mind Commissioner Melvin, can he tell us?

25          **DEPUTY COMMISSIONER MELVIN:**   Yes.

25

1           INMATE JAY:  I currently work for Prison Industry

2   Authority, PIA, as a production and material or

3   inventory coordinator.

4           PRESIDING COMMISSIONER KUBOCHI:  And how long

5   have you had that position?

6           INMATE JAY:  Approximately four years now.

7           PRESIDING COMMISSIONER KUBOCHI:  Thank you.

8           DEPUTY COMMISSIONER MELVIN:  Thank you.

9           PRESIDING COMMISSIONER KUBOCHI:  Commissioner

10  Melvin.

11          DEPUTY COMMISSIONER MELVIN:  And you have

12  certification in Inventory Materials.  And you're

13  certified as an Inventory Material Coordinator, I'm

14  sorry.  And I'm going to now go to the Board report

15  prepared by CCI Mitchell.  And it's dated 10/26/06.  And

16  I'm basically going to touch upon key portions of his

17  report, and obviously you'll get the chance to comment

18  on anything that --

19          ATTORNEY DEFILIPPIS:  If this is a good time, one

20  of the additional things that he does have in connection

21  with the work that he does in PIA is a certification in

22  forklift operations.

23          DEPUTY COMMISSIONER MELVIN:  Thank you.

24          ATTORNEY DEFILIPPIS:  He received that, I think

25  originally in 2003, which went through current.  And

1   then he's just updated that.  I guess the licensure is

2   good for three years.  So he's just updated that as of

3   last month through January of 2010.

4       **DEPUTY COMMISSIONER MELVIN:**  Thank you.  That is

5   noted in the submission that you presented me with, and

6   I overlooked it.  So thank you for bringing it to my

7   attention.  The counselor indicates that particularly

8   regarding personal factors, that he indicates that in

9   relation to the present offense, Jay was extensively

10  examined by psychiatrist Dr. David Sheffner, and

11  Sheffner stated in a letter dated October 7th, 1986,

12  that Jay is basically not antisocial.  He stated that

13  four prominent elements:  Dependency, depression, drugs,

14  and circumstances produced Jay's involvement in the

15  present offense.  And this information was obtained from

16  pages nine through 11 of the POR.

17      And regarding your residence, employment, and

18  other parole plans, Mr. Kubochi will cover.  The

19  counselor indicated that prior to release, you could

20  benefit from remaining disciplinary free and

21  participating in self-help programs.  Any comments on

22  that report?

23      **INMATE JAY:**  None by me.

24      **ATTORNEY DEFILIPPIS:**  No.

25      **DEPUTY COMMISSIONER MELVIN:**  Okay.  And then the

1    next report is the psychological report.  And that's

2    from, prepared by Dr. Merrick.  And regarding your

3    assessment of dangerousness, the doctor indicates that:

4              "Within a controlled setting, his violence

5         potential is lower than average due to his

6         excellent institutional adjustment.  If released

7         to the community, his violence potential is the

8         same as the average citizen in that he is a very

9         unlikely -- he is -- in that he is very unlikely

10        to harm anyone again.  That is his excellent

11        institutional adjustment should generalize to the

12        community.  Significant risk factors and

13        precursors to violence for him are a return to

14        drug slash alcohol use."

15   The author goes on to say that:

16             "The 2004 Board expressed concern about

17        previous evaluators -- about how previous

18        evaluators suggested that Jay was easily

19        influenced and extremely immature and that Jay

20        might require serious introspection and

21        counseling beyond a statement of regret regarding

22        a lapse of judgment, elements within him of a

23        deeper level of motivational force have yet to be

24        addressed.  This evaluator respectfully believes

25        that being easily influenced and immaturity are

reasonable, probably accurate inferences to be
made from Jay's behavior, but there are no
apparent pre- or post-offense behaviors that
confirm these hypotheses or turn them into
lifelong deep-seated unalterable traits for which
psychotherapy is mandated.  For example, there is
no evidence that Jay ever allowed the world class
predators in prison to manipulate him.

"Looking at the big picture of Jay's
adjustment, it does not appear he needs
psychotherapy.  Indeed, a look at all of his file
support and his many letters of recommendation
would militate toward a conclusion of overall
psychological strength, not the opposite."

Any comments on that report?

**ATTORNEY DEFILIPPIS:**  No, I think you covered it
all.

**DEPUTY COMMISSIONER MELVIN:**  Okay.  At this time,
I would like to know from the Chair if you'd like me to
go into letters of support?

**PRESIDING COMMISSIONER KUBOCHI:**  Yes, could you
please list them, and Counsel, what we will do is list
them for the record.  We will consider them during
deliberations.

**ATTORNEY DEFILIPPIS:**  Okay.

1      **INMATE JAY:**  If I may interject real quick?

2      **DEPUTY COMMISSIONER MELVIN:**  Yes.

3      **INMATE JAY:**  Just because we're dealing with

4  self-help and other things like that, before we move on

5  to the letters of support, I just wanted to reiterate

6  that I do have a laudatory chrono for anger class.

7      **DEPUTY COMMISSIONER MELVIN:**  Thank you.  That's

8  right, Mr. Jay.

9      **INMATE JAY:**  Thank you.

10      **DEPUTY COMMISSIONER MELVIN:**  There is a laudatory

11  chrono before me, and it's dated 2/15/07, from Gene

12  Villarreal, East Dorm Industry Patrol Officer.  And he

13  indicates that during the previous six years, Inmate Jay

14  has been housed at the Central Facility, East Dorm.

15          "While performing my duties as East Dorm

16      Industry Patrol Officer, I have been able to

17      observe this inmate in both a housing and

18      business environment.  During the course of this

19      observations as well as conversations, Inmate Jay

20      has proved himself to be a respectful, personable

21      individual with both staff and inmates.  It is

22      rare that I write a laudatory chrono for an

23      inmate, but as I have known Inmate Jay for over

24      five years and have never witnessed him to become

25      upset when dealing with staff or inmates, I take

1          exception.  This chrono is written as a character

2          reference."

3          And are there any additional chronos?

4          **ATTORNEY DEFILIPPIS:**  Just the other one on the

5    Anger Management course.  You had mentioned the Inmate

6    Employability Program.  But part of that did include

7    most recently an Anger Management course.  I have the

8    chrono right here if you need to --

9          **DEPUTY COMMISSIONER MELVIN:**  Okay.

10          **PRESIDING COMMISSIONER KUBOCHI:**  Okay, Counsel

11    has handed over a 2007 note indicating an Anger

12    Management course on or about July 29th, 2005?

13          **INMATE JAY:**  No, this one --

14          **ATTORNEY DEFILIPPIS:**  I think it's -- that's a

15    previous course that he took.  This one is --

16          **INMATE JAY:**  This one was a class I took in

17    October of 2006.  I believe it was October of 2006.  An

18    it's just a, it's basically called Anger II, which means

19    it's the second class in a series that they deal with in

20    IEP format.

21          **DEPUTY COMMISSIONER MELVIN:**  Thank you very

22    much, Mr. Jay.  And actually the date on this is January

23    19th, 2007.  And since you basically explained what it's

24    about, I won't read it in its entirety, but during

25    deliberations, of course, I'll read it in its entirety.

1       **INMATE JAY:**  Thank you very much.

2       **DEPUTY COMMISSIONER MELVIN:**  And then there are

3  additional chronos that I failed to mention.  And they

4  are a chrono for participation in AA dated January 2nd,

5  2007, for the fourth quarter.  Another one dated July

6  14th, 2006, from Jay Kramer for participation in AA and

7  that's for the second quarter in 2006.  And then another

8  one dated February 12th, 2006, from A. Stowick, and he's

9  the watch sergeant.  And it's for your act in donating

10 five personal books to the East Dorm library. And then

11 the last and final chrono that I have is dated

12 January 3rd, 2006, and that's from Jay Kramer for

13 participation in AA during the fourth quarter.

14      Now, you have provided the Panel with letters of

15 support.  And the letters of support are dated, a total

16 of four have been submitted.  The first one is dated

17 November 30th, 2006, and it's from Susan Mullins.  And

18 Ms. Mullins indicates that she will support you.  And

19 just to let you know that we're going to read the entire

20 letter during deliberation.  But I want to state on

21 record the -- what each letter is and the author and the

22 date of the letter.

23      **INMATE JAY:**  Okay.

24      **DEPUTY COMMISSIONER MELVIN:**  Then the next letter

25 is from Patricia Pfeiffer, and she indicates that she is

1   going to offer you support in the area of housing,

2   employment, and encouragement.  And it's dated

3   December 16th, 2006.  And then the third one is from

4   Reverend Hank Mitchel, and he has indicated that he will

5   offer support.  And then John E. Vanderbergh dated

6   January 25th, 2006, a letter of support for you.  And at

7   this time -- I'm sorry.  Go right ahead.

8           **INMATE JAY:**  Again, I just want to, I'm not sure

9   if the Board is aware of this, the Panel is aware of

10  this, but I also have a lot of other letters of support

11  that should be in the file.  And I just want to make

12  sure that the Panel is aware of them all.

13          **PRESIDING COMMISSIONER KUBOCHI:**  It's in the

14  board report, Counsel and Mr. Jay.

15          **ATTORNEY DEFILIPPIS:**  Yeah, there's a total of, I

16  believe, it's 53 support letters that --

17          **PRESIDING COMMISSIONER KUBOCHI:**  I believe

18  they're in the file.

19          **INMATE JAY:**  Okay.  Thank you very much.

20          **ATTORNEY DEFILIPPIS:**  Okay.  That's 53 in

21  addition to the four that were just noted by --

22          . **PRESIDING COMMISSIONER KUBOCHI:**  Yes, we know.

23          **ATTORNEY DEFILIPPIS:**  -- Ms. Melvin.

24          **DEPUTY COMMISSIONER MELVIN:**  And at this time,

25  I'll turn it back over to the Chair.

1      **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

2  Before we go into your parole plans, I've got a couple

3  questions if you don't mind, Mr. Jay.

4      **INMATE JAY:**  Yes, Sir.

5      **PRESIDING COMMISSIONER KUBOCHI:**  In looking at

6  your entire Board report, it appears that in view of

7  your drug usage in high school, your parents obtained

8  some type of psychological therapy for you?  Counseling?

9      **INMATE JAY:**  Well, what happened was it was

10  actually prior to my drug use.  I was seen, I can't

11  remember the doctor's name, but I was in approximately

12  ninth grade.

13      **PRESIDING COMMISSIONER KUBOCHI:**  Ninth grade.

14      **INMATE JAY:**  Where my drug use really began.

15      **PRESIDING COMMISSIONER KUBOCHI:**  About 14 years

16  old?

17      **INMATE JAY:**  I was about 14.

18      **PRESIDING COMMISSIONER KUBOCHI:**  And what during

19  the -- I'm going to back up.  About how many times did

20  you go there?

21      **INMATE JAY:**  Again, I don't remember.  I remember

22  I saw this doctor a minimum of five to six times over a

23  course of months.

24      **PRESIDING COMMISSIONER KUBOCHI:**  At that age your

25  parents would have drove you there?

1      **INMATE JAY:**  Yeah, they drove me after school.

2      **PRESIDING COMMISSIONER KUBOCHI:**  And did you --

3  What was your -- What did it appear to you that he was

4  trying to discuss with you?

5      **INMATE JAY:**  The doctor, just for the record, was

6  a woman.  And she -- I basically was dealing with

7  depression at that time.  And that was the main focus.

8  And through seeing her over the course of months, I came

9  to understand that I had a hard time dealing with sugar

10  and its effects on my body, and she called it Sugar Blue

11  Syndrome.  Some people get hyper.  I got depressed.  And

12  I didn't understand that until dealing with her.

13      **PRESIDING COMMISSIONER KUBOCHI:**  What were the

14  symptoms, because I'm sure you talked to your parents.

15  You talked to the therapist at why you -- why they

16  enrolled you.

17      **INMATE JAY:**  Right.  Well, basically the problem

18  that I was dealing with is I would become depressed.

19  Knowing now, I look back and it was because the sugar,

20  my body would crash, and I didn't understand that at the

21  time.  So I became depressed and didn't understand why I

22  became depressed, which made it even worse for me.  I

23  felt there was something wrong with me.

24      **PRESIDING COMMISSIONER KUBOCHI:**  Right.

25      **INMATE JAY:**  And I actually was feeling

1    physically down, you know.

2        **PRESIDING COMMISSIONER KUBOCHI:**  Right.

3        **INMATE JAY:**  And again that was the main focus of

4    it, and that's what I came to understand was the effects

5    that sugar plays on my body and depression.  And, of

6    course, depression itself.

7        **PRESIDING COMMISSIONER KUBOCHI:**  I have no

8    expertise in this area, but in addition to those periods

9    where you were depressed, would your parents discuss

10   with you their observations such as any anger issues,

11   any temper issues?  Would you go off the handle at

12   something that was just inconsequential?

13       **INMATE JAY:**  Right.  I think they did on a

14   surface level.  They never really -- My recollection,

15   they never really went into depth about it.  I mean, I

16   think they thought that they were doing the right thing

17   by bringing me to this doctor and --

18       **PRESIDING COMMISSIONER KUBOCHI:**  No, what I mean

19   by that is did they -- did you believe that you had

20   like a problem following their rules or fly off the

21   handle or --

22       **INMATE JAY:**  Well, no.  At that time I just was

23   dealing with severe depression.  And I think it wasn't

24   completely the sugar.  I mean, it was just the sugar

25   made it worse, you know.  And at that point, I think it

1  was just growing up, the hormones, the whole nine yards,

2  and not understanding how to deal with it at that time.

3      **PRESIDING COMMISSIONER KUBOCHI:**  And did you ever

4  have professional therapy after that before the life

5  crime?

6      **INMATE JAY:**  No.

7      **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

8      **INMATE JAY:**  No, I did not.

9      **PRESIDING COMMISSIONER KUBOCHI:**  And I just want

10  to touch upon what I noted in your entire chronology

11  while in the custody of the Department of Corrections.

12  There was a 1993 correctional counselor report

13  indicating that in 1991, you had gone through a 26-hour

14  advanced Alternative to Violence program.

15      **INMATE JAY:**  Yes.

16      **PRESIDING COMMISSIONER KUBOCHI:**  And that then

17  goes to the 2005 Anger Management, and then the 2006

18  Anger Management II; is that correct?

19      **INMATE JAY:**  Correct.

20      **PRESIDING COMMISSIONER KUBOCHI:**  And those are

21  the programs you've participated in?

22   .  **INMATE JAY:**  And many, many others.

23      **PRESIDING COMMISSIONER KUBOCHI:**  No, no, no.  I'm

24  not talking about AA and all that.

25      **INMATE JAY:**  Okay.  Yeah.

1    **PRESIDING COMMISSIONER KUBOCHI:**  Just as far as

2    the topic anger management.

3    **INMATE JAY:**  Right.

4    **PRESIDING COMMISSIONER KUBOCHI:**  And those

5    courses.

6    **ATTORNEY DEFILIPPIS:**  There's the Alternatives to

7    Violence course back in 1990.  There's trained to

8    facilitate AVP in October of 1990.  He took the Advanced

9    AVP course, 26-hour course, in 1991.  He became an

10   inside facilitator for AVP.  He had in 1991 126 hours

11   working as a facilitator.  Breaking Barriers course in

12   1992, 24-hour course.  He started NA in '92.  Advanced

13   Breaking Barriers was also in '92.  More inside

14   facilitating work for AVP in '92.  The Life Skills

15   program with Dr. Bakeman in 1994.  That was a 10-week

16   program.

17       Also, throughout that time, there was an outside

18   counselor coming in and that should be documented in the

19   Central File with reports from Marilyn Kennedy.  She was

20   seeing him on a twice a month basis at some points.  And

21   at some points, just because of the physical distance,

22   every other month.  And that started in 1988 and went

23   through December of 1998.  I think the last report she

24   prepared that's in the file is a 1999 report updating

25   everything.  Then of course there's the Inmate Peer

38

1    Education Programs.  And then the more recent anger

2    management course that you, both you have talked about

3    today.

4         **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank

5    you, sir.

6         **ATTORNEY DEFILIPPIS:**  Thank you.

7         **PRESIDING COMMISSIONER KUBOCHI:**  In regard to

8    your parole plans or as I call them, the future plans,

9    because that's the category listed in the Board report

10   in 2007.  As regards to the residence if granted parole,

11   you plan to live with your parents Herman and Lynn Jay?

12        **INMATE JAY:**  That is correct.

13        **PRESIDING COMMISSIONER KUBOCHI:**  And that's in

14   Valencia, California?

15        **INMATE JAY:**  Correct, Sir.

16        **PRESIDING COMMISSIONER KUBOCHI:**  Well, that was

17   the same place as -- they lived in the same place since

18   before the life crime or they moved?

19        **INMATE JAY:**  No, since the life crime they had

20   moved.  They used to live in Woodland Hills.

21        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

22        **INMATE JAY:**  Approximately 15 miles away.  And

23   they now live in the Santa Clarita Valley.

24        **PRESIDING COMMISSIONER KUBOCHI:**  As far as

25   employment, it's going to be with K-R-I-E-G-E-R, Krieger

1    Industries.

2    **INMATE JAY:**  Krieger.

3    **PRESIDING COMMISSIONER KUBOCHI:**  Krieger?

4    **INMATE JAY:**  Yes.

5    **PRESIDING COMMISSIONER KUBOCHI:**  And what type of

6    work is that, sir?

7    **INMATE JAY:**  Well, they mainly deal with

8    sprinkler and misting systems for various resorts and

9    restaurants and companies and hotels and stuff like

10   that.  I would be more on the sales end of it and

11   customer service.

12   **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  You have

13   a secondary employment opportunity and that's good to

14   have alternatives in case something doesn't pan out.

15   And that would be with Bishop John Bruno, B-R-U-N-O,

16   Episcopalian Church.  And I would assume that's in the

17   Los Angeles County area?

18   **INMATE JAY:**  It is.

19   **PRESIDING COMMISSIONER KUBOCHI:**  And you intend

20   to continue on with Alcoholics Anonymous meetings; is

21   that correct?

22   **INMATE JAY:**  Yeah, that's true.  Also, if I may

23   since we're talking about jobs.

24   **PRESIDING COMMISSIONER KUBOCHI:**  Sure.

25   **INMATE JAY:**  I asked my family to go on the

1  Internet, it's labormarket.com throughout the state to

2  see if there are jobs available in the area that I'm

3  currently involved in which is material coordinator,

4  inventory coordinator.  And I have this package that if

5  the Board would like to look at it.  It basically has

6  listings as recent as December and January for different

7  jobs in the San Fernando Valley that call for inventory

8  coordinators and control specialists.

9        So I just wanted to impress upon the Board that

10  I'm not just satisfied with one thing.  I do try to be

11  active in my parole and my parole plans, so.  If the

12  Board would like to look at it, I'll give it to my

13  attorney and you can look at it.

14        **PRESIDING COMMISSIONER KUBOCHI:**  We will consider

15  everything.

16        **INMATE JAY:**  Thank you, Sir.

17        **PRESIDING COMMISSIONER KUBOCHI:**  Just for the

18  record, I would like to have an understanding that we

19  will return this back to Mr. Jay.

20        **ATTORNEY DEFILIPPIS:**  That would be fine.

21        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

22        **INMATE JAY:**  Thank you.

23        **PRESIDING COMMISSIONER KUBOCHI:**  The other ones

24  I'm going to put in the file as a permanent record.  Is

25  that agreeable, Counsel?

1          **ATTORNEY DEFILIPPIS:**  That's fine.

2          **PRESIDING COMMISSIONER KUBOCHI:**  Is there

3     anything you'd like to add in regard to your parole

4     plans?  I'm not implying that they look skimpy.  I want

5     to be clear on that.

6          **INMATE JAY:**  No, I just it's if you have any

7     questions either regarding the parole plans, I'd be more

8     than happy to answer anything regarding church, AA, or

9     anything like that.

10         **PRESIDING COMMISSIONER KUBOCHI:**  No, I think you

11    thoroughly presented that, Sir.

12         **INMATE JAY:**  Okay.  Thank you very much.

13         **DEPUTY COMMISSIONER MELVIN:**  I actually do have a

14    question.  If given a date, what do you intend on

15    participating in any sort of therapy or AA type

16    programs, NA type programs?

17         **INMATE JAY:**  Absolutely.  Dealing with AA, there

18    are AA groups.  There are four AA groups at my mom's

19    church, which is approximately a mile away from where

20    I'll be living at their home.  And they have four

21    different meetings each week.  And I'll be attending

22    those.  Also, I have a cousin, Alex Mutan, who goes to

23    AA religiously out there, and can't wait to introduce me

24    to his groups.

25         In regards to psychological counseling, there's a

1    letter in the file from Dr. Cynthia Jewel, who has

2    offered three psychological -- she's a psychologist by

3    the way at Cal Lutheran.  And will offer her services as

4    well and the church itself.

5            **DEPUTY COMMISSIONER MELVIN:**  Thank you.

6            **INMATE JAY:**  Thank you.

7            **DEPUTY COMMISSIONER MELVIN:**  No additional

8    questions.

9            **PRESIDING COMMISSIONER KUBOCHI:**  Thank you,

10   Commissioner Melvin.  We have sent out Penal Code 3042

11   notices.  These notices go to agencies having a direct

12   interest in your case.  Presently the District

13   Attorney's Office of Los Angeles County is represented

14   by Mr. Bushling.  And I am obligated to read one letter

15   in opposition on the record.  From Los Angeles County

16   Sheriff's Department.  My review of the Central File

17   does not contain any other letters of opposition such as

18   from the victim's next of kin.  Did you see any,

19   Commissioner Melvin?

20           **DEPUTY COMMISSIONER MELVIN:**  No, I did not.

21           **ATTORNEY DEFILIPPIS:**  I have three letters from

22   the victim's next of kin.  She started writing in 1998.

23   It's Joyce Van Hove and Gus Van Hove --

24           **INMATE JAY:**  Van Hove.

25           **ATTORNEY DEFILIPPIS:**  Van Hove, excuse me,

1    H-O-V-E.  They are the parents of Shirley Rizk, the

2    victim in this case.  They also wrote in October of '01,

3    and then again in 2000, October 29, 2002.  They are

4    quite old now and --

5         **PRESIDING COMMISSIONER KUBOCHI:**  That's quite

6    right, Counsel.  Can you hand those copies for

7    (inaudible)?

8         **ATTORNEY DEFILIPPIS:**  These are the only copies

9    that I have.  I'm sure that we can get some copies made

10   to --

11        **PRESIDING COMMISSIONER KUBOCHI:**  No, what it is

12   is I will paraphrase it at the appropriate time and read

13   it into the record.

14        **ATTORNEY DEFILIPPIS:**  That's fine.

15        **PRESIDING COMMISSIONER KUBOCHI:**  In regard to the

16   letter in opposition by the Los Angeles County Sheriffs

17   Department, it's dated January 19th, 2006 [sic].  I'm

18   going to skip over their request that this letter be

19   perpetuated as they don't have the personnel to rewrite

20   a letter for every Board hearing.  At the bottom of the

21   page, at the third full paragraph, it states:

22             "On October 13th, 1985, Inmate Jay,

23        Richard Parker, Toran Meyer conspired to kill

24        Meyer's stepmother, Shirley Rizk.  Meyer led the

25        victim into the spare bedroom where Parker was

44

1    waiting with a noose to strangle her.  Mr. Parker

2    initially missed in his attempt to place the

3    noose around Victim Rizk's neck.  Inmate Jay held

4    the victim while Meyer and Parker placed the

5    noose around her neck and started to strangle

6    her.

7         "Meyer's stepbrother, Rory Rizk, walked

8    into the room and was immediately led out of the

9    room by Meyer while Jay and Parker continued to

10   kill the victim.  After approximately 15 minutes,

11   Victim Rizk died.  Believing the half-brother

12   witnessed the murder, it was decided that Rory

13   Rizk had to be killed as well.  They attempted to

14   poison the victim with a peanut butter sandwich

15   and a malt laced with rat poison.  The victim

16   didn't like the taste of the items and only

17   ingested a small amount of the contaminate.

18        "The trio attempted to hide their crime by

19   staging a car crash and fire.  Shirley Rizk was

20   placed in the driver seat of the vehicle and Rory

21   Rizk was tied up, blindfolded, and placed in the

22   back of the back seat of the car.  The car was

23   set on fire and they pushed the vehicle over the

24   side of the road in Malibu Canyon.  Rory Rizk was

25   able to untie himself and escaped from the

1    burning vehicle.  He was rescued after a passing

2    motorist stopped and heard the victim's cry for

3    help.

4         "Rory Rizk subsequently told authorities

5    what had occurred.  Inmate Jay told a friend that

6    Meyer had promised him two thousand dollars if he

7    helped kill his mother.  Jay's actions

8    demonstrate a total disregard to human life and

9    the laws of a civilized society.  Based on these

10   facts, it is the opinion of this department that

11   parole of Inmate Jay is inappropriate and should

12   be denied.  Leroy Baca, Sheriff, Raymond Peady,

13   P-E-A-D-Y, Captain, Homicide Bureau."

14        Commissioner Melvin, do you have any questions of

15   Mr. Jay?

16   **DEPUTY COMMISSIONER MELVIN:**  I actually do.  I'd

17   like to know what assurances you can offer this Panel

18   that you will not do what you did back in 1985?  And

19   that might be something that you're going to address in

20   your closing, and if it is, then you can refrain from

21   responding to it now, and just reserve the right to

22   speak on it later.

23   **INMATE JAY:**  Well, I'll briefly touch on it now

24   because I don't have a prepared statement at the end

25   although I will speak.  I would like to say this, that

1   the main reason why I can assure you that anything like

2   this will never happen again is because I am different

3   person today completely.  And when I say different, I

4   mean different on every level.  I'm a mature man, not a

5   young boy.  I am sober, which is perhaps the most

6   important.  I've been sober for over 20 years now.  I'm

7   steadfast in my sobriety.

8       I appreciate life.  I appreciate freedom.  I

9   understand the pain that I caused and I don't ever want

10  to cause that type of pain again.  Most importantly,

11  although I had many resources out there back in 1985,

12  they weren't -- it was more of an image than it is a

13  reality like it is today.  But even more important than

14  my friends and family and all the resource I have, the

15  internal resources and my belief in Christ as a

16  Christian, I know I will never allow myself to be put in

17  any type of position whether it's drugs or people.  And

18  that's my answer to you.

19      **DEPUTY COMMISSIONER MELVIN:**  Thank you.

20      **INMATE JAY:**  Thank you.

21      **DEPUTY COMMISSIONER MELVIN:**  No further

22  questions.

23      **PRESIDING COMMISSIONER KUBOCHI:**  At this time,

24  the District Attorney's representative has the

25  opportunity to ask any questions.

1      **DEPUTY DISTRICT ATTORNEY BUSHLING:**  I have no

2   questions.  Thank you.

3      **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  Do

4   you have any questions, Mr. Defilippis?

5      **ATTORNEY DEFILIPPIS:**  Just a few.  You talked

6   about your parole plans including AA.  So you've looked

7   into the availability of AA programs out in the streets?

8      **INMATE JAY:**  Absolutely.

9      **ATTORNEY DEFILIPPIS:**  And that's something that

10  you would continue doing?

11     **INMATE JAY:**  Absolutely.

12     **ATTORNEY DEFILIPPIS:**  And do you have a time

13  limit for how long you should be continuing in that?

14     **INMATE JAY:**  I'm going forever.  I mean, I know

15  that it's a lifelong program.  And I used to go to AA

16  because the Board required me.  You know, I did it.

17  Just like a lot of things.  And I don't do that anymore.

18  Not to take away from the Board Panel, but I do

19  everything for myself now knowing what I need to be

20  successful in life.  Whether it's in here or out there.

21  You know, and so AA is an important part of my life and

22  who I am today, and will remain so when I am released.

23     **ATTORNEY DEFILIPPIS:**  And I think your current

24  psychologist that reviewed your case talked about

25  potential issues of immaturity and being able to be led

1  along by other individuals.  What's changed about you
2  now that makes that no longer a problem?
3      **INMATE JAY:**  Well, in here, I mean, in prison,
4  there are so many opportunities where you can be led
5  astray and down the wrong path.  And today I recognize
6  all of those signs.  I recognize attempts that people
7  make to influence you.  Today I have the internal
8  resources, like I mentioned before, to be happy with who
9  I am and to know who I am today and know what I want.
10 I'm a person who values, again values more -- probably
11 the most important thing I value is my sobriety and my
12 faith in God.
13     **ATTORNEY DEFILIPPIS:**  That's all I have.
14     **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  It
15 is now the opportunity of the District Attorney's office
16 to provide a closing statement to the Panel.
17     **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Thank you.
18 I'd like to preface my statement by just saying that
19 nothing I say is intended to in any way beat up on Mr.
20 Jay or discourage him from the progress that he's
21 making.  But I'm probably going to say some things that
22 are harsh.  The DA's office is opposed to a finding of
23 suitability.  This was an extremely grueling murder.
24 This was not the kind of murder that you generally see
25 that takes a matter of seconds where somebody pulls a

1  gun and fires it a few times.  This was grueling murder

2  that took work.  It took 15 minutes.  The inmate had to

3  hold the victim down.  He had to listen to her screams.

4  He had to resist her struggling.

5       Drugs don't cause you to be that way.  Immaturity

6  doesn't call you to be that way.  That's a lack of a

7  moral governor.  He doesn't have that internal moral, or

8  he didn't have that internal moral governor that most of

9  us have.  I venture to say none of us in this room could

10 do that 15 minutes worth of work and listen to this

11 woman scream.  And I want to emphasize drugs cannot make

12 you do that.  There is something else because a lot of

13 people use drugs.  This was a horrific crime.

14      It was a lack of ability to empathize with the

15 victim as she lay there screaming and resisting.   And

16 then to attempt, after that, to murder an eight-year-old

17 child, it's just different.  There's something.  The

18 inmate had a lot of opportunities in life.  In fact, the

19 sentencing just said, "Matthew Jay is an enigma.  He in

20 comparison to Mr. Parker should be punished even more so

21 because he came from an environment that had everything

22 going for him."

23      This inmate doesn't have the kind of excuses we

24 very often see.  He did have everything going for him.

25 But he did this excessively horrific crime.  He gets to

1    the institution and he becomes a model prisoner.  He

2    went from one extreme, extreme criminality, to becoming

3    a model prison.  Not one 115, and I believe only one

4    very minor 128 in his entire package.  The thing that I

5    don't see addressed here is what has changed?  What made

6    him go from one extreme to the other?  Where is that

7    moral governor that was lacking?

8         The inmate talks about, well, I won't do drugs.

9    I won't do alcohol.  But where is the moral governor?

10   Where is that?  Where is his ability to empathize?  I

11   don't see that here.  And not many of us, like I say,

12   can do the kind of crime that was done here.  I think it

13   takes a special person, and I'm using that term in a

14   unique way.  And based on what he's capable of doing and

15   the fact that I don't see that addressed in what he's

16   done with himself, I would submit that he presents an

17   unreasonable risk to society.  Thank you.

18        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you, Mr.

19   Bushling.  Mr. Defilippis.

20        **ATTORNEY DEFILIPPIS:**  Thank you, Commissioners.

21   I may say some harsh things too because I don't think

22   Mr. Bushling has read the file.  You've got some reports

23   July 1994, there's a 1996 report, there's a 1999 report,

24   all of Marilyn Kennedy.  And this was started by Dr.

25   Sheffner back at the time of the, on the probation and

1    sentencing who did a full evaluation of Mr. Jay.  And he

2    came to a conclusion as to what exactly it was that led

3    to the crime.  And then that's brought forward in the

4    reports of Marilyn Kennedy.

5         The reports of Marilyn Kennedy very clearly

6    address the four issues that were brought up, which is

7    per Dr. David Sheffner, dependency, depression, drugs,

8    and circumstances.  And it was these four factors

9    leading together under the unique circumstances of what

10   happened that led Mr. Jay to participate in the

11   commission of this crime.  And you have the numerous

12   years of testimony that Mr. Jay has given over the years

13   regarding this matter.  He's testified in many of the

14   prior hearings, and talked about all the things that

15   happened.  I'm not sure where the statement about 15

16   minutes came from.  But that's been disputed since the

17   inception of this matter.  But I don't think that's

18   really the important point.

19        The important point is that those four issues

20   have each been taken care of.  And Dr. Kennedy talks

21   about that in her reports.  She talks about how Mr. Jay

22   now has a healthy sense of self.  He's resolved his

23   dependence, independence conflicts.  He was dependent

24   upon Toran Meyer.  He had an odd relationship with Mr.

25   Meyer and that had to do with the type of person that

1    Mr. Meyer was.

2          If you look at the probation officer's report,

3    the probation officer talks about Tory Meyer as being

4    someone who was influencing both defendants.  He was the

5    youngest of the three individuals.  And you would think

6    the 16-year-old is not going to be influencing the boy

7    that just turned 18 or the man that's 23 that were

8    involved in this crime.  But the PO described Tory Meyer

9    as being highly influential of both defendants.

10          The sheriff's officer, deputy investigating the

11    case said that Meyer had the ability to lead others and

12    that he influenced the defendants.  The probation

13    officer then went on to say that Meyer was a quote,

14    rather imposing figure, quite sophisticated, poised, and

15    apparently persuasive.  Always calm and seemed in

16    command of everything.  Seemed and looked much older

17    than his years.

18          The indications from everyone that talked to the

19    probation officer back at the time of the commitment

20    offense talked about Mr. Jay as, you know, that day

21    using marijuana, beer, rum, wine coolers, having

22    ingested six lines of cocaine and hashish, having taking

23    LSD.  They described his mind as quote fried was the

24    term that was used by the individuals that talked about

25    Mr. Jay.  They said that he was like a quote zombie, end

1    of quote.

2          Meyer, as you may know, went to CYA as a result

3    of his conviction, unlike Mr. Jay, Mr. Meyer did not

4    admit his culpability in his case.  He actually went to

5    trial, same DA's office tried that case.  And the

6    determination was made that Mr. Meyer was guilty of

7    conspiracy to commit manslaughter, manslaughter as to

8    Shirley Rizk, and attempted voluntary manslaughter as to

9    the young eight-year-old boy, Rory.  Meyer was then sent

10   to the youth authority.  He received a 12-year term.  He

11   got out I think in the early '90s, and he's the one

12   that's the mastermind of this whole event.

13         As you also know, this was an event that Mr.

14   Meyer had planned for quite some time because apparently

15   there was an abusive relationship between himself and

16   his mother, and that was what caused him to cook up this

17   plan and decide to do it.  Well, he had gone to Mr. Jay

18   approximately a year prior to the incident.  And that's

19   talked about in the sentencing report.  You'll hear both

20   the defense lawyer and the District Attorney talk about

21   that prior history.  And, in fact, the prosecutor notes

22   that Mr. Jay may have been influential in stopping the

23   crime from occurring on that earlier occasion, a year

24   prior, because Mr. Jay went to the authorities when that

25   happened.

54

1    But what occurred and what transpired and led to

2    the commitment offense, was the degeneration of the

3    downward spiral the drugs led him to over that year

4    leading up to the commitment offense.  And that's what

5    Dr. Sheffner talks about in his report of that downward

6    spiral from the drugs, the depression that he was

7    suffering at the time, his dependency on individuals

8    such as Toran Meyer and basically what he concluded of

9    that was that Mr. Jay was not an antisocial person.

10    If you look at his history before the life crime,

11    before that year of the downward spiral, you look at his

12    history, and he had things in his record such as being

13    an alter boy, being an A and B student.  Being basically

14    a pretty good kid.  He had some issues with depression

15    that he talked about with you earlier.  But overall, he

16    was a pretty good kid.  And then he has this downward

17    spiral that leads him into the commission of the

18    commitment offense.  But then after that, what does he

19    do?  You take those drugs away, he changes.  He comes

20    back to being the individual that he was before that

21    downward spiral.  And then he starts working on himself.

22    You know, this is a man who came to prison at a

23    young age.  He went to the youth authority first.  They

24    had housing issues apparently and he was nonadversely

25    transferred from YA much earlier than what was

1   anticipated and came over to CDC fairly quick.  I don't

2   think he was there for, I know it was less than a year.

3   But even during that time, when he hit YA, he got into

4   individual and group therapy over there in 1987.  He was

5   on the drug orientation team at YA for a period of four

6   months, and he began the individual counseling with Dr.

7   Kennedy.

8           So he was proactively going about doing, you

9   know, what it is that he needs to do to change his life.

10  So this isn't somebody who just sat back on their

11  haunches and said, "Hey, I'm in prison, I'm just going

12  to go with the flow."  He started doing things.

13          Now getting Dr. Kennedy coming into the

14  institution for him, that wasn't because somebody told

15  him he needed to do that.  It wasn't because it was

16  ordered for him.  This was something where he was

17  actively seeking out counseling on his own behalf and

18  doing the things that he needed to do to change his

19  life.  And that's why Dr. Kennedy in those reports, and

20  you'll see those in the Central File.  They're in with

21  the psychological reports.  And she talks about how he

22  has taken care of each of those four issues that Dr.

23  Sheffner had talked about as being the matters that

24  contributed to commission of the instance offense.

25          It's my professional opinion that Matthew Adam

50

1    Jay will not return to drugs, repeat his crime, or be a

2    anger to self or others.  Look at the psychological

3    reports.  You can go back to, you know, 1994, where Dr.

4    Kennedy starts writing the reports, and look at all of

5    the psychological reports and look at the dramatic

6    improvements that are being shown.

7         In 1994, Dr. Ronald Kitt talks about the fact

8    that back at the time of the 187, the homicide, he had

9    an extremely immature conscience and there was the

10   effects of substance abuse.  He notes the sobriety.  He

11   notes the improvement that's starting to happen already.

12   The increased maturity.  The improved autonomy.  It says

13   that he's likely to maintain his gains in the community.

14   And the continued benefit is going to be likely from the

15   things that he's doing.

16        You go to 1995, Dr. McDill talks about genuine

17   remorse, tears during the talking about the commitment

18   offense.  And counsel talks about where's the, you know,

19   the feelings of regret and remorse.  They're in here.

20   They're in the file.  It's talked about repeatedly in

21   terms of the way he handles when he talks about the

22   commitment offense.

23        Dr. McDill talks about how proud he is of his

24   sobriety.  That he now has, quote, important behavioral

25   controls that are in place and operating well.  Danger

1    of reoffense, this is back in 1995, the doctor is saying

2    the danger of reoffense is very below average.

3    Describes Mr. Jay as being adamant about his sobriety.

4    His life is very different today than it was as a teen.

5    That's only essentially nine or ten years after the

6    commitment offense.  He goes on to say rehabilitation

7    has been complete and that he will not be at risk for

8    reoffense upon release.  This is back in 1995.  He

9    describes Mr. Jay as non criminal, highly dependent, and

10   confused at the time of the crime.

11          Now also go back and look at what happened when

12   Mr. Jay first came to prison.  One of the first things

13   that CDC did with him was to take him and say, I mean,

14   you know what happens to these guys.  You come in, you

15   get classified, and immediately where do you go?  Level

16   IV.  All the time Level IV, because your points, because

17   of your life sentence, puts you up so high that you've

18   got to go to a Level IV institution.  Immediately an

19   override was done with Mr. Jay and he was put into a

20   Level III institution.

21          So he started off in a different view than other

22   individuals that normally come to prison on life crimes.

23   So you know that there was a view by CDC, by the state

24   itself, that he was of a lesser dangerousness even at

25   that early stage in his incarceration.  Dr. Dean Clare

58

1  in 1999 talks about a quote mature and effectively

2  rehabilitated end of quote individual.  He says he's a

3  negligible risk to the public order, finds no antisocial

4  personality disorder, calls him cooperative and candid.

5  In '99 is also when Marilyn Kennedy does her last report

6  and talks about how each of those issues was taken care

7  of.

8        Dr. Joe Reed in 2001 talks about how inconsistent

9  the crime is with the inmate's character.  And that's a

10  theme that you'll see consistently throughout here.

11  Everything you're going to look at in terms of this case

12  is there was a young man who was one way, became

13  different for a period of time, and then not only went

14  back to the good person that he was before, but now has

15  consistently done everything that he can do to change

16  himself and to become a better individual.

17        And Dr. Reed goes on to talk about how he

18  expressed empathy.  He's genuinely penitent.  He's

19  matured greatly and profited from groups and self-help.

20  Dr. Howlin in 2002, the same thing.  He talks about the

21  polysubstance abuse in sustained full remission.  He

22  will maintain his gains on parole.  He notes his

23  maturity.  His prognosis for community of living is

24  positive with good insight into the commitment offense.

25        Then Dr. Macomber in 2006 and Dr. Merrick in 2007

1  again both saying the same thing.  That, you know, drugs

2  are no longer a risk.  He has good insight.  Good

3  judgment.  Sincere remorse.  No diagnosable condition,

4  no need for treatment.  Now there's a reason that you

5  have three letters there from Shirley Rizk's parents

6  that are supportive of parole and talk about the fact

7  that Mr. Jay should be released and brought back into

8  the community.  Because what happened, and you'll know

9  this from testimony at earlier hearings, we didn't

10  really talk about it today, but consistently it's been

11  talked about, Mr. Jay, as part of his AA program, made

12  contact with the family of the victim and unbeknownst to

13  him, they would turn around and respond very favorably

14  to him.

15         Because again, this is another individual who is

16  looking at the situation and seeing the type of change

17  that he's put forth.  And that's consistent with what

18  you're going to see from every single letter that you

19  have in the file that talks about what he's done in

20  prison and how he's changed and how he's become a better

21  person.

22         Also look at the decisions from the last hearing,

23  the hearing before, and the hearing before that.  There

24  were very consistently some (inaudible) that were talked

25  about.  And you go back to, I think it was Commissioner

1    Munoz that talked about -- give me just a minute, I'll

2    find it.  You know, Commissioner Munoz starts talking

3    about how well he's doing in prison.  How he's been

4    doing since his incarceration.  He talks about the

5    strength of his parole plans.

6          And if you come forward to Commissioner Bordonaro

7    back in 2002 or not.  He says, this is on page 81 of the

8    transcript, quote, "I just think that you've come around

9    a corner.  You're heading down the home stretch.  I'd

10   love to tell you where the finish line is, but I can't

11   tell you that.  You've just got to keep focused on the

12   positive."  And Commissioner Bordonaro talked about at

13   the beginning of that the difficulty of the decision.

14   How tough it was to make the decision.

15         And that was reiterated last year real strongly

16   by Commissioner St. Julian where at page 89 of the

17   transcript she says, quote, "We really struggled with

18   this.  We really struggled with trying to balance the

19   commitment and your significant and undeniable strides

20   that you have made since coming to prison."  She goes on

21   to say, "I usually say at this point that I'm going to

22   read the decision and give you some recommendations, but

23   I don't have any recommendations for you.  You are doing

24   an excellent program.  You are doing everything that we

25   could ever ask somebody to do."

1          And then she's talking about at page 91 that he

2     has a significant history of narcotic and alcohol abuse,

3     which she says, quote, "Which is all behind him.  Thank

4     goodness."  Meaning it's been taken care of.  And then

5     she goes on to say something which I thought was very

6     interesting.  She says, quote, "I had seen people refer

7     to themselves before as model inmates.  I have rarely

8     seen a model inmate. But you are a model inmate."  And

9     she goes on to say they are very few and far between.

10    And you heard the District Attorney say the same thing.

11    He is a model inmate.

12          If you want to know how it is that someone can

13    come to prison and turn their life around, this is the

14    example of that.  This is a textbook example of how

15    somebody can come to prison and change their life and do

16    everything that they can do to turn themselves around.

17    Commissioner St. Julian goes on to talk about how on

18    page 92, his parole plans are excellent.  He's got

19    numerous offers of residence, employment, you know,

20    acceptable employment plans.  That he has marketable

21    skills.

22          And she goes on to say that, you know, "I know

23    other Panels have said this to you before, but your time

24    is going to come and it's going to be sooner rather than

25    later.  I'd like to see you again.  Maybe I'll see you

62

1  again."  She goes on to say, "I'm confident that it will

2  be in the near future."  Deputy Commissioner Smith talks

3  about the exceptional programming that he's done.  His

4  lack of disciplines.  His strong college work that he's

5  doing.  You know, and the fact that the recommendation

6  at that time is simply just continue doing what you're

7  doing.  There was no further recommendation of you need

8  something to be taken care of.  He goes on to say that,

9  you know, your positive changes are not recent.

10       It was a very strongly worded opinion.  It was a

11  one year denial, and it was so that he could come back

12  an another opportunity for a Panel to look at this case.

13  The crime is what it is.  It's never going to change.

14  What has changed in Mr. Jay.  And he's done everything

15  that he can do.  Each time that he's appeared before the

16  Board, the Board has told him what steps to take.  He's

17  taken those steps.  He's done those things.  He's

18  programmed in every manner that he can possibly program

19  from self-help to obtaining the marketable skills that

20  he has to having excellent parole plans.  He's got age

21  on his side.  He's got maturity on his side.  He has all

22  of the doctor's giving outstanding opinions about him.

23       There is nothing at all in his institutional

24  history that can give you any reason to believe that he

25  would currently be a danger to society if paroled.  This

1  is a man who has changed. He's done what he needs to

2  do. Keeping him in here for another year, if you give

3  him a one year denial, you know what you're going to

4  see. In one year he's going to come back. He's going

5  to have more self-help. He'll have taken care of any

6  loose ends that are hanging out. If, you know, some

7  certification that he has expires, he'll get it updated.

8  He'll go through whatever programs he's got available to

9  him. He'll find stuff out there to do, and he'll come

10  back here in a year and he'll present you with the same

11  thing again showing his excellent programming. He'll

12  have no 115s. He'll have no 128s. He won't get into

13  trouble. He'll have excellent psych reports. He'll

14  have people that are talking about him in a positive

15  light. Again, that's what's always going to happen with

16  this man because that's the program that he's set up and

17  that's what he's been doing throughout the time that

18  he's been here and it's going to continue to happen.

19      This is somebody you can release safely to the

20  streets and know it's going to be one of your success

21  stories. It's going to be somebody who not only is

22  going to go out there and be productive, but he's going

23  to keep doing the types of things, you know, he throws

24  out the name Alex Mutan, his cousin.

25      What you'll know from reading the letters in the

1    file, the support letters, Alex Mutan's mother and I

2    think it's also another youngster, Paul Mercoglianos,

3    M-E-R-C-O-G-L-I-A-N-O-S, these are two youngsters that

4    were having some difficulties out in the streets.  And

5    what was done was that contact was made with Matthew and

6    he was put in touch on the phone with these guys and

7    started talking with them and started counseling them.

8    And started leading them in the correction direction.

9    Because he's got that element of being able to say, you

10   know what, I've been there.  You know, I did that before

11   and look where it led me and helped to turn these two

12   youngsters lives around so that now you see support

13   letters in the file from the parents saying, you know

14   what, my kid was going down the wrong path.  And by

15   putting him in touch with Mr. Jay, that put him into the

16   right path and got him going in the right direction.

17          So this is a young man who is not only going to

18   be productive out there, he's going to be an asset to

19   the community.  And I would urge you very strongly at

20   this time to give him a parole date.

21          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you for

22   your comments.  Mr. Jay, it is now your opportunity to

23   address the Panel.

24          **INMATE JAY:**  Thank you very much.  I have a few

25   things I would like to let the Panel know.  Over the

1    years, I have actually thought, I have put myself or

2    tried to put myself in your position.  Why would I let

3    myself go.  I understand that you're here to protect the

4    public.  I understand that better than most.  I believe

5    actions speak louder than words.  You can hear all day

6    long how sorry I am.  I can tell you how much remorse I

7    have.  But I believe that over the last 21 years, I have

8    shown the Board how truly sorry I am.  I have shown the

9    Board how much I've grown.  I have shown the Board how

10   much pain I acknowledge that I caused by my actions.

11        All lifers can go to groups and get certificates.

12   It's great to have certificates.  It shows what we've

13   done.  It impresses the Board.  It impresses our family

14   members and everything.  But one of the reasons why I

15   got this chrono from Officer Villarreal as a reference,

16   a character reference, is because it shows who I am on a

17   daily basis.  When I'm not in group.  When I'm not in

18   classes.  When I'm not in interviewing for a psych

19   report for the Board.

20        So I ask that you look at who I am today.  I know

21   that if you look at who I was then, yes, I was a threat

22   and I deserve to be in prison.  Just like the DA said, I

23   did have problems with my moral compass.  It was

24   lacking.  But drugs played a vital role in sucking that

25   out of me.  In hiding it from me.  When I stopped using

66

1   drugs, when I came to prison, like my attorney said, I

2   have continued to grow in every way, shape, or form.

3   Why?  I found my true self.  I found my identity.  I

4   found my spirit.

5         And I apologize to everybody in this room for

6   having to be here today.  Most of all I apologize to the

7   community and to the Rizk family.  And I ask that you

8   find me suitable today.  Thank you.

9         **DEPUTY COMMISSIONER MELVIN:**  Thank you.

10        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

11                        **R E C E S S**

12                         --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    **DEPUTY COMMISSIONER MELVIN:**  We're back on the

4    record.

5    **PRESIDING COMMISSIONER KUBOCHI:**  The time is

6    11:20 in the matter of the life parole consideration for

7    Matthew Jay.  There was a split opinion.  I will go

8    first in announcing my decision.  In reviewing all the

9    facts and information received from the public and

10   relying upon the circumstances contained in the entire

11   Board report, I concluded that Mr. Jay is not suitable

12   for parole at this time and would pose an unreasonable

13   risk of danger to society or a threat to public safety

14   if released from prison based on the following factors:

15       The offense was carried out in an especially

16   cruel and callous manner.  There were multiple victims

17   attacked and injured during this incident that occurred

18   over many hours and at different locations throughout

19   the county of Los Angeles.  The offense was carried out

20   in a dispassionate calculated manner.  There were

21   discussions as far as a year earlier amongst you and the

22   codefendant about committing a murder.  You had met

23   shortly before the murder at a restaurant to plan this

24   out.  This was not accidental.  Drug use is inconsistent

25   **MATTHEW JAY    D-55653        DECISION PAGE 1      2/16/07**

1   with such a long term premeditated and deliberated plan.

2   There were even discussions as to where to dump the body

3   to make it look like an accident which is -- which

4   clearly shows planning and a degree of sophistication in

5   that it would throw off investigation as to the

6   perpetrators in this case.  It was carried out in a

7   cruel, in a manner that demonstrates an exceptional

8   callous disregard for human suffering.  The undisputed,

9   uncontradicted evidence relied upon by the Board

10  indicates that this strangling process occurred over 15

11  minutes.  One can only imagine the terror and horror of

12  the victim while this was going on.

13        Clearly the evidence shows that it took more than

14  one person who were pulling the legs of this woman while

15  she was being killed.  At various times, Mr. Meyer left

16  the room to take care of the brother who was inquiring

17  as to the noise and the circumstances.  The motive for

18  the crime was inexplicable.  There was no justification

19  to try to kill the other person.  The boy was eight

20  years old.  You let to go to the store.  You had an

21  opportunity to cease.

22        In any drug induced situation, you had

23  opportunity to stop and just put a halt to your own

24  individual participation.  I note in the record

25  **MATTHEW JAY    D-55653          DECISION PAGE 2      2/16/07**

1    additional aggravating circumstances such as in pursuit

2    of the plan, the victim was lured into a bedroom where

3    you and Mr. Parker were lying in wait.  The decision to

4    carry out this plan occurred over a long time.  Whether

5    you say that you were in a drug induced state on the day

6    of the crime or many, many days leading up to this crime

7    in which you knew the plan, I am particularly concerned

8    about the offer of two thousand dollars to commit this

9    crime offered by Mr. Meyer which clearly tells me that

10   you were more than just a passive follower in this case.

11        In fact, within the realm of human nature,

12   passive people generally will never get involved with a

13   homicide.  They just simply chicken out.

14                  (Thereupon, a recess was

15                   held off the record.)

16        **DEPUTY COMMISSIONER MELVIN:**  We're back on

17   record.

18        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  In

19   addition to the way that this crime was committed,

20   because the vehicle was going to go down a ravine to

21   make it look like an accident, it required a second

22   vehicle to drive away from the scene.  You were the

23   person that left to get the second vehicle and follow

24   the other vehicle to the ravine where the vehicle was

25   **MATTHEW JAY    D-55653        DECISION PAGE 3     2/16/07**

1  actually dumped.  Clearly that shows additional

2  opportunities to cease, additional willingness on your

3  part to follow through.

4       Throughout your life, starting as early as 14

5  years old, depression played a big role in affecting

6  your behavior and your understanding and your ability to

7  follow society's rule.  At some point in time, drugs

8  did, as the District Attorney pointed out, there are

9  many people who have drug problems that don't resort to

10  violent crime, crimes as particularly callous and with

11  such disregard for the feelings of others.

12       It is my position that notwithstanding your

13  behavior while incarcerated and the absence of a record,

14  the factors surrounding the commission of the crime as

15  well as the constant issue of depression which does

16  affect you, requires further insight on your part as to

17  the other attributes that you have as a person when you

18  stand before the Panel and say that you are fit and you

19  have looked at your drug issues and your alcohol issues.

20  It's not enough to simply say I will never use drugs and

21  therefore I would never attempt to do anything wrong.

22  The way that I as a Panel member see this, if you don't

23  get a better handle on your depression, that is going to

24  be the doorway back into a lifestyle that could be

25  **MATTHEW JAY    D-55653         DECISION PAGE 4      2/16/07**

1    detrimental to you as well as any other member of

2    society.

3          We have had the opposition of the Los Angeles

4    County District Attorney's Office, as well as the

5    opposition by the Los Angeles County Sheriff's

6    Department.  I believe that if a denial is upheld at

7    further proceedings beyond this hearing, that I would

8    highly encourage you to get additional self-help as

9    available to address depression issues.  You certainly

10   are studious enough.  But I personally would be more

11   satisfied with your suitability had you been able to

12   articulate, and I'm not blaming this on your intellect

13   or knowledge or anything else, but depression can be a

14   lifelong problem.  I'm not saying it's (indiscernible),

15   but going back before this life crime, at the age of 14

16   and then having everybody else that's diagnosed and

17   worked with you since that time continue to say that

18   depression is part of the fabric of who you are, is of

19   grave concern to me.

20         And I applaud you for all the other efforts that

21   you made, but I'm not going to make statements like

22   other Commissioners and say you're on the home stretch.

23   That's going to be up to other people.  You shouldn't

24   have a false sense of anything.  But also you shouldn't

25   **MATTHEW JAY    D-55653        DECISION PAGE 5      2/16/07**

1  think that there's no hope either.  But to assure the

2  safety of society and other people, you have to be able

3  to present additional insights as to this lifelong issue

4  that you've battled.  And it's through no fault of your

5  own.  Like I said, it's just a part of the fact of who

6  you are, sir.  And for those reasons, it is my decision

7  to deny you parole at this time for one year.

8          **INMATE JAY:**  Okay.

9          **DEPUTY COMMISSIONER MELVIN:**  Thank you very much,

10  Mr. Kubochi.  This Panel member has reviewed information

11  received from the public and relied on the following

12  circumstances in concluding that the prisoner is

13  suitable for parole and would not pose an unreasonable

14  risk of danger to society or threat to public safety if

15  released from prison.

16          The prisoner has no juvenile record of assaulting

17  others, has a stable social history as exhibited by

18  reasonably stable relationships with others, and I'm

19  considering the letters that I've received from your

20  parents as well as members of the church where your

21  mother is the priest.  While in prison, has enhanced his

22  or her ability to function within the law upon release

23  through participation in educational programs, self-help

24  and/or therapy, and vocational programs.

25  **MATTHEW JAY    D-55653        DECISION PAGE 6      2/16/07**

1       Mr. Jay has provided proof that he has

2  participated extensively in AA for over 17 years, he's

3  indicated, however, I just reviewed the period from

4  February through -- I'm sorry, January '06 to the

5  present.  He's also participated heavily in Anger

6  Management classes and IEP.  In addition, he has

7  attended -- I'm sorry, has received or has participated

8  in correspondence course through the University of Iowa,

9  having completed 88 units and needing 32 units to

10  complete his degree.

11       Regarding the area of work, he has received a

12  forklift operator certificate and license and received a

13  second certificate of proficiency as an inventory

14  material coordinator.  The inmate committed the crime as

15  a result of significant stress in his or her life.

16  There is reference in one of the reports, psychological

17  report from the doctor, who notes the depression and the

18  drug use.  He has also indicated on record the stress

19  that you were dealing with as a result of the depression

20  and the drug use.

21       The inmate lacks a significant criminal history

22  of violent crime.  There is no indication of a juvenile

23  record nor of any adult crimes before the life crime.

24  Because of maturation, growth, greater understanding,

25  **MATTHEW JAY    D-55653         DECISION PAGE 7     2/16/07**

1    and/or advanced age, has a reduced probability of

2    recidivism.  In reviewing the last three psychological

3    reports from Dr. Merrick, from Dr. Macomber, and then

4    from Dr. Reed, your dangerousness level was assessed as

5    lower than average.

6        Has recently maintained positive institutional

7    behavior which indicates significant improvement and

8    self control.  In this case, there are absolutely no

9    115s and no 128s.  Has maintained close family ties

10   while in prison via letters and/or visits.  Shows signs

11   of remorse by indicating that he understands the nature

12   and magnitude of the offense and accepts responsibility

13   for the criminal behavior and has a desire to change

14   towards good citizenship.  In reading the last three

15   psychological reports, it's noted that you are very

16   remorseful, cried, was deemed to be sincere by the

17   evaluator.

18       I'm going to go on and read some specific points

19   in the last psychological report of Dr. Merrick because

20   it forms really the basis for my decision.  "Within a

21   controlled setting, his violence potential is lower than

22   average due to his excellent institutional adjustment.

23   Jay's crime is what it is and he should be paroled or

24   not paroled based on those -- He should be paroled or

25   **MATTHEW JAY   D-55653        DECISION PAGE 8      2/16/07**

75

1  not paroled based on those custody factors, not on a

2  possible deeper level of motivation that could be raised

3  about anyone and that may have been raised as an issue

4  primarily due to the heinous nature of Jay's crime."

5       And then I'll go on to read an excerpt of Dr.

6  Macomber's report.  And Dr. Macomber indicated that, "In

7  considering his potential for dangerous behavior if

8  released on parole to the community, the level of

9  service inventory revised was administered.  This is an

10  actuarial measure that assesses criminal history,

11  substance abuse, educational attainment, vocational

12  attainment, emotional problems, and so forth.  His score

13  indicated a 1.8 cumulative frequency for prison inmates.

14  This means that if 100 men were released on parole, he

15  would do better than 98 percent of them.  This indicates

16  an extremely low risk level."

17       The base life offense of which the prisoner has

18  been convicted is second degree murder in violation of

19  Penal Code 187.  The offense occurred on October 13th,

20  1985.  The term is derived from the matrix located in

21  the California Code of Regulations, Title 15, at Section

22  2403(c), Second Degree Murder.  This Panel member finds

23  that Category III(c) is appropriate in that victim, the

24  victim suffered severe trauma and no prior relationship

25  **MATTHEW JAY    D-55653         DECISION PAGE 9    2/16/07**

1  between the victim and the inmate existed.

2      This Panel member assesses 252 months for the

3  base offense and notes that this is the aggravated, the

4  aggravated term.  In that during the commission of the

5  crime, the prisoner had a clear opportunity to cease but

6  instead continued.  Concurrent life sentence imposed by

7  the court.  In addition to the second degree murder

8  conviction, Count One, there is a second degree murder

9  attempt conviction in violation of Penal Code 187, case

10 number A811060, Count Two.  And I'm assessing the

11 aggravated term of 84 months.

12     Therefore, my calculation is as follows:  The

13 base term, 252 months, the other term 84 months, for a

14 total of 336 months.  Post-conviction credits were

15 calculated at 84 months.  Therefore total period of

16 confinement was, in my calculation, 252 months.  In

17 addition to these findings, I would impose special

18 conditions of parole, and they would be not to use or

19 possess alcoholic beverages.  Submit to alcohol testing.

20 Submit to anti-narcotic testing.  Participate in a

21 substance abuse program such as AA or NA.  And the

22 reason for the imposition of the special conditions are

23 as follows:  Essentially your, it's my opinion that your

24 behavior, what you did, was assisted by your continued

25 **MATTHEW JAY    D-55653        DECISION PAGE 10    2/16/07**

1   and repeated use of alcohol and/or drugs.  And because

2   of that history, you need to be able to have coping

3   mechanisms when you get out to deal with alcohol and

4   drugs which you're going to be presented with when

5   you're released.

6           In addition, I'd like to make this comment.  You

7   indicated that you're a different person.  And I do

8   believe that you're not the man that you were at 18

9   years old.  You indicated why this Panel should consider

10  that fact and you said you put yourself in our shoes.  I

11  personally believe that you should be judged by your

12  behavior.  Your behavior back in 1985 was completely,

13  completely exhibited a reprobate mind.  But in the 21

14  years since you've been here, you've demonstrated by

15  your behavior that you are ready to be released into

16  society.  And in my mind, being on parole serves as a

17  safeguard to not getting back in trouble and continuing

18  to pose a risk to society.  And so in my mind,

19  supervision is an appropriate safeguard.  Thank you.

20          **PRESIDING COMMISSIONER KUBOCHI:**  It is now 11:38.

21  This hearing is concluded, sir.

22          **INMATE JAY:**  Thank you both.

23          **ATTORNEY DEFILIPPIS:**  Thank you.

24                          --o0o--

25  **MATTHEW JAY   D-55653**        **DECISION PAGE 11**    **2/16/07**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    HELD OVER FOR EN BANC REVIEW

22    THIS DECISION WILL BE FINAL ON:  **PENDING REVIEW AND APPROVAL**

23    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

24    DATE, THE DECISION IS MODIFIED.

25    MATTHEW JAY   D-55653      DECISION PAGE 12    2/16/07

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, SANDRA TILLMAN, as the Official Transcriber,

hereby certify that the attached proceedings:

```
In the matter of the Life      )      CDC Number:  D-55653
Term Parole Consideration      )
Hearing of:                    )
                               )
MATTHEW JAY                    )
_____)
```

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 16, 2007

9:29 A.M.

were held as herein appears.  Further, this transcript

is a true, complete, and accurate record, to the best of

my ability, of the recorded material provided for

transcription.

*Sandra Tillman*

Sandra Tillman
March 5, 2007
Capitol Electronic Reporting

# EXHIBIT

# 2

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES    2-11-86 "E"

| | |
|---|---|
| People of the State of California, | No. A 811060 |
| Plaintiff, | |
| v. | **INFORMATION** |
| RICHARD ALLAN PARKER, | VIO. SEC. 187 P.C. |
| MATTHEW ADAM JAY and | VIO. SEC. 664/187 P.C. |
| TORRAN LEE MEIER, | VIO. SEC. 182/187 P.C. |
| Defendant. | VIO. SEC. 182/187 P.C. |

The said    RICHARD ALLAN PARKER, MATTHEW ADAM JAY and TORRAN LEE MEIER,

is accused by the District Attorney of and for the County of Los Angeles, State of California, by this

information, of the crime of    VIOLATION OF SECTION 187, Penal Code of California,

a felony, committed as follows: That the said    RICHARD ALLAN PARKER, MATTHEW ADAM JAY

and TORRAN LEE MEIER,

between the 13th day of October, 1985 and
or about the  14th   day of   October, 1985     , at and in the County of Los Angeles, State of

California, did willfully and unlawfully, and with malice aforethought murder Shirley

A. Rizk, a human being.

XXXX

XXXX

XXXX

| |
|---|
| Filed in open Superior Court of the State of California, County of Los Angeles, on motion XXXX of the District Attorney of said County. |
| DATED: |
| FRANK S. ZOLIN, County Clerk/Executive Officer |
| _____ |
| Deputy |

IRA REINER, District Attorney

for the County of Los Angeles, State of California

By _____XXXXXXXXXXX_____

Deputy

x XXXX

61550A2-rev. 3/85

# EXHIBIT
# 3

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT.**

03/12/87

HONORABLE:    GEORGE SANTHOS          JUDGE
              B MC KINNEY             Deputy Sheriff              E KENNAN        , Deputy Clerk
                                                                  B BURLESON      , Reporter
                                                          (Parties and counsel checked if present)

A811060
PEOPLE OF THE STATE OF CALIFORNIA        Counsel for       IRA REINER    , DISTRICT ATTY.    BY
                                         Plaintiff         E FELDMAN     X          DEPUTY
          VS

                                         Counsel for
JAYT MATTHEW ADAM                        Defendant  P LITTLEFIELD  , PUBLIC DEFENDER    BY

          X-138127                                  E STANFORD    X          DEPUTY

NATURE OF PROCEEDINGS  PROBATION AND SENTENCE
                                                          (Boxes checked if order applicable)

PROBATION DENIED. SENTENCE AS INDICATED BELOW.
Whereas the said defendant having PLED ~~(X)~~ ............... ~~XXXX~~ ..........................
guilty in this court of the crime of  MURDER, 187 PENAL CODE AND FOUND TO BE MURDER IN THE SECOND
DEGREE AS CHARGED IN COUNT 1 OF THE INFORMATION.   DEFT ALSO PLED GUILTY TO THE
CRIME OF ATTEMPTED MURDER AS CHARGED IN THE INFORMATION AS COUNT 2 664/187 PENAL CODE.

It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the
        ☐ County Jail of the County of Los Angeles for the term of.....................................

        ☒ State Prison for the term prescribed by law.  15 YRS TO LIFE FOR COUNT 1 PLUS 7 YRS AS
        TO COUNT 2 TO RUN CONCURRENTLY WITH COUNT 1.

        ☒ Defendant is given credit for............768................days in custody.
It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles
        ☒ to be by him delivered into the custody of the Director of Corrections at the California State Institution
        for........MEN..........................at........CHINO..............................

Remaining count(s) dismissed in interests of justice.
Bail exonerated.

                                                          ENTERED
                                                          03/12/87

                                                          FRANK S. ZOLIN
                                                          AND CLERK OF THE
                                                          SUPERIOR COURT

2    76J 005A - (REV.7-78)            STATE PRISON
     C109                             JUDGMENT

PINK ORIGINAL TO FILE                GREEN COPY TO PROBATION EXPEDITER
WHITE COPY TO MICROFILM              GOLDENROD TO COUNTY JAIL
YELLOW COPY TO STATE WIDE DISTRIBUTION

# EXHIBIT
# 4

PRESENT OFFENSE:
(CONTINUED)

SOURCES OF INFORMATION (this page)
D.A. FILE, PROBATION RECORDS

| REST DATE | TIME | BOOKED AS | OFFENSE | LOCATION OF ARREST | ARRESTING AGENCY |
|---|---|---|---|---|---|
| 10-16-85 | 1740 HRS | SAME | 187 PC | EL CAMINO HIGH SCHOOL | LASO |

| CO-DEFENDANT(S) | CASE NO. | DISPOSITION |
|---|---|---|
| RICHARD PARKER | A-811060 | 11-10-86 PLED GUILTY TO 187 P.C AND 664/187 PC - P&S HEARING 2-10-87. |

ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:

TORRAN MEIER                A-811060        6-24-86 FOUND GUILTY OF 192 PC
                                           (VOLUNTARY MANSLAUGHTER) AND
                                           664/192 PC (ATTEMPTED VOLUNTARY
                                           MANSLAUGHTER) AND 182/192 PC
                                           (CONSPIRACY TO COMMIT MANSLAUGHTER)
                                           ON 12-19-86 SENTENCED TO CALIFORNIA
                                           YOUTH AUTHORITY FOR 12 YEARS.

DEFENDANT JAY, IN CONSPIRACY WITH CO-DEFENDANTS MEIER

AND PARKER, STRANGLED AND KILLED MEIER'S MOTHER, SHIRLEY RIZK, AND

ATTEMPTED TO KILL, BY VARIOUS METHODS, THE EIGHT YEAR OLD HALF BROTHER

OF MEIER, RORY RIZK.

ON THE EVENING OF OCTOBER 13, 1985, DEFENDANT MEIER,

AT THAT TIME, AGE 16, WAS AT HIS PLACE OF EMPLOYMENT, AND APPARENTLY

DECIDED TO KILL HIS MOTHER THAT NIGHT.  HE WAS ABLE TO OBTAIN A

PROMISE OF ASSISTANCE FROM DEFENDANT JAY.  LATER, WHILE STILL AT

WORK, DEFENDANT MEIER TOLD DEFENDANT PARKER, AGE 23 OF HIS PLANS

AND PARKER ALSO AGREED TO ASSIST HIM.  AT SOME POINT, THE THREE

DEFENDANTS WENT TO A NEARBY RESTAURANT WHERE THEY DISCUSSED HOW THEY

WOULD KILL DEFENDANT MEIER'S MOTHER.  DEFENDANT MEIER PRODUCED A ROPE

-2-  (JAY)

1   THAT HE HAD FASHIONED INTO A NOOSE, AND IT WAS DECIDED THAT THEY

2   WOULD STRANGLE HER IN MEIER'S BEDROOM AND THEN TRANSPORT HER BODY,

3   IN HER CAR, TO THE MALIBU CANYON AREA, LIGHT THE CAR ON FIRE, AND

4   PUSH IT OVER A CLIFF IN ORDER TO MAKE IT APPEAR AN ACCIDENT.

5        THE THREE DEFENDANTS' THEN PROCEEDED TO THE HOME OF

6   DEFENDANT MEIER IN CANOGA PARK.  MEIER LET HIS TWO CO-DEFENDANTS

7   INTO HIS ROOM THROUGH A WINDOW.  WHILE PARKER AND JAY LAID IN WAIT,

8   DEFENDANT MEIER LURED HIS MOTHER INTO THE ROOM.  PARKER PLACED A NOOSE

9   AROUND THE NECK OF SHIRLEY RIZK, DEFENDANT MEIER'S MOTHER AND BEGAN

10  TO STRANGLE HER.  PARKER PULLED ON THE ROPE AROUND HER NECK, WHILE

11  THE OTHER TWO CO-DEFENDANTS PULLED ON HER LEGS.  AT SOME POINT DURING

12  THE STRANGULATION, HER EIGHT YEAR OLD SON, RORY, AWAKENED TO HER

13  SCREAMS AND WENT TO INVESTIGATE.  HE WAS ABLE TO LOOK INTO MEIER'S

14  BEDROOM AND OBSERVED JAY AND DEFENDANT PARKER IN THAT ROOM AND HIS

15  MOTHER ON THE FLOOR.  WHILE PARKER AND JAY CONTINUED TO ATTEMPT

16  THE STRANGULATION, DEFENDANT MEIER TOOK VICTIM RORY AWAY FROM THE

17  ROOM IN AN EFFORT TO KEEP HIM FROM KNOWING WHAT WAS HAPPENING.

18  MEIER TOLD HIS HALF BROTHER TO WATCH TELEVISION AND THEN RETURNED TO

19  HIS BEDROOM.  THE THREE DEFENDANTS THEN APPARENTLY STRANGLED

20  SHIRLEY RIZK FOR APPROXIMATELY 15 MINUTES BEFORE SHE DIED.  DURING

21  THIS PERIOD OF TIME, DEFENDANT MEIER REPEATEDLY LEFT THE ROOM TO

22  DEAL WITH HIS BROTHER WHO WANTED TO KNOW WHAT WAS GOING ON.  THE

23  DEFENDANTS CAME TO THE REALIZATION THAT RORY WAS A POTENTIAL WITNESS

    -3-  (JAY)

76C692G — PROB. 5A -  PS 11-85

1 AND THEN IT WAS DETERMINED THAT HE MUST ALSO BE KILLED. IT WAS

2 DECIDED THAT THEY WOULD POISON HIM AND DEFENDANT MEIER GAVE DEFENDANT

3 JAY SOME MONEY TO GO TO A STORE AND PURCHASE SNAROL SNAIL POISON AND

4 D-CON RAT POISON. WHILE JAY WENT TO GET THE POISON, PARKER AND MEIER

5 PLACED SHIRLEY RIZK'S BODY IN THE TRUNK OF THE CAR AND DEFENDANT

6 MEIER CLEANED BLOOD OFF THE FLOOR OF HIS BEDROOM RUG.

7 DEFENDANT JAY PURCHASED THE POISON AND RETURNED TO THE

8 MEIER RESIDENCE WITH IT.

9 DEFENDANT MEIER THEN ATTEMPTED TO POISON HIS BROTHER,

10 VICTIM RORY RIZK. AFTER TESTING HIS BLOOD SUGAR, AS RORY IS A DIABETIC,

11 DEFENDANT MEIER TRIED TO INDUCE HIM TO EAT A PEANUT AND BUTTER

12 SANDWICH LACED WITH SNAIL BAIT. RORY DID NOT LIKE THE TASTE OF THE

13 SANDWICH AND WOULD NOT EAT IT. MEIER THEN TRIED TO INDUCE RORY TO

14 DRINK SOME TYPE OF MALT WHICH HE MADE, ALSO LACED WITH POISON. RORY

15 AGAIN REFUSED BECAUSE OF ITS TASTE. AT SOME POINT RORY WENT INTO

16 THE GARAGE AND SAW HIS MOTHER'S BODY IN THE OPEN TRUCK OF HER VEHICLE

17 WITH HER LEGS EXTENDING FROM UNDER HER ROBE.

18 DEFENDANT MEIER THEN ASKED RORY IF HE WANTED TO GO FOR

19 A RIDE IN MALIBU CANYON. RORY AGREED. WITH HIS MOTHER'S BODY IN THE

20 TRUNK AND RORY IN THE BACK SEAT, DEFENDANT MEIER AND THE CO-DEFENDANTS

21 THEN DROVE AWAY FROM THE FAMILY HOME. EN ROUTE THEY STOPPED AT A GAS

22 STATION AND PURCHASED A GALLON OF GAS. AFTER DRIVING THROUGH THE

23 MALIBU CANYON AREA AND FINDING A GOOD LOCATION TO PUSH THE CAR OVER

-4- (JAY)

7bL692G — PROB. 5A — PS 11-85

1  A CLIFF, THEY DROVE BACK TO DEFENDANT JAY'S HOUSE. JAY THEN FOLLOWED

2  THEM TO THE AGREED-UPON LOCATION IN MALIBU CANYON. DEFENDANT MEIER

3  THEN POURED GASOLINE ON A RAG AND STUFFED THE RAG INTO THE GAS TANK

4  FILLER OF SHIRLEY RIZK'S CAR. MEIER THEN BLINDFOLDED RORY, TIED HIS

5  HANDS BEHIND HIS BACK, AND PUT HIM IN THE BACK SEAT OF THE CAR.

6  DEFENDANT PARKER THEN PLACED THE BODY OF SHIRLEY RIZK BEHIND THE

7  STEERING WHEEL. THE CAR WAS THEN PUSHED OVER THE EMBANKMENT AS

8  DEFENDANT PARKER LIT THE RAG ON FIRE. THE CAR ROLLED DOWN THE

9  EMBANKMENT, POSSIBLY ROLLING OVER, AND COMING TO REST APPROXIMATELY

10  THIRTY FEET BELOW. WITH THE CAR BURNING, THE DEFENDANTS THEN LEFT

11  IN DEFENDANT JAY'S CAR. AS THE CAR BECAME CONSUMED BY FLAMES, RORY

12  WAS ABLE TO UNTIE HIMSELF AND REMOVE HIS BLINDFOLD. HE SAW HIS

13  DECEASED MOTHER IN THE FRONT SEAT WITH BLOOD ON HER FACE. AFTER

14  OPENING A WINDOW, HE CLIMBED OUT OF THE BURNING CAR AND BEGAN TO

15  CALL FOR HELP.

16  A PASSING MOTORIST OBSERVED THE FIRE AND STOPPED TO

17  INVESTIGATE. HE HEARD RORY'S CALL FOR HELP AND ASSISTED HIM UP THE

18  HILL. LATER, SHERIFFS DEPUTIES AND FIRE DEPARTMENT PERSONNEL

19  ARRIVED ON THE SCENE AND RORY TOLD THEM WHAT HAPPENED. WHILE RORY

20  WAS BEING TRANSPORTED TO A HOSPITAL BY AMBULANCE, A DEPUTY SHERIFF

21  FOLLOWING THE AMBULANCE OBSERVED THE CAR DESCRIBED BY RORY AS THE

22  ONE OWNED BY RORY'S BROTHER, DEFENDANT MEIER. THE VEHICLE WAS

23  STOPPED. DEFENDANT MEIER AND DEFENDANT PARKER WERE ARRESTED AT THAT

-5-  (JAY)

POINT.

DEFENDANT PARKER MADE A FULL STATEMENT TO HOMICIDE INVESTIGATORS IMPLICATING HIMSELF, DEFENDANT MEIER AND DEFENDANT JAY. ON OCTOBER 16, 1985, DEFENDANT JAY WAS ARRESTED.

SUBSEQUENT INVESTIGATION BY SHERIFFS DEPUTIES REVEALED THAT SOME TIME PRIOR TO COMMITTING THESE OFFENSES, DEFENDANT MEIER APPROACHED OTHER INDIVIDUALS INFORMING THEM OF HIS DESIRE TO PLAN TO KILL HIS MOTHER. ACCORDING TO A SHERIFF'S REPORT, DEFENDANT MEIER REPORTEDLY TOLD ONE MICHAEL MENDELSOHN OF HIS PLAN IN THE SUMMER OF 1985. THEN IN SEPTEMBER OF 1985, DEFENDANT MEIER TOLD MENDELSOHN, "I'M GOING TO KILL HER AT HOME, I COULD CHOKE HER OR POISON HER, I'LL PUT HER IN A CAR, DRIVE HER TO MALIBU CANYON, PUSH THE CAR OVER THE CLIFF AND MAKE IT LOOK LIKE AN ACCIDENT. MATT (DEFENDANT JAY) WILL PICK ME UP." MENDELSOHN FURTHER TOLD OFFICERS THAT AT APPROXIMATELY 8:00 P.M., ON OCTOBER 13, 1985, HE WENT TO DEFENDANT MEIER'S PLACE OF WORK AND MEIER TOLD HIM "I'M GOING TO DO IT TONIGHT, RICK (CO-DEFENDANT RICHARD PARKER) KNOWS ALL ABOUT IT."

ANOTHER INDIVIDUAL, MARK DAVID SAFRAN, TOLD INVESTIGATING OFFICERS THAT THE DAY AFTER THE KILLING, DEFENDANT MATTHEW JAY TOLD HIM THAT THE DEFENDANT OFFERED HIM $2,000 TO HELP KILL HIS MOTHER.

-6- (JAY)

TELE692G — PROB. 5A — PS 11-85

VICTIM:

| SOURCES OF INFORMATION (1) |
|---|
| PROBATION RECORDS |

| NAME | COUNT(S) |
|---|---|
| RORY RIZK    (AGE EIGHT AT TIME OF OFFENSE) | II AND IV |

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

UNINJURED, BUT LATER PARTICIPATED IN THERAPY.

INSURANCE COVERAGE

| | ESTIMATED LOSS | RESTITUTION ALREADY MADE | APPLIED FOR VICTIM RESTITUTION FUND |
|---|---|---|---|
| LOSS: ☐ YES ☐ NO | | | ☐ UNK ☐ YES ☐ NO |

VICTIM STATEMENT:

THE UNDERSIGNED OFFICER DID NOT INTERVIEW THE VICTIM AS HE HAD ALREADY BEEN INTERVIEWED EXTENSIVELY BY ANOTHER PROBATION OFFICER IN RELATION TO THE INVESTIGATION OF TORRAN MEIER.  DURING THAT INVESTIGATION, THE VICTIM'S STATEMENT WAS IN GENERAL AGREEMENT WITH THE FACTS PRESENTED UNDER THE OFFENSE.  ESSENTIALLY, RORY TOLD THE PROBATION OFFICER THAT HIS BROTHER, MEIER, TRIED TO KILL HIM IN A WAY THAT WAS CONSISTENT WITH THE OFFICIAL VERSION.  HE DID NOT BELIEVE THAT HIS BROTHER HAD THE RIGHT TO KILL HIS MOTHER AND DID NOT BELIEVE SHE HAD TREATED HIM AS BADLY AS HE SAID, THAT SHE WOULD YELL AT HIM SOMETIME IF HE DID NOT DO WHAT HE WAS SUPPOSED TO DO AND SHE WOULD SLAP HIM ONCE IN A WHILE.  HE MADE NO COMMENTS AS TO THE OTHER TWO DEFENDANTS.

| RESTITUTION | TOTAL NUMBER OF VICTIMS | ESTIMATED LOSS TO ALL VICTIMS | VICTIM(S) NOTIFIED OF P&S HEARING ☐ YES ☐ NO |
|---|---|---|---|
| DOES DEFENDANT HAVE INSURANCE TO COVER RESTITUTION: ☐ YES ☐ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO. | |

-7-   (JAY)

_____ VICTIM LIST CONTINUES NEXT PAGE

ProP725B—Prob. 19SC (Rev. 6/85)

**PRIOR RECORD:**

| SOURCES OF INFORMATION (this page) |
|---|
| AUTOMATED RECORD CHECK, PROBATION DEPT. RECORD CHECK, INFORMATION FROM THE DISTRICT ATTORNEY'S FILE, DEFENDANT'S STATEMENT |

**AKA'S:**

> NONE.

JUVENILE HISTORY:

NONE.

ADULT HISTORY:

NONE.

-8- (JAY)

76P725B—Prob. 19SC (Rev. 6/85)

PERSONAL HISTORY:

      DEFENDANT, BARELY EIGHTEEN YEARS-OF-AGE AT THE TIME OF THE OFFENSE, HAS ALWAYS LIVED WITH HIS PARENTS, HAS NEVER MARRIED, HAS NO CHILDREN, PERFORMED VERY WELL IN HIGH SCHOOL UNTIL THE TWELFTH GRADE WHEN HIS GRADES DETERIORATED BECAUSE OF DRUG USE, FINALLY DROPPING OUT.  HE HAS COMPLETED HIS HIGH SCHOOL EDUCATION WHILE IN THE COUNTY JAIL.  AS TO EMPLOYMENT, HE HAS BEEN A COOK AT MARIE CALENDAR'S AND CARL'S JR., AND HAS ALSO WORKED AS A BUS BOY. HE HAS $1,500 IN SAVINGS AT THE PRESENT TIME AS A RESULT OF GIFTS THAT HAVE BEEN GIVEN TO HIM BY FRIENDS AND RELATIVES.

      OTHERWISE, SIGNIFICANT ASPECTS OF HIS PERSONAL HISTORY ARE BELOW.

ALCOHOL AND CONTROLLED SUBSTANCE ABUSE:

      (SOURCES OF INFORMATION: DEFENDANT AND INTERESTED PARTIES.)

      DEFENDANT FIRST USED MARIJUANA AND ALCOHOL IN THE SEVENTH GRADE, TAKING BOTH ON THE SAME EVENING.  HE IMMEDIATELY SAID YES AND AFTERWARDS HE LIKED THE EFFECT AND THE EUPHORIA.  AT AGE 15, HE WAS A REGULAR MARIJUANA USER.  DAILY CONSUMPTION GREW TO 15 TO 20 "BOWLS" (PIPE LOADS) FOR AN AVERAGE OF $20 A DAY HABIT.  MARIJUANA STATES DEFENDANT, WAS GIVEN TO HIM BY A FRIEND AND HE BOUGHT SOME OF IT HIMSELF.  AT AGE 17, HE WAS USING COCAINE AND USED FIVE TO SEVEN TIMES A MONTH FOR A COST OF APPROXIMATELY $150 A MONTH.  DEFENDANT

-9-  (JAY)

SAYS HE WAS ABLE TO FINANCE THIS FROM WORKING AND FROM MONEY HE HAD

IN THE BANK.  DEFENDANT STATES HE HAS ALSO USED METHAMPHETAMINE

ORALLY.

FROM AGE 14 TO AGE 16, HE WAS DRINKING EACH WEEKEND.

HE SAW IT AS A GAME, TRYING TO OUTDRINK OTHERS AND SEEING JUST HOW

MUCH HE COULD CONSUME, AND SOME RECORDS SHOW THAT HE SOMETIMES DRANK

UNTIL HE BECAME ILL.  HE BELIEVES HE WAS AN ALCOHOLIC FROM AGE 14 TO

AGE 16.

DEFENDANT STATES HE WAS IN TREATMENT WITH A

PSYCHOLOGIST AT A HOSPITAL IN WOODLAND HILLS, BUT CANNOT REMEMBER

WHAT SHE SAID ABOUT DRUG USE OR ALCOHOL USE.  DEFENDANT'S MOTHER SAYS

THE PSYCHOLOGIST DISMISSED IT AS "CHILDHOOD REBELLION".

FURTHER, DEFENDANT STATES THAT HE WAS USING MARIJUANA

EVERY DAY FOR SIX MONTHS PRIOR TO THE PRESENT OFFENSE.

PHYSICAL/MENTAL/EMOTIONAL HEALTH:

(SOURCES OF INFORMATION:  DEFENDANT AND PARENTS)

DEFENDANT'S PARENTS SENT HIM TO COUNSELING WHEN

DEFENDANT WAS IN THE SECOND GRADE AS HE ALWAYS "GAVE UP" WITH RESPECT

TO HIS OLDER BROTHER, ANDREW, WHO IS EXCEEDINGLY BRIGHT AND VERY

COMPETITIVE.

AT ABOUT AGE 15, DEFENDANT WAS IN TREATMENT WITH A

PSYCHOLOGIST AT A HOSPITAL IN WOODLAND HILLS AND THAT PERSON

DISMISSED DEFENDANT'S DRUG AND ALCOHOL USE "REBELLION" AS INDICATED

-10-  (JAY)

1  ABOVE.

2        IN RELATION TO THE PRESENT OFFENSE, DEFENDANT WAS

3  EXTENSIVELY EXAMINED BY PSYCHIATRIST, DR. DAVID SHEFFNER, WHO

4  RECEIVED TESTING RESULTS INPUT FROM PSYCHOLOGIST MARTHA ROGERS.

5  DR. SHEFFNER SAYS IN A LETTER DATED OCTOBER 7, 1986, THAT DEFENDANT

6  IS NOT BASICALLY ANTI-SOCIAL, THAT FOUR PROMINENT ELEMENTS,

7  DEPENDENCY, DEPRESSION, DRUGS AND CIRCUMSTANCES PRODUCED DEFENDANT'S

8  INVOLVEMENT IN THE PRESENT OFFENSE.  A MORE DETAILED ACCOUNT IS

9  CONTAINED UNDER PARAGRAPH HEADING  PSYCHIATRIC REPORT.

10        DEFENDANT HAS BEEN AN ASTHMA SUFFERER.

OTHER RELEVANT DEFENDANT INFORMATION:

12        CHILDHOOD/UPBRINGING:

13        DEFENDANT IS THE SECOND OF THREE CHILDREN BORN TO

14  DAVID JAY AND LYNN DEBA.  THE FATHER IS A TEACHER OF FILM LITERATURE

15  AND ENGLISH IN THE LOS ANGELES CITY SCHOOL SYSTEM.  THE MOTHER IS AN

16  EPISCOPALIAN PRIEST.  IN REVIEWING THE PYCHIATRIC REPORT BY

17  DR. SHEFFNER AND TALKING WITH INTERESTED PARTIES, AS WELL AS

18  INTERVIEWING DEFENDANT AND DEFENDANT'S PARENTS, IT IS CONCLUDED THAT

19  THE FAMILY HAS ALWAYS BEEN STABLE AND HARMONIOUS.

20  EDUCATION:

21        FROM ALL REPORTS, DEFENDANT WAS A VERY GOOD STUDENT

22  IN SCHOOL, RECEIVING A'S AND B'S UNTIL THE TWELFTH GRADE WHEN

23  EVERYTHING BEGAN TO DETERIORATE BECAUSE OF DRUG USE.

    -11- (JAY)

76C692G — PROB. 5A —  PS 1: -85

DEFENDANT'S STATEMENT:

DEFENDANT ADMITS TO HELPING IN THE STRANGULATION OF VICTIM SHIRLEY RIZK, TO BUYING THE POISON THAT WAS TO BE USED TO MURDER RORY RIZK AND TO GENERALLY PARTICIPATING IN THE CONSPIRACY.

HE SAYS HE HELD THE VICTIM'S RIGHT SHOULDER AND HER RIGHT ARM WHILE DEFENDANTS PARKER AND MEIER STRANGLED HER WITH A NOOSE. HE COMMENTED, "I WAS TOO SCARED TO JUST GET OUT (BEFORE COMPLETION OF THE STRANGLING ... I FROZE." FURTHER, HE RECALLS CRYING WHILE IT WAS HAPPENING. HE ASKED TO LEAVE AND GO HOME WHILE THE VICTIM WAS STILL STRUGGLING, AND ACCORDING TO DEFENDANT, MEIER TOLD HIM THAT NO, HE COULD NOT, AS "WE STILL NEED YOU."

THEN, SAYS DEFENDANT, "TORRY" SENT HIM TO THE STORE FOR RAT POISON THAT WAS TO BE USED TO KILL RORY, WHO UNEXPECTEDLY HAD BECOME A WITNESS WHEN HE SAW HIS MOTHER BEING STRANGLED. AT THAT TIME DEFENDANT DESCRIBES HIS STATE OF MIND AS THAT OF "MASS CONFUSION, HYSTERIA, FEAR ... I FELT LIKE I HAD NO ANSWERS."

HE BOUGHT THE POISON AND WENT BACK TO THE SCENE OF THE MURDER. BY THAT TIME, MEIER AND PARKER HAD THE VICTIM'S BODY IN THE TRUNK OF THE VICTIM'S VEHICLE. HE TOLD TORY THAT HE NEEDED TO LEAVE. HE TOLD TORRY THAT HE NEEDED TO LEAVE. TORRY REPLIED THAT IT WAS ALL RIGHT FOR HIM TO LEAVE, BUT THEY (CO-DEFENDANTS) WOULD PICK HIM UP IN ABOUT TWO HOURS. THEY DID, AND DEFENDANT FOLLOWED THEM IN HIS FATHER'S CAR. HE STOPPED ABOUT TWENTY YARDS

-12- (JAY)

1    BEHIND.  THE CO-DEFENDANTS TOLD HIM THAT VICTIM RORY WAS IN THE CAR

2    ASLEEP.  WHILE STILL SITTING IN HIS FATHER'S VEHICLE HE SAW THE

3    CO-DEFENDANTS PUSH THE CAR OVER A CLIFF.  THEY GOT IN DEFENDANT'S

4    VEHICLE AND DEFENDANT DROVE THEM BACK TO MEIER'S RESIDENCE.

5    DEFENDANT THEN WENT HOME AND WENT TO SLEEP.  THE NEXT DAY HE HAD NO

6    IDEA WHAT HAD HAPPENED.  IT DID NOT REGISTER UNTIL HE SAW IT ON THE

7    NEWS.  HE THEN TOLD HIS BROTHER AND "SOMEONE ELSE" WHAT HE HAD DONE.

8    LATER, THE POLICE ARRIVED AND ARRESTED HIM.

9           DEFENDANT RELATES, "I FEEL MUCH REMORSE FOR WHAT

10   HAPPENED, BUT I'M GLAD THAT THE KID LIVED ... I'M ECSTATIC THAT I'M

11   SOBER.  ... I NEED TO GO ON WITH MY LIFE.  I GET DEPRESSED WHEN I

12   THINK WHAT I HAVE TAKEN PART IN."  HE FURTHER EXPLAINED, "I FELT

13   SUCKED INTO IT ... POWERLESS."  HE FEELS IT WOULD NOT HAVE HAPPENED

14   HAD HE REJECTED ALCOHOL AND MARIJUANA WHEN IT WAS OFFERED HIM AT AN

15   EARLY AGE, OR WHEN HIS PARENTS FIRST COUNSELED HIM CONCERNING

16   SUBSTANCE ABUSE.  ABOUT THAT, DEFENDANT SAID THAT HIS PARENTS FOUND

17   HIM UNDER THE INFLUENCE AT ABOUT THE AGE OF FIFTEEN OR SIXTEEN.

18   THEY SAT HIM DOWN FOR ABOUT AN HOUR AND TOLD HIM HOW FRIGHTENED THEY

19   WERE FOR HIS FUTURE.  THEY TOLD HIM ABOUT THE DELETERIOUS EFFECTS OF

20   SUBSTANCE ABUSE.  HE TOLD THEM THAT IT WOULD BE THE LAST TIME.

21   HOWEVER, HE DID NOT STOP BECAUSE HE LIKED IT.  HE LIKED THE FEELING

22   IT GAVE HIM.  HE KNEW IT WAS ILLEGAL, BUT USED IT ANYWAY.

23           SO, THE USE WENT ON AND HIS CONSUMPTION INCREASED,

     -13-  (JAY)

76C692G — PROB. 5A —  PS 11-85

1   FINALLY RESULTING IN A SHARPLY DETERIORATING STATE AND LEADING TO

2   HIS SCHOOL GRADES FALLING FROM A'S AND B'S TO F'S, ACCOMPANIED BY

3   CHRONIC TRUANCY.  FOR A SIX MONTH PERIOD PRIOR TO THE MURDER HE WAS

4   IN A DAILY STATE OF MARIJUANA INTOXICATION, AND WENT TO GREAT LENGTHS

5   TO CONCEAL THIS FROM HIS PARENTS.

6         AS TO TORRAN MEIER, DEFENDANT STATES HE FIRST BECAME

7   ACQUAINTED WHILE THEY WERE WORKING TOGETHER IN A FAST FOOD RESTAURANT.

8   HE SAW HIM AS A "VERY BIG GUY" AND "INTIMIDATING".  ON A NUMBER OF

9   OCCASIONS DEFENDANT HAD OBSERVED HIM IN AFTER SCHOOL FIGHTS.  HE

10   SEEMED "CRAZY".  HE, MEIER, COMMENTED ON NUMEROUS OCCASIONS THAT HE

11   WAS GOING TO KILL HIS MOTHER.  DEFENDANT SAYS HE TURNED DOWN AN

12   EARLIER OFFER TO HELP MURDER MEIER'S MOTHER AND AT THAT TIME HE,

13   MARK SAFRON AND ERIC LORDAHAL WENT TO THE WEST VALLEY POLICE STATION

14   AND REPORTED IT.

15         HE TRIED TO SEVER HIS RELATIONSHIP WITH MEIER AND TO

16   AVOID HIM AS MUCH AS POSSIBLE, AND DID SO FOR THE MOST PART.

17   HOWEVER, ONE DAY MEIER CALLED AND THEN CAME TO DEFENDANT'S HOME.

18   THEY HELD A CONVERSATION OUTSIDE.  MEIER SAID HE NEEDED A FAVOR.

19   THEN HE PULLED OUT A ROPE FROM BEHIND HIS BACK AND ALLEGEDLY SAID,

20   "TONIGHT'S THE NIGHT, WILL YOU HELP ME?"  DEFENDANT NODDED HIS HEAD,

21   YES.  HE BELIEVES HE DID SO BECAUSE HE WAS UNDER THE COMBINED

22   INFLUENCE OF MARIJUANA, ALCOHOL, COCAINE AND HASHISH.

23         DEFENDANT ADMITS THAT MEIER OFFERED HIM $1,000 FOR

-14-  (JAY)

76C692G — PROB. 5A -  PS 11-85

1  HIS ROLE, BUT DEFENDANT AGREED TO THE CONSPIRACY BEFORE THE OFFER

2  WAS MADE.  IN ANY EVENT, HE DID NOT EXPECT TO RECEIVE THE MONEY AS

3  HE DID NOT BELIEVE THAT MEIER HAD THAT KIND OF CASH.  WHEN THE OFFER

4  WAS MADE HE, DEFENDANT, RESPONDED, "OKAY" ... "SURE", OR SOMETHING TO

5  THAT EFFECT.

6         AS TO RICHARD PARKER, DEFENDANT STATES HE KNEW HIM FOR

7  ONLY ONE WEEK.  HE WAS AWARE THAT HE HAD JUST RECENTLY GOT OUT OF

8  JAIL AND THAT PARKER WANTED TO GET INTO THE RIGHT CROWD SO THAT HE

9  COULD GO STRAIGHT.  HE DID NOT KNOW FOR WHAT TYPE OF OFFENSE PARKER

10 HAD BEEN INCARCERATED FOR.

11        AGAIN, DEFENDANT SAID THAT IT WAS DIFFICULT TO EXPLAIN,

12 BUT FOR MONTHS PRECEDING THE OFFENSE HE FELT HE HAD LOST CONTROL OF

13 HIS LIFE AND WAS TOTALLY POWERLESS.

14        DEFENDANT IS REQUESTING THAT HE BE HOUSED IN A YOUTH

15 AUTHORITY FACILITY.

16 PSYCHIATRIC REPORT:

17        AS REPORTED EARLIER IN THE REPORT, DEFENDANT HAS BEEN

18 EXAMINED BY DR. DAVID J. SHEFFNER, NEWPORT BEACH, TELEPHONE NUMBER

19 714/645-4323.  DEFENDANT REPORTED TO THE DOCTOR THAT HE SAW A

20 PSYCHOLOGIST FOR AT LEAST TWO YEARS, THE LAST TIME BEING IN JANUARY

21 OF 1985.  THEY WORKED ON FAMILY, SCHOOL PROBLEMS AND DRUG PROBLEMS.

22 DEFENDANT TOLD THE PSYCHIATRIST THAT HE WAS AN ALCOHOLIC IN ABOUT

23 1981 OR 1982.  HE ALSO REPORTED THAT HIS MOTHER HAD BEEN VERY BUSY

-15-  (JAY)

1  FOR THE LAST YEARS, BUT ALSO REPORTED A VERY GOOD FAMILY LIFE, AND

2  THAT THE FAMILY SPENT A LOT OF TIME TOGETHER.

3          IT WAS THE DOCTOR'S PSYCHIATRIC IMPRESSION THAT

4  DEFENDANT WAS NOT BASICALLY ANTI-SOCIAL IN PERSONALITY

5  STRUCTURE-BEHAVIOR.  AS REPORTED EARLIER, HE BELIEVED THAT DEFENDANT'S

6  PARTICIPATION IN THE OFFENSE WAS MULTI-DETERMINED WITH FOUR PROMINENT

7  ELEMENTS, EACH NECESSARY, BUT NOT SUFFICIENT IN ITSELF TO PRODUCE

8  DEFENDANT'S INVOLVEMENT AND THEY WERE DEPENDENCY, DEPRESSION, DRUGS

9  AND CIRCUMSTANCES.

10         HE WENT ON TO DESCRIBE DEFENDANT AS PASSING-DEPENDENT

   PERSONALITY AND BEING A FOLLOWER VERSUS AN INSTIGATOR,

12  SELF-SACRAFICING IN INTERPERSONAL RELATIONSHIPS.  HE WAS NOT

13  CONSIDERED TO BE SOCIALLY OR PHYSICALLY AN AGGRESSIVE PERSON.

14         THERE WAS EVIDENCE OF CHRONIC CHILDHOOD DEPRESSION

15  WHICH INCREASED WITH DEMANDS OF ADOLESCENCE, WITH ALCOHOLISM AND

16  DEPRESSION INCREASED EVEN MORE WHEN DEFENDANT BROKE UP WITH A

17  GIRLFRIEND IN 1984.  THE DOCTOR WROTE: "DEPENDENCY, DRUGS AND

18  DEPRESSION ALL COMBINED IN A SPIRALING PSYCHIATRIC DETERIORATION

19  RESULTING IN APATHETIC, SEVERELY DEPRESSED, SEVERELY DRUG-DEPENDENT,

20  NON-FUNCTIONING ADOLESCENT.  DOING DRUGS BECAME THE FOCAL POINT OF

21  HIS LIFE AND DRUG DEPRESSION-DEPENDENCY WERE INTERTWINED, EACH

22  REINFORCING THE OTHER."

       THE DOCTOR CITED AN EXAMPLE OF BEHAVIOR CHANGE IN THAT

   -16-  (JAY)

76C692G — PROB. 5A —  PS 11-85

1    DEFENDANT ALLEGEDLY TRIED TO TURN IN CO-DEFENDANT MEIER A YEAR

2    EARLIER AND THEN AFTER SEVERE DRUG USE, AGREED TO PARTICIPATE IN THE

3    CRIME.

4              THE DOCTOR FURTHER WROTE THAT "DEPENDENCY,

5    DEPRESSION AND CHRONIC APATHY, SECONDARY TO DEPRESSION AND MARIJUANA

6    SET THE STAGE FOR THE OFFENSE, BUT ... THERE WAS A VERY PROMINENT

7    CIRCUMSTANTIAL ELEMENT OPERATING AS WELL, I.E., GIVEN THE

8    "LEADERSHIP" (AND MOTIVATION) OF TORRY..." FURTHER, ... IT IS HARD

9    TO IMAGINE MATT'S INVOLVEMENT IN THE MURDER WITHOUT THE VERY

10   SPECIFIC CIRCUMSTANCES OF HIS EXPOSURE TO TORRY."

              THE DOCTOR CONCLUDED THAT IF DEFENDANT IS TO BE

12   INCARCERATED, HE SHOULD BE PLACED WHERE THERE ARE MAXIMUM

13   POSSIBILITIES FOR GROWTH MIGHT OCCUR, SUCH AS SCHOOLING,

14   PSYCHOTHERAPEUTIC FACILITIES.

15             THE DOCTOR'S REPORT WHICH WAS PROVIDED TO THE PROBATION

16   OFFICER BY DEFENDANT'S ATTORNEY, IS ATTACHED FOR THE COURT'S

17   CONSIDERATION.

18   <u>INTERESTED PARTIES</u>:

19             PROBATION OFFICER ATTEMPTED TO REACH INVESTIGATING

20   DEPUTIES IN THIS CASE. A MESSAGE WAS LEFT, BUT AS THE TIME OF

21   DICTATION, THERE HAVE BEEN NO RESPONSE. HOWEVER, SERGEANT RENE LAPORTE

22   SHERIFF'S DEPARTMENT INVESTIGATOR SPOKE WITH THE PREVIOUS PROBATION

23   OFFICER WHO DID THE PRE-SENTENCE INVESTIGATION IN THE MEIER CASE.

     -17-  (JAY)

1 HE TALKED MOSTLY ABOUT MEIER'S INVOLVEMENT AND HIS DISENCHANTMENT

2 WITH THE JURY VERDICT. HE DID SAY, HOWEVER, THAT DEFENDANT MEIER

3 INFLUENCE JAY AND PARKER IN THIS CASE AND HE POINTED OUT THAT THERE

4 WAS SOME EVIDENCE THAT DEFENDANT WAS OFFERED MONEY TO HELP OUT.

5         ANOTHER JUVENILE OFFICER IN THE PROBATION DEPARTMENT

6 SPOKE WITH ANOTHER SHERIFF'S INVESTIGATOR, RUSSELL ULOTH, WHO SAID

7 THAT HE FELT DEFENDANT MEIER HAD THE ABILITY TO LEAD OTHERS AND

8 INFLUENCED THE CO-DEFENDANTS TO HELP HIM KILL HIS MOTHER. HE ALSO

9 POINTED OUT THAT JAY WAS OFFERED $2,000 TO HELP DEFENDANT MEIER.

10        PROBATION OFFICER INTERVIEWED DEFENDANT'S PARENTS IN

PERSON. THEY INDICATED THAT THEY HAD DONE WHAT THEY FELT WAS

12 EVERYTHING, INCLUDING GOING TO SUCH LENGTHS AS SEARCHING DEFENDANT'S

13 ROOM. THEY ONCE CONSIDERED INSTITUTIONALIZATION. PRIOR TO THAT

14 THEY HAD SEEN A PSYCHOLOGIST AT A HOSPITAL IN WOODLAND HILLS WHO

15 DISMISSED THE MATTER AS TEENAGE REBELLION, AND ACCORDING TO THE

16 MOTHER AND FATHER, SAID THAT THE MOTHER WAS OVERREACTING TO HER

17 BACKGROUND. IN THIS REGARD, THE MOTHER STATES THAT HER MOTHER AND

18 FATHER WERE ALCOHOLICS, AND IT IS HER UNDERSTANDING THAT IT IS

19 COMMON KNOWLEDGE THAT ALCOHOLISM TENDS TO RUN IN FAMILIES. THEY SAID

20 THAT THE WHOLE THING IS EXTREMELY FRIGHTENING, AS THEY WERE JUST

21 TAKEN OVER AND THEY FELT HELPLESS. AS TO DEFENDANT, THEY SAY THAT HE

22 WAS LIKEABLE TO EVERYONE AND WAS GOOD AT ALL AGE LEVELS UNTIL JUST

PRIOR TO THE OFFENSE. THEY ACKNOWLEDGE THAT HE HAD BEEN REFERRED

-18-  (JAY)

76C692G — PROB. 5A —  PS 11-85

1   FOR COUNSELING IN THE SECOND GRADE BECAUSE OF A POOR SELF-IMAGE,

2   EXPLAINING THAT HE WAS FAR OVERSHADOWED BY HIS BROTHER ANDREW WHO

3   WAS VERY COMPETITIVE.  HIS YOUNGER SISTER WAS EXCEPTIONALLY CUTE

4   AND APPARENTLY SHE GOT A LOT OF ATTENTION, BUT THEY ARE NOT SURE IF

5   THAT IS PART OF THE PROBLEM.

6       IN GENERAL, THE PARENTS ARE VERY DISTRESSED, AND

7   EXPRESSED HOPE THAT THEIR SON CAN STILL MAKE SOMETHING OF HIS LIFE.

8   THEY WERE VERY CONCERNED THAT HE IS NOT STRONG ENOUGH TO WITHSTAND

9   A STATE PRISON INSTITUTION AND HOPE THAT HE WILL BE INCARCERATED IN

10  A YOUTH AUTHORITY FACILITY, AND THAT HE WILL BE GIVEN PROTECTION

    THAT HE NEEDS, AS HE IS NOT A STRONG PERSON EITHER EMOTIONALLY OR

12  PHYSICALLY.  THE PARENTS GAVE REFERENCES OF THE REVEREND JESS TAYLOR

13  AND A "MRS. MENDOZE, A BIOLOGY TEACHER AT EL CAMINO HIGH SCHOOL."

14      PROBATION OFFICER SPOKE WITH A LONG-TIME FRIEND OF

15  DEFENDANT, 19 YEAR OLD MICHAEL LITTLE, TELEPHONE NO. 805/544-3519

16  AND 818/889-1945.  HE DESCRIBES DEFENDANT AS VERY EASY-GOING AND

17  FRIENDLY, AS NOT A STRONG PERSON, BUT INSTEAD A FOLLOWER.  HE JUST

18  LIKES TO SAY YES AND WANTS NO "HASSLES".  HE WANTS TO GET ALONG WITH

19  EVERYONE.  HE WAS A CHURCH ALTAR BOY AND A B-PLUS STUDENT UNTIL HIS

20  SENIOR YEAR.  HE BROKE UP WITH A GIRLFRIEND AT ABOUT THAT TIME AND

21  WAS USING A LOT OF DRUGS.  HIS DRUGS WERE PROVIDED BY TWO OR THREE

22  DIFFERENT PEOPLE, BUT HE WAS ALSO DOING SOME SELLING TO SUPPORT HIS

23  HABIT.  HE SMOKED MARIJUANA EVERY DAY AND WAS ALSO USING COCAINE AND

    -19-  (JAY)

DRINKING.  HE WOULD ESTIMATE THAT HIS MARIJUANA USAGE WAS FOUR TO
FIVE "JOINTS" A DAY FOR A PERIOD OF SEVERAL MONTHS PRIOR TO THE
PRESENT OFFENSE.  HE WAS WITH THE DEFENDANT ON THE EVENING OF THE
OFFENSE ABOUT 6:30 P.M., AND HE WAS ALREADY UNDER THE INFLUENCE OF
MARIJUANA.  THE DEFENDANT WAS DRINKING AND BEER AND LATER DRANK RUM
AND WINE COOLERS.  HE PERSONALLY SAW HIM TAKE "SIX LINES OF COKE",
AND FINISHED UP WITH HASHISH.  HE HAD LSD THE NIGHT BEFORE.
MR. LITTLE STATES, "HIS MIND WAS FRIED, HE DIDN'T KNOW WHAT HE WAS
DOING."  HE EMPHASIZES THAT THE PERSON HE KNEW THAT NIGHT WAS NOT
THE PERSON HE USED TO KNOW BECAUSE, "I KNOW HOW MATT ACTS."  HE HAS
SEEN HIM RECENTLY AND DESCRIBES HIM AS THE "NEW MAN".

          FURTHER, AS TO DEFENDANT'S STATE JUST PRIOR TO THE
OFFENSE, MR. LITTLE STATES THAT HE LOOKED TO BE IN A "ZOMBIE".
SOMETIMES IT WOULD TAKE HIM FIVE TO TEN MINUTES TO RESPOND TO A
QUESTION.  FURTHER, HE SAYS THE DEFENDANT WAS ABLE TO FOOL HIS
PARENTS BY GETTING UP EARLY AND PRETENDING TO GO TO SCHOOL, BUT
INSTEAD HE WOULD GET "STONED" AND COME HOME AND GO TO HIS ROOM.

          PROBATION OFFICER TALKED WITH MR. PATRICK DICKINSON,
THE PROBATION OFFICER WHO PREPARED THE PRE-SENTENCE INVESTIGATION IN
THE CASE OF TORRAN MEIER.  HE DESCRIBED MEIER AS A RATHER IMPOSING
FIGURE, QUITE SOPHISTICATED, POISED AND APPARENTLY PERSUASIVE.  HE
WAS ALWAYS CALM AND SEEMED IN COMMAND OF EVERYTHING, EVEN WHILE
INCARCERATED AT JUVENILE HALL WHERE HE SEEMED TO HAVE ALREADY

     -20-  (JAY)

1  ESTABLISHED RAPPORT WITH THE STAFF.  HE SEEMED AND LOOKED MUCH OLDER

2  THAN HIS YEARS.

3         PROBATION OFFICER HAS REVIEWED THE PROBATION REPORT

4  OF RICHARD PARKER.  IT SHOWS THAT PARKER WAS A TRANSIENT, AND

5  APPARENTLY HAD NO PLACE TO LIVE.  INFORMATION RECEIVED BY THE

6  PROBATION OFFICER INDICATES THAT HE WAS LIVING IN A BOX AT THE TIME

7  OF THE OFFENSE.  HIS RECORD SHOWS CONVICTIONS FOR AUTO BURGLARY,

8  PROPERTY THEFT, PETTY THEFT, ET CETERA.  HE REPORTED AT THE TIME

9  OF THE PROBATION INTERVIEW THAT HE WAS "LIVING ON THE STREETS AND

10 TORRY ASKED ME IF I WANTED TO HELP HIM DO SOMETHING ..."

11        THE REVEREND JESS TAYLOR OF WOODLAND HILLS, SAYS HE

12 HAS KNOWN THE FAMILY A LONG TIME.  AND THAT DEFENDANT GREW UP AS A

13 PART OF HIS CONGREGATION.  HE WAS ACTIVE IN THE CHURCH UNTIL ABOUT

14 TWO YEARS AGO.  HE DESCRIBES THE FAMILY AS "TOP FLIGHT PEOPLE", AND

15 SAYS, "SO WAS MATT."  HE SAYS THAT DEFENDANT WAS ALWAYS A

16 COOPERATIVE PERSON AND TRIED TO GET ALONG.  FURTHER, THAT HE WAS

17 "JUST A GOOD KID."  HE SUBSTANTIATES THAT THE DEFENDANT WAS AN ALTAR

18 BOY.  HE HAS VISITED DEFENDANT IN CUSTODY AND FEELS THAT HE IS WELL

19 ON HIS WAY TO A REORDERED LIFE.  HE HOPES THAT THE

20 DEPARTMENT OF CORRECTIONS WILL TAKE MEASURES TO PROTECT HIM.

21        MRS. MENDOZA, A BIOLOGY TEACHER AT EL CAMINO HIGH

22 SCHOOL STATES THAT DEFENDANT WAS "OUTSTANDING."  HE RECEIVED ONLY

23 A'S AND B'S, AND SHE BELIEVES THIS WAS IN THE TENTH AND ELEVENTH

         -21-  (JAY)

GRADES. HE WAS ALSO HER TEACHING ASSISTANT. OF ALL THE STUDENTS

SHE HAS TAUGHT SHE WOULD PLACE HIM IN THE UPPER FIVE. SHE

DESCRIBES HIM AS BRIGHT AND AS HAVING STUDIED HARD AND HAVING A GOOD

PERSONALITY.

ADDITIONAL INFORMATION:

PROBATION OFFICER HAS REVIEWED THE AMENABILITY

DETERMINATION REPORT FROM THE YOUTH AUTHORITY IN THE *CASE OF* TORRAN LEE MEIER.

DEFENDANT MEIER WAS REFERRED TO DIAGNOSTIC STUDY PRIOR TO HIS

SENTENCE AND DURING THAT STUDY DEFENDANT MEIER, ON PAGE 17 OF THE

REPORT TOLD AN EXAMINER THAT HE FELT DEFENDANT JAY, AT THE TIME OF

THE OFFENSE, WAS OUT OF HIS MIND FROM THE RESULTS OF HIS HISTORY OF

CHRONIC DRUG ABUSE.

EVALUATION:

THIS YOUNG DEFENDANT'S PARTICIPATION IN MURDER AND

ATTEMPTED MURDER HAS ITS ROOTS IN A SUBMISSIVE NATURE, DEPRESSION

AND PRONENESS TO SUBSTANCE ABUSE AND HIS PRESENCE IN A SOCIETY AT A

TIME WHEN INTOXICANTS WERE GENERALLY DISMISSED AS A HARMLESS PHASE

OF GROWING UP. THE LATTER ELEMENT WAS A VIEWPOINT THAT APPARENTLY

PREVAILED AT A TIME WHEN HIS PARENTS WERE SEEKING SOLUTIONS.

BY ALL ACCOUNTS, DEFENDANT WAS A FAIRLY WELL-ADJUSTED,

CONTENTED MEMBER OF A HIGHLY STABLE FAMILY. WHILE HE WAS PROBABLY

THE WEAKEST OF THE THREE CHILDREN, HE DID WELL IN SCHOOL, HAD FRIENDS

AND WAS WELL LIKED BY EVERYONE. ALL THIS WAS ABOUT TO END UPON THE

-22-  (JAY)

INTRODUCTION OF MARIJUANA AND ALCOHOL WHICH HE LIKED VERY MUCH, AS IT MADE HIM FEEL GOOD. HE SUCCUMBED AND THE SPIRAL BEGAN. THERE WAS LITTLE IMPEDIMENT TO WHAT WAS TO BE A SEARCH FOR OBLIVION.

BY THE TIME HE BEGAN HIS ASSOCIATION WITH TORRAN MEIER, DEFENDANT WAS RAPIDLY DETERIORATING. MEIER HAD A PLAN, BUT NEEDED HELP. IT WAS NOT EASY TO RECRUIT OTHERS TO HELP STRANGLE HIS MOTHER, BUT EVENTUALLY THE STRONG, PERSUASIVE MEIER FOUND ACQUIESENCE FROM PARKER, A HOMELESS DRIFTER AND THIEF, AND THE DRUG-DAZED JAY, WHOM MEIER DESCRIBED TO PAROLE AUTHORITIES AS BEING OUT OF HIS MIND FROM THE RESULTS OF CHRONIC DRUG ABUSE AT THE TIME OF THE OFFENSE.

THUS, THE DEPENDENCY, DEPRESSION, DRUGS, CIRCUMSTANCES CYCLE REFERRED TO IN DR. DAVID SHEFFNER'S THOROUGH AND INCISIVE ANALYSIS WAS COMPLETED WITH THE TRAGIC RESULTS THAT ARE NOW A MATTER OF RECORD.

THE UNDERSIGNED OFFICER AGREES WITH THE ABOVE DOCTOR'S ASSESSMENT OF THIS DEFENDANT. HE DOES NOT APPEAR TO BE BASICALLY ANTI-SOCIAL, AND ANY INCARCERATION SHOULD TAKE THIS INTO ACCOUNT, AS WELL AS DEFENDANT'S POTENTIAL TO BE A PRODUCTIVE CITIZEN. HE NEED ONLY TO LIVE A LIFE OF SOBRIETY. HE IS APPARENTLY REMORSEFUL AND UNDERSTANDING OF WHAT LED TO THE CATASTROPHIC EVENTS ON THE EVENING OF THE OFFENSE.

SENTENCING CONSIDERATIONS:

-23- (JAY)

75C692G — PROB. 5A — PS 11-85

CIRCUMSTANCES IN MITIGATION:

1.  OF THE THREE DEFENDANTS, DEFENDANT WAS THE MOST
    PASSIVE PARTICIPANT, AND WHILE HIS ROLE CANNOT
    BE SAID TO BE A MINOR ONE, IT WAS THE MOST
    MINOR OF THE THREE.

2.  THE DEFENDANT PARTICIPATED IN THE CRIME UNDER
    THE CIRCUMSTANCES OF EXTREME DRUG USE, WHICH WAS
    EVEN ACKNOWLEDGED BY CO-DEFENDANT MEIER, WHO
    INSTIGATED THE CRIME.  THIS WOULD INDICATE THE
    DEFENDANT'S CONDUCT WAS PARTIALLY EXCUSABLE FOR
    SOME OTHER REASON NOT AMOUNTING TO A DEFENSE.

3.  THE DEFENDANT WITH NO APPARENT PRE-DISPOSITION
    TO DO SO, WAS INDUCED BY DEFENDANT MEIER TO
    PARTICIPATE IN THE CRIME.

4.  DEFENDANT HAS NO PRIOR RECORD.

5.  DEFENDANT VOLUNTARILY ACKNOWLEDGES COMMITTING
    THE CRIME BEFORE HE WAS APPREHENDED, THUS
    INSURING HIS EVENTUAL ARREST AND CONVICTION.

CIRCUMSTANCES IN AGGRAVATION:

1.  THE CRIME INVOLVED GREAT VIOLENCE, DISCLOSING A
    HIGH DEGREE OF CRUELTY AND CALLOUSNESS. WHETHER
    OR NOT CHARGED OR CHARGEABLE AS AN ENHANCEMENT
    UNDER SECTION 12022.7 PENAL CODE.

DEFENDANT APPEARS TO BE INELIGIBLE FOR PROBATION

UNLESS THE COURT FINDS THIS IS AN UNUSUAL CASE.

DUE TO THE NATURE OF THE OFFENSE, THE PROBATION

OFFICER CANNOT RECOMMEND ANYTHING OTHER THAN DENIAL PROBATION AND

A COMMITMENT TO THE DEPARTMENT OF CORRECTIONS.  AS POINTED OUT IN

VARIOUS PARTS OF THE REPORT, DEFENDANT IS NOT A STRONG PERSON, BUT

HE IS BRIGHT, USEFUL AND SALVAGEABLE.  IT IS SUGGESTED THAT THE

-24-  (JAY)

760892G — PROB. 5A —  PS 11-85

1   DEPARTMENT OF CORRECTIONS PLACE DEFENDANT IN A MINIMUM SECURITY

2   INSTITUTION IN A PLACE THAT IS REASONABLY SAFE AND DUTIES THAT WILL

3   ENHANCE THE FUNCTION OF THE INSTITUTION.

4   RECOMMENDATION:

5            IT IS RECOMMENDED THAT PROBATION BE DENIED, AND THAT

6   THE DEFENDANT BE SENTENCED TO STATE PRISON WITH PRE-IMPRISONMENT

7   CREDIT OF 482 DAYS, THAT THE COURT ORDER THE DEFENDANT TO PAY A

8   RESTITUTION FINE OF $100 IN SUBDIVISION (A) OF SECTION 13967 OF THE

9   GOVERNMENT CODE.

10  RESPECTFULLY SUBMITTED,

    BARRY J. NIDORF,
    PROBATION OFFICER

12

13  BY

14  ROBERT E. KELSEY, DEPUTY
    EAST SAN FERNANDO VALLEY AREA OFFICE
15  901-4053

16

17  READ AND APPROVED:              I HAVE READ AND CONSIDERED
                                    THE FOREGOING REPORT OF
18                                  THE PROBATION OFFICER

19  BY
    ART KEENER, SDPO

20
                                    _____
21                                  JUDGE OF THE SUPERIOR COURT

    (SUBMITTED 2-2-87)
22  (TYPED 2-3-87)
    REK:RH    (6)


    -25-  (JAY)

76C692G - PROB. 5A - PS 11-85

# EXHIBIT
# 5

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NE "B"                    HON. GEORGE XANTHOS, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA,  )
                                        )
                       PLAINTIFF,       )
                                        )
        VS.                             )   NO. A811060
                                        )
MATTHEW ADAM JAY,                       )   STATE PRISON
                                        )
                       DEFENDANT.       )
_____ )

PASADENA, CALIFORNIA; THURSDAY, MARCH 12, 1987 A.M. SESSION

        UPON THE ABOVE DATE, THE DEFENDANT BEING PRESENT

IN COURT AND REPRESENTED BY COUNSEL, E. STANFORD; THE PEOPLE

BEING REPRESENTED BY E. FELDMAN, DEPUTY DISTRICT ATTORNEY

OF LOS ANGELES COUNTY, THE FOLLOWING PROCEEDINGS WERE HELD:

        (BARBARA BURLESON, OFFICIAL REPORTER, CSR #2247.)


    THE COURT:  ON THE MATTER OF PEOPLE VERSUS MATTHEW

ADAM JAY, 811060, MR. JAY IS PRESENT WITH HIS ATTORNEY

MR. STANFORD.  PEOPLE ARE REPRESENTED BY MR. FELDMAN.

        MR. JAY, TODAY IS THE DAY SET FOR YOUR PROBATION

1    AND SENTENCING.

2            DID YOU EVER INQUIRE INSOFAR AS THE ARBUCKLE

3    WAIVERS?

4            DID MR. JAY GIVE AN ARBUCKLE WAIVER WHEN HE PLED

5    EARLIER TO JUDGE PEREZ?

6        MR. STANFORD:  YES.

7        THE COURT:  WAS THERE AN ARBUCKLE WAIVER?

8        MR. STANFORD:  YES.

9        MR. FELDMAN:  YES.  IT WAS AN EXPLICIT UNDERSTANDING

10   HE WOULD BE SENTENCED BY YOUR HONOR.

11       THE COURT:  IS THAT YOUR UNDERSTANDING, MR. JAY?

12   YOU ENTERED YOUR PLEA BEFORE JUDGE PEREZ IN VAN NUYS, AND

13   YOUR ATTORNEY HAS INDICATED THAT YOU REQUESTED THAT I SENTENCE

14   YOU.  DO YOU GIVE UP YOUR RIGHT TO BE SENTENCED BY JUDGE PEREZ

15   SO I CAN DO THAT?

16       DEFENDANT JAY:  YES, YOUR HONOR.

17       THE COURT:  THANK YOU.

18           COUNSEL JOIN?

19       MR. STANFORD:  YES, YOUR HONOR.

20       THE COURT:  THANK YOU.

21           AS I SAID, TODAY IS PROBATION AND SENTENCING TIME.

22   DO YOU WANT TO BE HEARD?

23       MR. STANFORD:  YES, YOUR HONOR.

24       THE COURT:  ALL RIGHT.

25       MR. STANFORD:  THANK YOU.

26           IF YOUR HONOR PLEASES AND MR. FELDMAN, I THINK

27   IT MIGHT BE APPROPRIATE TO SAY HERE THAT EVERY BEAUTIFUL WORK

28   OF ART HAS SOME DEFECT IN IT.  SOMETIMES IT IS NOT APPARENT

1    TO THE EYE OF THE BEHOLDER; SOMETIMES IT IS.

2         SOMETIMES THERE IS A GAP IN THE WAY THE PAINTING

3    IS PREPARED, SOME DEFECT IN THE ARTIST.  THE BLACK SPOT IN

4    THE OTHERWISE ENERGETIC AND LOVELY LIFE OF MATTHEW JAY, THE

5    GAP, THE ABERRATION WAS HIS INVOLVEMENT IN THE CRIME WHICH

6    LED TO THE DEATH OF SHIRLEY RIZK AND WHICH INVOLVED THE ATTEMPTED

7    MURDER OF LITTLE RORY RIZK.

8         THIS CASE HAS RAISED MANY THOUGHTS IN THE MINDS

9    OF THE FAMILY OF MATT JAY.  IT HAS RAISED MANY THOUGHTS IN

10   MY MIND AS COUNSEL.

11        I WOULD SAY THAT I IS AN AMERICAN TRAGEDY NO LESS

12   THAN THE TRAGEDY THAT THEODORE DREISER WAS TALKING ABOUT,

13   ALTHOUGH HIS NOVEL AND HIS ANALYSIS WAS A LITTLE DIFFERENT

14   THAN WHEN HE TALKED ABOUT THE MATERIALISM AND THE FACT THAT

15   AN INDIVIDUAL GOT CAUGHT UP IN THE MATERIALISM OF LIFE AND

16   WHAT HAPPENED TO MATT JAY IS NOT LESS THAN AN AMERICAN TRAGEDY.

17        HE IS JOINED HERE TODAY, AS THE COURT CAN SEE,

18   BY FAMILY AND FRIENDS.  THERE HAVE BEEN NO LESS THAN 40 OR

19   50 LETTERS OF RECOMMENDATION WHICH HAVE BEEN SENT TO THE COURT

20   ON BEHALF OF THIS YOUNG MAN.

21        THE COURT:  FORTY-FOUR TO BE EXACT.

22        MR. STANFORD:  FORTY-FOUR.  THANK YOU.

23        HIS MOTHER IS PRESENT.  HIS FATHER IS PRESENT.

24   HIS BROTHER AND SISTER ARE PRESENT.  THE PEOPLE WHO YOU SEE

25   BEFORE YOU, YOUR HONOR, ARE NOT MERELY HIS RELATIVES, BUT

26   THEY ARE MEMBERS OF THE COMMUNITY, NOT ONLY THE CHURCH

27   COMMUNITY BUT THE GENERAL COMMUNITY IN WHICH MATT JAY LIVED,

28   AND HOPEFULLY A COMMUNITY TO WHICH HE WILL RETURN IN DUE COURSE.

1    THESE LETTERS POINT OUT SEVERAL FACTORS ABOUT

2 MATT JAY WHICH CAN BE CONSIDERED, OF COURSE, AS DESCRIPTIVE

3 OF HIS CHARACTER.  HE IS A LOVING INDIVIDUAL, A RELIGIOUS

4 YOUNG MAN, CAME FROM A GOOD FAMILY.

5    WHEN HE WAS SOBER HE HELPED OTHERS.  HE EVEN

6 EXTENDED HIMSELF TO THE EXTENT -- AND I THINK THERE IS A

7 RELATIONSHIP OR MENTION OF IT IN THE PROBATION REPORT -- HE

8 EVEN TRIED TO DISSUADE OTHER YOUNG PEOPLE TO STAY AWAY FROM

9 DRUGS WHEN HE WAS SOBER, WHEN HE WAS NOT ON DRUGS.

10    HE WAS A LEADER IN HIS CHURCH COMMUNITY WHEN HE

11 WAS IN CONTROL OF HIMSELF.  THESE ARE THE THINGS THAT ARE

12 SAID IN THE LETTERS.  HE HAS A FUTURE AS IT SAYS.  I AM SURE

13 HE DOES.

14    HE COMPLETED HIGH SCHOOL IN THE COUNTY JAIL HALL

15 OF JUSTICE TO SHOW HIMSELF THAT HE COULD DO IT AND TO HELP

16 HIS REHABILITATION AND TO SHOW HIS PARENTS THAT YOU COULD

17 DO IT.  HE HAS THE LOVE AND SUPPORT OF HIS COMMUNITY AND OF

18 HIS FAMILY, BUT NOT ONE LETTER HAS OVERLOOKED THE SERIOUSNESS

19 OF THIS CRIME.  NOT ONE LETTER HAS SAID THAT HE OUGHT TO NOT

20 BE PUNISHED FOR HIS CRIME, BUT IT IS -- IT IS SIMPLY A HARD,

21 DIFFICULT THING TO TALK ABOUT WHEN ONE FINDS A YOUNG MAN WHO

22 COULD NOT SAY NO TO TORRY MEIER, WHO I THINK WAS REFERRED

23 TO IN MATT JAY'S REPORT AS BEING A LEADER AND A RATHER

24 AGGRESSIVE INDIVIDUAL.

25    BE THAT AS IT MAY, THAT IS IN THE PAST.  THE

26 PROBATION DEPARTMENT HAS THOROUGHLY REVIEWED MATT JAY'S CASE.

27 THEY HAVE SEEN FIT -- PRECISELY ROBERT KELSEY, THE PROBATION

28 OFFICER IN THIS CASE, HAS SEEN FIT TO NOTICE NO LESS THAN

1    FIVE CIRCUMSTANCES IN MITIGATION FOR THIS YOUNG MAN WHO, I

2    MIGHT ADD, WAS 18 YEARS AND 76 DAYS AT THE TIME THIS EVENT

3    OCCURRED.

4         WITH REGARD TO THE FACT OF THE CRIME, I AM GOING

5    TO SAY PROBABLY THREE SENTENCES, AND THE FIRST SENTENCE I

6    WOULD SAY THAT MATT JAY PARTICIPATED BUT WAS NOT THE PRIME

7    ACTOR IN THE CRIME IN THE HOUSE WHERE SHIRLEY RIZK DIED.

8    HE DID NOT EVEN TOUCH ANY ROPE OR ANYTHING OF THIS SORT.

9         SECONDLY, IT WAS ALLEGED -- AND HE HAS ADMITTED

10   THAT HE PURCHASED POISON.  HOWEVER, IT WAS SOMEBODY ELSE WHO

11   DID SOMETHING WITH THAT POISON IN AN ATTEMPT TO DO AWAY WITH

12   RORY RIZK, AND NOT ONLY DID TORRY MEIER -- MY REMARKS ARE

13   NOT INTENDED TO IN ANY WAY EXPLAIN OR DIMINISH THIS YOUNG

14   MAN'S RESPONSIBILITY, BUT TWICE TORRY MEIER TRIED TO USE THE

15   POISON, ONCE IN A SANDWICH AND ONCE IN SOME MALTED MILK

16   SUBSTANCE.

17        I AM SAYING THAT THERE IS SOME REMOVAL AS FAR

18   AS A COMPLETE PARTICIPATION IN THE RORY RIZK SITUATION.

19        MY CLIENT DID NOT  SET FIRE TO ANY CAR IN MALIBU,

20   ALTHOUGH THERE IS INFORMATION THAT HE WAS ON THE ROAD IN A

21   SEPARATE CAR.  I AM NOT GOING TO TALK ABOUT THE FACTS ANYMORE

22   BECAUSE THOSE ARE THE ACCURATE FACTS AS THE REPORT SEEMS TO

23   INDICATE.

24        ONE OF THE INTERESTING FACETS OF MY CLIENT'S

25   BACKGROUND IS REALLY MENTIONED IN THE CIRCUMSTANCES MITIGATION

26   NUMBER FIVE IN WHICH THE PROBATION DEPARTMENT MENTIONS THAT

27   THE DEFENDANT VOLUNTARILY ACKNOWLEDGES COMMITTING THE CRIME

28   BEFORE HE WAS APPREHENDED THUS ENSURING HIS EVENTUAL ARREST

1    AND CONVICTION.

2    WHY DID HE -- MATT JAY -- AN OTHERWISE FINE YOUNG

3    MAN TALK THE DAY AFTER OR TWO DAYS AFTER THE EVENT?  I DON'T

4    KNOW, AND GOD ONLY KNOWS THAT, BUT I CAN SUGGEST THAT HAVING

5    SOBERED UP THE DAY AFTER AND HAVING HEARD ON THE TELEVISION

6    OR SEEING ON THE TELEVISION OR HAD SOME INFORMATION AS TO

7    WHAT HAPPENED, THE REAL REALIZATION OF WHAT HE WAS INVOLVED

8    IN CAME UPON HIS SHOULDERS AND HE SIMPLY WAS INVOLVED IN SOME

9    EFFORT TO RELEASE HIS GUILT TO WHOMEVER WOULD LISTEN TO HIM.

10    THIS MAN HAS BEEN -- AND I SAY "MAN" ADVISEDLY --

11    HAS BEEN REMORSEFUL FROM THE TIME BEFORE HE WAS EVEN ARRESTED.

12    HE HAS BEEN COMPASSIONATE WITH PEOPLE THAT HE HAS KNOWN AND

13    HE IS DEEPLY, DEEPLY SORRY FOR WHAT HE HAS DONE.  HE HAS NO

14    PRIOR RECORD.

15    FURTHERMORE, AS THE PROBATION DEPARTMENT HAS

16    MENTIONED AS A FURTHER CIRCUMSTANCE IN MITIGATION, HE WAS

17    A PASSIVE PARTICIPANT.  THAT IS NUMBER ONE IN THIS EVENT,

18    AND WHILE HIS ROLE CANNOT BE SAID TO BE A MINOR ONE, HE WAS

19    THE MOST MINOR OF THE THREE.  HE WAS A PASSIVE PARTICIPANT

20    BECAUSE, AS THE COURT KNOWS PARTICULARLY FROM THE REPORT OF

21    THE PSYCHIATRIST WHO EXAMINED HIM AND HOSPITAL REPORTS

22    MENTIONED IN THE PROBATION REPORT -- THIS YOUNG MAN WAS

23    UNFORTUNATELY FOR HIMSELF AND HIS FAMILY USING DRUGS, BUT

24    HE WAS USING DRUGS ON THE DAY AND ON THE NIGHT OF THE CRIME.

25    HE WAS USING MARIJUANA.  THERE WAS A SUGGESTION OF A LITTLE

26    COCAINE.  THERE WAS HASHISH AND THERE WAS DRINKING OF SOME

27    BEER,  AND THE PSYCHIATRISTS' REPORTS INDICATE THAT WERE IT

28    NOT FOR THE STUPOROUS CONDITION OF THIS YOUNG MAN OR THE

CONDITION THAT HE WAS IN OF BEING PASSIVE AND NONRESISTANT

TO FORCE BECAUSE OF HIS DRUG INVOLVEMENT AND, NUMBER TWO,

BECAUSE OF THE FORCEFUL CHARACTER OF TORRY MEIER HE WOULD

HAVE NAMELY -- MATT JAY WOULD HAVE NEVER BEEN INVOLVED IN

THIS CRIME, ALL OF WHICH IS FINE, BUT HE DID GET INVOLVED.

BUT I AM SUGGESTING TO THE COURT THAT HE DID NOT

GET INVOLVED AS A PERSON WITH COMPLETE CONTROL OVER HIMSELF,

ALTHOUGH IT IS TRUE AND IT WILL BE ARGUED THAT HE DROVE A

CAR AND WENT TO A STORE.  I DON'T KNOW.  I AM NOT ENOUGH OF

A DOCTOR TO KNOW HOW MUCH A PERSON HAS TO BE IN CONTROL OF

THEMSELVES TO GO TO A STORE OR DRIVE A CAR, BUT THERE IS A

BACKGROUND TO THIS YOUNG MAN SHOWING THAT HE USED DRUGS BECAUSE

OF A DISAPPOINTMENT THAT WENT ON.

HIS FAMILY TRIED TO HELP HIM AND IT CAME TO A

CLIMATIC END WITH THIS CASE.  FOR EXAMPLE, PAGE 4 OF THE

PROBATION REPORT, LINES 12 TO 14 -- "IN A DAZED, STUPOROUS

CONDITION THIS YOUNG MAN BOUGHT POISONS AT MEIER'S DIRECTION."

PAGE 4, LINES 12 TO 14.

THE COMMENT ABOUT THE EVENTS FROM THE LITTLE

VICTIM HIMSELF, PAGE 7, LINES 15 TO 16, RORY SAYS THE BROTHER

TRIED TO KILL HIM AND THERE WAS NO COMMENT BY RORY AS TO THE

OTHER TWO.  I DON'T KNOW WHY, BUT I'M JUST MENTIONING THESE

THINGS SO THAT THE ACCURATE FACTS AS AT LEAST I VIEW THEM

ON BEHALF OF MY CLIENT WOULD BE UNDERSTOOD BY THE COURT.

OF COURSE, THE SINGLE MOST AGGRAVATING CIRCUMSTANCE

AND THE ONLY CIRCUMSTANCE THAT IS USED IN AGGRAVATION IS THE

CRIME ITSELF.  IT WAS A CRIME OF GREAT VIOLENCE AND WAS A

HIGH DEGREE OF CRUELTY, BUT AS THE COURT MAY HAVE NOTICED --

1   AGAIN RETURNING TO THE FACTS OF THE CRIME, THIS NOW FROM THE

2   MOUTH OF THE DEFENDANT HIMSELF TO THE PROBATION OFFICER --

3   PAGE 12, LINES 7 TO 10:

4           "MATT JAY WAS CRYING, TOO SCARED TO WITHDRAW

5   BEFORE THE CRIME WAS COMPLETED. 'I FROZE,' SAYS HE. MEIER

6   SAYS, 'WE NEED YOU.'"

7           AT LEAST MATT JAY IS TELLING THE PROBATION OFFICER

8   THAT HE -- MATT JAY -- WAS AFRAID OF WHAT WOULD HAPPEN TO

9   HIM HAD HE ATTEMPTED TO WITHDRAW -- WAS IN A STATE OF MASS

10  CONFUSION AND SO ON AND SO FORTH, AND HE DIDN'T HAVE THE

11  COURAGE TO WITHDRAW OR ANYTHING OF THAT SORT.

12          BUT A YEAR BEFORE THE CRIME HE HAD GREAT COURAGE,

13  WHICH IS AN INDICATION OF HIS FUTURE ABILITY TO RETURN TO

14  SOCIETY, BECAUSE HE WENT TO THE WEST VALLEY POLICE DEPARTMENT

15  AND REPORTED TO THE WEST VALLEY LOS ANGELES POLICE DEPARTMENT

16  WITH TWO OTHER FRIENDS OF HIS THAT MR. MEIER HAD MADE OVERTURES

17  ABOUT KILLING HIS MOTHER A YEAR BEFORE THIS CRIME OCCURRED,

18  AND THAT INFORMATION IS CONTAINED IN THE REPORTS THAT ARE

19  IN OUR POSSESSION. GOD ONLY KNOWS WHY HE DIDN'T DO IT IN

20  OCTOBER OF 1985, BUT I AM MERELY MENTIONING IT TO THE COURT

21  BECAUSE IT SHOWS THAT THE MAN -- ALMOST A MAN  -- HAS MANY,

22  MANY BEAUTIFUL QUALITIES.

23          THERE ARE OTHER MITIGATING CIRCUMSTANCES THAT

24  HAVE BEEN MENTIONED BY THE PROBATION OFFICER. OF COURSE,

25  POINT TWO CIRCUMSTANCE WAS THAT THE DEFENDANT HERE PARTICIPATED

26  IN THE CRIME UNDER CIRCUMSTANCES OF EXTREME DRUG USE WHICH

27  WAS EVEN ACKNOWLEDGED BY THE CO-DEFENDANT MEIER.

28          THE LAST SENTENCE OF THE PROBATION OFFICER'S

1  REPORT AS TO POINT TWO SAYS:

2         "THIS WOULD INDICATE THE DEFENDANT'S CONDUCT WAS

3  PARTIALLY EXCUSABLE FOR SOME OTHER REASON NOT AMOUNTING TO

4  A DEFENSE."

5         THAT IS THE ESSENCE OF THIS CASE, YOUR HONOR.

6  MATT JAY IS NOW THE WAY HE WAS WHEN HE WAS RIGHT, AND GOD

7  WILLING, HE WILL BE RIGHT AGAIN.

8         ONE OF THE OTHER MITIGATING CIRCUMSTANCES THAT

9  HAS BEEN MENTIONED IS THAT HE HIMSELF WAS INDUCED BY DEFENDANT

10 MEIER TO PARTICIPATE IN THE CRIME AND, OF COURSE, MR. JAY

11 HAS NO PRIOR RECORD.

12         ANOTHER MITIGATING CIRCUMSTANCE THAT I WOULD LIKE

13 TO MENTION SIMPLY TO ASSIST MY CLIENT HERE IS THAT UNDER

14 RULE 414 OF THE CALIFORNIA RULES OF COURT SUBSECTION D AND

15 SUBPARAGRAPH 7, THE EFFECTIVE IMPRISONMENT UPON HIM AND IN

16 MY OPINION THE REMORSEFUL EFFECT OR THE REMORSEFULNESS OF

17 THE DEFENDANT HIMSELF MIGHT CERTAINLY BE TAKEN INTO

18 CONSIDERATION, BUT I THINK IT IS SIGNIFICANT THAT THIS YOUNG

19 MAN HAS IMPRESSED SO MANY PEOPLE.  HE HAS IMPRESSED NOT ONLY

20 THE PEOPLE IN THIS COURTROOM WHO HAVE COME TO SUPPORT HIM,

21 BUT HE HAS IMPRESSED THE PROBATION OFFICER WHO HAS DONE

22 EVERYTHING THAT HE COULD DO EVEN TO THE POINT OF SUGGESTING

23 THAT THIS MAY VERY WELL BE AN UNUSUAL CASE FOR THE COURT TO

24 CONSIDER.

25         THERE ARE CERTAIN CRITERIA WHICH MAY FALL INTO

26 THAT CATEGORY UNDER RULE 416 OF THE CALIFORNIA RULES OF COURT.

27 I WILL JUST MENTION THOSE POINTS IN PASSING.

28         SUBSECTION D, "THERE MIGHT HAVE BEEN SOME COERCION

1    OR DURESS NOT AMOUNTING TO A DEFENSE." I AM NOT SURE WHETHER

2    THE FACTS THAT I HAVE RELATED AMOUNT TO ACTUAL COERCION, BUT

3    IT BORDERS ON THAT.

4          SUBSECTION E, RULE 416 DISCUSSES "BECAUSE OF SOME

5    PSYCHOLOGICAL PROBLEMS NOT AMOUNTING TO A DEFENSE THIS COULD

6    BE CONSIDERED AN UNUSUAL CASE," BUT LAST AND NOT LEAST, I

7    WOULD SAY THAT THE DEFENDANT'S AGE, HIS BEING NOW 19 YEARS

8    OF AGE BUT ONLY 76 DAYS BEYOND 18 AT THE TIME OF THE CRIME,

9    SHOULD HAVE SOME BEARING ON THE COURT'S CONSIDERATION IN THIS

10   CASE.

11          HE WAS A PASSIVE PARTICIPANT IN A TRAGEDY THAT

12   WILL KEEP HIM OUT OF SOCIETY, YOUR HONOR, FOR A LONG WHILE.

13   IF IT WERE NOT FOR THIS CASE, IF IT WERE NOT FOR THIS ONE

14   BLACK MARK, THIS IS ON HIS RECORD ON AN OTHERWISE BEAUTIFUL

15   PAINTING, THIS YOUNG MAN IS THE TYPE OF PERSON THAT ANYBODY

16   IN THIS ROOM WOULD LOVE TO HAVE OVER TO THEIR HOMES, TO A

17   YOUTH GROUP OUTING, TO KNOW AND TO LOVE FOR MANY, MANY YEARS.

18          I WOULD, OF COURSE, EXPECT THE COURT TO TAKE ALL

19   THESE ITEMS INTO CONSIDERATION AS I'M SURE THE COURT WILL,

20   AND I MUST SAY THAT THE DISTRICT ATTORNEY'S OFFICE IN A

21   CURIOUS WAY HAS BEEN HELPFUL IN THIS CASE, BECAUSE I THINK

22   THE DISTRICT ATTORNEY'S OFFICE HAS REALIZED THE TRAGEDY OF

23   THIS SITUATION. THEY HAVE REALIZED THE PROBLEM THAT MR. JAY

24   FACES WHEN THE MAIN CULPRIT HAS BEEN SENTENCED IN A DIFFERENT

25   WAY. I DON'T KNOW WHAT CAN BE DONE ABOUT THAT, BUT THE

26   SYMPATHIES THAT MR. JAY HAS FOR HIM SHOULD BE CONSIDERED.

27          HE IS AN EXCELLENT YOUNG MAN SAVE FOR THIS CASE.

28   I WOULD THINK, YOUR HONOR, THAT ONE POINT IN ADDITION TO WHAT

1    I HAVE MENTIONED BEFORE IS THAT -- AND THIS HAS BEEN MENTIONED

2    BY THE COURT -- WHATEVER THE COURT DOES, IT IS IMPORTANT THAT

3    THIS YOUNG MAN WHO DEEPLY UNDERSTANDS WHAT HE HAS DONE, BE

4    GIVEN A CHANCE TO GROW AND DEVELOP AND TO LIVE IN AN

5    ENVIRONMENT WHERE THERE IS AS MUCH EDUCATION AS POSSIBLE AND

6    AS MUCH CHANCE FOR DEVELOPMENT AS POSSIBLE, AND IN THAT RESPECT,

7    OF COURSE, WE WOULD REQUEST THAT IN THE COURT'S SENTENCING,

8    THERE BE A DEFINITE AND CONCRETE RECOMMENDATION THAT HE BE

9    HOUSED IN THE CALIFORNIA YOUTH AUTHORITY.

10            HAVING SAID WHAT I HAVE JUST SAID, YOUR HONOR,

11   I SIMPLY WOULD ASK THE COURT TO FORGIVE THE LENGTH OF MY

12   REMARKS.  I HAVE BEEN AFFECTED BY THIS YOUNG MAN AS HAS

13   EVERYBODY ELSE.  BUT FOR THIS ONE BLACK MARK HE WOULD BE A

14   FINE CITIZEN, AND I AM CERTAIN THAT HE WILL AGAIN BE A USEFUL

15   AND PRODUCTIVE MEMBER OF SOCIETY.

16            THANK YOU.

17        THE COURT:  THANK YOU, MR. STANFORD.

18            MR. FELDMAN.

19        MR. FELDMAN:  THANK YOU.

20            YOUR HONOR, COUNSEL, AS THIS COURT WELL KNOWS

21   THE FUNCTION OF THE DISTRICT ATTORNEY'S OFFICE IS GENERALLY

22   NOT SIMPLY TO CONVICT OR SIMPLY TO SEEK MAXIMUM SENTENCING,

23   BUT BASICALLY TO SEEK SUBSTANTIAL JUSTICE WHEREVER AND HOWEVER

24   IT PERCEIVES IT AND, INDEED, IN MY COMMENTS TO THE COURT I

25   WILL TRY TO REFLECT OUR HONEST APPRAISAL OF MATTHEW JAY AND

26   WHAT WE FEEL THE ACCURATE PROSPECTIVE SHOULD BE BOTH BEFORE

27   THIS COURT AND SUBSEQUENT AUTHORITIES THAT WILL BE VIEWING

28   HIM AND HIS INCARCERATION.

1    COUNSEL REFERS TO MATTHEW JAY AS AN ALMOST PRIME

2   EXAMPLE OF A 1980'S AMERICAN TRAGEDY.  IN MANY OF COUNSEL'S

3   REMARKS I FIND MYSELF IN AGREEMENT.  IN A FEW PARTICULARS,

4   I VARY.

5        IN HIS REFLECTION OF THE TRAGEDY OF MATTHEW JAY,

6   I HAVE TO AGREE.  IN MANY PARTS OF SOCIETY, PERHAPS UNTIL

7   RECENTLY MAYBE STILL IN SOME COURTS TODAY WE HEAR REFERENCES

8   TO DRUG OFFENSES AS VICTIMLESS CRIMES, AND I THINK PERHAPS

9   AS MUCH AS ANY CASE THAT I CAN RECALL THE PROSECUTION -- THE

10   OFFENSE OF MATTHEW JAY REALLY DISAPPROVES OF THE CONCEPT THEY

11   ARE VICTIMLESS CRIMES.

12        MATTHEW JAY AND THE OTHERS WERE VICTIMS IN THE

13   MORE TRADITIONAL WAYS OF THE CRIME INVOLVING THE DEATH OF

14   SHIRLEY RIZK AND NEAR DEATH OF RORY RIZK IS VERY MUCH THE

15   VICTIM OF THE DRUG LIFE AND THE DRUG CRIMES THAT WERE A PART

16   OF MATTHEW JAY UNTIL OCTOBER OF 1985.

17        AS COUNSEL HAS STATED, IT IS CLEARLY A FACT THAT

18   THE YEAR BEFORE THIS DEFENDANT JOINED WITH TORRY MEIER AND

19   MR. PARKER IN THE KILLING OF SHIRLEY RIZK AND THE ATTEMPTED

20   MURDER OF RORY RIZK, THERE HAD BEEN ANOTHER OVERTURE MADE

21   AND, INDEED, THIS DEFENDANT AT THAT TIME SAID, "NO," AND

22   PERHAPS WITH THE PEER PRESSURE THAT HE AND HIS FRIENDS WERE

23   ABLE TO DISSUADE TORRY MEIER FROM GOING FORWARD AT THAT TIME

24   AND CERTAINLY DID NOT JOIN IN WITH TORRY MEIER.

25        I THINK THE EVIDENCE IS FAIRLY CLEAR THAT INDEED

26   IN OCTOBER OF 1985 MATTHEW JAY HAD GONE VERY FAR DOWN THE

27   ROAD FROM A YEAR EARLIER IN HIS INVOLVEMENT IN DRUGS AND THE

28   EFFECTS THAT IT HAD ON HIS LIFE, AND, INDEED, ON THAT OCCASION

1   WHEN THE OVERTURE WAS MADE HE DIDN'T DISSUADE, HE PARTICIPATED

2   AND HE JOINED IN THE KILLING OF SHIRLEY RIZK AND ATTEMPTED

3   MURDER OF RORY RIZK.

4       I'M NOT SO SURE THAT I TOTALLY AGREE WITH

5   COUNSEL'S REFERENCE TO MATTHEW JAY OR THE PROBATION OFFICER'S

6   REFERENCES TO MATTHEW JAY AS A PASSIVE PARTICIPANT AND THAT

7   HE WAS TRUELY AND COMPLETELY DAZED AND STUPOROUS IN HIS

8   INVOLVEMENT IN THE CRIME AND THE FACTS TO REFLECT THAT AT

9   THE TIME WHEN TORRY MEIER WOULD LEAVE THAT 15 TO 20 MINUTE

10  STRANGULATION OF SHIRLEY RIZK TO ABATE THE FEARS OF RORY TO

11  MAKE SURE THAT RORY WAS TAKEN CARE OF AND NOT INERTERFERING

12  IN IT, THE TWO REMAINING DEFENDANTS -- THIS DEFENDANT AND

13  RICHARD PARKER -- CONTINUED IN THAT STRANGULATION, AND TO

14  THAT EXTENT THE EVIDENCE WE SUBMIT IS FAIRLY CLEAR THERE WAS,

15  INDEED, ACTIVE PARTICIPATION IN THAT STRANGULATION AND,

16  INDEED, AS COUNSEL HAS INDICATED WHEN THE DECISION WAS MADE

17  AMONGST THEM THAT RORY RIZK COULD NOT BE ALLOWED TO LIVE,

18  THIS DEFENDANT DID -- WHETHER HE TOOK THE INITIATIVE OR UPON

19  THE INSTRUCTION OF TORRY MEIER -- HE DID GO OUT AND GET THE

20  POISONS WHICH SUBSEQUENTLY WERE USED IN AN ATTEMPT TO TAKE

21  THE LIFE OF EIGHT-YEAR-OLD RORY RIZK, AND, LASTLY, AT THE

22  TIME THAT THE BODY OF SHIRLEY RIZK WAS BEING PREPARED TO BE

23  DISPOSED OF AND THE ATTEMPT IS BEING MADE TO BURN RORY RIZK

24  ALIVE, THIS DEFENDANT DRIVES A FAIRLY SIGNIFICANT DISTANCE,

25  FAIRLY SECURITOUS (PHONETICALLY), OUT TO MALIBU CANYON AND

26  PERFORMS THE ROLE OF GETAWAY DRIVER TO ALLOW THE OTHER

27  PARTICIPANTS TO LEAVE THE SCENE.

28      COUNSEL MAY VERY WELL BE RIGHT THAT BUT FOR HIS

(13)

1  DRUG INVOLVEMENT THIS IS THE ONLY SIGNIFICANT BLACK MARK ON

2  AN OTHERWISE FINE LIFE LOOKING IN TERMS OF ITS POTENTIAL OF

3  MATTHEW JAY, BUT IT IS A TERRIBLE BLACK MARK AND IT IS A VERY

4  SIGNIFICANT ONE AND THE COURT NEED NOT WEIGH EQUALLY ALL THE

5  VARIOUS CONSIDERATIONS IN DETERMINING WHAT DISPOSITION TO

6  IMPOSE, WHAT PARTICULAR SENTENCE TO IMPOSE AND WHAT

7  ALTERNATIVES.

8          WE DO DISAGREE WITH COUNSEL THAT THIS IS AN

9  UNUSUAL CASE UNDER RULE 416.  JUST THE ENORMITY OF THE OFFENSE,

10  THE METHOD IN WHICH IT WAS CONDUCTED, THE PERIOD OF TIME OVER

11  WHICH IT WAS CONDUCTED, THE CRUELTY, THE VIOLENCE, THE

12  EXTREME VULNERABILITY OF RORY RIZK WOULD MAKE THIS AN

13  INAPPROPRIATE CASE IN OUR VIEW TO DETERMINE THIS TO BE AN

14  UNUSUAL CASE WHERE STATE PRISON WOULD NOT BE THE APPROPRIATE

15  SENTENCE ALTERNATIVE.

16          IN CONCLUSION, YES, WE DO BELIEVE THAT MATTHEW

17  JAY IS A TRAGEDY AS WAS THE TRAGEDY OF THE LOSS OF THE LIFE

18  OF SHIRLEY RIZK AND NEAR GREAT TRAGEDY OF THE LOSS OF RORY

19  RIZK'S LIFE, BUT NONETHELESS STATE PRISON SENTENCING IS THE

20  ONLY MEANINGFUL ALTERNATIVE.  WE DON'T OPPOSE THE CONCURRENT

21  AND DON'T OPPOSE 1731(C) ORDER REQUESTED BY COUNSEL THAT HE

22  BE HOUSE IN YOUTH AUTHORITY AND GIVEN WHATEVER APPROPRIATE

23  TREATMENT, TRAINING AND PROGRAMS AVAILABLE TO THE YOUTH

24  AUTHORITY UNTIL HE REACHES AGE 25.

25          THE COURT:  ANYTHING FURTHER?

26      MR. STANFORD:  NO.

27      THE COURT:  WAIVE ARRAIGNMENT FOR JUDGMENT?

28      MR. STANFORD:  YES.  SO WAIVED.

(14)

1    THE COURT:  IS THERE ANY LEGAL CAUSE?

2    MR. STANFORD:  NO, YOUR HONOR.

3    THE COURT:  I HAVE HAD THIS PROBATION REPORT AND

4    PRACTICALLY ALL OF THE FORTY-SOME-ODD LETTERS ON MY DESK IN

5    CHAMBERS SINCE I RETURNED TO WORK ON MARCH THE 2ND AND SOME

6    CAME IN AFTER THAT.

7        THE COURT, IN LOOKING AT THIS PROBATION REPORT,

8    LOOKING AT ALL THESE LETTERS, OBVIOUSLY PROPOUND AN ENIGMATIC

9    SITUATION.  MATTHEW JAY IS AN ENIGMA.  HE, IN COMPARISON TO

10   MR. PARKER, SHOULD BE PUNISHED EVEN MORE SO BECAUSE HE CAME

11   FROM AN ENVIRONMENT THAT HE HAD EVERYTHING GOING FOR HIM.

12       HIS FATHER IS AN EDUCATOR; HIS MOTHER IN THE

13   MINISTRY; ACTIVE IN HIS CHURCH, AND THE THING THE COURT WAS

14   ALSO IMPRESSED WITH ALL THESE LETTERS THAT WERE WRITTEN ON

15   BEHALF OF MR. JAY ALL TELLING ME HOW MANY YEARS THEY HAVE

16   KNOWN HIM, ALL OF THESE CLOSE FRIENDS.

17       WELL, NOT ONLY HAS MR. JAY LET THEM DOWN, BUT

18   HIS FRIENDS LET HIM DOWN.  I THINK HIS FRIENDS AND HIS

19   ASSOCIATES AND HIS RELATIVES ARE EQUALLY AS CULPABLE IN HAVING

20   MR. JAY SITTING HERE TODAY AS HE IS.  THIS DOESN'T COME

21   TO JUST ONE YEAR.

22       I HAVE LETTERS FROM HIS FRIENDS TELLING ME THAT

23   THEY HAVE KNOWN HE HAS HAD A PROBLEM SINCE HE WAS 14, 15

24   YEARS OLD. NOBODY BOTHERED TO BLOW THE WHISTLE ON HIM AND

25   TODAY HE IS FACED WITH LOOKING AT A STATE PRISON COMMITMENT

26   PERHAPS FOR THE REST OF HIS LIFE.

27       THE COURT IS VERY MINDFUL OF THE FACT OF HIS AGE

28   AND HIS PARTICIPATION IN THIS CRIME.  THE COURT IS PERSUADED

(15)

1    BY ALL OF THE LETTERS WHO SEEM TO THINK THAT MR. JAY -- AND

2    I AM ALSO SATISFIED WITH THE STATEMENTS HE HAS MADE TO THE

3    PROBATION DEPARTMENT -- MR. JAY CAN LEAD A SUCCESSFUL LIFE,

4    BUT I AM NOT GOING TO FORGET THAT WE HAVE A LIFE THAT HAS

5    BEEN TAKEN ALREADY AND THAT HE PARTICIPATED IN THAT AND,

6    SECONDLY, THAT BUT FOR A FORTUITOUS EVENT THAT AN EIGHT-AND-

7    A-HALF-YEAR-OLD BOY'S LIFE WOULD HAVE BEEN SNUFFED OUT.

8          NOW I DON'T FIND ANYTHING IN THIS FILE THAT WOULD

9    WARRANT ME TO COME TO THE CONCLUSION THAT THERE ARE

10   EXTENUATING CIRCUMSTANCES OR THAT THIS IS AN UNUSUAL CASE

11   THAT WOULD WARRANT MY GRANTING PROBATION TO MR. JAY.

12   ACCORDINGLY, PROBATION WILL BE DENIED.

13         WE NOW COME TO THE SENTENCING.  MR. JAY HAS PLED

14   TO COUNT I OF THE INFORMATION, SECOND DEGREE MURDER, AND IN

15   LOOKING AT THIS ENTIRE MATTER AND READING ALL OF THE REPORTS

16   AND READING EVERYTHING THAT I HAVE BEFORE ME, I AM GOING TO

17   SENTENCE MR. JAY TO STATE PRISON FOR THE TERM PRESCRIBED BY

18   LAW, THAT IS 15 YEARS TO LIFE.  HOWEVER, BECAUSE OF HIS AGE

19   AND BECAUSE OF HIS APPARENT -- AND BECAUSE OF ALL OF THESE

20   FACTORS THAT THIS COURT HAS CONSIDERED, I THINK IT APPROPRIATE

21   THAT PURSUANT TO THE PROVISIONS OF 1731.5 OF THE WELFARE AND

22   INSTITUTIONS CODE SUBSECTION C, THAT MR. JAY WILL BE HOUSED

23   IN THE CALIFORNIA YOUTH AUTHORITY TO UNDERGO WHATEVER PROGRAMS

24   ARE AVAILABLE TO HIM DURING SUCH TIME THAT HE IS IN CUSTODY.

25         UNDER THAT SECTION, MR. JAY, SO YOU UNDERSTAND,

26   YOU WILL BE SENT TO THE CALIFORNIA YOUTH AUTHORITY IF THEY

27   TAKE YOU.  IF THEY DO NOT, THEN YOU HAVE TO COME BACK HERE

28   AND WE WILL SEND YOU TO STATE PRISON, BUT ASSUMING THAT YOU

1   ARE STILL INCARCERATED BY THE TIME YOU ARE AGE 25 AND THERE

2   IS A BALANCE TO BE SERVED ON YOUR TERM, YOU WILL BE SENT TO

3   STATE PRISON UNDER THAT CODE SECTION.  DO YOU UNDERSTAND THAT,

4   SIR?

5        DEFENDANT JAY:  YES, SIR.

6        THE COURT:  NOW, ACCORDING TO THE PROBATION REPORT

7   THAT I HAVE BEFORE ME YOU HAVE BEEN IN CUSTODY AS OF TODAY

8   512 DAYS.

9        . IS THAT YOUR CALCULATION?

10       MR. STANFORD:  YES, YOUR HONOR, THAT IS, THAT'S CORRECT.

11       THE COURT:  AND I WILL GIVE YOU CREDIT FOR THE 512 DAYS

12  THAT YOU HAVE ALREADY SERVED TOGETHER WITH AN ADDITIONAL 256

13  DAYS GOOD TIME WORK TIME, MAKING TOTAL CREDITS OF 760 DAYS

14  AGAINST YOUR LIFE SENTENCE.

15       AS TO COUNT II OF THE INFORMATION WHICH IS THE

16  ATTEMPTED MURDER OF RORY RIZK, THE COURT FINDS THAT THERE

17  ARE FACTORS IN MITIGATION WHICH DO NOT PREPONDERATE OVER THE

18  FACTORS IN AGGRAVATION NOR DO I FIND FACTORS IN AGGRAVATION

19  THAT PREPONDERATE OVER THE FACTORS IN MITIGATION, WHICH MEANS

20  THAT BOTH BALANCE OUT.  I AM GOING TO SENTENCE YOU TO THE

21  MID TERM FOR THE ATTEMPTED MURDER OF RORY RIZK AS TO COUNT II,

22  SEVEN YEARS BE SERVED CONCURRENT, BE SERVED AT THE SAME TIME

23  YOU ARE SERVING THE LIFE SENTENCE, WHICH MEANS IN THAT EFFECT

24  OF YOUR SENTENCE WILL BE SERVED 15 TO LIFE, UP TO THE TIME

25  YOU ARE 25 YOU WILL BE IN THE CALIFORNIA YOUTH AUTHORITY.

26  AFTER YOU ARE THROUGH SERVING YOUR TIME IN EITHER THE YOUTH

27  AUTHORITY AND/OR STATE PRISON, YOU WILL BE PUT ON A PERIOD

28  OF PAROLE UNDER 3000.1 OF THE PENAL CODE FOR A PERIOD OF YEARS

1    UP TO THE REST OF YOUR LIFE, AND IF AT SOME POINT IN TIME

2    THE BOARD OF PRISON TERMS OR STATE AUTHORITIES WHO HAVE AUTHORITY

3    OVER PAROLE MAY SET A PAROLE FOR YOU, AND IF YOU ARE

4    RELEASED ON PAROLE YOU WILL BE RELEASED ON PAROLE UNDER CERTAIN

5    TERMS AND CONDITIONS FOR A PERIOD OF TIME THEY SHALL DETERMINE,

6    AND IF YOU VIOLATE ANY TERMS OF PAROLE, THEN YOU ARE LOOKING

7    TO BE RETURNED TO STATE PRISON FOR A LOT LONGER; DO YOU

8    UNDERSTAND THAT?

9        DEFENDANT JAY:  YES, SIR.

10        THE COURT:  PEOPLE'S MOTION?

11        MR. FELDMAN:  DISMISSED, 1385.

12        THE COURT:  MOTION GRANTED.

13            ANYTHING FURTHER?

14        MR. STANFORD:  NOTHING FURTHER.

15        THE COURT:  GOOD LUCK TO YOU, MR. JAY.

16        DEFENDANT JAY:  THANK YOU.

17        THE COURT:   WILL ORDER A COPY OF THIS TRANSCRIPT,

18    ORIGINAL AND TWO COPIES OF THE SENTENCING TRANSCRIPT FOR THOSE

19    WHO WANT IT.

20        MR. STANFORD:  THANK YOU, YOUR HONOR.

21        MIGHT I JUST REQUEST THAT THE COURT MAKE AS PART

22    OF ITS JUDGMENT THAT THE ABSTRACT SHOULD REFLECT IF THE COURT

23    IS SO WILLING THAT SPECIAL CONSIDERATION BE GIVEN TO THE

24    DEFENDANT MATTHEW JAY FOR IMMEDIATE HOUSING WITH THE CALIFORNIA

25    YOUTH AUTHORITY.  THAT LANGUAGE MAY HELP IN SEEING THAT THE

26    COURT'S JUDGMENT IS FOLLOWED OUT, NAMELY, BY HIS GOING TO

27    THE YOUTH AUTHORITY.

28        THE COURT:  SO ORDERED.

1          MR. STANFORD:  THANK YOU.

2     THE COURT:  GOOD LUCK.

3          (PROCEEDING CONCLUDED.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                 FOR THE COUNTY OF LOS ANGELES

3  DEPARTMENT NE "B"              HON. GEORGE XANTHOS, JUDGE

4

5  THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )

6                    PLAINTIFF, )
                                   )

7     VS.                     )      NO. A811060
                                   )

8  MATTHEW ADAM JAY,           )REPORTER'S CERTIFICATE
                                   )

9                   DEFENDANT. )

10

11  STATE OF CALIFORNIA,    )
                       )  SS

12  COUNTY OF LOS ANGELES.  )

13         I, BARBARA BURLESON, OFFICIAL REPORTER OF

14  THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE

15  COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING

16  IS A TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD

17  AT THE TIME OF PRONOUNCING SENTENCE; THAT THE VIEWS AND

18  RECOMMENDATIONS OF THE COURT, IF ANY, ARE CONTAINED THEREIN,

19  PURSUANT TO SECTION 1203.01 OF THE PENAL CODE.

20         DATED THIS 20 DAY OF APRIL, 1987.

21

22

23

24

25  _____
                                       CSR #2247

26                        OFFICIAL REPORTER

27

28

# EXHIBIT
# 6

| NAME and NUMBER | JAY, M. | D-55653 | ED-015U | CDC-128B |

During the previous six (6) years, inmate Jay has been housed at the Central Facility East Dorm.  While performing my duties as East Dorm Industry Patrol Officer, I have been able to observe this inmate in both a housing and a business environment.  During the course of these observations, as well as conversations, inmate Jay has proved himself to be a respectful personable individual with both staff and inmates.  It is rare that I write a laudatory chrono for an inmate, but as I have known inmate Jay for over five (5) years, and have never witnessed him to become upset when dealing with staff or inmates, I take exception.  This chrono is written as a character reference.

Orig:   C-File
      Write
      Inmate
      Housing Unit

G. Villareal
East Dorm Industry Patrol Officer
Correctional Training Facility

**DATE: 02/15/07**          *Informational*          General Chrono

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128-B (Rev.4/74)

| NAME and NUMBER | JAY, M. | D55653 | ED-015U |

You attended meetings for the Wednesday AA Central A Group for the 3rd Quarter (Jul, Aug, Sep) 2006.
You began participating in this Group on 10-6-99.  You have not only provided service and input to the Group with your attendance but also by your election to an Office of Service.  Mr. Jay attends AA meetings with a positive and enthusiastic attitude.  As staff sponsor observing all members, it is noted that he has consistently shown respect toward his fellow inmates, staff sponsors and guest speakers while attending the AA meetings.  Through this program, he is shown the tools available to him for recovery. By following 'The 12 Steps of Recovery' in his life, he can show his willingness to improve himself if applied.  Mr. Jay is to be commened for his role in the success of the group.

Elected Position: Secretary

J. Kramer
Group Staff Sponsor

Original : Central File
    cc: Staff Sponsor
      : Inmate

DATE   10/4/2006

**Wednesday AA Central A  -LAUDATORY CHRONO**



california **pri/on industry authority**

State of California • Department of Corrections

**Date:**  January 4, 2006

**From:**  PIA Wood Products

**To:**  Board of Prison Terms,
State of California

**Re:  Mathew Adam Jay #D-55653**

Mr. Jay began working for PIA Wood Products on April 11, 2001.  He was initially assigned to Assembly #1, as a furniture assembler.  His duties included assembling furniture, operating an Industrial Belt Sander, and maintaining a safe working environment.  During this period Mr. Jay was able to develop his work-skills to an above average work performance level. (Refer to CDC 101s)

On February 8, 2002, he was re-hired by Charlie D. Walker, Industrial Superintendent I, as an Assistant Production Coordinator.  Based on his past clerical experience and positive attitude toward staff and inmates he was highly recommended to this office.  Since assigned he has done well in developing the required skills to become an effective production clerk.  His duties include but are not limited to:  Working knowledge of MAPS computer programs - Inventory Management, Shop Floor Control, Material Requirements, and Query Reports.

On May 22, 2003, Mr. Jay's consistant effort to exceed production standards (demonstrating a comprehensive knowledge of equipment, a good attitude and work habits) was rewarded.  On this day he received a Certificate of Proficiency as a Production Coordinator DOT# 221.167-018.  Shortly thereafter, (10/3/03) receiving his Lift Truck Operators Certification as well. (Cert.#4108)

Additionally, Mr. Jay was one of two inmates who independently sought out the CSS (Customer Service Specialist) program, offered by the ETA (Electronics Technician Association) and introduced it to PIA.  The CSS program teaches important skills for the workplace and life such as safety, ethics, team work, communication, handling emotions, and interpersonal relationships.  Mr. Jay received his Customer Service Specialist Certification in November, 2004.  As of February, 2005, he has become an official Professional Member of the International Electronics Technician Association.

In addition to his duties as my production clerk, he acts as a second with facilitating our IEP (Inmate Employability Program).  This program is designed to offer skilled Prison Industry inmate workers priority job placement upon their release from prison.  His knowledge and willingness to help is greatly appreciated.



california **prison industry authority**

State of California • Department of Corrections

Supervising Mr. Jay during the previous 46 months has allowed us the opportunity to observe his character. Under our supervision he has proven to be dependable, tactful, trustworthy, and respectful.

This letter is written as a character reference in an effort to provide the reader with a professional view of Mr. Jay.

*Charlie D. Walker PI Superintendent I*
PIA-Furniture Factory
CTF Soledad

CDC-128 B (Rev. 4/74)

NAME and NUMBER  **JAY**  **D-55653**

Inmate **JAY** has successfully completed the third phase of our Inmate Employability Program, "Finding Employment: The First Step for the Ex-Offender for Making it on the Outside." In addition to reviewing issues related to "Re-Engaging into Society" and "The Four Phases of Community Re-Entry," he has now received instructions on job searching while incarcerated, interview tips, networking to find employment, and accessing community resources related to finding employment. With employment being a prerequisite for parole, it is paramount for ex-offenders to have the ability to effectively access employment resources. With the completion of this phase of our program, Inmate **JAY**'s chance of finding gainful employment upon release is excellent. He is commended for his diligence and participation in our **Inmate Employability Program.**

CHARLIE D. WALKER
Superintendent II / I.E.P. Coordinator
Prison Industry Authority
CTF-Soledad

DATE **DECEMBER 2, 2005**     LAUDATORY CHRONO

GENERAL CHRONO

---

CDC-128 B (Rev. 4/74)

NAME and NUMBER  **JAY**  **D-55653**

Inmate **JAY** has voluntarily participated in **three** (3) hours of I.E.P. video review and dialogue of issues related to Anger Management. These issues include, but are not limited to: violent thinking vs. nonviolent thinking, reducing emotional levels of anger, and identifying the fears that drive anger. Understanding how the "continuum of fear" can lead to violence and, ultimately, involvement in the Criminal Justice System. In this video, Carl Reddick, Instructor on Cognitive Programming at the Oregon Police Academy, impresses on participants strategies to help understand that "anger is an emotion, not a behavior." These strategies, which include evaluating your own belief system, identifying the fears that drive your emotions, determining your place in the world, being personally accountable for your actions, beliefs and behaviors, and owning your own problems have proven to be corner stones of building productive citizens in society. With these strategies, Inmate **JAY** is now capable of understanding his anger and controlling his emotions. He is commended for his efforts to become a productive citizen.

CHARLIE D. WALKER
Superintendent II / I.E.P. Coordinator
Prison Industry Authority
CTF-Soledad

DATE **JULY 29, 2005**     LAUDATORY CHRONO - ANGER MANAGEMENT

GENERAL CHRONO



PIA

CALIFORNIA REPUBLIC

Proudly made in California
www.pia.ca.gov

State of California
Department of Corrections and Rehabilitation
Correctional Training Facility – Soledad

**Date:**   Friday, October 27, 2006

**To:**   Board of Prison Hearings

**From:**   Charlie .D. Walker, Superintendent I
Inmate Employability Program Coordinator
Prison Industry Authority ● P.O. Box 700 ● Soledad, CA 93960-0700

**Subject:**   **Inmate Employability Program Participation by Matthew Jay, D55653**

Our Inmate Employability Program (IEP) is designed to prepare skilled prisoners assigned to the Prison Industry Authority, Furniture Factory, for gainful employment upon release from custody. As Superintendent I, IEP Coordinator, here at CTF—Soledad, I have developed a series of sessions designed to address employment needs and personal issues that may effect an individual's performance while adjusting to society. Our research has determined that statistically, more than 170,000 men and women are incarcerated here in California and nearly 95% will be released back into the community at some point (including those convicted of life crimes). With 80% of crimes committed being drug and/or alcohol related, I have taken the position to address these issues through our Inmate Employability Program.

During the previous years, inmate Matthew Jay has participated in a number of these developmental programs offered through IEP. They include, but are not limited to: Session 1 – Re-Engaging into Society; Session 2 – Four Phases of Community Re-Entry; Session 3 – finding Employment; Session 4 – How to succeed on the Job; and Session 5 – Anger Management (please refer to related chronos).

In addition to the above, I will continue to address such important issues as addiction, crime, and rejoining society through a series of videos, along with 3 to 4 hours of discussion and dialogue.

Our next session entitled: "Going Home", is a six part video series designed to guide offenders through the process of taking a look at their lives, empowering themselves, the deception of addiction, understanding the rules of the game, giving up the game, and the art of mainstreaming.

As the IEP Coordinator, I lead each class in discussion and dialogue following each video, which allows for a better understanding of the material provided.

The first two videos deal with who they are as individuals and how in connecting with who they really are, can empower themselves. It all begins by looking at and being honest with themselves. By doing so they can better understand how their addictions (to drugs, money, alcohol, The "fast life") controlled the choices they made in life. The class, through dialogue, comes to see how the qualities they exhibited in their addictive states played a key role in empowering them. These qualities include perception, diligence, focus, precision, and communication. Ultimately, the class discussion leads to the understanding that empowerment equals success.

Sessions 3 and 4 focus on "addiction" and "the game", that is, the lifestyles that were lead before incarceration. The deception of addiction helps everyone to understand that whether they used, abused, or sold drugs, the consequences of their actions were the same. After watching The Rules Of The Game, the class soon learns that addiction is a primary disease and if left untreated, other problems will be impossible to fix (whether it is depression or some physical ailment). The "Game" referred to in the video depicts a life of chaos, disrespecting loved ones, insanity and dishonesty. They ultimately learn that the rules of addiction are: Not Trusting, Not Feeling, and Not Caring.

Re: M a t t h e w   J a y , D 5 5 6 5 3

The final two videos teach them how to rejoin society and play by their rules. Once again, truth is of the utmost importance. This is the key, which enables each prisoner to get back on track towards the mainstream of society. By giving up the game, the class learns what normal behavior entails... that is, intellect over emotion. If they continue, "As Is" they move further and further away from society. Finally, the class comes to understand the importance of making adjustments. This involves taking personal inventory.

In closing, I would like to inform the reader that Mr. Matthew Jay has participated in our program for a minimum of three years. His participation is indicative of his desire to do well upon his re-entry into a free society. He is commended for his efforts.

C.D. Walker, Superintendent I
Inmate Employability Program Coordinator
Prison Industry Authority – Soledad

cc:      File

STATE OF CALIFORNIA
CDCR-PIA 101 (REV. 1/2007)

# WORK SUPERVISOR'S REPORT

DEPARTMENT OF CORRECTIONS

### QUARTERLY REPORT

| GRADES | GRADE | | | GRADE | |
|---|---|---|---|---|---|
| 1=Exceptional | 1 | A. | Demonstrated Skill and Knowledge | 1 | F. Teamwork and Participation |
| 2=Above Average | 1 | B. | Attitude Toward Fellow Inmates and Workers | 1 | G. Learning Ability |
| 3=Satisfactory | 1 | C. | Attitude To Supervisors and Staff | 1 | H. Use of Tools and Equipment |
| 4=Below Average | 1 | D. | Interest in Assigned Work | 1 | I. Quality of Work |
| 5=Unsatisfactory | 1 | E. | Effort Displayed in Assigned Work | 1 | J. Quantity of Work |

| PAY STATUS: From $ 3A/.65 | To $ SAME | From Job No. 2380 | To Job No. SAME |
|---|---|---|---|

| Total No. Hours Assigned | Total No. Hours Worked | | |
|---|---|---|---|

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | Length of supervision  |
|---|---|---|---|
| SHOP #1 OFFICE | 4/11/01 | PRODUCTION ASSISTANT | PERIOD COVERED BY REPORT 11/01/06 TO 02/01/07 |

| RECOMMEND FOR: ☐ REASSIGNMENT | ☑ RETAIN | ☐ PAY INCREASE | ☐ PAY DECREASE | INMATE'S INITIALS |
|---|---|---|---|---|

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)

Imate JAY has excellent work habits. He completes all assignments given to him, and works well with just normal supervision.

| SUPERVISOR C. WALKER | WORK DETAIL INDUSTRY | ETHNICITY WHI |
|---|---|---|
| INMATE'S NAME JAY, M. | NUMBER D-55653 | INSTITUTION CTF-ED | DATE 02/01/07 |

INMATE COPY

**NAME and NUMBER**  Jay, Matthew, D55653        **Housing**  ED-015U     CDC-128B (Rev 4/74)

Recent studies have indicated that anger and its related effects are the most consistent findings with criminal behavior. Dr. Cardwell, C. Nuckols, PHD, addresses this behavior in a series of videos entitled 'Anger – The Bottom Line', 'Overcoming Early Life Trauma', and 'Creating a Second Chance'. Inmate JAY has voluntarily participated in several hours of instruction and dialogue designed to enhance his ability to deal with anger constructively. These instructions include: Understanding the process of early childhood development, the results of abuse. Neglect and the damaging effects on social behavior. Dr. Nuckols impresses on the individual the need to understand why people make us angry and how to stay in control. He goes on to discuss drug/alcohol abuse, neglect, AD/HD, conduct disorders and its relationship to the criminal justice system, and how effectively treating these abuses will reduce crime and prison population. The goal of this program is to help Mr. JAY make sense of his life and ultimately create a second chance. He is commended for his participation in our Inmate Employability Program.

Orig:   Central File
cc:      Personnel File
          Inmate
**DATE January 19, 2007**

**Anger Management II**
**Inmate Employability Program**
**Laudatory**

*Charlie D. X̶*
Charlie D. Walker
Superintendent I/IEP Coordinator
Prison Industry Authority - CTF
**GENERAL CHRONO**

# WORK EXPERIENCE EVALUATION

Prison Industry Authority
PIA Form 1-E (Rev 3-03)

**PLEASE PRINT**

| | |
|---|---|
| Expected Date of Parole: | LIFER |

Complete on "Final" Reports only
( ) Parole    Date:
( ) Transfer  Date:

( ) Unassigned--*Reason*

Where paroled or transferred to? (below)

| **Name** (First, Last) | MATTHEW JAY | |
|---|---|---|
| **CDC Number** | D-55653 | |
| Annual Report ( X )    Final Report ( ) | | Institution: CTF-SOLEDAD |

Note: The purpose of this form is to document and evaluate the work experience, job skills and work habits of the worker assigned to the Prison Industry Authority.

**PIA Enterprise:**  SHOP #1, OFFICE, FURNITURE FACTORY

Skills Ratings for Job Skills and Equipment Experience (Use numbers)
  1 **Journey Level***--Extensive job and/or equipment skill; ability to work independently.
  2 **Semi Skilled**--Moderate knowledge and experience, requiring some supervision and guidance.
  3 **Trainee**--Unskilled worker with limited knowledge, requiring close supervision and guidance.

## JOB SKILLS

| 1<br>Job Title | 2<br>DOT Code | 3<br>Factory Work Center or Area | 4<br>Dates of Employment | 5<br>Skill Rating | 6<br>Rater's Name and Date (Please Print) |
|---|---|---|---|---|---|
| PRODUCTION CLERK | 221.383-018 | SHOP #1 | 04/01 TO 11/06 | 1 | C. WALKER, 11/01/06 |
| | | | | | |
| | | | | | |
| | | | | | |

## EQUIPMENT EXPERIENCE

If more space is needed, use Work Experience Evaluation Supplement

| 7<br>Equipment Type (include manufacturer's name, model and year, if available) | 8<br>Rating | 9<br>Rater's Name and Date |
|---|---|---|
| BPCS SOFTWARE / M.A.P.S. | 1 | C. WALKER, 11/01/06 |
| RCA TV w/ ZENTIH VHS RECORDER | 1 | C. WALKER, 11/01/06 |
| CANNON IKON COPY MACHINE IAGE RUNNER 330S | 1 | C. WALKER, 11/01/06 |
| IBM 4230 PRINTER | 1 | C. WALKER, 11/01/06 |
| GBC CLASSIC CUT CL 320 | 1 | C. WALKER, 11/01/06 |
| OLYMPIA STARTYPE 3 TYPEWRITER | 1 | C. WALKER, 11/01/06 |
| FORKLIFT OPERATOR CLASS 5, LC4, 4,000 - 7,000 lbS. | 2 | C. WALKER, 11/01/06 |
| | | |
| | | |
| | | |
| | | |
| | | |

* The term "journey level" as used above is a PIA term, not to be construed with the definition of a journey-person/apprentice in private industry.



# Certificate of Proficiency

PIA
Proudly made in California
www.pia-ca.gov
CALIFORNIA REPUBLIC

This is to certify that

*Mathew Jay*

Has achieved proficiency
in the following occupational category:

Institution: Correctional Training Facility
CDC#: D-55653

Industry: Furniture

| Job Title/Specialty | D.O.T. No.* | No. of Hours |
|---|---|---|
| Clerk, General/Materials Coordinator | 209.562-010 | 4,750 + |

* US Department of Labor, Dictionary of Occupational Titles

_(signature)_                    1-12-2007
Supervisor                       Date

_(signature)_
General Manager (A), Prison Industry Authority

# Certificate

## OF COMPLETION

This is to re-certify that

Matthew Adam Jay

has fulfilled all the theoretical and practical evaluation
requirements of OSHA 1910.178 (l), and, as such,
has maintained the designation of

# Certified Operator

on the following type(s) of equipment:

Class 5, LC 4, 4,000 Lbs.

and is hereby authorized to operate at the following worksite:

Furniture Factory/Corp. Yard

4108-072-R                                    January 27, 2007
October 03, 2003                              January 27, 2010

**IVES**
TRAINING & COMPLIANCE
GROUP INC

P.I.A. Furniture Factory          C.D. Walker, 4108



**MOBILE EQUIPMENT**

## OPERATOR CERTIFICATION

THIS CARD CERTIFIES THAT

____ Jay

*OPERATOR SIGNATURE*

has successfully fulfilled all the theoretical and practical training and evaluation requirements of OSHA 1910.178(l) and is hereby authorized to operate the industrial truck(s) listed on the reverse in the following work area (or application) _____

**10/06**

*(I)RE CERTIFICATION DATE*      *( )EXPIRY DATE*

4108

*(I)INST CERT NO.*      *INSTRUCTOR SIGNATURE*

___re Factory

*EMPLOYER SIGNATURE*

| TYPE OF TRUCK (IIA CLASSIFICATION) | INSTRUCTOR NAME | CERTIFICATION DATE |
|---|---|---|
| Class 5, LC 4, 4000 lbs. | C.D. Walker | Oct. 03 ___ |
| | | |
| | | |
| | | |
| | | |

*REFER TO THIS OPERATOR'S CERTIFICATION FOLDER FOR COMPLETE DETAILS ON TRAINING & EVALUATION (INCL. MORE SPECIFICS ON ___)*

---

**IVES**

**POWERED INDUSTRIAL TRUCK**

## OPERATOR CERTIFICATION

THIS CARD CERTIFIES THAT

OPERATOR NAME

Matthew Adam Jay

*OPERATOR SIGNATURE*

has successfully fulfilled all the theoretical and practical training and evaluation requirements of OSHA 1910.178(l) and is hereby authorized to operate the industrial truck(s) listed on the reverse in the following work area (or application) _____

| OPERATOR CERTIFICATION NO. | CERTIFICATION DATE(S) | | |
|---|---|---|---|
| ____072-R | __03-03 | 01-27-07 | 01/10 |

INSTRUCTOR NAME

_ Walker      4108

*(I)INST CERT NO.*      *INSTRUCTOR SIGNATURE*

EMPLOYER NAME

_A. Furniture Factory

*AUTHORIZING PERSON*      *EMPLOYER SIGNATURE*

| TYPE OF TRUCK (IIA CLASSIFICATION) | INSTRUCTOR NAME | CERTIFICATION DATE |
|---|---|---|
| Class 5, LC 4, 4,000 lbs. | C.D. Walker | 01-27-07 |
| | | |
| | | |
| | | |

*REFER TO THIS OPERATOR'S CERTIFICATION FOLDER FOR COMPLETE DETAILS ON TRAINING & EVALUATION (INCL. MORE SPECIFICS ON TRUCKS & ATTACHMENTS)*

# EXHIBIT
# 7

SUMMARY OF PSYCHIATRIC TREATMENT
FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
AUGUST, 1994 CALENDAR

MARILYN KENNEDY, L.C.S.W., Ph. D.
JULY 30, 1994

Matthew Adam Jay has been in psychotherapy with this therapist since 1990. Initially, the sessions held at the R. J. Donovan Correctional Facility, San Diego, consisted of one two hour session monthly. When prison restrictions and/or Matthew's employment schedule indicated, the sessions were held every two or three months. Since Matthew's transfer to Soledad, psychotherapy has been given every other month.

This therapist's psychiatric intervention with Matthew has been on a volunteer basis. My services have been free of charge, Although I have traveled one hundred and eighty miles, one way, to San Diego and two hundred and seventy miles to Soledad. I have done so willingly and with heartfelt conviction that Matthew Adam Jay is capable of being restored to a condition of good mental, emotional and spiritual health.

As per the request of Matthew Jay and Attorney, Barbara J. Robb. I am writing a relatively brief summary of my findings, impressions and recommendations. I am assuming that the Board members are familiar with this matter and will therefore not repeat historical matters which are not controversial.

The instruments utilized throughout the past five years include the:
1. California Psychological Inventory ( CPI )
2. Myers-Briggs Type Indicator ( MBTI )
3. Minnesota Multiphasic Personality Inventory-2 ( MMPI-2 )
4. Draw A Person-House-Family
5. Sentence Completion Test

At all times Matthew has been pleasant, cooperative, appreciative and coherent. His moods have been within normal limits, He has related well to this therapist, has not been hostile, is outgoing, appropriate, extremely open and makes every effort to be candidly realistic about his past, present and future.

There is no history nor clinical evidence of hallucinations, delusions, paranoid ideation, ideas of reference or other evidence of a thought disorder. There is no evidence of any intellectual or memory deficit. His capacity for abstract thought is within normal limits.

Although having had problems with depression in his adolescent years, with no history of manic symptomatology, there has been no indication of depression since Matthew's initial psychotherapeutic session to this present time.

( 1 )

IMPRESSIONS:

Matthew is not basically antisocial or sociopathic in personality structure-behavior. Matthew's participation in the crime was mult-determined, with four prominent elements. Specifically; dependency, depression, drugs and circumstances.

During the past five years Matthew has dealt with these issues in psychotherapy. I submit now my impressions in each of these areas.

A.  Dependency:  The process of therapy has assisted Matthew in understanding and dealing with unresolved conflicts generating from his passive-dependent personality. He is not socially-physically an aggressive person. Matthew has dealt with issues of being a follower versus an instigator and inappropriately self-sacrificing in interpersonal relationships. At the present time he has a healthy sense of self and as his prison record indicates he has resolved dependence-independence conflicts.

B.  Depression:  While there is evidence of chronic childhood depression and a strong family history of depression the course of therapy has not revealed any of the features of a person with a depressive disorder. At the time of the crime there were depressive equivalents such as alcoholism, drug dependency and the loss of a girlfriend which impacted upon his attitude and behavior. Matthew's ability to make good use of the prison's rehabilitation programs, sustain steady employment and receive his high school diploma, followed by completing two years of university studies, is a clear indicator that he is not now afflicted with, nor has he suffered major depression during his nine years of incarceration.

C.  Drugs:  Evidence suggested that there was an acute intoxication on the night of the murder. Alcohol, cocaine, hashish and marijuana acted in an additive fashion. This was the first time that he used all four drugs together. Matthew's dependency, drugs and depression all combined in a spiraling psychiatric deterioration resulting in an apathetic, severely depressed, severely drug dependent, non-functioning adolescent. Due to sobriety, maturity, therapy and improved autonomy, Matthew is presently functioning in a well-integrated, healthy manner. He is highly motivated to maintain sobriety. The psychic determinisms contributing to his substance abuse were not based upon a chemical imbalance but to inappropriate ways of soothing his depression and life stressors. Matthew is capable of sustaining healthy functioning if he maintains sobriety.

D.  Circumstances:  Dependency, depression, chronic apathy and acute intoxication set the stage for the crime. Therapy has focussed upon prominent circumstantial elements as well. Matthew's identification with an aggressor ( specifically, the boy who wanted his mother dead ) and his intoxication ( i.e., an acute organic brain syndrome ) were significant precipitants of his behavior, by means of producing decreased capacity for logical thought, decreased judgment and decreased inhibitions. Matthew's behavior on the night of the offense was significantly influenced by drugs. In contrast to the criminal behaviors which are manifestations of an antisocial personality disorder, insightful psychotherapy has proven Matthew to be remorseful, possessing a healthy conscience, increasingly more aware of his responsibility, poor decisions and bad judgment during the homicide.

## CONCLUSIONS AND RECOMMENDATIONS:

Matthew is capable of being a responsible, sober, law abiding adult. His past nine years of incarceration has evidenced that he is able to sustain employment, complete academic goals, conform to the social norms of the prison, is consistently appropriate in attitude and behaviors, honored all obligations and has a healthy regard for the truth. He has made amends with God, self and the family of his victim.

I recommend consideration of parole and release at the first legally possible time. In the interim, Matthew should continue participation in the prison rehabilitation programs, with emphasis on obtaining his bachelor's degree, and continue psychotherapy.

It is my professional opinion that Matthew Adam Jay will not return to drugs, repeat his crime, or be a danger to self or others. He is preparing to be qualified as a substance abuse counselor upon release. He has the potential of making a significant contribution to society as a "wounded healer".

Respectfully Submitted,

Marilyn Kennedy, L.C.S.W., Ph.D.



MARILYN KENNEDY, M.S., M.S.W., L.C.S.W., Ph.D.
5629 Glenhaven Circle
Westlake Village, CA. 91362

Tele: (818) 889-9857
Fax: (818) 706-1008

## UPDATED CONCLUSIONS AND RECOMMENDATIONS
### FOR THE BOARD OF PRISON TERMS
### PAROLE CONSIDERATION HEARING
### FEBRUARY 18, 1999

January 23, 1999

Matthew Adam Jay has been in psychotherapy with this therapist since 1990. Initially, the sessions held at the R. J. Donovan Correctional Facility, San Diego, consisted of one two hour session monthly. When prison restrictions and/or Matthew's employment schedule indicated, the sessions were held every two or three months. Following Matthew's transfer to Soledad, psychotherapy was given every other month. At Tehachapi this therapist intervened with Matthew monthly. Schedules and distance have prevented therapeutic visits with Matthew on an ongoing basis, however, telephone sessions have continued.

This therapist's psychiatric intervention with Matthew has been on a volunteer basis. My services have been free of charge. Although I have traveled one hundred and eighty miles one way to San Diego, two hundred and seventy miles to Soledad, and one hundred and thirty miles one way to Tehachapi, I have done so willingly and with heartfelt conviction that Matthew Adam Jay is capable of being restored to a condition of good mental, emotional and spiritual health. My last visit with Matthew was on December 10, 1998, at the California State Prison, Solano, Vacaville, California.

As per the request of Matthew Jay and his attorney, John E. D. Nicholson, I am writing an updated summary of my January 12, 1996 report. I am assuming that the Board members will have access to the 1994 material so, therefore, I will not repeat historical matters which are not controversial.

The therapeutic sessions continue to focus on issues of dependency, depression, drugs and circumstances. Without one moments hesitation, I submit that Matthew has a healthy sense of self and, as his prison record indicates, he has resolved his dependence/independence conflicts. He has not suffered with major depression during his years of incarceration. Matthew is capable of sustaining healthy, socially appropriate functioning while maintaining sobriety. In contrast to the criminal behaviors which are manifestations of an antisocial personality disorder, insightful psychotherapy has evidenced Matthew to be remorseful, possessing a healthy conscience, increasingly more aware of his responsibility, poor decisions and bad judgment culminating in a homicide.

My conclusions and recommendations remain the same only intensified by his healthy growth and continued healing.

( 4 )

Matthew is capable of being a responsible, sober, law-abiding adult. His approximately thirteen years of incarceration have evidenced that he is able to sustain employment, complete academic goals, conform to the social norms of the prison, is consistently appropriate in attitude and behaviors, honored all obligations and has a healthy regard for the truth. He has made amends with God, self and the family of his victim.

I recommend consideration of parole and release at the first legally possible time. In the interim, Matthew should continue participation in the prison rehabilitation programs, with emphasis on obtaining his bachelor's degree, and continue psychotherapy.

Since August, 1998, I have consulted with situation specific individuals who will assist Matthew with employment and suitable life style opportunities upon his release from prison.

I am enclosing two letters which outline significant resources appropriate to Matthew's needs.

In addition, I am an aftercare therapist for The Betty Ford Center, 39000 Bob Hope Drive, Rancho Mirage, California, 92270; (760) 773-4100. This treatment center hires counselors who have experienced substance-related disorders in their personal lives. They are indispensible members of the rehabilitation team. I would make this resource available to Matthew if considered relevant and time-appropriate.

The Veterans' Foundation, Inc., is sponsoring a project entitled "Take Aim". Actor Tim Conway is their national spokesperson. The project is focused on educating the youth of America regarding moral and ethical issues, the evolution and dynamic history of military involvement and the consequences and implications of adolescent drug abuse. Sierra Entertainment, Corp., along with other notable enterprises, is a supporter of the Veterans' project. There is every possibility that Matthew could be on the team of spokespersons and/or counselors for the youth participating in this project. This idea has been presented to the administration of "Take Aim".

It is my professional opinion that Matthew Adam Jay will not return to drugs, repeat his crime, or be a danger to self or others. He is preparing to be qualified as a substance abuse counselor upon release. He has the potential of making a significant contribution to society as a "wounded healer". He promises to be a useful and law-abiding citizen of the community.


Respectfully Submitted,

*Marilyn Kennedy, M.S., M.S.W., L.C.S.W., Ph.D.*

Marilyn Kennedy, M.S., M.S.W., L.C.S.W., .Ph.D.
   Clinical Psychologist
   Clinical Social Worker


enclosures:2

# EXHIBIT
# 8

**PSYCHOLOGICAL EVALUATION**
**FOR THE BOARD OF PAROLE HEARINGS**
**REVISED FEBRUARY 2007**
**PAROLE CONSIDERATION HEARING**
**FEBRUARY LIFE TERM INMATE CALENDAR**

**CORRECTIONAL TRAINING FACILITY-SOLEDAD**
**February 2, 2007**

This is a psychological evaluation for the Board of Parole Hearings on Matthew Jay, CDCR #D-55653. This report is the product of a personal interview as well as a review of his central file. This interview was a single contact for the sole purpose of preparing this report.

## I. IDENTIFYING INFORMATION:

He is a first-term, Caucasian, 39-year-old, single male. He is an active Christian. He had no unusual physical characteristics and denied the use of any nicknames or aliases.

## II. DEVELOPMENTAL HISTORY:

He had no prenatal or perinatal concerns, birth defects, abnormalities of developmental milestones, history of cruelty to animals, enuresis, arson or a history of physical or sexual abuse, either as a perpetrator or a victim.

## III. EDUCATION:

He got his high school diploma (and GED) in 1987. He is currently enrolled in college studies.

## IV. FAMILY HISTORY:

His parents are still married and he has an older brother and a younger sister. His relationship with his family members is good. He says his father has written him a letter every day.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

He says he is a heterosexual male with no history of high-risk behavior or sexual aggression.

## VI. MARITAL HISTORY:

He has never married and has no children.

## VII.  MILITARY HISTORY:

He never served in the military.

## VIII.  EMPLOYMENT/INCOME HISTORY:

He has work experience as a cook.  In prison, he has had training in bakery, production coordinating and inventory clerk.

## IX.  SUBSTANCE ABUSE HISTORY:

He has a history of Polysubstance Dependence (in institutional remission).  He has attended AA since 1989.

## X.  PSYCHIATRIC AND MEDICAL HISTORY:

He has no history of serious accident, head injury, suicidal behavior, significant impairment, seizure or other neurological conditions.

## XI.  PLANS IF GRANTED RELEASE:

He plans to live with his parents and work in a sprinkler/misting company.  If paroled, the prognosis for successful, responsible, legal, prosocial community adjustment appears to be positive.  This release plan is viable.

## XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

He exhibited no depressive or psychotic symptomatology.  His intellectual functioning was estimated to be in the average range.  He was composed, cooperative and alert.  His mood was calm with congruent affect.  His insight and judgment were good.  He is not currently in need of any mental health treatment.

## CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:       Polysubstance Dependence, in institutional remission
AXIS II:      None
AXIS III:     None
AXIS IV:      Incarceration
AXIS V:       GAF=85

## XIII.  REVIEW OF LIFE CRIME:

He continues to express remorse and regret.  This has been a consistent pattern.  He says he has written the victim's family a letter of apology and they have responded favorably.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

Within a controlled setting, his violence potential is lower than average due to his excellent institutional adjustment.  If released to the community, his violence potential is the same as the average citizen, in that he is very unlikely to harm anyone again.  That is, his excellent institutional adjustment should generalize to the community.  Significant risk factors and precursors to violence for him are a return to drug/alcohol use.

## XV.  CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

He is competent and responsible for his behavior and has the capacity to abide by institutional standards and has exhibited excellent behavior during his incarceration.  He does not have a mental health disorder that would necessitate treatment either while incarcerated or on parole.  Mandatory conditions of parole and recommendations include monitoring for substance abuse, attendance in drug/alcohol treatment and employment. Parole decisions should be based on custody factors.

The 2004 Board expressed concern about how previous evaluators suggested that Jay was "easily influenced [and] extremely immature" and that Jay might "require serious introspection and counseling…beyond a statement of regret regarding a lapse of judgment, elements within him of a deeper level of motivational force have yet to be addressed…."  This evaluator respectfully believes that being easily influenced and immaturity are reasonable, probably accurate, inferences to be made from Jay's behavior but there are no apparent pre- or post-offense behaviors that confirm these hypotheses or turn them into lifelong, deep-seated, unalterable traits for which psychotherapy is mandated.  For example, there is no evidence that Jay ever allowed the world-class predators in prison to manipulate him.

Second, Jay's crime is what it is, and he should be paroled, or not paroled, based on those custody factors, not on a possible "deeper level of motivation" that could be raised about anyone, and that may have been raised as an issue primarily due to the heinous nature of Jay's crime.  If this evaluator's respectful difference of opinion is accurate, then Jay is in the uncomfortable position of having to "prove a negative," that he doesn't need psychological treatment.  Looking at "the big picture" of Jay's adjustment, it does not appear he needs psychotherapy.  Indeed, a look at all of his file support and his many letters of recommendation would militate toward a conclusion of overall psychological strength, not the opposite.

W.K. Marek, Ph.D.
Psychologist
Correctional Training Facility-Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility-Soledad

# EXHIBIT
# 9



INMATE COPY

***PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS***
***REVISED SEPTEMBER 1998***
***PAROLE CONSIDERATION HEARING***
***JANUARY 2006 LIFE-TERM INMATE CALENDAR***

***CORRECTIONAL TRAINING FACILITY, SOLEDAD***
***DECEMBER 10, 2005***

*NAME:*          JAY, MATHEW
*CDC #:*         D-55653
*DOB:*           07/29/67
*MEPD:*          10/18/95
*DATE OF OFFENSE:* 10/13/85
*OFFENSE:*   Penal Code 187, Murder, Second Degree
             Penal Code 187, Attempted Murder, Second Degree
*SENTENCE:* 15 years to Life
*COUNTY OF COMMITMENT:*  Los Angeles County
*EVALUATION DATE:*  12/15/05

## I.    *IDENTIFYING INFORMATION:*

Inmate Mathew Jay is a first-term, Caucasian, 38-year-old, single male who has
served 20 years of his sentence. He is an active Christian.

### *SOURCES OF INFORMATION:*

This evaluation is based upon a single, 90-minute, psychodiagnostic evaluation,
plus review of the Central file and medical file.

The last Board of Prison Terms' panel asked for a current psychological
evaluation because they noted that the 1990 psychological evaluation by Dr.
Charlens at R.J. Donovan, and the 1994 psychological evaluation by Ronald Kitt,
Ph.D., raised questions about the motivational issues that caused this offense. The
Board felt that these issues have not been addressed.

The previous psychological evaluation, dated 10/09/02, by J. Howlin, Ph.D., is
still quite current and valid.

*JAY, MATHEW*
*CDC NUMBER: D-55653*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE TWO*

### *CLINICAL ASSESSMENT*

**XII.  *CURRENT MENTAL STATUS/TREATMENT NEEDS*:**

The mental status examination is entirely within normal limits.  Inmate Jay is quite bright intellectually.  He is functioning in the high average ranges intellectually.  His judgment is sound.  He had good self-awareness and insight.

Inmate Jay has remained entirely disciplinary-free during the last 20 years of his incarceration.  This is commendable.  Drugs and alcohol are readily available in the institutional environment.  However, he has significantly changed his life, and he has avoided any ~~environment~~ with drugs or alcohol during the last 20 years.  In addition, he has participated extensively in therapy groups, self-help programming, and ongoing Alcoholics Anonymous.  He also has helped the bishop in his church develop alcohol and drug abuse programs, which he hopes to become involved in in a more direct manner upon his parole.  Due to the fact that drugs and alcohol are available, and he could have used them if he had chosen to, it is clear that drugs and alcohol are no longer a problem in his life.  Therefore, this cannot be listed as a current diagnostic problem.

*[handwritten: INVOLVE-MENT]*

### *CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV)*:

| | |
|---|---|
| *AXIS I:* | No contributory clinical disorder. |
| *AXIS II:* | No contributory personality disorder. |
| *AXIS III:* | Asthma. |
| *AXIS IV:* | Life-term incarceration. |
| *AXIS V:* | Current GAF = 90. |

**XIII.  *REVIEW OF LIFE CRIME*:**

In addressing the question of causative factors, the California Youth Authority psychiatric evaluation, dated 06/24/87, does lend some insight into his functioning at the time of the commitment offense.  Quoting a prior psychiatric evaluation, the defendant was described as a passive-dependent personality, and there was evidence of a chronic childhood depression, which increased the demands of adolescence, and developed a strong dependence on drugs, which combined in a

*JAY, MATHEW*
*CDC NUMBER: D-55653*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE THREE*

spiraling psychiatric deterioration, resulting in an "apathetic, severely depressed, severely drug-dependent, and nonfunctioning adolescent." Drug use was seen as a significant precipitant of his behavior.

At the time of the commitment offense, inmate Jay was severely intoxicated on LSD, which he had taken for the first time in conjunction with hashish and alcohol. The psychiatrist noted that inmate Jay was very remorseful for the offense, and he is now very anti-drug, and would like to spend his life trying to help other people get off of drugs.

In the 10/11/95 psychological evaluation by Dr. McDill, it was noted that inmate Jay broke into tears in discussing the offense. His remorse appeared to be very genuine. When asked why he participated in such a crime, the inmate listed several factors. He stated that, at that time in his life, he did not have the ability to say no. He stated the drugs numbed him and disinhibited him. He was operating with a strong wish to help a friend and to please someone in a life where he seemed unable to please anyone. He also mentioned his basic immaturity and youthful stupidity. The psychologist stated that such a description pretty much tells the whole story.

The last psychological evaluation by Dr. Howlin on 10/15/02, reported that inmate Jay felt his heavy, ongoing drug use significantly interfered with his ability to know right from wrong. He stated he never thought the crime would happen, but when it did happen, it was too late. Prior to this offense, inmate Jay had been struggling with low self-esteem and occasional depression, coupled with heavy drug use.

When questioned by this evaluator, inmate Jay stated that, at that time in his life, as an 18-year-old, due to his chronic drug use, he could not think right. He had no appreciation of life's values. He stated that the heavy use of drugs had caused him to become an uncaring person who did not consider the consequences of his actions, or even what he was doing. In addition, he was immature, dependent on his friends, including the 16-year-old son of the victim. Inmate Jay accepted responsibility for his participation in this offense. He understands that, if it were not for his role in the crime, it probably would not have happened. He stated that

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

he saw his 16-year-old friend being abused by the victim, and he wanted to befriend and protect his friend. He stated that his extreme intoxication at the time caused severely impaired judgment.

He did accept responsibility for this offense, and stated that if he had not participated in it, it could not have happened. His feelings or remorse appear to be sincere and genuine. He was very happy with the victim's parents forgiving him, and he does correspond with them regularly.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

A.    In considering his potential for dangerous behavior in the institution, inmate Jay has remained entirely disciplinary-free. He has grown significantly over his 20 years of incarceration. He is no longer the immature, drug-dependant individual that he was at the time of the commitment offense. He demonstrates strong prosocial values. There are no antisocial values or thinking in this case. His violence potential is definitely below average in comparison to other inmates.

B.    In considering his potential for dangerous behavior if released on parole to the community, the Level of Service Inventory-Revised, was administered. This is an actuarial measure that assesses criminal history, substance abuse, educational attainment, vocational attainment, emotional problems, and several other factors. His score indicated a 1.8 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better than 98% of them. This indicates an extremely low risk level. As a result, his potential for violence is no more than the average citizen in the community, and is probably less than the average citizen in the community due to his life experiences.

C.    At the time of the commitment offense, risk factors were his immaturity and his severe substance dependence. After 20 years of drug and alcohol abuse programming, and maturity that comes with age and experience, this is no longer a factor. There are no significant risk factors at this time.

JAY, M.        D-55653        CTF-CENTRAL        12/15/05        gmj

*JAY, MATHEW*
*CDC NUMBER: D-55653*
*BPT PSYCHOLOGICAL EVALUATION*
*PAGE FIVE*

XV.     **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

There are no mental or emotional problems in this case that would interfere with
parole planning. He has strong family support in the community. He also has
strong community support. He has achieved vocational skills, and he does have
job offers in the community. The prognosis for successful adjustment to the
community is excellent in this case.

M. Macomber, Ph.D.
**Staff Psychologist**
**Correctional Training Facility, Soledad**

B. Zika, Ph.D.
**Senior Supervising Psychologist**
**Correctional Training Facility, Soledad**

*MM/gmj*

*D:  12/15/05*
*T:  12/17/05*

C:\Documents and Settings\gjorgensen\My Documents\JAY, MATHEW   D-55653   01-06   MACOMBER.doc

*JAY, M.          D-55653          CTF-CENTRAL          12/15/05          gmj*

# EXHIBIT
# 10

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
NOVEMBER 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
OCTOBER 9, 2002

This is a psychological evaluation for the Board of Prison
Terms on inmate Mathew Jay, CDC# D-55653.  This report is
the product of a personal interview, conducted on 10/09/02,
as well as a review of his Central file and unit health
record.  This interview was a single contact with this
individual for the sole purpose of preparing this report.

PSYCHOSOCIAL ASSESSMENT

I.    IDENTIFYING INFORMATION:

      Inmate Jay is a 35-year-old, single, Caucasian male.
      His date of birth is 07/29/67.  He stated his religious
      affiliation as being Christian, specifically
      Episcopalian.  He presented with no unusual physical
      characteristics, and denied the use of nicknames or
      aliases.

II.   DEVELOPMENTAL HISTORY:

      Inmate Jay denied any history of birth defects or
      abnormalities of developmental milestones.  He denied a
      history of cruelty to animals, a history of arson, or a
      history of physical or sexual abuse as either a
      perpetrator or a victim.

      He stated that he had appendicitis as a child, and also
      had seasonal asthma, beginning in childhood, which he
      continues to take medication for on an intermittent
      basis.

      Inmate Jay stated that at about the age of 12, and
      shortly after beginning to experiment with alcohol and
      drugs, he was hospitalized for one to two days as a
      result of an overdose of his brother's asthma
      medication.  He stated that, at the time, he was having
      difficulties with the building up of his emotions, and

JAY, M.      D-55653      CTF-CENTRAL      10/15/02      gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

some conflict with his family.  He stated that after
discharge from the hospital, he received no additional
mental health treatment, and did not take any
psychotropic medication.  He denied any additional
childhood medical concerns.

III.  **EDUCATIONAL HISTORY**:

Inmate Jay stated that he completed his high school
diploma while in the county jail.  He has been involved
in working on a bachelor of liberal studies degree
through the University of Iowa, taking correspondence
courses.  He explained that he started taking the
courses when offered at CDC, but when that program was
discontinued, started through correspondence.  He hopes
to earn his bachelor's degree with a focus on social
work and drug counseling.  He denied any history of
special education.

IV.  **FAMILY HISTORY**:

Inmate Jay explained that his family is, overall, a
warm, supportive and caring family.  His parents are
still married.  His father is 69, and his mother is 61.
His father works as a teacher, and his mother is an
Episcopalian minister.  He explained that both of his
parents suffer from diabetes.

Inmate Jay has one older brother, age 37, who is
married, and one sister, age 33, who is also married.

Inmate Jay denied any family history of drug or alcohol
abuse.  He communicates with his family on a regular
basis, receiving visits often, and letters from family
members.  He explained that his father writes on a
daily basis.  Inmate Jay described his relationship
with his family currently as very positive.

V.  **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION**:

Inmate Jay stated that he is a heterosexual male.
He denied any history of high-risk sexual behavior,
including sexual aggression.

JAY, M.       D-55653       CTF-CENTRAL       10/15/02       gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

## VI.  MARITAL HISTORY:

Inmate Jay has never been married.  He was incarcerated in the county jail at the age of 18 for the commitment offense.  He has no children.

He described a long-term relationship with a woman, whom he continues to communicate with frequently.  He explained that he met this woman in church while he was still in the community.  He has continued to communicate with her, and described the relationship as being positive.

## VII.  MILITARY HISTORY:

Inmate Jay denied any history of military service.

## VIII. EMPLOYMENT/INCOME HISTORY:

Inmate Jay explained that he worked in the food industry prior to being incarcerated.  He worked for about one year at Carl's Junior as a cook.  He said he also worked for about six months at a restaurant called Marie Calendar's, again as a cook.  He explained that both of these jobs were while he was in school, so he worked mostly after school.

Since his incarceration in CDC, he has worked in sewing machine repair and in textiles, and has had various porter jobs.  He worked in the bakery for about five years, and is currently working as a shipping clerk for PIA, where he is in charge of production.

Aside from working towards a bachelor's degree and working as a shipping clerk, inmate Jay said that he likes to write poetry.

## IX.  SUBSTANCE ABUSE HISTORY:

Inmate Jay explained that he started experimenting with alcohol at about age 12.  This progressed to the use of marijuana.  He said that by about the age of 16, he was using alcohol and marijuana on an almost daily basis.  He said that he experimented with both LSD and cocaine one time each.  He denied the use of any other illicit substance.

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


Inmate Jay had no substance abuse treatment prior to being incarcerated.  However, since entering CDC in 1987, he explained that he has had continuous attendance at both Alcoholics Anonymous and Narcotics Anonymous.  For about the past year and a half, he has been mostly involved in AA since, he explained, it addresses recovery for both alcohol and drugs.

Inmate Jay demonstrated insight specifically related to factors about his own recovery.  He has a sponsor arranged, who is a chaplain in the same community where his parents live, and hopes to follow through with this plan if paroled.  He seems to realize that recovery from substance abuse oftentimes is an ongoing process.

Self-help-wise, he has been involved in several programs since being incarcerated.  He has been involved in the Alternatives to Violence program, in Breaking Barriers, and was involved in a Life Skills group with Dr. Bakeman.  He has also had occasional, individual counseling with a psychologist at a different institution.  However, this is not documented in the file.

It should be noted that inmate Jay has zero disciplinary CDC-115s or CDC-128s related to allegations regarding substance use in prison.

X.  **PSYCHIATRIC AND MEDICAL HISTORY**:

As mentioned earlier in this report, inmate Jay was hospitalized as a teen for about two days related to an overdose of his brother's asthma medication.  He denied any subsequent psychological treatment, including a history of suicidal gestures or attempts.

He denied any additional hospitalizations, including any psychiatric hospitalizations.  He denied any history of serious accidents or head injuries, or a history of seizures or other neurological conditions.  As noted, he uses an inhaler for asthma on an occasional basis.

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

XI.  **PLANS IF GRANTED RELEASE**:

Inmate Jay stated that he hopes to live with his parents in Valencia if paroled.  He explained that they agreed to this plan for his transition back into the community.  He hopes to attend his mother's church, where she serves as an Episcopalian minister.  He stated that they also have regular AA meetings there that he will join.  He would like to eventually complete his bachelor's degree, and if he does not complete in within CDC, he hopes to continue it in the community.  He stated that he has had two job offers, one working for a bishop of the Episcopalian Church in Los Angeles, and the second working for a consulting firm, doing clerical work.  Additionally, he hopes to be able to utilize his degree in social work and drug counseling in either of these job offers, or in possible additional areas.

Based on what was discussed with this clinician, it appears that his parole plans are viable, and his prognosis for community living is positive.

## CLINICAL ASSESSMENT

XII. **CURRENT MENTAL STATUS/TREATMENT NEEDS**:

Inmate Jay is a 35-year-old, single, Caucasian male. He appeared his stated age.  He was appropriately dressed and groomed.  He was coherent, cooperative, calm and alert throughout the interview.  His speech, flow of thought and affect were all within the normal range.  His intellectual functioning was estimated to be slightly above average when compared to this Level II inmate population.  There was no evidence of a mood or thought disorder.  His judgment appeared to be sound.  He demonstrated good insight into his commitment offense.

**CURRENT DIAGNOSTIC IMPRESSIONS**:

AXIS I:     Polysubstance Dependence, in sustained full
            remission in a controlled environment.
AXIS II:    No Contributory Personality Disorder.

JAY, M.      D-55653       CTF-CENTRAL      10/15/02        gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

AXIS III:  Asthma.
AXIS IV:   Incarceration.
AXIS V:    GAF = 85.

His prognosis is positive for being able to maintain his current mental status in the community upon parole.

## XIII. REVIEW OF LIFE CRIME:

Inmate Jay is serving a 15 year to life sentence for Second Degree Murder.  He was 18 years old when incarcerated for this crime, and spent about two years in county jail before entering CDC in 1987.  Therefore, he has been incarcerated for almost 17 years.

Inmate Jay described the circumstances surrounding the commitment offense.  He admitted to being heavily intoxicated preceding the crime, and had been using marijuana, alcohol, and cocaine.  The crime consisted of his participation in the strangling death of one of the crime partners' mother, and then the subsequent attempted murder of the crime partner's eight-year-old half brother, who allegedly witnessed part of the murder of the mother.

This reviewer agrees with the past psychological evaluation, done by Dr. Reed:  the idea that the crime was quite violent, and quite removed from both inmate Jay's history and functioning since being incarcerated.

Inmate Jay explained his attempts at making sense of what happened.  He stated that he feels it was his heavy, ongoing drug use that significantly interfered with his ability to know right from wrong.  He added that he never really thought that the crime would happen, and when it in fact did, it was too late.  He also added that, prior to the crime, he had been struggling with low self-esteem and on-and-off-again depression, coupled with the heavy drug use.  Inmate Jay also discussed an increasingly conflictual relationship with family members preceding the crime.

The above-diagnosed psychopathology would likely be directly related to the crime.  Inmate Jay demonstrated

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE SEVEN

what appeared to be insight into his actions and the crime, and remorse for the victim and the victim's family members.

Since being incarcerated for a period of almost 17 years, the Central file notes zero CDC-115s or CDC-128 counseling chronos. Inmate Jay did add that he received one CDC-128 counseling chrono for smoking, which was not found in the Central file by this reviewer.

Inmate Jay denied any gang involvement either prior to or since his incarceration.

XIV. ASSESSMENT OF DANGEROUSNESS:

A.  In consideration of several factors, including his lack of a criminal history prior to his commitment offense, his lack of a CDC-115 disciplinary history, and his insight and increased maturity since his incarceration, his violence potential within a controlled setting is estimated to be well below average relative to this Level II inmate population.

B.  If released to the community, his violence potential is estimated to be no more than the average citizen in the community.

C.  A possible risk factor for this inmate which could be a precursor to violence would be to choose to go back to the use of alcohol and/or drugs again. Should this inmate make the choice to use substances again, his violence potential would be considered higher than the average citizen in the community. As noted earlier, however, inmate Jay does appear to have insight into his substance abuse history, and awareness of the idea that recovery from such a history is most likely going to be an ongoing process, and has made plans for the future addressing these issues.

XV. CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.  This inmate is competent and responsible for his behavior. He has the capacity to abide by

JAY, M.        D-55653        CTF-CENTRAL        10/15/02        gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE EIGHT

institutional standards and has done so during his
incarceration period.

B.   This inmate does not have a mental health disorder
which would necessitate treatment, either during
his incarceration period or following parole.

C.   As inmate Jay has acknowledged a significant
history related to the abuse of alcohol and drugs,
I would recommend upon parole:

1)   Continued abstinence from all illegal drugs and
alcohol.

2)   Mandatory attendance at self-help groups, such
as Alcoholics Anonymous or Narcotics Anonymous.


JEFF HOWLIN, Ed.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD


B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JH/gmj

D:   10/09/02
T:   10/15/02

# EXHIBIT
# 11

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
(REVISED AUGUST 1998)
FEBRUARY 2001 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
FEBRUARY 7, 2001

This is a psychological evaluation for the Board of Prison
Terms for inmate Mathew Jay, CDC# D-55653.  This report is
based upon a personal clinical interview of the inmate,
conducted on 02/07/01, as well as a review of his Central
file and unit health record.  This clinical interview and a
review of all pertinent documents were for the express
purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

I.   IDENTIFYING INFORMATION:

Inmate Jay is a 33-year-old, single, Caucasian male
whose date of birth is 07/29/67.  English is his
primary language and he is an American citizen.  His
stated religious preference is Christian.  No obvious
unusual physical characteristics were observed and he
denies ever using any nicknames or aliases.

II.  DEVELOPMENTAL HISTORY:

Inmate Jay denies any childhood history of physical or
sexual abuse as either a perpetrator or a victim.
Between the ages of seven to nine, he saw a
psychiatrist for apparent relational problems with his
siblings.

At about the age of 12 to 13, he began using drugs,
including marijuana, alcohol, etc.  Over the next
several years, he became increasingly rebellious
towards his parents and had developed a history of
depression.

In 1983, he attempted suicide by overdosing on his
brother's asthma medication.  He ultimately dropped out
of school in the 12th grade, primarily due to his heavy
drug use.  During his childhood, he suffered from
chronic asthma, a condition which currently remains.

JAY       D-55653        CTF-CENTRAL        02/20/01        gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

In summary, heavy drug use significantly impacted his development as an adolescent.

### III.  EDUCATIONAL HISTORY:

Inmate Jay acknowledges that he attended public school and also a private Catholic school.  He completed the 11th grade and ultimately attained his GED and high school diploma in the Los Angeles County Jail in 1986. He is currently working towards a BA degree in social work from the University of Iowa.  The record indicated that in 1987, his measured grade point level ranged from 11.1 to 12.3.  He has no history of special education in school.  As noted previously, he dropped out of high school due to drug related problems.

### IV.  FAMILY HISTORY:

Records indicate this inmate has no significant family history of drug abuse or significant family history of crime.  He generally describes his immediate relationships with his family members as very warm and supportive.  He states he receives daily letters, phone calls and frequently receives visits.  He reports that there is no history of abuse in these relationships.

### V.  PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Jay is a heterosexual male.  He denies any history of sexual aggression or high-risk sexual behavior.

### VI.  MARITAL HISTORY:

Inmate Jay states that he has never been married and has no children.

### VII.  MILITARY HISTORY:

Inmate Jay has no history of military service.

### VIII. EMPLOYMENT/INCOME HISTORY:

While this inmate was only 18 at the time of the instant offense, his preincarceration work history includes working two years as a restaurant cook and as a baker.

JAY        D-55653        CTF-CENTRAL        02/20/01        gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

His incarceration work history includes working five years in a bakery and he has received numerous laudatory chronos for his work.

IX.    **SUBSTANCE ABUSE HISTORY:**

Inmate Jay acknowledges having severely abused alcohol, marijuana, LSD and cocaine in the past.  He admitted heavy drug usage during his teenage years.  He states that he has remained abstinent since 1985, the time of his incarceration, and has remained drug-free since that time.

He states that he began attending Alcoholics Anonymous and Narcotics Anonymous in 1987 and has regularly attended until the current date.  He plans to continue attending AA and NA.  This inmate does have a significant substance abuse history.

X.    **PSYCHIATRIC AND MEDICAL HISTORY:**

Inmate Jay's recent psychiatric diagnosis includes Polysubstance Abuse (by history), in institutional remission.  He was hospitalized as a teenager in 1983 for the previously mentioned drug overdose.  There were no serious residual effects.  He denies a history of serious accidents, including head injuries.  He has no history of seizure or other neurological conditions. He does have chronic asthma and currently takes medication for this condition.

XI.    **PLANS IF GRANTED RELEASE:**

If granted parole, inmate Jay plans to live in Los Angeles County with his parents, who have agreed to this arrangement.  His financial and vocational plans include working as a cook and baker, or in various labor jobs.  He also plans to continue attending school.

**CLINICAL ASSESSMENT**

XII.    **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

During the clinical interview, inmate Jay was alert and oriented to person, place and time.  He was well dressed and groomed.  His speech was articulate and

JAY        D-55653        CTF-CENTRAL        02/20/01        gmj

JAY, MATHEW
CDC NUMBER: D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

contextually meaningful. His mood and affect were within normal limits and his behavior was appropriate to the setting. No evidence of a mood or thought disorder was demonstrated. His estimated level of intellectual functioning was in the average to above average range.

<u>CURRENT DIAGNOSTIC IMPRESSIONS</u>:

AXIS I:      Polysubstance Dependence, in sustained full
             remission in a controlled environment (by
             history).
AXIS II:     No Contributory Personality Disorder.
AXIS III:    Asthma.

In addition to attending Alcoholics Anonymous and Narcotics Anonymous, inmate Jay has completed a number of other self-help groups. In 1994, he completed the Lifeskills group with Dr. Bakeman. From 1990 until 1992, he attended Alternatives to Violence. In 1990, he completed Breaking Barriers, beginning and advanced classes. A chrono dated 1990 indicates that inmate Jay completed personal, individual counseling from Dr. Kennedy, a clinical psychologist, over a period of several years.

XIII. <u>REVIEW OF LIFE CRIME</u>:

Inmate Jay described the circumstances surrounding his commitment offense involving Second Degree Murder and Attempted Murder.

In this crime, the inmate was a participant in the strangling death of one of the crime partners' mother and the attempted murder of this crime partner's eight-year-old, half brother. The crime did appear markedly violent and is significantly inconsistent with the inmate's current demeanor and nonviolent history within CDC.

As reported in previous psychological evaluations, the inmate stated that he was very immature and that his judgment was drastically altered by chronic, heavy drug usage. He did demonstrate empathy towards the damage done to the victims and appeared to be genuinely penitent for his crime. Heavy drug abuse does appear to be directly related to the instant offense, and the

JAY      D-55653         CTF-CENTRAL      02/20/01        gmj



JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

inmate appears to have an adequate understanding of this relationship and the need to maintain abstinence from drug and alcohol use.

XIV. **ASSESSMENT OF DANGEROUSNESS:**

A.  His violence potential within a controlled setting is considered to be significantly below average relative to this Level II inmate population. Additionally, his level of dangerousness is considered to be average to that of the average citizen in the community.  These conclusions are based upon several factors.

On the one hand, he heavily abused drugs from the age of 12 or 13 until the age of 18.  Such heavy drug usage during this development period likely heavily impacted his cognitive, emotional and social development.

On the other hand, however, he has no history of juvenile crime or a history of adult criminal behavior, other than the instant offense.  He also has no history of gang involvement.  Significantly, he has never received any CDC-115 violations during his entire incarceration of 13 years within CDC. Moreover, he has no disciplinaries for violent behavior during this entire period.  No significant psychopathic traits were observed during the interview.  This inmate appears to have matured greatly during his 13 years of incarceration within CDC and to have profited from his participation in the Lifeskills group and his individual counseling with Dr. Kennedy.  However, it should be noted that no report regarding his progress was found in regards to his individual counseling with Dr. Kennedy.  Nonetheless, he appears to have matured greatly both from the self-help groups and therapy, and from the structured programming within CDC.

Therefore, in light of these factors, his violence potential is considered to be significantly below average relative to this Level II inmate population.

JAY       D-55653       CTF-CENTRAL       02/20/01       gmj

JAY, MATHEW
CDC NUMBER:  D-55653
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

B.  If released to the community, his violence potential is considered to be no more than that of the average citizen in the community, if he remains free from substance abuse.

C.  Substance abuse is a risk factor which may be a precursor to violence for this individual.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.  This inmate is competent and responsible for his behavior.  He has the capacity to abide by institutional standards and has largely done so during his incarceration.

B.  This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following upon parole.

C.  This inmate does appear to have a significant substance abuse history, and continued participation in  Alcoholics Anonymous and Narcotics Anonymous is suggested both during his incarceration within CDC and as a contingency for parole.


JOE REED, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad


R. S. COATE, Psy.D.
Senior Supervising Clinical Psychologist
Correctional Training Facility, Soledad

JR/gmj

D:  02/14/01
T:  02/20/01


JAY        D-55653        CTF-CENTRAL        02/20/01        gmj

# EXHIBIT
# 12

## CALIFORNIA STATE PRISON - SOLANO
### Vacaville, California

## PSYCHOLOGICAL EVALUATION
## FOR THE BOARD OF PRISON TERMS

| | |
|---|---|
| **NAME:** | Jay, Matthew |
| **CDC#:** | D-55653 |
| **HSG:** | 14-G-6U |

### IDENTIFICATION:

This is a thirty-one year old, single white first-termer who is serving a fifteen year to life term on being convicted of Murder Second and Attempted Murder Second. The offense took place in October, 1986. This report was prepared for his second subsequent hearing for parole consideration, after he was given a three year denial in January, 1996. He was interviewed on December 3, 1998, following a review of his CDC central and medical files.

### RELEVANT BACKGROUND DATA:

The following will summarize and update a very thorough psychological evaluation prepared for his previous board appearance.

The inmate has a thirty-three year old brother and a twenty-nine year old sister. Both are doing well in life. The parental marriage is intact and the couple are prepared to help the inmate in his eventual reintegration into the community.

As set down in previous reports, the inmate was a confused, depressed, drug-ridden, and essentially non-functional teenager who dropped out of school in the twelfth grade. Native ability, however, is at least average. As a prisoner he promptly earned a diploma and he has worked steadily toward an AB degree. His goal? "I want to be a drug counselor."

Though he was acting out in various ways prior to his commitment offense, he had no arrest history before age nineteen. As a followup to this, his ensuing twelve years in the penal system include no disciplinary writeups whatever. (He came to the Department of Corrections after spending only a few months with the Youth Authority.)

He has been involved in numerous self-help groups, including AA and NA. He developed a strong religious identification. He now works as building porter. He has had no gang involvement.

JACKالسون،
CDC# D-55653
Board of Prison Terms
December 28, 1998

Health is sound, and his only medical condition is asthma which is controlled with an Albuterol inhaler. He has never required hospitalization. Vision and hearing are both excellent.

The inmate cooperated fully with this evaluation, with an outgoing and candid manner. He was oriented in all spheres. Fund of general information was broad and his overall thinking style led to an impression that intelligence was above average. Personal hygiene was good. He had excellent recall for major life events, tended to look back at his teenage behavior as effectively being that of a different person. He feels that as an adolescent he was a lost, misguided, and drugged-out loser who "Didn't know how to say no." As currently functioning he fits criteria for no major psychiatric disorder. As a further negative, there are insufficient indications of teenage misbehavior to support a diagnosis of antisocial personality disorder.

## IMPRESSION AND RECOMMENDATIONS:

The writer agrees with the 1995 assessment in finding this thirty-one year old to be a mature and effectively rehabilitated person. If paroled he would pose a negligible risk to the public order.

Respectfully submitted,

Dean J. Clair, Ph.D.
Clinical Psychologist

DC/dh

D: 12/28/98
T: 12/28/98

fl: c:\jeanne\d55653b

# EXHIBIT
# 13

COPY TO INMATE
VIA CC-1 _____

BOARD OF PRISON TERMS
PSYCHOLOGICAL EVALUATION

Jay, Mathew   D- 55653

CCI-II, October 11, 1995

This is the inmate's first Subsequent Parole Consideration hearing.

## I.   Identifying Information and Mental Health History:

The inmate is a 28 year old Anglo male--date of birth 7-29-67.  He is single, without children.  He was born in California; schooled through the 12th grade, at which time he dropped out due to extensive drug use.  The inmate obtained both a high school diploma and GED while in custody at Soledad.  The inmate indicated that he worked as a cook and in ticket sales for an airline company. The inmate acknowledged using alcohol, marijuana, methamphetamines, cocaine, and LSD.  There is no military experience nor any gang affiliation.

The inmate serving a 15 year to life sentence for Murder Second Degree, of which he has served 10 years.  He has been in prison once, in jail once.  He has no juvenile record.

The inmate indicated that he has never been psychiatrically hospitalized; he has never been on psychiatric medication; he is not on psychiatric medications at this time.  He attempted suicide at age eleven, taking an histamine pill overdose, which he immediately threw up, and called for help.  When asked why he attempted suicide, he indicated that he was in an emotional turmoil and did not know what else to do.  The inmate has been in psychiatric treatment for some time, off and on.  He was treated intensively by a psychologist at the Woodview Calabasas Hospital for a combination of dependency, depression, immaturity, and drug abuse.  The treating psychologists then, as well as the probation department, painted a picture of this individual being noncriminal, highly dependent, and confused.  A description with which this evaluator largely agrees--more on that later.

## II.   Mental Status Examination:

The inmate presented as neat, clean, well-groomed, well-nourished, athletic-looking, with especially good hygiene.  Posture, gait, and bearing were within normal limits; inmate was alert and responsive.  The inmate's attitude was cooperative, nondefensive, open, nonhostile, seemingly forthright, nonevasive, perhaps just a bit ingratiating.  There were no vegetative signs of depression. Inmate was calm, relaxed, composed, nonagitated.  There was no psychomotor acceleration or retardation.  There were no signs of nervousness or fidgeting. Mood/Affect: calm, relaxed, composed, even bright and animated.  There were no perceptual disorders noted or reported.  Speech was within normal limits, nonpressured, without disfluencies.  Speech was fluent, articulate, well-paced. There were no production problems, no stuttering, cluttering, mumbling, slurring, echolalia.  Thoughts were tight, well-knit, well-organized, relevant, nontangential, noncircumstantial.  All thoughts were coherent, nondigressive, nonrambling.  There was no evidence of thought slippage or mismanagement. All thoughts were on-point and nonperseverative.  Sensorium was clear; inmate was alert and responsive.  The inmate was oriented in all spheres, and as to situation and purpose of interview.  Memory was intact and unimpaired. Attention/Concentration: focused, goal-directed, goal-oriented, undistracted,

clear, without interference. The inmate appeared to have an adequate amount
of intelligence and an adequate fund of knowledge. Insight/Judgment: intact
and unimpaired. There was no current evidence of suicidality or grave
disability. There are no special psychiatric conditions or treatment needs
attending this case.

III.  Diagnosis:

Axis I:    Polysubstance Abuse, by history, in institutional remission.

Axis II:   No Diagnosis.

Axis III:  No illnesses noted or reported.

Axis IV:   Stressors: incarceration-mild.

Axis V:    GAF: 85.

IV.   Summary/Discussion:

This inmate presented as an individual who clearly has turned a significant
corner in his life. His classification score of zero and his complete absence
of CDC 115's and CDC 128's indicate that crucial behavioral and impulse controls
are solidly in place. This individual is managing to steer clear of the kinds
of trouble inmates ordinarily get themselves into. It is rather remarkable
that there is not one disciplinary in over ten years of incarceration.

The inmate was able to talk about his complicity and responsibility in the
crime. During the discussion of the murder, he did tear up, which tears he
fought back. His remorse seemed genuine--his tears did not come across as
mere show. When asked why he participated in such a crime, the inmate listed
several factors. He indicated that, at that time in his life, he did not have
the ability to say no. He mentioned that drugs numbed him and disinhibited
him. He stated that he was operating from a strong wish to help a friend--
to please someone in a life where he seemed unable to please anyone. He also
indicated that he was in drug-induced twilight zone, dissociated state of mind.
He also mentioned basic immaturity and youthful punk stupidity. Such a
description pretty much tells the whole story.

When asked how he had changed while in prison, the inmate stated that he was
no longer a drug user--he is quite proud of his ten years of sobriety. He
has participated in A.A. and N.A. for years-he currently is in A.A. He
indicated that, in contrast to himself in earlier years, he now had a solid
sense of self and self-esteem. He completed his education and is now one course
shy from obtaining his AA Degree in general studies. He indicated that he
had become a Christian and has, therefore, spiritually grown. He indicated
that he had socially grown. He found that he could reach out to obtain help,
and to help. While in the custody, he has received training in the bakery,
and in sewing machine repair, where he is currently working. The inmate
indicated that he participated in Breaking Barriers and Alternatives to Violence
groups.

This inmate seems to have reached a watershed, of sorts, in his life. It is
clear from the behavioral record that important behavioral controls are in

place and operating well. This inmate's danger of reoffense is very below average for the inmate population, as indicated in his behavioral record. This individual's life, as it is today, is clearly different from the way it used to be. He is adamant about his sobriety-he places a great store of importance on continued sobriety. He realizes that drugs are dangerous and he counsels other youths to stay away from them.

This individual wrote a letter to the now 20 year-old young man who was ten at the time of witnessing the strangulation of his mother, and who was in the car when it was pushed over a cliff in an attempt to make the murder look like an accident. Miraculously the child escaped, cried for help, and was rescued. The inmate wrote to this young man in an attempt to express his remorse over having taken the life of his mother. For all practical purposes, this inmate's behavioral record indicates that rehabilitation has been complete, in that he will not be at risk for reoffense upon release.

S. McDill, Ph.D.
Staff Psychologist

# EXHIBIT
# 14

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
SEPTEMBER 1994 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 13, 1994

This is the second mental health evaluation for the Board of Prison Terms on inmate Mathew Jay, DOB: 07/29/67. He was seen for a 45 minute interview in addition to his Central file and medical record. This was the only contact for the sole purpose of this evaluation. The previous evaluation by Dr. Charlens described a diagnosis of antisocial personality disorder.

The appearance and self-expression of this inmate appears inconsistent with the previous diagnosis of antisocial personality disorder. He appears to be emotionally stable and motivated for change. He describes his feelings of remorse. He is able to provide detailed explanations for the causative factors, as well as his own self-understanding. He describes his participation in counseling from an outside psychologist who comes to visit him, as well as his own religious beliefs. He has no psychiatric symptoms at this time. His judgment for hypothetical situations show that his problem solving ability is effective and prosocial. Furthermore, he is capable of a high level of ethical reasoning.

However, the description of his participation in the homicide is in contrast to the impression he creates during the interview. It is possible that he is quite sincere about his motivation for change and his insights about his previously being a follower who was easily influenced by others. One can only speculate that his participation in the homicide was a result of an extremely immature conscience as well as the effects of substance abuse. It is difficult to reach an objective conclusion about his potential for future criminal behavior.

PSYCHIATRIC DIAGNOSIS:

    AXIS I:        Mixed substance abuse, in remission.

    AXIS II:      Personality disorder with sociopathic features.

    EXPLANATION: The above diagnosis describes some of the elements which contributed towards his participation in the

JAY        D-55653        CTF-NORTH       06/15/94       rr

homicide.  A more extensive psychological evaluation, with formal assessment procedures (testing), is needed for a more thorough description of his psychological functioning.

PSYCHIATRIC CONCLUSIONS:    The diagnosed psychopathology is indirectly related to the criminal behavior.  During observation in the institution he has psychiatrically improved slightly due to sobriety, maturity and improved autonomy.    In a less controlled setting, he is likely to maintain his present gains if he refrains from substance abuse.

SUGGESTED ACTION:    It is recommended that he continue in his present rehabilitation program as continued benefit is likely. He appears to be making progress in the areas that contributed towards his participation in the offense.    He appears to need further progress in the area of describing his responsibility in making poor decisions and exercising bad judgment during the homicide.

PAROLE AND RELEASE:    If this inmate were to be considered for parole or release, his violence potential in the past is estimated to be average and at present is estimated to be decreased.    There are no special recommendations of parole.    It is recommended that he continue to receive psychotherapy as it is available.

RONALD H. KITT, Ph.D.
Clinical Psychologist
Correctional Training Facility, Soledad

# EXHIBIT

# 15



## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## NOVEMBER 2002 CALENDAR

JAY, MATTHEW

D55653

I. **COMMITMENT FACTORS:**

A.   **Life Crime:** Murder Second, PC-187; Attempted Murder, PC 664/187, Los Angeles County, Case #A811060. Victim of the Murder: Shirley Rizk (mother of the co-defendant), age unknown. Victim of the Attempted Murder: Rory Rizk (son of the murder victim and half brother of the co-defendant), age 8 years old. Jay was originally received on 6/10/87 by the California Youth Authority (CYA) and then received by the California Department of Corrections (CDC) due to institutional crowding conditions, his demonstrated ability to function in a higher security institution and the availability of CDC programs to meet his needs. Jay received a sentence of 15 years to Life and has a current MEPD of 10/18/95.

1.   **Summary of Crime:** The offense occurred on the night October 15,1985, when Jay and co-defendant's Richard Parker and Torran Meier strangled and killed Meier's mother, Shirley Rizk and attempted by various methods to kill Meier's eight (8) year old brother Rory Rizk.

On the evening of October 13, 1985, sixteen year old Meier had decided to kill his mother. He obtained a promise of assistance from Richard Parker and Matthew Jay. Meier, Jay and Parker discussed how they would kill Meier's mother. Meier produced a rope that he had fashioned into a noose and it was decided that they would strangle her in Meier's bedroom and then transport her body in her car to Malibu Canyon, light the car on fire, and push it over the cliff in order for it to appear like an accident. Meier let Jay and Parker enter his bedroom through the window. Meier lured his mother into the bedroom and Parker placed a noose around her neck and began to strangle her. While Parker pulled the rope around her neck, Jay and Meier held her down. During the strangulation, Meier's half-brother, Rory, awoke to the screams and went to his brother's room to investigate. Rory observed the strangulation and while Parker and Jay continued, Meier took Rory away from the room to keep him from knowing what was happening. Meier told Rory to watch television and then returned to the bedroom. It took fifteen (15) minutes to complete the strangulation of Shirley Rizk. During this time, Meier repeatedly left the room to deal with his half brother, who wanted to know what was going on. The three (3)

JAY, MATTHEW            D-55653              CTF-SOLEDAD            NOV/2002

crime partners then realized that Rory was a potential witness and he must also be killed. Meier gave Jay money to go buy snail and rat poison. While Jay was gone, Parker and Meier placed Shirley Rizk's body into the trunk of her car. Meier cleaned the blood off his bedroom rug and after Jay returned with the poison Meier attempted to poison Rory, first by placing the poison into a sandwich then placing it into a malt drink. Rory refused the food and drink because of the bad taste. After the attempted poisoning, Rory went to the garage and saw his mother's body in the open trunk of her vehicle with her legs extending from under her robe. Meier then asked Rory if he wanted to go for a ride to Malibu Canyon and Rory agreed. With his mother's body in the trunk and Rory in the back seat, Jay and his crime partners drove away from the crime scene. In route they stopped at a gas station and purchased a gallon of gas. After driving through Malibu Canyon and finding a location to push the car over the edge, they drove back to Jay's house. Jay followed them to the spot in Malibu Canyon. Meier tied up and blindfolded Rory in the back seat, then put a rag with gas into the gas tank filler spout. Parker put the body of Shirley Rizk behind the steering wheel. The car was then pushed over the embankment as Parker lit the rag on fire. The car rolled down the embankment, possibly rolling over and coming to rest approximately thirty (30) feet below. The defendants then left in Jay's car. Rory was able to untie himself and remove his blindfold. He saw his deceased mother in the front seat with blood on her face. After opening the window he climbed out of the burning car and began calling for help. A passing motorist observed the fire and stopped to investigate. He heard Rory call for help and assisted him up the hill. Later, the sheriff deputies and fire department personnel arrived on the scene and Rory told them what had happened. Meier and Parker were arrested that night. Jay was arrested on October 16, 1985. This information was obtained from pages 2 through 6 of the Probation Officer's Report (P.O.R.).

2.   **Prisoner's Version:**  Inmate Jay indicates that the P.O.R. version is fairly accurate regarding the circumstances of the instant offense. He indicated that during that period of his life, drug usage was major factor and part of his day-to-day life. He states that he was under the influence of alcohol, cocaine, hashish, marijuana and LSD. Jay indicates that he is very sorry about his actions during that time. He states that he understands what he did was very wrong. He indicated remorse for the pain caused to the victim and his family members. In an effort to show his sincerity, Jay is trying to improve himself to make his possible return to society a successful one.

JAY, MATTHEW          D-55653              CTF-SOLEDAD          NOV/2002

B.    **Aggravating/Mitigating Circumstances:**

    1.    **Aggravating Factors:**

        a.    The eight (8) year old victim of the Attempted Murder was particularly vulnerable due his young age and small stature.

        b.    During the commission of the crime Jay had a clear opportunity to cease but instead continued.

        c.    Jay engaged in other reliably documented criminal conduct which was integral part of the crime for which he is currently committed, in that he received a concurrent term for the Attempted Murder of eight (8) year old Rory Rizk.

    2.    **Mitigating Factors:** Jay did not have a prior criminal history.

II.    **PRECONVICTION FACTORS:**

A.    **Juvenile Record:** None noted.

B.    **Adult Convictions:** The instant offense of Murder Second and Attempted Murder are Jay's only arrests and convictions.

C.    **Personal Factors:** Jay is the second of three (3) children born to Herman and Lynn Jay. He has an older brother and a younger sister. Jay's father is a retired teacher from Los Angeles County School District and his mother, an Episcopalian Priest. There is no arrest history of any of the other family members. At the time of the instant offense, Jay was barely eighteen (18) years of age and had always lived with his parents. He had never married and had no children. He had performed very well in high school until the twelfth grade when his grades deteriorated because of drug use and he eventually dropped out of high school. He later completed his high school education while in county jail. While in high school he had been a cook at Marie Calendar's and Carl's Junior Restaurants and had also worked as a bus boy. He first used marijuana and alcohol in the seventh grade. By age 15 he was a regular marijuana user. Daily consumption grew to 15 to 20 pipe loads per day. At age 17, he began using cocaine at a rate of 5 to 7 times per month. He stated that he was able to finance this from working and from money he had in the bank. Jay told the probation officer that he also used methamphetamines orally. From age 14 to 16, he was drinking every weekend. He said he saw it as a game, trying to out drink others and seeing just how much he could consume. He stated he was in treatment with a psychologist at a hospital in Woodlands Hills but cannot remember much about it.

JAY, MATTHEW        D-55653        CTF-SOLEDAD        NOV/2002

In relation to the present offense, Jay was extensively examined by psychiatric doctor David Sheffner. Sheffner stated in a letter dated October 7, 1986 that Jay is basically not anti-social. He stated that four prominent elements: dependency, depression, drugs, and circumstances produced Jay's involvement in the present offense. This information was obtained from pages 9 through 11 of the POR.

## III.   POSTCONVICTION FACTORS:

**A.**   Special Accommodations/Disability:  None.

**B.**   Custody History:  Since his last appearance before the Board of Prison Terms on 11/7/01, Jay has remained housed in the general population at CTF. He remained working for the Prison Industries Authority as a furniture assembler until February, 2002, when he was assigned as a clerk in the Prison Industries Authority.

**C.**   Work, Education, Vocation, Therapy & Self-Help Activities:  Jay received two CDC-128B's indicating his continued attendance at Alcoholic's Anonymous meetings.

**D.**   Disciplinary History:  Jay has remained totally disciplinary free during his entire incarceration. He has not received any CDC-128A's nor has he received any CDC-115's.

## IV.   FUTURE PLANS:

**A.**   Residence:  If granted parole, Jay plans to live with his parents, Herman and Lynn Jay at 26084 Viento Court, Valencia, California 91335. Telephone #(661) 255-0809. This is in Los Angeles, which is his county of commitment.

**B.**   Employment:  Jay plans to work and attend services at St. Stephen Church in Valencia, California. He eventually plans to seek to employment with the Betty Ford Clinic as a Drug Counselor. He intends on completing his education by attending CSU-Northridge and to attend Alcoholic Anonymous meetings at St. Stephens Church.

## V.   USINS STATUS:  Jay is a U.S. citizen.

JAY, MATTHEW              D-55653                    CTF-SOLEDAD          NOV/2002

VI.    **SUMMARY:**

A.    Considering the commitment offense, lack of any prior criminal record and prison adjustment, it is believed that Jay would pose a low degree of threat to the public if released from prison at this time.

B.    Prior to release, Jay could benefit from: Remaining disciplinary free, continuing in his work assignment and attending self help programs as available.

C.    This report is based upon a thorough review of the file and an interview with Jay lasting approximately one hour.

D.    Jay signed a CDC-128B dated 8/13/02, indicating that he had reviewed his file in preparation for his appearance before the Board of Prison Terms.

E.    No accommodation for the purposes of effective communication was required per the Armstrong Remedial Plan (ARP).

JAY, MATTHEW              D-55653                    CTF-SOLEDAD           NOV/2002

_P.R. Miner_
Correctional Counselor I

10/2/02
Date

_C. Plymesser_
Correctional Counselor II

10/7/02
Date

_L. Trexler_
Facility Captain(A)

10-7-02
Date

_D.S. Levorse_
Classification and Parole Representative

10.8.02
Date

JAY, MATTHEW          D-55653              CTF-SOLEDAD          NOV/2002

# EXHIBIT
# 16

**Board of Parole Hearings**                                    State of California

## MISCELLANEOUS DECISION

### FACTS

During the April 17, 2007 Executive Meeting of the Board of Parole Hearings, the Board, sitting en banc, considered the split decision of the February 16, 2007 subsequent parole consideration hearing panel for Matthew Jay, D-55653. By unanimous vote of the full Board, the prisoner was found unsuitable for parole and parole consideration was denied for one year.

### DECISION(S)

By unanimous vote of the full Board, the proposed decision is unsuitable for parole and parole consideration is denied for one year.

| STAFF (Name) | TITLE | DATE |
|---|---|---|
| JOHN F. MONDAY | Executive Officer | 4/26/07 |

| NAME | NUMBER | INSTITUTION |
|---|---|---|
| **JAY, Matthew** | **D-55653** | CTF |

**Board of Parole Hearings**
***En banc* decisions**
**April 17, 2007**

**GRAY, Larry Earl  C-51482**
Decision:  Decline to refer to court for consideration of sentence recall
Motion by Shelton Second by Bryson
Aye: Biggers, Bryson; Davis, Eng; Garner; Inglee; Kubochi; Martinez; Prizmich; Shelton;
No:
Abstain: Woods

**HENDERSON, James  C-97219**
Decision:  Decline to refer to court for consideration of sentence recall.
Motion by Biggers Second by Prizmich
Aye: Biggers, Bryson; Davis, Eng; Garner; Inglee; Kubochi; Martinez; Prizmich; Shelton;
No:
Abstain:  Woods

**JAY, Matthew  D-55653**
Decision:  Find unsuitable for parole and deny for 1 year for the reasons articulated by the
Commissioner at the hearing 02-16-07.
Motion by Eng Second by Martinez
Aye: Biggers, Bryson; Davis, Eng; Garner; Inglee; Kubochi; Martinez; Prizmich; Shelton;
Woods
No:
Abstain:

**JOHNSON, Gary  H-19000**
Decision:  Set new hearing due to lack of articulation of basis of decision at 02-14-07 hearing
Motion by Shelton Second by Garner
Aye: Biggers, Bryson; Davis, Eng; Garner; Inglee; Kubochi; Martinez; Prizmich; Shelton;
Woods
No:
Abstain:

**OTREY, Doler  H-46410**
Decision:  Find unsuitable for parole and deny for 1 year for the reasons articulated by the
Commissioner at the hearing 02-05-07.
Motion by Garner Second by Kubochi
Aye: Biggers, Bryson; Davis, Eng; Garner; Inglee; Kubochi; Martinez; Prizmich; Shelton;
Woods
No:
Abstain:

**ROGERS, Raymond   C-54337**
Decision:  Find unsuitable for parole and deny for 1 year for the reasons articulated by the
Commissioner at the hearing 03-01-07.
Motion by Bryson Second by Biggers
Aye: Biggers, Bryson; Davis, Eng; Garner; Inglee; Kubochi; Martinez; Prizmich; Shelton;
Woods
No:
Abstain:

# EXHIBIT
# 17

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | AUGUST 15, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004792
In re,
MATTHEW ADAM JAY,
          Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

    The Court has read and considered petitioner's Writ of Habeas Corpus filed on July 11, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

    Petitioner was received in the Department of Corrections on September 24, 1987 after a conviction for second-degree murder. He was sentenced to fifteen years to life. His minimum parole eligibility date was October 18, 1995. The record reflects that petitioner and his two crime partners plotted to murder the mother of one of the partners. They lured the victim into a bedroom, where petitioner held her legs as a crime partner strangled her to death. The attack lasted fifteen minutes. The victim's eight-year old son awoke as a result of the struggle and entered the room. Because he was a witness to the murder of his mother, they decided to kill the child using poison, which petitioner purchased. Fortunately, the child refused to eat the poison. They put his mother's body in the trunk of her car. The boy agreed to go for a ride with his brother. They drove to Malibu Canyon with petitioner following in a getaway car. Once they reached the top of a ravine, they placed the victim's body in the driver's seat, while her son was tied up and blindfolded in the back. They threw gasoline on the vehicle and pushed it off the ravine. The child was able to escape.

    A parole suitability hearing was held for petitioner on February 16, 2007, which concluded in a split decision with Presiding Commission Kubochi finding petitioner unsuitable for parole, while Deputy Commission Melvin found him suitable. The decision was submitted for en banc review. The en banc panel concurred with Commission Kubochi and concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety.

    The record reflects that petitioner committed the offense in an especially heinous, atrocious and cruel manner, which is some evidence tending to show that petitioner is unsuitable for parole. In this case, multiple victims were attacked, injured or killed in the same incident. (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(A).) Although petitioner and his crime partners only killed one victim, they twice attacked a second victim, who was a young child by attempting to poison him and then tying him up in the back of a car which they sent off a cliff.

1

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

**DEPT 100**

| | | |
|---|---|---|
| Date: AUGUST 15, 2007 | | |
| Honorable: STEVEN R. VAN SICKLEN | Judge JOSEPH M. PULIDO | Deputy Clerk |
| NONE | Bailiff NONE | Reporter |

(Parties and Counsel checked if present)

BH004792
In re,
MATTHEW ADAM JAY,
         Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

       Additionally, there is some evidence that the crime was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D).) The method used to murder the victim was strangulation, which itself demonstrates an exceptionally callous disregard for human suffering in comparison to other more immediate means. (*In re Scott* (2004) 119 Cal.App.4th 871, at 891.) The attack lasted over fifteen minutes, during which time the victim was struggling loudly enough to alert her young son who was in another room. This shows unnecessarily prolonged pain and suffering, which is also evidence of a callous disregard for human suffering. (In re Smith (2003) 114 Cal.App.4th 343, 367.) Because the offense was especially heinous, there is some evidence to support the Board's denial.

       The Court rejects petitioner's argument that he is entitled to release based on the terms of his plea agreement. A plea bargain violation claim depends upon the actual terms of the agreement, not the subjective understanding of the defendant or deficient advice provided by his attorney. (*In re Honesto* (2005) 130 Cal.App.4th 81, 91-93.) According to the terms of his plea bargain, petitioner pled guilty to second degree murder and agreed to a sentence that carried a maximum term of life in prison. Petitioner has "no vested right to determination of his sentence at less than the maximum." (*In re Schoengarth* (1967) 66 Cal.2d 295, 302.) Therefore, the Board did not violate the plea bargain in finding petitioner unsuitable for parole.

       Accordingly, the petition is denied.

       The court order is signed and filed this date. The clerk is directed to give notice.

       A true copy of this minute order is sent via U.S. Mail to the following parties:

Matthew Adam Jay
D-55653
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

Department of Justice- State of California
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

2

| Minutes Entered |
|---|
| 08-15-07 |
| County Clerk |

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012<br><br>PLAINTIFF/PETITIONER:<br><br>MATTHEW ADAM JAY | CONFORMED COPY<br><br>AUG 1 5 2007<br><br>LOS ANGELES<br>SUPERIOR COURT<br><br>Joseph M. Pulido |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004792 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time                ☒ Order re: Writ of Habeas Corpus
☐ Order to Show Cause                 ☐ Order
☐ Order for Informal Response         ☐ Order re:
☐ Order for Supplemental Pleading     ☒ Copy of Petition for Writ of Habeas Corpus for the
                                         Attorney General

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to the cause.  I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

August 15, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_____, Clerk
        Joseph M. Pulido

Matthew Adam Jay
D-55653
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

Department of Justice- State of California
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

# EXHIBIT
# 18

VOLUME 3   NUMBER 4       CALIFORNIA LIFER NEWSLETTER   #16         JULY 2007    PAGE 22

# PAROLE BOARD POLITICS AND DEEP-SEEDED PROBLEMS DETAILED BY FORMER BPH COMMISSIONER

On June 5th, former BPH Commissioner Belinda Harris-Ritter wrote a detailed 5-page letter to the Senate Rules Committee and "To Whom it May Concern" to enlighten interested parties on some of the serious problems at the heart of the Board's ineptitude. Mrs. Ritter-Harris, who resigned six months earlier in January 2007 after chairing lifer suitability hearings for six months, graciously gave her permission to publish her expose in full:

### DO NOT BLAME THE COMMISSIONERS FOR PAROLE BOARD PROBLEMS

Last July I began my term as a Commissioner on the Board of Parole Hearings, an appointee of Governor Schwarzenegger. I was naive in thinking that the Board would be allowed to do its job. I left the Board in January of this year frustrated by the inability of the Board to function, exhausted from the out of control travel schedule and still weak from the flu and norovirus picked up in prison facilities crawling with disease.

I left, not because I had given up, but because I received a telephone call from Alberto Roldan, a deputy appointment's secretary, in which he told me I was being given the opportunity to resign because the Governor wanted to go in another direction and appoint someone else in my place. I was told that I was forbidden to tell anyone of the call, forbidden to attend the upcoming Board meeting and if I did not do what I was told, I would be terminated. I asked what I had done to cause this to occur and was told I had done nothing wrong. I knew that if the Governor wanted to put someone new on the Board there was an open seat so clearly I was considered a problem. There was no opposition to me on record and I was often told by victim advocates/relatives and inmate counsel alike that I did an excellent job. I had been unaware that there was opposition to me from the people responsible for my being there in the first place.

I am not the only Commissioner to have met that fate. Recently, another excellent Commissioner was confirmed by the Senate but only after an attack on her by people in the Governor's office, the District Attorney's Association and spearheaded by Senator Jeff Denham. Senator Denham sent out press releases saying he was appalled by early releases due to grants. A grant of parole is not an early release. The penal code specifically states that Parole shall

be granted unless there is a public safety reason not to grant it. They forget not only the actual law that controls what Commissioners must do but also that the Commissioner does not make the Decision alone. A civil service Deputy Commissioner is involved in every case and must agree with the Commissioner to grant parole or it is a split vote that goes to the full Board sitting en banc.

The Commissioner has no say in who the deputy Commissioner will be or what prison he or she is assigned to each week. That is all manipulated by the Executive Officer who answers to the Governor and /or CDCR.

When the Governor and legislature reorganized the Department of Corrections effective July, 2005, they destroyed any independence of the Board of Parole Hearings. The Board was no longer free-standing but was stuffed into the newly named California Department of Corrections and Rehabilitation (CDCR).

The Board itself has no control over the hiring of the civil service staff. The legal counsel will tell you they work for CDCR and the Executive Officer is appointed by the Governor, not the Board. He, like the Board, is part of CDCR. Although he is not appointed by the Board the role of the administrator should still be to take direction from the Board he or she serves, not to dictate what is done. This is because the Executive Officer is not a member of the Board. That reality was lost in the transition. He acts on direction from somewhere other than the Board, unknown to the Commissioners. Commissioners are assigned to various prisons weeks in advance then at the last minute-without explanation, the Executive Officer tells scheduling to change the schedule and inform the Commissioners of the switch. That is just one example.

Add to the reorganization problems the fact that the legal staff considers itself to work for CDCR, apparently not understanding who the client is (the Board) regardless of who pays their salaries (CDCR) and that the legal staff has, in my opinion, absolutely no understanding of the Bagley – Keene Open Meeting Act and you have a recipe for disaster.

Regulations are presented for approval by the Board when the Board has not considered or voted on whether regulations are needed. Although there is an item on each agenda for the legal report and the Executive Officer report those have at times consisted of announcing the number of cases in the backlog for the legal staff and introducing the new deputy commissioners by the Executive Officer.

Never, during my time on the Board, did either present any report of substance. The Board members are never told how the number in the backlog is calculated and there is no acknowledgement of cases that are on appeal or problems that come up in panel decisions except in illegal closed sessions allegedly to consider litigation. However, the Bagley- Keene Act is very clear that to be considered under this litigation exception there must be "...an adjudicatory proceeding before a court, administrative body, hearing officer or arbitrator. Litigation is considered to be pending if, 1) it has been initiated formally

(e.g. a complaint, claim or petition has been filed) or (2) based on existing facts and circumstances and on the advice of its legal counsel, the state body believes there is significant exposure to litigation against it, or it is meeting to decide whether a closed session is authorized because of significant exposure to litigation or (3) based on existing facts and circumstances the state body has decided or is deciding whether to initiate legislation. (Bagley –Keene Act section 11126). Further, a memo must be sent to the Board members by the staff and after the litigation is resolved that memo becomes a publicly accessible document. Under the Act, "the agency's legal counsel must submit a memorandum which complies with the requirements of Section 11126(e)(2)(C)(ii) prior to the closed session. This document is confidential until the pending litigation has been finally adjudicated or otherwise settled.

There was never any discussion of the Board budget nor was a budget ever approved while I was on the Board. I was told by the Executive Officer in December that "the Board is working on the budget" apparently meaning his civil service staff. Also in December I was told by him that the names of three potential deputy commissioners (civil service employees) were run through the Governor's office prior to any hiring decision being made. I am not mentioning their names out of respect for the three individuals involved. Two were hired and one was not. Why is the Governor's office involved in civil service hiring outside his office?

The scheduling of the Commissioners at the various institutions is a process without input from the individuals involved and appears to me to benefit certain Commissioners while punishing others. In a semi-mutiny all the Board members agreed that the scheduling needed to be addressed along with some other housekeeping issues. This was presented to the Board Chair following a closed session in December. He tried to say the issues could not be discussed because of the Bagley-Keene Act. This made it clear to me that he had, just like the legal staff, no understanding of the Act or its purpose. Needless to say the scheduling was not improved. I was told I could not be scheduled at the prisons near my home because it was not fair to the Commissioners who lived far away from prisons. Repeatedly I was told that everyone had to travel three to four hours. Other Commissioners were, however, routinely scheduled at prisons near their homes.

Many times hearings had to be canceled because of disease at the institutions. These diseases included norovirus, tuberculosis, chicken pox and the flu. I am not the only Commissioner to have contracted the flu and norovirus. I have canceled hearings of prisoners who were vomiting in the holding cells while waiting to have their hearings and taken flak for the postponements.

(Continued on page 23)

## Parole Board Politics (from page 22)

At one facility the Commissioner was told by CDCR staff that even though six of the inmates were in quarantine the hearings should go forward and the Commissioner and Deputy Commissioner could wear masks. The Commissioner and Deputy Commissioner refused to hold the hearings under those circumstances. Clearly if the inmate is too ill to stand up there are due process considerations being violated.

Another problem related to this is that under Penal Code section 5080 the Board can ask CDCR to move a prisoner because of health reasons. I had a case where the inmate absolutely needed to be moved to a facility where he could have mental health treatment and medical intervention. I cited this section in the postponement of his hearing. Under that code section CDCR must report to BPH within 30 days why he cannot be moved for the medical treatment or move him. In this particular case he was not moved and did not receive the medical attention and CDCR gave no reason.

The Commissioner who followed me ignored these serious considerations and denied the parole for 5 years without addressing the medical issues.

At an open- to- the-public training session in December, I asked our legal staff about the application of this code section. The reply from the attorney training us was that she was still getting up to speed and would get back to me. She never did.

In that same training we were repeatedly told "the Board wants it done this way" or the Board wants you to do this". I finally raised the point that we **were** the Board and we had given no such direction and I questioned who had. There was no answer. The Chair, however, did go to two other Commissioners (both women) and tell them to please let me know to stop asking questions in open session. I find it incredible first, that he would say that and second, that he could not he could not talk to me himself.

All the Commissioners have many similar stories about problems with CDCR but problems with CDCR are never addressed at the Board or at the Senate Rules Committee.

The Commissioners have become merely hearing officers. At most state Boards the trial level is conducted by administrative law judges and/or hearing officers and appeals are taken by the Board itself. At the BPH the Commissioners are the hearing officers and while I was on the Board there was no appeals process. It had been removed following some court action indicating it was a problem because no appeal was ever granted.

I understand the appeals process is being reinstituted. How do you do that after a court has told you to stop? This implementation of the appeals process was not done at the behest of the Board. The Board never discussed it nor voted on it.

The agenda is put together by staff but the Board members are never asked if they have items for the agenda. Items on the agenda include cases where there was a split decision between the Deputy Commissioner and the and the Commissioner and referrals of non murder cases from the Governor for en banc review of a panel decision. These are the only Board meetings I have ever been to where no one on the Board says anything except the Chair who is running the meeting. Board business is rarely ever addressed by the members of the Board.

The problem of untimely psychological evaluations was to end when the Board took over responsibility from CDCR for preparation of the reports. It has not changed. At some institutions it appears the union of psychologists has instigated a work slow down or stoppage by not preparing the reports timely. This causes legitimate reasons for inmates to request postponements and Commissioners are told by their legal staff to do the hearings anyway.

Add to all of this the track record of CDCR in every other area. Across the Board headline after headline shows it is the same response as stated in a report from the State Bureau of Audits in follow-up to an audit done in 2005 to see if there had been any changes. In the March 27, 2007 letter from state auditor Elaine Howle to the Governor and legislative leaders it was stated that there was still a lack of validity in the projections of the prison population. This report, titled "Department of Corrections: It needs to better ensure against conflicts of interest and to improve its inmate population projections (2005-105)" was also copied to every member of the legislature.

It seems that nearly every week we in Sacramento read about CDCR not cooperating with a court or a special master related to conditions at the prisons whether it is health, overcrowding or some other area. I believe it is time to look at how badly CDCR has compromised the Parole process as well.

Let me be perfectly clear. I understand the need for public safety. It is paramount. I say that from the shoes of the victim's next of kin.

My father and stepmother were murdered and I have worked for many years in the state where that occurred to ensure due process for victims and their families. I also believe that while protecting due process for victims we cannot throw out due process for the inmates. As an attorney, I understand the significance of due process and believe that it is the very foundation of our way of life in this country.

Due process should not be tossed aside because there is a backlog of hearings. The Governor should appoint the twelfth member of the Board- this was not done the entire time I was on the Board. Prior Commissioners should be recruited to come back for a limited period to take care of the backlog, but hearings should not be crammed down the throats of inmates who are ill, have not had an opportunity to appeal a serious discipline accusation or who have a habeas case at the appellate level or need time to meet with counsel. Postponements and continuances should not be allowed for the purpose of choosing a specific Commissioner or manipulating the process but legitimate reasons should not be ignored.

I would be fine with a law that stated convicted murderers shall never be released from prison. But that is not the law we have. The law states that when these life inmates come up for parole they are to be paroled unless it would be a public safety problem. The burden is on the state to show there is a public safety issue. Either follow this or change the law.

The legal staff should be trained in the Bagley-Keene Act and should be responsive to questions from Commissioners and cite authority for their opinions, all the while understanding the Board is their client, not CDCR. CDCR should also understand that the Board is the client. The legal staff should also understand that they merely advise the Board and the Board makes the decisions.

But most important, for the Board to actually function, there must be openness about who is doing what and at whose direction and if that cannot occur under the present structure the Board should be removed from CDCR and allowed to hire its own Executive Officer and legal staff.



GOV. SCHWARZENEGGER PICKS A CABINET

ROBERT DOWNEY JR. — Attorney General

WYNONA RYDER — Consumer Affairs

MICHAEL JACKSON — Child Welfare

# EXHIBIT
# 19

THE MONTEREY COUNTY HERALD, TUESDAY, OCTOBER 9, 2007

# Parole board members feel pressure

## THOSE ASKED TO RESIGN DENY THAT THEY'RE SOFT ON CRIME



Tracey St. Julien, left, and Bilenda Harris-Ritter both say they were forced off the state's parole board.

JULIA REYNOLDS/ Special to The Herald

**By JULIA REYNOLDS**
*Herald Staff Writer*

"In 1981, my father and stepmother were murdered," Bilenda Harris-Ritter said matter-of-factly. She took a break from work, and was sitting in the noisy lobby of a Sacramento office building.

"It was an extraordinarily horrific thing to go through for my family, and we will never truly be over it," she said.

That's why she was shocked to be labeled soft on criminals in California.

Harris-Ritter said she feels she is a casualty in a battle over parole that this year is playing out in the state's courts.

For years, she worked to protect victims' rights in her home state of Arkansas before moving to Sacramento.

Last year, Gov. Arnold Schwarzenegger appointed her to the state's Board of Parole Hearings. A lawyer and a member of the California Bar Association, Harris-Ritter was thrilled. She said she would bring a crime victim's sensitivity and an attorney's respect for due process to the job.

But she'd only been a parole commissioner for a few months before a governor's aide called. Alberto Roldan, deputy appointments secretary in Schwarzenegger's office, told her the governor would like her resignation from the board.

"I said, 'Why, what have I done?' And



> **"I said, 'Why, what have I done?' And his response was that I hadn't done anything, just the governor wanted to go in a different direction."**
>
> **Bilenda Harris-Ritter**
> Former parole commissioner

his response was that I hadn't done anything, just the governor wanted to go in a different direction," she said.

Harris-Ritter said she was stunned.

"He said, 'You're forbidden,' that was the specific word he used — 'you're forbidden to tell anyone about this phone call, you're forbidden to attend the board meeting next week, and we need to know if you're going to resign or be terminated.'"

Given that ultimatum, Harris-Ritter felt she had no choice but to resign. But she said she never agreed to keep quiet.

Schwarzenegger's office confirmed last

*Please see* **Parole page A12**

week that the governor asked Harris-Ritter to resign, but declined to give a reason.

She tried to figure out the reason she was let go, and the only thing that made sense, she said, was that a few months earlier she'd seen a Web site criticizing her for granting "too many" paroles to prisoners with life sentences.

In the three months she served, Harris-Ritter says she gave only 12 parole grants out of approximately 300 life cases — about four percent.

"I didn't find a public safety reason not to grant them parole and so I followed the law and I granted it," she said.

To the Doris Tate Crime Victims Bureau, 12 was far too many.

"We were concerned with her performance on the board," said Christine Ward, executive director of the nonprofit group that had posted the criticism.

Although Ward said the group doesn't oppose parole in principle for all lifers, the exceptions are few and very far between.

"Her numbers were extraordinarily high," Ward said. "And that concerned us."

Harris-Ritter said that surprised her.

"There was a lot ... on this particular victims' group Web site that people should write to the governor and demand that this liberal parole board be removed," she said. "I've never been called liberal in my life."

A lifelong Republican, Harris-Ritter said she is especially conservative when it comes to public safety.

"I am not someone who would be considered pro-parole," she said. "I am pro-due process. I believe that we need to follow and implement the laws that we have appropriately, and if we don't like the law, then we need to make concerted efforts to change it."

Mike Reynolds, known as the "godfather of Three Strikes" for the tougher sentencing law he pushed through in 1994, would agree on that last point

8103682022479136840246850246860

At a rally last month outside the two state prisons in Soledad, he said life without parole or the death penalty for murderers would be far more fitting than expecting victims' families to endure the pain of attending parole hearings every two to five years, usually at their own expense.

Harriet Salarno, chairwoman of the advocacy group Crime Victims United of California, also attended the rally and criticized Schwarzenegger for allowing some convicted murderers to be paroled.

"It's shameful that victims and their families are re-victimized by his parole policies," Salarno said.

The rally was held to lend moral support to a mother who that afternoon attended the fourth parole hearing of her daughter's killer at the Correctional Training Facility.

While that man was once more denied, he is scheduled to come back before the board in four years.

**Others asked to leave**

Harris-Ritter is not the only parole board member who was asked to leave her post. Tracey St. Julien, also of Sacramento, blames politics for her dismissal.

Appointed by Schwarzenegger in July 2005, St. Julien served on the board and was a few weeks away from her official Senate confirmation. But before that could happen, she was asked to step down.

The reason, she said, was that between hearings at the Correctional Training Facility in Soledad a conferencing microphone was accidentally left on.

Some district attorneys overheard her casually telling an inmate's lawyer she "loved" giving parole grants. Riverside County prosecutors complained about it in a letter to the board's executive director, while a state group of district attorneys wrote to the governor, St. Julien said.

St. Julien, who said she gave very few grants, defends her eavesdropped statement.

"You're dealing with murder," she said. "And if there is any glimmer of hope and humanity . . . then yes, I love that. It didn't happen a lot, but when it happened it was a good feeling. So I made that statement and I would say it again. But apparently it was very unpalatable during the election cycle."

Harris-Ritter wrote a letter about her own dismissal to the state Senate Rules Committee last spring.

Around that time, Sen. Jeff Denham, R-Merced, had sent out a news release criticizing the "early release of inmates" under the Schwarzenegger-appointed board. Harris-Ritter says that phrase is inaccurate.

"I wanted to point out to the members of Rules that when someone gets a parole date and is paroled, it's not 'early release,'" she said. "That's the way the law is written — when you come up for your parole date, you shall be paroled unless there's a public safety issue that would trump that and would overrule it."

That's a point that a Santa Clara County judge took to heart recently when she issued a strongly worded ruling aimed at overhauling the Board of Parole Hearings.

"Something is certainly wrong" with the parole board, Superior Court Judge Linda Condron wrote when she ordered the "malfunctioning" board to come up with clear criteria for denying parole to lifer inmates.

In all of nearly 3,000 cases reviewed by the court, the board's reasons for denying parole to convicted murderers, Condron said, are "vague and all inclusive and thus truly meaningless."

Condron found that the board was ignoring previous Supreme Court rulings in which the board was found at fault for using overly-broad interpretations of the nature of the original offense for denying parole.

Several federal courts have held that unless public safety can be shown to be at specific risk, lifer inmates should be allowed to be paroled when their minimum release date comes up — for example, after 25 years on a 25-to-life sentence.

The problem came when the board, in every one of the thousands of cases examined by Condron's court, cited "the nature of the crime" as its reason for denying parole, calling each murder "especially heinous, atrocious or cruel."

"The board has continued to deny countless paroles, labeling the crime 'callous' without ever suggesting what crime would not qualify as 'callous,'" Condron wrote.

Such terms are "unconstitutionally vague," the judge ruled. Other states, she wrote, have come up with much more specific language to distinguish between parole-eligible crimes and those that truly represent a danger to public safety.

"The system is malfunctioning and must be repaired," she wrote in the Aug. 30 ruling. "The board must make efforts to comply with due process."

Harris-Ritter said she also had a hard time interpreting the board's criteria when she served as a commissioner.

"It is really a subjective thing whether the crime is horrible enough to fit the criteria," she said. "They're just saying every single case is horrific and that's not possible."

Gov. Schwarzenegger has used the same criteria when he overruled many of the rare board decisions in favor of parole, something he's done hundreds of times since he took office.

"It's my personal opinion that it's overused by the governor's office, but I also feel that if you're the victim, or your next of kin is the victim of a crime, it doesn't matter what the circumstances are. It's horrific to you," Harris-Ritter said. "That's a really tough place the court has put people in, making a decision about 'Well, this was a really horrible crime and this was just a regular murder.'"

An appeals court is reviewing Condron's order to the Board of Parole Hearings to come up with clearer definitions and better training within 90 days. The state Attorney General's Office is scheduled to present its opening brief Nov. 13.

If upheld, Condron's ruling could mean that many of the 3,000 lifers who come up for review each year might seek new hearings.

Meanwhile, the Senate Rules Committee, headed by Senate President Pro Tem Don Perata, D-Oakland, is looking into other complaints about parole board practices.

Harris-Ritter said she is not all that confident things will change soon — not as long as politicians are calling the shots.

"It appears," she said, "that there is a lot of pressure on the governor."

*Julia Reynolds can be reached at 648-1187 or jreynolds@ montereyherald.com.*

# EXHIBIT
# 20

1

2

3                        SUPERIOR COURT OF CALIFORNIA

4                          COUNTY OF SANTA CLARA

5

6        _____

7    In re                              )    No.: 71614
                                         )
8        ARTHUR CRISCIONE,               )
                                         )    ORDER
9    On Habeas Corpus                    )
         _____ )

10

11

12                            **INTRODUCTION**

13        Petitioner alleges that he has been denied due process of law

14   because the Board has used standards and criteria which are

15   unconstitutionally vague in order to find him unsuitable for parole.

16   Alternatively, he argues that those standards, even if

17   constitutionally sound, are nonetheless being applied in an arbitrary

18   and meaningless fashion by the Board.  He relies upon evidence that

19   in one hundred percent of 2690 randomly chosen cases, the Board found

20   the commitment offense to be "especially heinous, atrocious or

21   cruel", a factor tending to show unsuitability under Title 15

22   §2402(c)(1).

23           **Are the Board Criteria Unconstitutionally Vague?**

24        Our courts have long recognized that both state and federal due

25   process requirements dictate that the Board must apply detailed

26   standards when evaluating whether an individual inmate is unsuitable

27   for parole on public safety grounds.  (See *In re Dannenberg* (2005) 34

28

                                        1

Cal.4th 1061 at p. 1096, footnote 16.)   Those standards are found in 15 CCR §2402(c) (Dannenberg, supra, 34 Cal.4th at p. 1080,) and do include detailed criteria to be applied by the Board when considering the commitment offense:

> (c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>
> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
> > (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> >
> > (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> >
> > (C) The victim was abused, defiled or mutilated during or after the offense.
> >
> > (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> >
> > (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

In response to Petitioners claim that the regulations are impermissibly vague, Respondent argues that while "especially heinous, atrocious or cruel" might be vague in the abstract it is limited by factors (A)-(E) of §2402(c)(1), and thus provides a 'principled basis' for distinguishing between those cases which are contemplated in that section and those which are not.   An examination of cases involving vagueness challenges to death penalty statutes is instructive here and shows that Respondent's position has merit:

"Our precedents make clear that a State's capital sentencing

scheme also must genuinely narrow the class of persons eligible
for the death penalty.  When the purpose of a statutory
aggravating circumstance is to enable the sentencer to
distinguish those who deserve capital punishment from those who
do not, the circumstance must provide a principled basis for
doing so.  If the sentencer fairly could conclude that an
aggravating circumstance applies to every defendant eligible for
the death penalty, the circumstance is constitutionally infirm."
(*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard v.
Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating
circumstance that 'an ordinary person could honestly believe'
described every murder," and, *Godfrey v. Georgia* (1980) 446 U.S.
420, 428-429: "A person of ordinary sensibility could fairly
characterize almost every murder as 'outrageously or wantonly
vile, horrible and inhuman.'")

It cannot fairly be said that 'every murder' could be

categorized as "especially heinous, atrocious or cruel" under the

Board regulations, since the defining factors contained in

subdivisions (A)-(E) clearly narrow the group of cases to which it

applies.  Although Petitioner also argues that the "vague statutory

language is not rendered more precise by defining it in terms or

synonyms of equal or greater uncertainty" (*People v. Superior Court

(Engert)* (1982) 31 Cal.3d 797, 803, *Pryor v. Municipal Court* (1979)

25 Cal.3d 238, 249. *See also Walton v. Arizona* (1990) 497 U.S. 639,

654), the factors in those subdivisions are not themselves vague or

uncertain.  The mere fact that there may be some subjective component

(such as "exceptionally callous" disregard for human suffering) does

not render that factor unconstitutionally vague.  The proper degree

of definition of such factors is not susceptible of mathematical

precision, but will be constitutionally sufficient if it gives

meaningful guidance to the Board.

A law is void for vagueness if it "fails to provide adequate
notice to those who must observe its strictures and
impermissibly delegates basic policy matters to policemen,
judges, and juries for resolution on an ad hoc and subjective
basis, with the attendant dangers of arbitrary and

3

discriminatory application."  (*People v. Rubalcava* (2000) 23 Cal.4th 322, 332, quoting *People ex rel. Gallo v. Acuna* (1997) 14 Cal. 4th 1090, 1116, quoting *Grayned v. City of Rockford* (1972) 408 U.S. 104, 108-109.)

A review of cases expressing approval of definitions to limit the application of otherwise vague terms in death penalty statutes leads inextricably to the conclusion that the limiting factors in §2402(c) easily pass constitutional muster.  An Arizona statute was upheld that provided a crime is committed in an 'especially cruel manner' when the perpetrator inflicts mental anguish or physical abuse before the victim's death," and that "mental anguish includes a victim's uncertainty as to his ultimate fate."  (*Walton v. Arizona* (1990) 497 U.S. 639, 654.)  Similarly, the court in *Maynard v. Cartwright*, 486 U.S. at 364-365, approved a definition that would limit Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance to murders involving "some kind of torture or physical abuse.  In Florida, the statute authorizing the death penalty if the crime is "especially heinous, atrocious, or cruel," satisfied due process concerns where it was further defined as "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Dixon* (1973) 283 So. 2d 1 at p. 9.

Here, the factors in subdivisions (A)-(E) provide equally clear limiting construction to the term "especially heinous, atrocious, or cruel" in §2402(c).

**Has the Board Engaged in a Pattern of Arbitrary Application of the Criteria?**

As previously noted, 15 CCR §2402 provides detailed criteria for determining whether a crime is "exceptionally heinous, atrocious or cruel" such that it tends to indicate unsuitability for parole.  Our

4

1   courts have held that to fit within those criteria and thus serve as

2   a basis for a finding of unsuitability, the circumstances of the

3   crime must be more aggravated or violent than the minimum necessary

4   to sustain a conviction for that offense. (*In re Rosenkrantz* (2002)

5   29 Cal.4th 616, 682-683.) Where that is the case, the nature of the

6   prisoner's offense, *alone,* can constitute a sufficient basis for

7   denying parole. (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095.)

8      Petitioner claims that those criteria, even if constitutionally

9   sound, have been applied by the Board in an arbitrary and capricious

10   manner rendering them devoid of any meaning whatever. The role of

11   the reviewing court under these circumstances has been addressed

12   previously in the specific context of Parole Board actions:

13      "[Courts have] an obligation, however, to look beyond the facial
       validity of a statute that is subject to possible

14      unconstitutional administration since a law though fair on its
       face and impartial in appearance may be open to serious abuses

15      in administration and courts may be imposed upon if the
       substantial rights of the persons charged are not adequately

16      safeguarded at every stage of the proceedings. We have
       recognized that this court's obligation to oversee the execution

17      of the penal laws of California extends not only to judicial
       proceedings, but also to the administration of the Indeterminate

18      Sentence Law." (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
       quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)

19

20      Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21   closest on point to the present situation, the California Supreme

22   Court stated: "This court has traditionally accepted its

23   responsibility to prevent an authority vested with discretion from

24   implementing a policy which would defeat the legislative motive for

25   enacting a system of laws." Where, as here, the question is whether

26   determinations are being made in a manner that is arbitrary and

27   capricious, judicial oversight "must be extensive enough to protect

28

1  limited right of parole applicants 'to be free from an arbitrary

2  parole decision... and to something more than mere pro-forma

3  consideration.'"  (In re Ramirez (2001) 94 Cal.App.4th 549 at p. 564,

4  quoting In re Sturm (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"

6  void for vagueness challenge.

7

8                    **The Evidence Presented**

9      A similar claim to those raised here, involving allegations of

10 abuse of discretion by the Board in making parole decisions, was

11 presented to the Court of Appeal in In re Ramirez, supra.  The court

12 there observed that such a "serious claim of abuse of discretion"

13 must be "adequately supported with evidence" which should be

14 "comprehensive."  (Ramirez, supra, 94 Cal.App.4th at p. 564, fn. 5.)

15 The claim was rejected in that case because there was not "a

16 sufficient record to evaluate."  (Ibid.)  In these cases, however,

17 there is comprehensive evidence offered in support of Petitioner's

18 claims.

19     Discovery orders were issued in five different cases involving

20 life term inmates (Petitioners) who all presented identical claims.[1]

21

22 [1] This Court takes judicial notice of the several other cases currently
   pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which
23 raise this same issue and in which proof was presented on this same point.
   (Evidence Code § 452(d).  See specifically, in the habeas corpus context,
24 In re Vargus (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
   notice was taken of the evidence in four other cases and in which the court
25 noted: "Facts from other cases may assist petitioner in establishing a
   pattern."  See generally McKell v. Washington Mutual, Inc. (2006) 142
26 Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
   judicial notice of ... established facts from both the same case and other
   cases."  And see AB Group v. Wertin (1997) 59 Cal.App.4th 1022, 1036:
27 Judicial notice taken of other cases when matters are "just as relevant to
   the present [case] as they are to the others.")

28

1    The purpose of the discovery was to bring before the Court a
2    comprehensive compilation and examination of Board decisions in a
3    statistically significant number of cases.  The Board decisions under
4    examination consisted of final decisions of the Board for life-term
5    inmates convicted of first or second degree murder and presently
6    eligible for parole.  Included were all such decisions issued in
7    certain months, chosen by virtue of their proximity in time to the
8    parole denials challenged in the pending petitions.  All Board
9    decisions in the months of August, September and October of 2002,
10   July, August, September, October, November, and December of 2003,
11   January and February of 2004, February of 2005, and January of 2006
12   were compiled.  This resulted in a review of 2690 cases decided in a
13   total of 13 months.

14       The purpose of the review was to determine how many inmates had
15   actually been denied parole based in whole or in part on the Board's
16   finding that their commitment offense fits the criteria set forth in
17   Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18   member of the research team conducting the review, Karen Rega,
19   testified that in its decisions the Board does not actually cite CCR
20   rule §2402(c), but consistently uses the specific words or phrases
21   ("verbiage from code") contained therein, so that it could easily be
22   determined when that criteria was being applied.  (For example,
23   finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24   "dispassionate" "calculated" or "execution style" invokes
25   §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26   invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or
27   demonstrated a "disregard for human suffering" fits criteria

28

1  §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2  or "trivial" invokes §2402(c)(1)(E).)

3      Petitioners provided charts, summaries, declarations, and the

4  raw data establishing the above in the cases of Lewis #68038,

5  Jameison #71194, Bragg #108543, and Ngo #127611.  In this case

6  (Criscione #71614) the evidence was presented somewhat differently.

7  Both to spread the burden of the exhaustive examination, and to

8  provide a check on Petitioners' methods, this Court ordered

9  Respondent to undertake an examination of two randomly chosen months

10  in the same manner as Petitioner had been doing.  Respondent complied

11  and provided periodic updates in which they continued to report that

12  at all "the relevant hearings the Board relied on the commitment

13  offense as a basis for denying parole."  (See "Respondent's Final

14  Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15  on this matter counsel for Respondents stipulated that "in all of

16  those cases examined [by Respondent pursuant to the Criscione

17  discovery orders] the Board relied on the commitment offense as a

18  basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19  evidentiary hearing transcript.)

20      The result of the initial examination was that in over 90

21  percent of cases the Board had found the commitment offense to be

22  "especially heinous, atrocious or cruel" as set forth in Title 15

23  §2402(c)(1).  In the remaining 10% of cases either parole had been

24  granted, or it was unclear whether §2402(c)(1) was a reason for the

25  parole denial.  For all such cases, the decisions in the prior

26  hearing for the inmate were obtained and examined.  In every case,

27  the Board had determined at some point in time that every inmates

28

8

1    crime was "especially heinous, atrocious or cruel" under Title 15
2    §2402(c)(1).

3        Thus, it was shown that 100% of commitment offenses reviewed by
4    the Board during the 13 months under examination were found to be
5    "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6        A further statistic of significance in this case is that there
7    are only 9,750 inmates total who are eligible for, and who are
8    currently receiving, parole consideration hearings as life term
9    inmates.   (See "Respondent's Evidentiary Hearing Brief," at p. 4,
10   filed April 16, 2007.)

11

12                              **USE OF STATISTICS**

13       In *International Brotherhood of Teamsters v. United States*
14   (1977) 431 U.S. 324, 338-340, the United States Supreme Court
15   reaffirmed that statistical evidence, of sufficient "proportions,"
16   can be sound and compelling proof.   As noted by the court in *Everett*
17   *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited
18   therein, "courts regularly have employed statistics to support an
19   inference of intentional discrimination."

20       More recently, the United States Supreme Court, in *Miller-El v.*
21   *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas
22   petitioner's allegations that the prosecutor was illegally using his
23   peremptory challenges to exclude African-Americans from the
24   petitioner's jury, noted that "the statistical evidence alone" was
25   compelling.   The high court analyzed the numbers and concluded:
26   "Happenstance is unlikely to produce this disparity."   (See also
27   *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

1   evidence" was noted as possibly being dispositive.  And see *People v.*
2   *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3   analysis, combined into an "actuarial instrument" was substantial
4   proof.)

5       A statistical compilation and examination such as has been
6   presented in these cases is entirely appropriate and sufficient
7   evidence from which to draw sound conclusions about the Board's
8   overall methods and practices.

9

10              **THE EXPERT'S TESTIMONY**

11      Petitioners provided expert testimony from Professor Mohammad
12  Kafai regarding the statistics and the conclusions that necessarily
13  follow from them.  Professor Kafai is the director of the statistics
14  program at San Francisco State University, he personally teaches
15  statistics and probabilities, and it was undisputed that he was
16  qualified to give the expert testimony that he did.  No evidence was
17  presented that conflicts or contradicts the testimony and conclusions
18  of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19  testimony was to be admissible and considered in the cases of all
20  five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21  hearing transcript.)

22      Professor Kafai testified that the samples in each case, which
23  consisted of two or three months of Board decisions, are
24  statistically sufficient to draw conclusions about the entire
25  population of life term inmates currently facing parole eligibility
26  hearings.  Given that every inmate within the statistically
27  significant samples had his or her crime labeled "'particularly

28

                            10

1   egregious'" or "especially heinous, atrocious or cruel" under Title

2   15 §2402(c)(1), it can be mathematically concluded that the same

3   finding has been made for every inmate in the entire population of

4   9,750.  Although he testified that statisticians never like to state

5   unequivocally that something is proven to a 100% certainty, (because

6   unforeseen anomalies are always theoretically possible,) he did

7   indicate the evidence he had thus far examined came as close to that

8   conclusion as could be allowed.  Not surprisingly, Professor Kafai

9   also testified that "more than 50% can't by definition constitute an

10  exception."

11      Having found the data provided to the expert to be sound this

12  Court also finds the expert's conclusions to be sound.  In each of

13  the five cases before the Court over 400 inmates were randomly chosen

14  for examination.  That number was statistically significant and was

15  enough for the expert to draw conclusions about the entire population

16  of 9,750 parole eligible inmates.  The fact that the approximately

17  2000 inmates examined in the other cases also had their parole denied

18  based entirely or in part on the crime itself (§2402(c)(1)), both

19  corroborates and validates the expert's conclusion in each individual

20  case and also provides an overwhelming and irrefutable sample size

21  from which even a non expert can confidently draw conclusions.

22

23                           **DISCUSSION**

24      Although the evidence establishes that the Board frequently says

25  parole is denied "first," "foremost," "primarily," or "mainly,"

26  because of the commitment offense, this statement of primacy or

27  weight is not relevant to the question now before the Court.

28

                                 11

1  Petitioners acknowledge that the Board generally also cites other
2  reasons for its decision.  The question before this Court, however,
3  is not whether the commitment offense is the primary or sole reason
4  why parole is denied -- the question is whether the commitment
5  offense is labeled "'particularly egregious'" and thus could be used,
6  under *Dannenberg*, primarily or exclusively to deny parole.
7      The evidence proves that in a relevant and statistically
8  significant period where the Board has considered life term offenses
9  in the context of a parole suitability determination, every such
10  offense has been found to be "particularly egregious" or "especially
11  heinous, atrocious or cruel."[2]  This evidence conclusively
12  demonstrates that the Board completely disregards the detailed
13  standards and criteria of §2402(c).  "Especially" means particularly,
14  or "to a distinctly greater extent or degree than is common."[3]  (EC §
15  451(e).)  By simple definition the term "especially" as contained in
16  section 2402(C)(1) cannot possibly apply in 100% of cases, yet that
17  is precisely how it has been applied by the Board.  As pointed out by
18  the Second District Court of Appeal, not every murder can be found to
19  be "atrocious, heinous, or callous" or the equivalent without "doing
20
21  [2] In a single case out of the 2690 that were examined Petitioner has conceded that
    the Board did not invoke §2402(c)(1).  This Court finds that concession to be
    improvidently made and the result of over caution.  When announcing the decision at
    the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
22  by stating "I don't believe this offense is particularly aggravated..."  However
    the commissioner proceeds to describe the crime as a drug deal to which Fletcher
23  brought a gun so "we could say there was some measure of calculation in that."  The
    commissioner continued by observing that the reason someone would bring a gun to a
24  drug transaction was to make sure things went according to their plan "so I guess
    we can say that that represents calculation and perhaps it's aggravated to that
    extent."  As is the Board's standard practice, by using the word 'calculated' from
25  §2402(c)(1)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher
    had brought a habeas petition Respondent's position would be that there is 'some
26  evidence' supporting this.  The ambiguity created by the commissioner's initial
    statement was cleared up several pages later when he announces that "based upon the
27  crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2006)
    136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
    year denial.)
28

12

1  violence" to the requirements of due process. (*In re Lawrence* (2007)

2  150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred

3  here, where the evidence shows that the determinations of the Board

4  in this regard are made not on the basis of detailed guidelines and

5  individualized consideration, but rather through the use of all

6  encompassing catch phrases gleaned from the regulations.

7

8                          **THE BOARD'S METHODS**

9       Because it makes no effort to distinguish the applicability of

10  the criteria between one case and another, the Board is able to force

11  every case of murder into one or more of the categories contained in

12  §2402(c).

13       For example, if the inmate's actions result in an instant death

14  the Board finds that it was done in a "dispassionate and calculated

15  manner, such as an execution-style murder."  At the same time the

16  Board finds that a murder not resulting in near instant death shows a

17  "callous disregard for human suffering" without any further analysis

18  or articulation of facts which justify that conclusion.  If a knife

19  or blunt object was used, the victim was "abused, defiled, or

20  mutilated."  If a gun was used the murder was performed in a

21  "dispassionate and calculated manner, such as an execution-style

22  murder."  If bare hands were used to extinguish another human life

23  then the crime is "particularly heinous and atrocious."

24       Similarly, if several acts, spanning some amount of time, were

25  necessary for the murder the Board may deny parole because the inmate

26  had "opportunities to stop" but did not.  However if the murder was

27  _____

28  [3] Princeton University World Net Dictionary (2006).

1  accomplished quickly parole will be denied because it was done in a
2  dispassionate and calculated manner and the victim never had a chance
3  to defend themselves or flee.  If the crime occurred in public, or
4  with other people in the vicinity, it has been said that the inmate
5  "showed a callous disregard" or "lack of respect" for the
6  "community."  However if the crime occurs when the victim is found
7  alone it could be said that the inmate's actions were aggravated
8  because the victim was isolated and more vulnerable.

9      In this manner, under the Board's cursory approach, every murder
10 has been found to fit within the unsuitability criteria.  What this
11 reduces to is nothing less than a denial of parole for the very
12 reason the inmates are present before the Board - i.e. they committed
13 murder.  It is circular reasoning, or in fact no reasoning at all,
14 for the Board to begin each hearing by stating the inmate is before
15 them for parole consideration, having passed the minimum eligible
16 parole date based on a murder conviction, and for the Board to then
17 conclude that parole will be denied because the inmate committed acts
18 that amount to nothing more than the minimum necessary to convict
19 them of that crime.  As stated quite plainly by the Sixth District:
20 "A conviction for murder does not automatically render one unsuitable
21 for parole."  (*Smith, supra*, 114 Cal.App.4th at p. 366, citing
22 *Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

23     In summary, when every single inmate is denied parole because
24 his or her crime qualifies as a §2402(c)(1) exception to the rule
25 that a parole date shall normally be set, then the exception has
26 clearly swallowed the rule and the rule is being illegally
27 interpreted and applied.  When every single life crime that the Board
28

1  examines is "particularly egregious" and "especially heinous,

2  atrocious or cruel" it is obvious that the Board is operating without

3  any limits and with unfettered discretion.

4      Other examples of the failure to 'connect up' the facts of the

5  individual case with the criteria and the ultimate findings abound in

6  the decisions of the reviewing courts.  Some of the state cases to

7  have reversed Parole Board or Governor abuses of discretion in

8  denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9  *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10 *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith,* and *In*

11 *re Capistran.*

12     When "the record provides no reasonable grounds to reject, or

13 even challenge, the findings and conclusions of the psychologist and

14 counselor concerning [the inmate's] dangerousness" the Board may not

15 do so.  (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16     When an inmate, although only convicted of a second degree

17 murder, has been incarcerated for such time that, with custody

18 credits, he would have reached his MEPD if he had been convicted of a

19 first, the Board must point to evidence that his crime was aggravated

20 or exceptional even for a first degree murder if they are going to

21 use the crime as a basis for denying parole.  (*In re Weider* (2006)

22 145 Cal.App.4th 570, 582-583.)[4]

23

24 [4]   This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra*, is
    particularly applicable in this case.  Petitioner was convicted of second degree,
25 but acquitted of first degree, murder over 25 years ago.  (*People v. Criscione*
    (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even
26 had he been convicted of a first.  In a currently pending habeas petition in which
    he challenges his 2007 parole denial the first reason the Board gave was the crime
    itself and the presiding commissioner explained: "His actions go well beyond the
    minimum necessary for a conviction of murder in the second degree."  (Decision page
27 2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact
    that he was acquitted of first degree is further proof of their willfulness and

28

15

1    A "petitioner's young age at the time of the offense" must be

2  considered.  (In re Elkins (2006) 144 Cal.App.4th 475, 500, quoting

3  Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4  1085: "The reliability of the facts of the crime as a predictor for

5  his dangerousness was diminished further by his young age of 18, just

6  barely an adult. 'The susceptibility of juveniles to immature and

7  irresponsible behavior means their irresponsible conduct is not as

8  morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in

10  a conclusory fashion, and then stating "this is derived from the

11  facts" without ever linking the two together, is insufficient.  (In

12  re Roderick, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the

13  Board is responsible for articulating the grounds for its findings

14  and for citing to evidence supporting those grounds."  (See also In

15  re Barker (2007) 151 Cal.App.4th 346, 371, disapproving

16  "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,

18  predictive value for future criminality.  Simply from the passing of

19  time, [an inmate's] crimes almost 20 years ago have lost much of

20  their usefulness in foreseeing the likelihood of future offenses than

21  if he had committed them five or ten years ago."  (In re Lee (2006)

22  143 Cal.App.4th 1400, 1412.)  It should be noted that this rule

23

24  bias.  The jury had a reasonable doubt that Petitioner committed first degree
murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
position than if they had not.  Had the jury convicted him of the greater offense

25  Petitioner has served so much time that he would already be having subsequent
parole hearings on a first and the Board would not have been able to use the 'some
evidence' of first degree behavior against him.  As observed previously, the

26  Board's position in this regard is "so ridiculous that simply to state it is to
refute it."  (Weider, supra, 145 Cal.App.4th at p. 583.)

27  [5] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
18 at the time of his crime.  The impetus behind the shooting was youth group or

28

16

1   applies with even more force when the Board is relying on any

2   criminality that occurred before the crime.  In that situation, just

3   as with the crime itself, the Board must explain why such old events

4   have any relevance and especially when the inmate has spent a decade

5   as a model prisoner.

6       Murders situationally related to intimate relationships are

7   unfortunately commonplace because emotions are strongest in such

8   domestic settings.  When a murder occurs because of "stress unlikely

9   to be reproduced in the future" this is a factor that affirmatively

10  points towards suitability.  (*In re Lawrence* (2007) 150 Cal.App.4th

11  1511 and cases cited therein.)

12      "The evidence must substantiate the ultimate conclusion that the

13  prisoner's release currently poses an unreasonable risk of danger to

14  the public.  It violates a prisoner's right to due process when the

15  Board or Governor attaches significance to evidence that forewarns no

16  danger to the public."  (*In re Tripp* (2007) 150 Cal.App.4th 306,

17  313.)

18      The Board "cannot rely on the fact that the killing could have

19  been avoided to show the killing was especially brutal."  (*In re*

20  *Cooper* (2007) 153 Cal.App.4th 1043, 1064.)

21      The Board's focus must be upon how the inmate "actually

22  committed his crimes" not the "incorporeal realm of legal

23  constructs."  (*Lee, supra*, 143 Cal.App.4th at p. 1413.)  This is

24  especially significant when the murder conviction is based on the

25  felony murder rule, provocative act doctrine, or accomplice liability

26  such that the inmate did not intend to kill or may not have even been

27  _____

    gang rivalries, posturing, and threats which mature adults would not have been

28

17

1  the actual killer.

2      The Board has ample guidance before it in the decisions of the

3  various reviewing courts to constrain its abuse, but has failed to

4  avail itself of the opportunity to do so.

5

6                    **SEPARATION OF POWERS DOCTRINE**

7      The evidence presented, as discussed above, has established a

8  void for vagueness "as applied" due process violation.  That same

9  evidence also proves a separate but related Constitutional violation

10  -- an as applied separation of powers violation.

11      The separation of powers doctrine provides "that the legislative

12  power is the power to enact statutes, the executive power is the

13  power to execute or enforce statutes, and the judicial power is the

14  power to interpret statutes and to determine their

15  constitutionality."  (*Lockyer v. City and County of San Francisco*

16  (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

17  Board is not executing/enforcing the legislature's statutes as

18  intended it is this Court's duty to intervene.  The question here is

19  whether the Board is violating the separation of powers doctrine by

20  appropriating to itself absolute power over parole matters and

21  disregarding the limits and guidelines placed by the statute.[6]

22      "Government Code section 11342.2 provides: 'Whenever by the

23

24  caught up in.
   [6] "It is settled that Administrative regulations that violate acts of the
25  Legislature are void and no protestations that they are merely an exercise of
   administrative discretion can sanctify them.  They must conform to the legislative
   will if we are to preserve an orderly system of government.  Nor is the motivation
26  of the agency relevant: It is fundamental that an administrative agency may not
   usurp the legislative function, no matter how altruistic its motives are."
27  (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
   Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
   San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

28

1    express or implied terms of any statute a state agency has authority

2    to adopt regulations to implement, interpret, make specific or

3    otherwise carry out the provisions of the statute, no regulation

4    adopted is valid or effective unless consistent and not in conflict

5    with the statute and reasonably necessary to effectuate the purpose

6    of the statute.'  Administrative regulations that alter or amend the

7    statute or enlarge or impair its scope are void and courts not only

8    may, but it is their obligation to strike down such regulations."

9    (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75

10    Cal.App.4th 1315, 1341, citations omitted.)

11        The vice of overbroad and vague regulations such as are at issue

12    here is that they can be manipulated, or 'interpreted,' by executive

13    agencies as a source of unfettered discretion to apply the law

14    without regard to the intend of the people as expressed by the

15    legislature's enabling statutes.  In short, agencies usurp unlimited

16    authority from vague regulations and become super-legislatures that

17    are unaccountable to the people.  As it has sometimes been framed and

18    addressed in the case law, a vague or all encompassing standard runs

19    the risk of "violat[ing] the separation of powers doctrine by

20    'transforming every [executive decisionmaker] into a "mini-

21    legislature" with the power to determine on an ad hoc basis what

22    types of behavior [satisfy their jurisdiction].'"  (*People v. Ellison*

23    (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*

24    *(Caswell)* (1988) 46 Cal.3d 381, 402.)

25        "It is concern about 'encroachment and aggrandizement,' the

26    [United States Supreme Court] reiterated, that has animated its

27    separation of powers jurisprudence.  'Accordingly, we have not

28

1  hesitated to strike down provisions of law that either accrete to a

2  single Branch powers more appropriately diffused among separate

3  Branches or that undermine the authority and independence of one or

4  another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th

5  472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,

6  382.)  This articulation of the principle speaks directly to the

7  situation at hand.  The Board, by its enactment and interpretation of

8  Title 15, §2402, has appropriated to itself absolute power over

9  'lifer' matters.  Overreaching beyond the letter and spirit of the

10 Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by

11 the Board to supply the power to declare every crime enough to deny

12 parole forever.  The fact that Title 15, §2402, has been invoked in

13 every case, but then sometime later not invoked, tends to show either

14 completely arbitrary and capricious behavior or that unwritten

15 standards are what really determine outcomes.  In either event, all

16 pretenses of taking guidance from, or being limited by, the

17 legislature's statutes have been abandoned.  "[I]t is an elementary

18 proposition that statutes control administrative interpretations."

19 (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)

20 Title 15 §2402 as applied, however, has no controls or limitations.

21     The PC § 3041(b) exception to the rule can only be invoked when

22 the "gravity of the current convicted offense or offenses, or the

23 timing and gravity of current or past convicted offense or offenses,

24 is such that consideration of the public safety requires a more

25 lengthy period of incarceration for this individual."  The word

26 "gravity" is a directive for comparison just as "more lengthy"

27 indicates a deviation from the norm.  While *Dannenberg* held there

28

1  does not need to be intra case comparison for the purposes of term

2  uniformity or proportionality, there necessarily has to be some sort

3  of comparison for the purposes of adhering to the legislative mandate

4  that parole is available.  The Board employs no meaningful yardstick

5  in measuring parole suitability.  This is a violation of the

6  separation of powers doctrine.  (*People v. Wright* (1982) 30 Cal.3d

7  705, 712-713.  And see *Terhune v. Superior Court* (1998) 65

8  Cal.App.4th 864, 872-873.  Compare *Whitman v. Am. Trucking Ass'ns*

9  (2001) 531 U.S. 457, 472, describing a delegation challenge as

10  existing when the legislature fails to lay down "an intelligible

11  principle to which the person or body authorized to act is directed

12  to conform.")

13

14                              **RESPONDENT'S POSITION**

15      The Attorney General has suggested, without pointing to any

16  concrete examples, that it is possible that the Board, when invoking

17  the crime as a reason to deny parole, is not placing it within

18  §2402(c)(1) but instead using is as some sort of 'lesser factor'

19  which, only when combined with other unsuitability criteria, can

20  contribute to a valid parole denial.  The two problems with this

21  position are, first, there is no evidentiary support for this

22  assertion, and second, it would have no impact on the constitutional

23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was

25  utilizing the crime as a 'lesser factor' which needs others to fully

26  support a parole denial, the Board would then be admitting it was

27  denying parole, in part, for the very reason that the person is

28

1  before the panel and eligible for parole in the first place - the

2  commitment offense.  Respondent's argument suggests that a crime that

3  only qualified as the *Dannenberg* "minimum necessary" could still be

4  invoked as a reason for denying parole.  Respondent argues that when

5  the crime is invoked 'not in the *Dannenberg* sense,' there must be

6  other reasons for the parole denial and the crime alone would not be

7  enough in this context.  This position is inconsistent with the law

8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly

10 egregious," or one where "no circumstances of the offense reasonably

11 could be considered more aggravated or violent than the minimum

12 necessary to sustain a conviction for that offense."  (*Dannenberg,*

13 *supra,* 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.

14  If a crime consists of only the bare elements then it is not

15 aggravated and it cannot, in and of itself, serve as a basis for

16 parole denials once the inmate becomes eligible for parole.  It is

17 the reason an inmate may be incarcerated initially for the equivalent

18 of 15 or 25 years, and then examined to determination rehabilitation

19 efforts when they come before the Board, but a crime that is no more

20 than the bare minimum cannot be factored into the equation pursuant

21 to PC § 3041(b) or any of the case law interpreting it.

22      In oral argument Respondent suggested a second way the

23 commitment offense can be used outside of §2402(c)(1).  If for

24 example a crime had its roots in gang allegiances or rivalries and

25 the inmate continued to associate with gangs while incarcerated, then

26 an aspect of the crime, even if the crime otherwise consisted of no

27 more than the minimum elements, could be combined with other behavior

28

1  to support a parole denial. Similarly, if a crime was rooted in an

2  inmate's then existing drug addiction, and the Board was to point to

3  a recent 115 involving drugs, the evidence that the inmate's drug

4  issues had not been resolved would justify a parole denial even if

5  the crime itself was not aggravated. A finding that the inmate is

6  not suitable for release under these circumstances, however, is not

7  based on the facts of the commitment offense as tending to show

8  unsuitability. It is based on the conclusion that can be drawn about

9  Petitioner's lack of rehabilitation or change since the offense, and

10 thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's

12 methodology or analysis, nor, provided any actual evidence of the

13 crime being invoked *other* than pursuant to §2402(c)(1). Drawing

14 conclusions from the Board's direct statements, or its precise

15 recitations of the §2402(c)(1) language, logically indicates an

16 invocation of §2402(c)(1), and Respondent's suggestion otherwise is

17 insupportable.

18

19               **THE QUESTION OF BIAS**

20      Because the issue has been squarely presented, and strenuously

21 argued by Petitioners, this Court is obligated to rule on the charge

22 that the Board's actions prove an overriding bias and deliberate

23 corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*

25 *Aikens* (1983) 460 U.S. 711, the United States Supreme Court

26 acknowledged "there will seldom be 'eyewitness' testimony as to the

27 [] mental processes" of the allegedly biased decisionmaker. Instead,

28

                              23

1 an examination of other cases for trends or patterns can provide the

2 necessary circumstantial evidence. (See *Aikens, supra,* at footnote

3 2.) Reaffirming that such circumstantial evidence will be sufficient

4 the Court stated: "The law often obliges finders of fact to inquire

5 into a person's state of mind. As Lord Justice Bowen said in

6 treating this problem in an action for misrepresentation nearly a

7 century ago, 'The state of a man's mind is as much a fact as the

8 state of his digestion. It is true that it is very difficult to

9 prove what the state of a man's mind at a particular time is, but if

10 it can be ascertained it is as much a fact as anything else.'"

11 (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29

12 Ch. Div. 459, 483.)[7]

13      The discovery in these cases was granted in part due to the

14 Petitioners' prima facie showing of bias and the necessity that it be

15 "adequately supported with evidence" if such evidence is available.

16 (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5. See also *Nasha v.*

17 *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking

18 to show bias or prejudice on the part of an administrative decision

19 maker is required to prove the same 'with concrete facts.'" And see

20 *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,

21 841: "The challenge to the fairness of the adjudicator must set forth

22 concrete facts demonstrating bias or prejudice." See also *Hobson v.*

23

24 [7] As occurred in *Aikens, supra,* and as suggested in prior orders of this Court, Respondent should have provided direct evidence from the decisionmakers. While the fact that a *Defendant* does not explain his or her actions cannot be held against

25 him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S. 610,) it is appropriate to give some weight to the consideration that the Board has

26 failed to offer any direct evidence or explanation on its own behalf. While the case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the proposition that *Petitioner* may not inquire into the Board members mental

27 processes, Respondent is not precluded from offering such direct evidence if they were able to testify as to their good faith and conscientious efforts.

28

1    *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.

2    school desegregation case in which the court determined from a

3    statistical and factual analysis that racial bias was influencing

4    policy.)

5        In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6    a similar claim of biased decision making was asserted and it was

7    rejected because, although the defendant clearly articulated it, "he

8    has not demonstrated it.  Therefore, he has failed to bear his burden

9    of showing a constitutional violation as a demonstrable reality, not

10   mere speculation."  In the present cases Petitioners have provided

11   overwhelming concrete evidence.  It is difficult to believe that the

12   Board's universal application of §2402(c)(1) has been an inadvertent

13   mistake or oversight on their part.  It is hard to credit the Board's

14   position that it does not know its own patterns and practices reveal

15   a complete lack of standards or constraints on their power.

16   Respondent's protestations ring hollow, and it seems a statistical

17   impossibility, that the Board's use of "detailed" criteria in such a

18   fashion that they are rendered meaningless is a result of good faith

19   efforts on their part.  That every murder is "especially heinous,

20   atrocious or cruel," and can therefore be an exception to the rule

21   that a parole date should be set, does not seem to be an accident on

22   their part.

23       Although no court has thus far agreed with the accusation that

24   the Board approaches its duties with a predetermination and a bias,

25   no court has previously been presented the comprehensive evidence

26   outlined herein.  While this Court does not turn a blind eye to the

27   reasonable conclusion that the Board's unconstitutional practices are

28

                                    25

1  willful, there is another possibility. The pattern of errors

2  demonstrated by the discovery in this case, and the continuously

3  growing body of Court of Appeal opinions finding consistent and

4  persistent abuse of discretion, may instead be caused by the fact

5  that the Board is simply overworked and substantively untrained. The

6  impossibility of the blanket applicability of §2402(c)(1) may be only

7  the result of sloppy preparation and inadvertent carelessness.

8       The Board must first be given an opportunity to comply with the

9  necessary remedy provided by this court before it is possible to

10 enter a finding of conscious bias and illegal sub rosa policy. To do

11 otherwise would ignore the complexities and magnitude of the largely

12 discretionary duties with which that Board is vested.

13

14                          **CONCLUSION**

15      The conclusive nature of the proof in this case, and the

16 suggestion of institutional bias do not preclude formulation of an

17 remedy which will guarantee adequate restrictions on, and guidance

18 for, the Board's exercise of discretion in making parole suitability

19 determinations. The Board can be made to lawfully perform its duties

20 if given explicit instructions.

21      As noted supra, a reason the proof in this case irrefutably

22 establishes constitutional violations is because the Board does not,

23 in actual fact, operate within the limiting construction of the

24 regulations. The Board's expansive interpretation allows it to

25 operate without any true standards. Although numerous rulings of

26 both state and federal courts of appeal have invalidated the Board's

27 application of the §2402(c) criteria to particular facts, the Board

28

                               26

1  does not take guidance from these binding precedents and ignores them

2  for all other purposes.  In the most recent of these cases, *In re*

3  *Roderick*, (2007) ____ Cal.App.4th ____ (A113370) the First District

4  held four of five §2402 factors "found" by the Board to be

5  unsupported by any evidence.  At footnote 14 the court took the time

6  to criticize the Board for its repeated use of a "stock phrase"

7  "generically across the state."  The court also clarified that "at

8  minimum, the Board is responsible for articulating the grounds for

9  its findings and for citing to evidence supporting those grounds."

10      There is nothing in the evidence presented that would allow any

11  conclusion but that, without intervention of the Courts, the Board

12  will ignore the lessons of these rulings in the future and continue

13  to employ its formulaic approach of citing a criteria from

14  §2402(c)(1), repeating the facts of the crime, but never

15  demonstrating a logical connection between the two.  This is the

16  core problem with the Board's methodology -- they provide no

17  explanation or rationale for the findings regarding the crime itself.

18   This practice results in violence to the requirements of due

19  process and individualized consideration which are paramount to the

20  appropriate exercise of its broad discretion.

21      The only solution is one that compels the Board to identify the

22  logical connection between the facts upon which it relies and the

23  specific criteria found to apply in the individual case.    For

24  example, the Board often finds that an inmate's motive is "trivial"

25  without ever suggesting why, on these facts, that motive is not just

26  as trivial as the motive behind any other murder.  What motive is not

27  trivial?   By any definition "trivial" is a word of comparison and

28

only has meaning when there can be examples that are not "trivial."

Similarly, although the Sixth District made it plain four years ago that "all [] murders by definition involve some callousness," (*In re Smith* (2003) 114 Cal.App.4th 343, 345,) the Board has continued to deny countless paroles labeling the crime "callous" without ever suggesting what crime would not qualify as "callous" and without consistently explaining why the individual case before it demonstrates "exceptional" callousness.

Respondent has consistently refused to suggest what possible instances of murder would *not* fit the Board's amorphous application of the §2402 criteria. Citing *Dannenberg*, Respondent insists such comparative analysis is unnecessary. Respondent fundamentally misunderstands the *Dannenberg* holding.

The PC § 3041(b) exception to the rule can only be invoked when the "gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual." The word "gravity" is a directive for comparison just as "more lengthy" indicates a deviation from the norm. While *Dannenberg* held there does not need to be intra case comparison for the purposes of term uniformity or proportionality, there necessarily has to be some sort of comparison for the purposes of adhering to the legislative mandate that parole is available. This is implicit in §2402 because the qualifier "especially," in "especially heinous atrocious or cruel," requires that some form of comparison be made. While the original drafters of §2402 seemed to have recognized this fact, the ongoing

1  conduct of the Board has completely ignored it, and this is the

2  essence of the due process violation Petitioners have asserted.

3     As noted in his dissent in the recent case of *In re Roderick,*

4  *supra*, Justice Sepulveda would have deferred to the Board's

5  'exercise' of discretion because "Board members have both training

6  and vast experience in this field.  They conduct literally thousands

7  of parole suitability hearings each year.  The Board therefore has

8  the opportunity to evaluate the egregiousness of the facts of a great

9  number of commitment offenses.  ...  The Board's training and

10  experience in evaluating these circumstances far exceeds that of

11  most, if not all, judges."  The evidence in this case, however,

12  suggests a flaw in granting such deference.  Since the Board

13  continues to place every murder in the category of offenses "tending

14  to show unsuitability," something is certainly wrong.  Since the

15  Board's vast experience is undeniable, the problem must be in the

16  Board's training and understanding of the distinguishing features of

17  the guidelines and criteria.  Although Justice Sepulveda presumes

18  that Board members receive substantive training, there is no evidence

19  before this court to suggest that it does, and substantial

20  circumstantial evidence to suggest that it does not.

21     In the vast numbers of Santa Clara County cases reviewed by this

22  Court, the Board's formulaic decisions regarding the commitment

23  offense do not contain any explanation or thoughtful reasoning.

24  Instead, the Board's conclusionary invocation of words from

25  §2402(c)(1) is linked to a repetition of the facts from the Board

26  report by the stock phrase: "These conclusions are drawn from the

27  statement of facts wherein ..."  Thereafter the inmate files a habeas

28

1  corpus petition and Respondent, after requesting an extension of
2  time, files a boilerplate reply asserting the Board's power is
3  "great" and "almost unlimited" and thus any "modicum" of evidence
4  suffices.  Respondent does not cite or distinguish the expanding body
5  of case law that is often directly on point as to specific findings
6  made.  Thereafter, if the writ is granted, the Board is directed to
7  conduct a new hearing "in compliance with due process" and that order
8  is appealed by Respondent.  On appeal the order is usually upheld
9  with modifications and in the end, after countless hours of attorney
10 and judicial time, the Board conducts a new two hour hearing at which
11 they abuse their discretion and violate due process in some different
12 way.

13     This system is malfunctioning and must be repaired.  The
14 solution must begin with the source of the problem.  The Board must
15 make efforts to comply with due process in the first instance.  The
16 case law published over the last five years provides ample and
17 sufficient guidelines and must be followed.  Although the Board
18 methods suggest it believes this to be optional, it is not.

19
20                         **THE REMEDY**

21     Thus, it is the order of this Court that the Board develop,
22 submit for approval, and then institute a training policy for its
23 members based on the current and expanding body of published state,
24 and federal, case law reviewing parole suitability decisions, and
25 specifically the application of §2402 criteria.  In addition to
26 developing guidelines and further criteria for the substantive
27 application of §2402 the Board must develop rules, policies and
28

1  procedures to ensure that the substantive guidelines are followed.

2      This Court finds its authority to impose this remedy to flow

3  from the fundamental principles of judicial review announced over two

4  centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5  Citing that landmark case, the California Supreme Court has

6  recognized "Under time-honored principles of the common law, these

7  incidents of the parole applicant's right to 'due consideration'

8  cannot exist in any practical sense unless there also exists a remedy

9  against their abrogation."  (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10      In *Strum* the court directed that the Board modify its rules and

11  procedures so that thereafter "The Authority will be required [,]

12  commencing with the finality of this opinion, to support all its

13  denials of parole with a written, definitive statement of its reasons

14  therefor and to communicate such statement to the inmate concerned."

15  (*Sturm* at p. 273.)

16      Similarly, in the case of *Minnis, supra*, the California Supreme

17  Court held the Board's policy of categorically denying parole to drug

18  dealers was illegal.  Based on its analysis the court there was

19  clearly prepared to order that Board to modify its rules and

20  procedures however such was unnecessary because the Board

21  "voluntarily rescinded" the illegal policy.  While the remedy in this

22  case is of greater scope than that necessary in either *Strum* or

23  *Minnis, supra*, so too has been the showing of a systematic abuse of

24  discretion and distortion of process.

25      The most recent case to address the court's roles and duties in

26  overseeing the parole suitability process has been *In re Rosenkrantz,*

27  *supra,* 29 Cal.4th 616.  In that case the court explained that

28

1  judicial review of a Governor's parole determination comports with,
2  and indeed furthers, separation of powers principles because the
3  courts are not exercising "complete power" over the executive branch
4  and do not "defeat or materially impair" the appropriate exercise or
5  scope of executive duties. (*Rosenkrantz* at p. 662.) Citing *Strum*,
6  *supra*, the court reaffirmed that a life term inmate's "due process
7  rights cannot exist in any practical sense without a remedy against
8  its abrogation." (*Rosenkrantz* at p. 664.)

9      The *Rosenkrantz* court also put forth what it believed was an
10 extreme example but which, unfortunately, has been shown to exist in
11 this case.  The court stated: "In the present context, for example,
12 judicial review could prevent a Governor from usurping the
13 legislative power, in the event a Governor failed to observe the
14 constitutionally specified limitations upon the parole review
15 authority imposed by the voters and the Legislature."  This is
16 exactly what the evidence in this case has proven.  As noted above
17 the Board has arrogated to itself absolute authority, despite
18 legislative limitations and presumptions, through the mechanism of a
19 vague and all inclusive, and thus truly meaningless, application of
20 standards.  The remedy this Court is imposing is narrowly tailored to
21 redress this constitutional violation.

22     The consequence of the Board's actions (of giving § 2402(c)(1)
23 such a broadly all encompassing and universal application) is that
24 they have unwittingly invalidated the basis of the California Supreme
25 Court's holding in *Dannenberg*.  The reason the four justice majority
26 in *Dannenberg* upheld the Board's standard operating procedures in the
27 face of the Court of Appeal and dissent position is because "the

28

1    Board must apply detailed standards when evaluating whether an

2    individual inmate is unsuitable for parole on public safety grounds."

3    (*Dannenberg* at p. 1096, footnote 16. See also page 1080: "the

4    regulations do set detailed standards and criteria for determining

5    whether a murderer with an indeterminate life sentence is suitable

6    for parole.")   However, Petitioners in these cases have proven that

7    there are no "detailed standards" at all.  Instead the Board has

8    systematically reduced the "detailed standards" to empty words.  The

9    remedy this Court orders, that there truly be "detailed standards,"

10   requires the promulgation of further rules and procedures to

11   constrain and guide the Board's powers.  This remedy differs in

12   specifics, but not in kind, from what courts have previously imposed

13   and have always had the power to impose.

14       The Board must fashion a training program and further rules,

15   standards and regulations based on the opinions and decisions of the

16   state and federal court cases which provide a limiting construction

17   to the criteria which are applied.[9]  The Board must also make

18   provisions for the continuing education of its commissioners as new

19   case law is published and becomes binding authority.  This Court will

20   not, at this point, outline the requirements and lessons to be taken

21   from the above cases.  It is the Board's duty, in the first instance

22   to undertake this task.  The training program, and associated rules

23   and regulations, shall be served and submitted to this Court, in

24   _____

25   [8]While the showing and analysis in this case was limited to § 2402(c)(1), the
     conclusions that the evidence compelled, that the Board has been carelessly
     distorting and misapplying the regulations, is not so limited. Accordingly, the
26   training program that is necessary for the Board can not reasonably be limited to
     just § 2402(c)(1). Thus, to the extent case law recognizes, clarifies and
     establishes remedies for other due process violations they must also be
27   incorporated into the necessary rules and training the Board is required to abide
     by.

28

1  writing, within 90 days.  Counsel for Petitioners, and any other
2  interested parties, may submit briefs or comments within 30 days
3  thereafter.  After receipt and review of the materials this Court
4  will finalize the training program, and associated rules, and the
5  Petitioners in these cases shall receive a new hearing before a Board
6  that does not operate with the unfettered discretion and caprice
7  demonstrated by the evidence here presented.

8                                    **ORDER**

9       For the above reasons the habeas corpus petition is granted and
10 it is hereby ordered that Petitioner be provide a new hearing which
11 shall comply with due process as outlined above.  Respondent shall
12 provide weekly updates to this Court on the progress of its
13 development of the new rules and regulations outlined above.

14
15
16
17 DATED:  *Aug 30* , 2007        *Linda R. Condron*
18                               LINDA R. CONDRON
                                 JUDGE OF THE SUPERIOR COURT
19
20 cc:  Petitioner's Attorney (Jacob Burland)
21      Attorney General (Denise Yates, Scott Mather)
22
23
24
25
26
27 —————————————————————————————————————————
28

                                    34

# EXHIBIT
# 21



## CA Parole Board Crisis

**"Protecting the rights of victims through positive actions"**



Home | About DTCVB | Resource Information | Legislation

News | Foundation/Services | Membership | Links

Watch Your Drink | CA Parole Board Crisis | Events

## Contact Information

**(916) 273-3603 phone**      **(888) 235-7067 toll free/fax**

**1809 S Street, Suite 101316,  Sacramento, CA 95814**

**email us at - information@doristate.com**

website last updated June 26, 2007

## California's Parole Board Crisis

As of June 2007, the Board of Parole Hearings had granted release dates to 710 inmates sentenced to life in prison. Click here to read more about California's Parole Board and the dangerous society they are creating.

## Board of Parole Hearings Meeting Schedule 2007

**Meetings are held at 1515 K Street 5th Floor, Sacramento, CA**

**July 17**

**August 21**

**September 18**

**October 16**

Parole Board Crisis



**Parole Board Crisis**

"Protecting the rights of victims through positive actions"

| Home | About Et.al. | Review your Complaint | Legislative | News | Foundation Donates | Membership |
| Link! | Watch Your Back | CA Parole Board Crisis | Events |

### Contact Information

**(916) 273-3603 phone**       **(888) 235-7067 toll free/fax**

**1809 S Street, Suite 101316,  Sacramento, CA 95814**

email us at - information@doristate.com

website last updated June 26, 2007

According to the Governor's Office - Since Governor Schwarzenegger took office on November 17, 2003 to date (June 2007) , the Board of Parole Hearings (the commissioners appointed by Governor Schwarzenegger) have granted release dates to 751 inmates sentenced to life prison.

This is two-hundred and one (201)  more grants given under the Schwarzenegger administration, than over the previous 14 years under two different Governors.

Of these life inmates released - over a dozen have violated their parole!  These violations include possession of weapons, being at large (not checking in with their parole officer), traveling in and out of state, assaults on children and of course, drugs.

During the past two administrations, Governor Wilson, and then Governor Davis, took the issue of Public Safety very seriously.  Under their leadership, appointees to the parole board were tough on crime and most had law enforcement backgrounds.

The current composition of the board is shifting to that of individuals whose professional background does not include law enforcement. The Senate Rules Committee, Chaired by Senator Don Perata, has called a moratorium on confirmations for any individual with law enforcement background appointed as a Parole Board Commissioner.  They are looking for Commissioners with social work, clergy, and it was just suggested in a recent confirmation hearing, farming background.

It appeares that Governor Schwarzenegger has given in to the demands of the Senate Rules Committee, appointing Parole Commissioners who are under-qualified and more concerned about keeping their jobs than keeping the citizens of the state of California safe.  Below are the number of inmates sentenced to life with the *possibility* of parole that have been released by Governor Schwarzenegger as well as the number of grants given by each commissioner currently seated on the Parole Board - All appointed by Governor Schwarzenegger.

Since taking office on November 17, 2003, Governor Schwarzenegger has allowed parole to go forward on **159** violent criminals sentenced to life with the possibility of parole.

Of 18 grants in 2003, he allowed 6 to parole.

In 2004 of 207 grants, he allowed 72 to parole. After "we are disappointed in you" commercials and pending elections, things change.

In 2005 of 179 grants, he allowed parole for 35.

In 2006 of 205 grants, he has allowed parole to 25.

So far this year (2007) , the Governor has allowed the release of 21 life sentenced inmates.  Though we hear that he is toughening up

and letting fewer lifer inmates out of prison - the proof is in the numbers. 21 life inmates released as of June 2007 - and the month is not over yet.

**By comparison**,

Governor Davis allowed parole for **8** out of **370** total grants sent to him by the Parole Board during his term in office.

Governor Wilson allowed parole for **132** out of **180** total grants sent to him by the Parole Board during his term of office (8 years).

## The Governor Has Appointed a Dangerous Parole Board

Here are the numbers of releases granted per Commissioner for 2007 - remember, these people were sentenced to life with the *possibility* of parole. We believe that the Governor is beginning to appoint Commissioners that put the public's safety above the needs of the inmate - time will tell. Commissioner A. Stanley Kubochi who was appointed in January 2007, Commissioners Prizmich and Woods were both appointed in March 2007.

| Commissioner | January | February | March | April | May | Total | Total Months on Board 2007 | Monthly Grant Average |
|---|---|---|---|---|---|---|---|---|
| Inglee | 0 | 1 | 1 | 4 | 3 | 9 | 4 | 2.25 |
| Bryson | 0 | 1 | 5 | 0 | 0 | 6 | 4 | 1.5 |
| Garner | 1 | 1 | 1 | 1 | 0 | 4 | 4 | 1 |
| Davis | 0 | 0 | 1 | 0 | 1 | 2 | 4 | 0.5 |
| Biggers | 1 | 1 | 1 | 0 | 1 | 4 | 4 | 1 |
| Shelton | 4 | 0 | 0 | 0 | 1 | 5 | 4 | 1.25 |
| Kubochi | 0 | 0 | 1 | 1 | 0 | 2 | 4 | 0.5 |
| Martinez | 0 | 2 | 2 | 0 | 0 | 5 | 4 | 1.25 |
| Eng | 0 | 1 | 1 | 2 | 1 | 5 | 4 | 1.25 |
| Prizmich | | | | | 1 | 1 | 1 | 1 |
| Woods | | | | | 3 | 3 | 1 | 3 |
| Total Grants | 6 | 7 | 13 | 8 | 11 | 46 | | |

We will update the above information monthly

Numbers do not tell the whole story in this chart. As you look at the chart below you will notice that some Commissioners have low grant numbers, however, the caliber of criminal that they are deeming appropriate for release into society is more than questionable. Some of the inmates that have received grants are not suitable for release and cause a serious threat to society. A concern with granting release to inmates that are not suitable for release is that the Governor must then overturn the Parole Commissioner's decision. By doing this, the Commissioner, forcing the Governor to do their job for them, has now made it possible for the courts to intervene. It is common practice when a decision is overturned that an inmate attorney will file an appeal to reverse the Governor's decision. If they find a judge sympathetic to their case, the judge will force the state to release the inmate. This is why we are seeing so many court cases where the courts are ruling that inmates be released from prison.

There is also concern regarding the integrity of the Commissioners. A significant decline in grant numbers does not necessarily indicate a change in philosophy for a Commissioner.

## 2006 Commissioner Grant Numbers

Biggers began hearing cases in February of 2006. Davis did not begin to hear cases until March 2006. Williams began hearing cases in May of 2006. Shelton began hearing cases in April 2006. Martinez began hearing cases in July of 2006. Harris-Ritter did not begin to hear cases until August 2006.

Total #

7/1/2007

| Commissioner | January | February | March | April | May | June | July | August | Sept | October | November | December | split/fav | Total | Mo | Mo Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inglee | 1 | 2 | 3 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | | 14 | 12 | 1.17 |
| Bryson | 2 | 2 | 1 | 3 | 3 | 0 | 1 | 6 | 5 | 3 | 6 | 3 | | 35 | 12 | 2.9 |
| Garner | 5 | 0 | 8 | 2 | 4 | 2 | 4 | 2 | 0 | 4 | 1 | 1 | | 33 | 12 | 2.75 |
| Davis | | | 0 | 2 | 0 | 1 | 0 | 1 | 1 | 5 | 1 | 1 | | 12 | 10 | 1 |
| Williams | | | | | 1 | 0 | 2 | 6 | 2 | 6 | 2 | 6 | | 25 | 8 | 3.13 |
| Biggers | | 0 | 0 | 0 | 2 | 1 | 2 | 5 | 5 | 1 | 1 | 0 | | 17 | 11 | 1.5 |
| Shelton | | | | 0 | 3 | 2 | 3 | 1 | 0 | 1 | 1 | 1 | | 12 | 9 | 1.3 |
| **Harris-Ritter | | | | | | | 4 | 1 | 6 | 1 | 1 | 1 | 2 | 12 | 5 | 2.4 |
| Martinez | | | | | 0 | 0 | 1 | | 2 | 3 | 0 | | | 6 | 6 | 1 |
| Eng | | | | | | | | | 0 | 0 | 1 | | | 1 | 3 | 0.3 |
| Poncabare | | | | | | | | | | | 0 | 0 | | 0 | 2 | 0 |

**Amongst the bad news we have been reporting in regards to the Parole Board, there is good news for victims! Recently appointed BPH Commissioner, Bilenda Harris-Ritter has resigned her position at the Parole Board effective January 19, 2007. Harris-Ritter, who we were told was a victim-advocate in Arkansas before coming to California, voted to grant parole to **fourteen** life inmates who appeared before her during her first three months as a Commissioner. In two of those cases, the Deputy Commissioner on the panel refused to agree with her, causing the decisions to be tied. Of those fourteen, **five were convicted of first degree murder, four second degree murder, two attempted first degree murder** and **three were convicted of kidnap.** She also voted, during closed meetings of the BPH Commissioners, to uphold the grant of release in 17 cases that had been returned to the board for a second look by Governor Schwarzenegger.

Here is a killer that Harris-Ritter found suitable to be released from prison:

**9/06 Thomas McCoy**

McCoy was convicted of First Degree Murder of 72-year-old security guard, Rufus Elliott. The murder was committed during the course of attempting to rob Mr. Elliott of his gun, and, in fact the gun that McCoy used in the murder had been taken in a previous robbery of another security guard. Elliott was shot several times.

In this particular case, the Deputy Commissioner serving on the panel with Harris-Ritter voted against parole, causing a tie-vote.

On November 21, 2006 this case was heard en banc before the entire Parole Board. All members of the Parole Board, except for Ms. Harris-Ritter, voted to deny parole for 1 year. Mr. McCoy is still in prison.

We are very pleased with Ms. Harris-Ritter's decision to resign from the Parole Board. The DTCVB believes that this was the right decision for victims and for public safety.

Click here to see the monthly en banc decisions by the Parole Board

## Your letters are important and your voices are being heard - please continue to write!

We are asking you to help us to stop this threat to public safety. We urge you, your family and friends, to write letters to the Governor to re-instate a "tough on crime" Board of Parole Hearings (Parole Board) and to only appoint new commissioners with strong "tough on crime" views and a seriousness in protecting public safety.

We urge you to send your letters in now, time is of the essence. Several Commissioner's terms are ending July 1, 2007. The Governor has 60 days from their term expiration date to decide if he will or will not reappoint them to the Board. This means that the current seated Commissioners whose terms expire **can** be removed and replaced with "tough on crime" Commissioners.

Please send your letter to

Governor Arnold Schwarzenegger
State Capitol Building
Sacramento, CA 95814

Or fax your letter to the number below

**Fax: 916-445-4633**

**Attn: Governor Schwarzenegger**

To ensure that your letter does not get misplaced at the Capitol, please also copy a letter to the Doris Tate Crime Victims Bureau. You may fax it to 888-235-7067, email it to information@doristate.com or mail it to the address listed above. If you need more information, please feel free to call us.

For information on recently confirmed Commissioners - click here

Here are just a few of the killers released by Governor Schwarzenegger:

**Luis Frias** (1st degree murder) In October 1977, 18-year-old Frias brutally attacked 78-year-old San Francisco resident Gertrude Roberts to steal her purse. The attack on the elderly victim knocked her out of her shoes. Frias kicked her in the head to quiet her once she was on the ground. He later characterized this act as "merciful...[doing] her a favor by killing her." Frias wanted money for gas and got $14 out of Ms. Roberts' purse.

**Dennis Riney** (1st degree murder) In March 1973 in LA, he murdered a liquor store clerk during a robbery. He was arrested on suspicion of 11 counts of armed robbery and while in jail was charged with first degree murder of the clerk. Riney had escaped from a Colorado state prison before coming to Los Angeles.

**Randy Mendoza** (1st degree murder) On November 11, 1973 at the age of 18, Mendoza and a crime partner robbed and murdered Dan Montgomery who was a liquor store clerk in Fresno. Police found Montgomery in a stockroom. He was stabbed 5 times while lying incapacitated on the floor after being hit on the head with a bottle by Mendoza. Governor Davis reversed a grant in 2003 noting that the degree of violence and viciousness in the murder is exceptionally heinous and the motive was trivial. Montgomery was killed in the course of a planned robbery to get beer for a party. After hitting him on the head, Mendoza stole Montgomery's gold watch as he lay on the floor dying from stab wounds.

**Rocky LaBoa** (1st degree murder) On November 23, 1980 in Kern County, LaBoa with three crime partners robbed and killed Juan Morones after breaking into his home. The stole about 20 dollars from the unarmed victim who was shot in the face. At the time of the murder, LaBoa was on parole for a burglary conviction. Governor Davis reversed his parole grant in 2003 citing that he demonstrated a callous indifference to the lives and suffering of others in that he planned and participated in a home invasion robbery "for the thrill of it".

**Richard Rael** (2nd degree murder) On August 26, 1980, Rael and two crime partners robbed two hitchhikers they picked up from an A's baseball game. The trio beat and stabbed both men, killing one and leave the second to bleed to death in the street. Both victims were college honor students. One of the victims was found by a passerby. Police say this is the only thing that saved him from dying.

# EXHIBIT
# 22

**Office of the Governor**  ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

## PRESS RELEASE

06/27/2006  GAAS:409:06  FOR IMMEDIATE RELEASE

### Gov. Schwarzenegger Sponsors Crime Victims Bill of Rights and Announces New Crime Victim Advocate

Governor Schwarzenegger today took three aggressive steps to continue building on his commitment to public safety in California. Addressing local officials at the Alameda County Family Justice Center, the Governor announced that he is sponsoring the Crime Victims Bill of Rights, he has appointed Susan Fisher to fill the newly created position of Crime Victim Advocate, and he is expediting a program to track dangerous criminals using GPS.

"Being a victim of crime is a life-altering experience and I know that victims face challenges and hardships most of us cannot even imagine," said Governor Schwarzenegger. "Too often, we focus on just locking up the criminals and putting them behind bars, or putting more cops on the streets. But there's one very important part of the equation that is too often neglected and is missing, and those are the crime victims and their families."

The Crime Victims Bill of Rights is a comprehensive legislative proposal authored by Assemblymember Nicole Parra, (D-Hanford), to help crime victims overcome the hardships caused by criminal acts. This legislation will build upon the efforts of Senator Feinstein (D-CA) and Senator Kyl (R-AZ), who introduced a similar constitutional amendment at the federal level, by creating a strong set of rights for victims in our State Constitution. The legislation, (ACA 37) will give victims new rights, allowing them to:

- Have direct contact with the district attorney in serious, violent cases.

- Attend all public hearings and be present and heard at parole hearings.

- Receive information about their case, including sentencing and release data.

- To have a lawyer or the district attorney enforce their rights in court.

The Governor also directed the California Department of Corrections and Rehabilitation (CDCR) to place GPS monitors on 2000 offenders over the next two years instead of the originally scheduled four years, cutting the time in half. Last year, the Governor signed the pilot program into law to better track the worst 2000 sex offenders and other criminals in California and enhance public safety.

Also announced today, Governor Schwarzenegger appointed Susan Fisher as his Crime Victim Advocate, a position created by Executive Order S-05-06 on April 24, 2006 to serve within the Governor's Office as California's lead advocate on state and federal policy impacting crime victims.

"Susan has a long history working with victim rights groups, and like many who have been touched by violent crime in their family, her experience was a call to help others," said Governor Schwarzenegger. "Now she will be the single leading advocate on state and federal policy regarding crime victims and I look forward to working with her in this new role for the people of California."

Susan L. Fisher, 53, of Sacramento, most recently served as chair of the Board of Parole Hearings. She was appointed to the Board in July 2005. Previously, she served as a commissioner on the Board of Prison Terms from January 2004 until July 2005. From 1999 to 2004 she served as executive director of the Doris Tate Crime Victims Bureau and, before that, served on the Bureau's board of directors for seven years. She also served as president of Citizens for Law and Order. This position is not subject to Senate confirmation. The compensation is $95,000.

# EXHIBIT
# 23

THE MONTEREY COUNTY HERALD, SUNDAY, OCTOBER 14, 2007

# Commentary

www.montereyherald.com

**On the Opinion page:** Today's college students are Quiet Americans. — Thomas Friedman



## Judge weighs in on Herald series

POLICIES CONTRIBUTED TO PAROLE SLAY

BY ROBERT S. MOODY

MoodyPage E1

# Moody

*From* **page E1**

ransom, etc. — were not being released either, even though they may be entitled to be released under the applicable rules. In one such case, a man who had been convicted of second-degree murder and sentenced to 15 years to life and who had been a model prisoner and was not a public safety risk was denied parole after having served 27 years in prison.

This failure to release inmates according to the rules, coupled with the fact that death sentences imposed in California are rarely carried out — there are only a handful of exceptions in the past 45 years — results in the surprising reality that the vast majority of the time, in spite of the strenuous and often extremely expensive efforts of the trial courts to determine whether a sentence should be death, life without parole, life with parole, or a term of years with a life top, the sentences ultimately turn out to be the same: life without any realistic possibility of parole.

I think the problem stems in part from the Willie Horton situation, where former Massachusetts Gov. Michael Dukakis, in the midst of his 1988 campaign for president, was shown to have been involved in the release of a life-with-possibility-of-parole inmate who later raped a Maryland woman and beat her boyfriend. This was politically devastating to Dukakis, regardless of whether he was personally culpable.

Since then, all governors who bear parole responsibilities have been heavily scrutinized by their political opponents to

see if they could be blamed for the criminal acts of any lifer parolee who did something awful after receiving a grant of parole that the governor could have prevented or overturned.

All the governors of California of all political stripes since then, and the parole boards they have appointed, have been increasingly unwilling to permit release of life crime inmates, regardless of the merits of individual cases. That is understandable in a way because in practical terms, the system makes the governor politically responsible for everything the released inmates may do. This is unfair, and it is not my intention to criticize the individual governors. This approach, however, is having a devastating impact upon the integrity of the justice system and upon the administration of the prisons themselves.

We have laws and rules that require, absent a showing of unacceptable risk to public safety, the release of inmates on parole after service of the "matrix" number of years, a formula established by the Department of Corrections, and then we fail to follow them. It is a deception, one could even say a sham, to accept a plea bargain or to impose a sentence involving some form of life with parole term only to find out years later that the reality was straight life because the parole board refused to grant parole under any circumstances, or if it did grant parole, the governor overturned the grant.

These practices have often made the trial courts unwittingly complicit in the perpetration of a deception of both the sentenced inmates and the public.

From the standpoint of the administration of the prisons,

while the public may not be aware of the realities described above, the inmates most certainly are. The question for them is why, if they are never getting out anyway, should they work, or attend classes, or seek counseling, or abstain from gang activities or stabbings. The mirage of an earned release, followed by the reality of perpetual denials of parole, leaves them hopeless and extremely embittered. The correctional officers must then face the behavioral consequences.

It is true that the great majority of "lifers" are too dangerous to release, but this is not true of all of them, and the justice system has a moral obligation to honor its commitments to those who have served their time and proved themselves worthy of release.

Our state constitution places the responsibility for parole releases upon the executive, meaning the governor, and recent California Supreme Court rulings have held that if there is any evidentiary basis (and there is just about always some such basis) for a governor's reversal of a grant of parole by the parole board for a life inmate, the reversal will stand, which effectively limits judicial review of the governor's action to the vanishing point.

It therefore may well be that the most promising path out of this totally unacceptable situation is a constitutional amendment to take the governor's office out of the equation, leaving parole decisions to some form of independent body, perhaps composed of retired judges or some other suitably neutral but knowledgeable professionals. It might be better for everybody, including the governors.

# EXHIBIT
# 24



CALIFORNIA STATE SENATE

| |
|---|
| Home |
| News Room |
| Legislation |
| Biography |
| District |
| Newsletters |
| Photo Gallery |
| Calendar |
| Contact Me |
| Violence Prevention Initiative |
| Health Care |
| Vote Us Out |

**SEARCH**

[        ] GO

⊙ Full Site
○ This Section

**Search Tips**

## Perata Calls for Greater Examination of Parole Board Procedures, Questions Administration's Commitment to Rehabilitating Prisoners

*Wednesday, June 13, 2007*

FOR IMMEDIATE RELEASE:
Contact: Alicia Trost
(916) 651-4188

(SACRAMENTO) – The forced resignation of a member of the state Board of Parole Hearings raises questions about the Board's independence and whether the Governor is committed to rehabilitation programs and giving deserving prison inmates a fair chance to earn parole, Senate President Pro Tem Don Perata (D-Oakland) said Wednesday.

In a letter to the state Senate, Board Commissioner Bilenda Harris-Ritter said she was instructed by a Governor's deputy appointment's secretary to resign earlier this year. The request came as a vocal victims' right group highlighted her votes in favor of granting parole.

"It's troubling, to say the least, that a member of the Parole Board is telling us she quit the board at the request of the administration," Perata said. "The Board is supposed to be independent, and current law gives the Governor authority to overturn its decisions.

"Stacking the Board with members who oppose releasing prisoners under almost any circumstance undercuts state rehabilitation efforts, adds to the prison system's overcrowding and allows the Governor to sidestep this critical issue without taking any political heat."

Perata put over John Monday, the Parole Board's executive officer, to a later hearing pending more information on parole revocations. Monday appeared at Wednesday's Rules hearing and must be confirmed by the Senate by the end of August to remain on the job.

The Rules Committee approved Parole Board appointees Janice Eng and Ed Martinez on a 4-0 vote.

# # #

**Privacy Policy | Accessibility Statement**

Home | News Room | Legislation | Biography | District | Newsletters | Photo Gallery | Calendar | Contact Me | Violence Prevention Initiative | Health Care | Vote Us Out

powered by Avenet.net

MATTHEW ADAM JAY, D55653
CTF-EAST DORM (ED-154)
P.O. Box 689
SOLEDAD, CA. 93960

LEGAL MAIL

**RECEIVED**

APR 1 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Pro se

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA. 94102